**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **D'ANGELO & EURELL,** *et al.,* | : | **CIVIL ACTION** |
| | : | |
| Plaintiffs, | : | **No. 2:23-cv-00397** |
| | : | |
| v. | : | |
| | : | |
| **ALLIED WORLD SPECIALITY INSURANCE** | : | |
| **COMPANY,** *et al.,* | : | |
| | : | |
| Defendants. | : | |
| | : | |

**APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **Table of Contents**

**Policy** ................................................................................................................ 1

**D'Angelo & Eurell 30(b)(6) Deposition Testimony** ........................................ 26

**David D'Angelo Underlying Deposition Testimony** ........................................ 122

**Brief in Support of Summary Judgment Motion in Underlying Action** ......... 127

**Plaintiffs' Answer to Markley's Amended Complaint** .................................... 131

**June 12, 2012 Correspondence Warshawsky to David** ................................... 134

**June 28, 2012 Correspondence David to Warshawsky** ................................... 138

**Application** ...................................................................................................... 140

**August 17, 2012 Correspondence Warshawsky to David** ............................... 146

**August 30, 2012 Correspondence David to Warshawsky** ............................... 148

**September 25, 2012 Correspondence Warshawsky to David** .......................... 150

**October 5, 2012 Correspondence David to Warshawsky** ............................... 152

**October 9, 2012 Correspondence Warshawsky to David** ............................... 154

**December 22, 2012 to January 28, 2013 Email Correspondence** ................... 157

**Motion in Limine Hearing Transcript in Underlying Action** ........................ 167

**February 6, 2013 to February 8, 2013 Email Correspondence** ...................... 173

**February 11, 2013 Notice to Allied World** .................................................... 177

**February 12, 2013 Claim Acknowledgement** ................................................. 179

**February 15, 2013 Email Dwyer to David** ..................................................... 181

**February 21, 2013 Email David to Dwyer** ..................................................... 184

**March 4, 2013 Email David to Dwyer** ........................................................... 199

**March 13, 2013 Denial** ................................................................................... 202

**March 21, 2013 Email David to Dwyer** ......................................................... 208

**March 28, 2013 Correspondence David to Warshawsky** ............................... 210

**March 29, 2013 Denial** ................................................................................... 212

**Plaintiffs Discovery Responses in the Underlying Action** ............................ 219

**April 5, 2013 Correspondence Barbin to David** ............................................ 231

**April 9, 2013 Email David to Dwyer** ............................................................. 239

**April 9, 2013 Email David to Barbin** ............................................................. 242

**April 18, 2013 Denial** ..................................................................................... 244

**April 29, 2013 Correspondence Barbin to David** ..............................................**249**

**June 12, 2013 to June 13, 2013 Email Correspondence** ...............................**255**

**November 26, 2014 Email David to Allied World** .........................................**257**

**Markley's Complaint, October 29, 2014** ........................................................**260**

**November 26, 2014 Denial** ...............................................................................**297**

**Markley's Amended Complaint, April 8, 2015** .............................................**305**

**January 5, 2016 Denial** ....................................................................................**366**

**December 11, 2015 to April 11, 2016 Email Correspondence** ....................**368**

**Markley's Expert Report, October 2019** ......................................................**375**

**November 15, 2012 Correspondence Enclosing Expert Report** ..................**401**

**Verdict Sheet, April 23, 2021** .........................................................................**405**

**Docket Sheet in Underlying Action** ...............................................................**413**

# Policy



# Lawyers Professional Liability Insurance Policy Declarations

☒ **Darwin National Assurance Company**                    **Policy Number:** 0307-7741

**Main Administrative Office Address:**            **Corporate Address:**
**9 Farm Springs Road**                          **1807 North Market Street**
**Farmington, CT 06032**                         **Wilmington, DE 19802**

**THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD, AND REPORTED IN ACCORDANCE WITH SECTION IV.I. OF THE POLICY. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES WILL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION AMOUNT. IN NO EVENT WILL THE INSURER BE LIABLE FOR CLAIMS EXPENSES OR DAMAGES IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. PLEASE READ THE ENTIRE POLICY CAREFULLY.**

---

**Item 1. Name and Mailing Address of Named Insured:**

D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA 19110

---

**Item 2. Policy Period:**

Inception Date:     August 20, 2012
Expiration Date:    August 20, 2013
                    **At 12:01AM Standard Time at the Mailing Address shown above**

---

**Item 3. Limit of Liability (**inclusive of **Claims Expenses):**

(a)   $500,000 maximum limit of liability per **CLAIM**

(b)   $1,000,000 maximum aggregate limit of liability for all **CLAIMS**

---

**Item 4. Retention:**

$5,000 each and every **CLAIM**

---

**Item 5. Notices required to be given to the Insurer must be addressed to:**

For Notice of Claims and Circumstances:            For All Other Notices:
noticeofloss@darwinpro.com                          9 Farm Springs Road
                                                    Farmington, CT 06032

---

**Item 6. Premium:**

Total Premium: $4,718

DRWN E4405 (9/2008)

**App. 002**

**Item 7. Retroactive Date:**

None - Prior Acts Coverage Provided

**Item 8. Endorsements Attached at Issuance:**

1. e1103 (09/2008) Pennsylvania State Amendatory
2. v2671 (01/2011) Omnibus Endorsement

THESE DECLARATIONS, THE POLICY FORM, ANY ENDORSEMENTS AND THE APPLICATION CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE INSURER AND THE INSURED RELATING TO THIS INSURANCE.

**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers.**

_____                    _____
SECRETARY                                              PRESIDENT

_____
AUTHORIZED SIGNATURE

_____                    _____
Licensed Agent                                         License Number

**If the policyholder wishes to present inquiries or obtain information about coverage or to provide assistance in resolving complaints, please contact Darwin Professional Underwriters at (860) 284-1300.**

DRWN E4405 (9/2008)

**App. 003**

**ENDORSEMENT NO. 1**

**PENNSYLVANIA STATE AMENDATORY**

This Endorsement, effective at 12:01 a.m. on August 20, 2012, forms part of

      Policy No.     0307-7741
      Issued to     D'Angelo & Eurell
      Issued by    Darwin National Assurance Company

To be attached to and form a part of all Lawyers Professional Liability Policies written in the State of Pennsylvania.

In consideration of the premium charged, it is understood and agreed that:

I.    Section II, DEFINITIONS, Subsection E., the definition of "**Damages**," is amended to read as follows:

    "E.    **DAMAGES** means the monetary portion of any judgment, award or settlement, including post- judgment interest. **Damages** shall not include:

        1.    criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

        2.    punitive, exemplary or the multiplied portion of multiple damages;

        3.    matters deemed uninsurable by law;

        4.    the return or restitution of legal fees, costs and expenses, no matter how claimed;

        5.    any form of equitable or non-monetary relief; or

        6.    pre-judgment interest."

II.    Section IV, CONDITIONS, Subsection M. CANCELLATION; NO OBLIGATION TO RENEW, is amended to read as follows:

    "M.    **CANCELLATION; NO OBLIGATION TO RENEW**

        1.    This Policy shall terminate upon the Expiration Date set forth in Item 2(b) of the Declarations, or upon any earlier cancellation.

        2.    This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect.  If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

        3.    This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least sixty (60) days prior to the effective date of such cancellation, for the following reasons:

            (a)    a condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the **Policy Period**;

            (b)    loss of reinsurance or a substantial decrease in reinsurance, which loss or decrease shall, at the time of cancellation, be certified to the Insurance Commissioner of Pennsylvania as directly affecting in-force policies;

            (c)    the Policy was obtained through fraudulent statements, omissions or

e1103 (9/2008)

concealment of fact material to the acceptance of the risk or to the hazard assumed by the **Insurer**;

(d)    material failure to comply with the policy terms, conditions or contractual duties;

(e)    any other reason that the Insurance Commissioner of Pennsylvania may approve.

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

4.    This Policy may be canceled by the **Insurer** by delivering or mailing written notice to the **Named Insured**, at its last known address, at least fifteen (15) days prior to the effective date of such cancellation, for the following reasons:

(a)    the **Insured** has made a material misrepresentation which affects the insurability of the risk; or

(b)    the **Insured** failed to pay a premium when due.

Such notice shall include the reason(s) for cancellation and shall also state that, at the **Named Insured's** written request, the **Insurer** shall provide loss information to the **Named Insured**. The **Named Insured's** written request must be made within ten (10) days from the **Named Insured's** receipt of notice.

5.    If the Policy is canceled by the **Insurer**, the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter. Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

6.    The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail by first-class or certified mail written notice, to the **Named Insured**, at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2 of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

7.    If the **Insurer** increases the premium upon renewal, the **Insurer** will deliver or mail to the **Named Insured**, at its last known address, written notice to that effect at least thirty (30) days before the Expiration Date set forth in ITEM 2(b) of the Declarations."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

**App. 005**

**ENDORSEMENT NO. 2**

**OMNIBUS ENDORSEMENT**

This Endorsement, effective at 12:01 a.m. on  August 20, 2012, forms part of

> Policy No.       0307-7741
> Issued to        D'Angelo & Eurell
> Issued by        Darwin National Assurance Company

In consideration of the premium charged, it is hereby agreed that this Policy is amended as follows:

1.  Section I., INSURING AGREEMENT B., ADDITIONAL COVERAGES, is deleted in its entirety and replaced with the following:

   **B.    ADDITIONAL COVERAGES**

   1.    Reimbursement for Lost Earnings Coverage

   The **Insurer** shall reimburse each **Insured** up to $500 for personal earnings actually lost each day or part of a day such **Insured**, at the **Insurer's** express request, attends a trial, hearing or arbitration arising from a **Claim** first made during the **Policy Period** and reported to the **Insurer** in accordance with Section IV, Condition I. of this Policy. The maximum amount payable under this Additional Coverage 1. is $10,000 per **Claim** and $30,000 in the aggregate for all **Claims**, regardless of the number of **Claims**, the number of **Insureds**, or the number of days lost or trials, hearings or arbitrations attended.  Any payment made by the **Insurer** under this Additional Coverage 1. shall be in addition to the applicable Limit of Liability and shall not be subject to the Retention.

   This coverage shall not apply in the event of a **Disciplinary Proceeding**.

   2.    Disciplinary Proceedings Coverage

   The **Insurer** will pay on behalf of an **Insured**, reasonable fees, costs and expenses incurred in responding to a **Disciplinary Proceeding** initiated against the **Insured** and reported to the **Insurer** during the **Policy Period** or any **Extended Reporting Period**.  The maximum amount payable under this Additional Coverage 2. is $20,000 per **Disciplinary Proceeding** and $60,000 in the aggregate for all **Disciplinary Proceedings**, regardless of the number of **Disciplinary Proceedings** or **Insureds**.  Any payment made by the **Insurer** under this Additional Coverage 2. shall be in addition to the applicable Limit of Liability and shall not be subject to the Retention.

   3.    Non-Profit Director and Officer Coverage

   The **Insurer** will reimburse an individual **Insured** lawyer, subject to the Limit of Liability as set forth in Item 3. of the Declarations, all amounts that such **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of a **Non-Profit Director or Officer Wrongful Act** that is first made during the **Policy Period** or any **Extended Reporting Period**.

**App. 006**

The coverage provided under this Additional Coverage 3. is excess of, and shall not contribute with, any other insurance plan or program of insurance or self-insurance carried by the **Non-Profit Organization**, and any contribution and indemnification to which the individual **Insured** lawyer is entitled to from such **Non-Profit Organization**.

The most the **Insurer** shall pay for **Claims** for which coverage is provided under this Additional Coverage 3. shall be an amount equal to the lesser of:

(a)      the per **Claim** Limit of Liability under the **Non-Profit Organization's** Directors and Officers Liability Insurance; or

(b)      the Limit of Liability set forth in Item 3.(a) of the Declarations,

up to the maximum amount of $500,000 per **Claim** and in the aggregate for all such **Claims**. Any payment made by the **Insurer** under this Additional Coverage 3. shall be part of, and not in addition to, the applicable Limit of Liability.

It is a condition precedent to coverage under this Additional Coverage 3. that:

(a)      such individual **Insured** lawyer is serving as a director, officer or committee member of the **Non-Profit Organization** with the express written consent or at the request of the **Named Insured**;

(b)      such **Non-Profit Organization** will have, in full force and effect during the **Policy Period** or any **Extended Reporting Period**, Directors and Officers Liability Insurance with Limits of Liability of at least $500,000 per claim and in the aggregate for all claims; and

(c)      no more than ten percent (10%) of the **Named Insured's** annual gross revenues are derived directly or indirectly from **Legal Services** performed by any **Insured** for the **Non-Profit Organization**.

In the event that a **Wrongful Act** or **Related Act or Omission** gives rise to a **Claim** or multiple **Claims** under both this Additional Coverage 3. and Insuring Agreement I.A. of the Policy, then only one per **Claim** Limit of Liability and one Retention shall apply to all such **Claims**.

4.      Subpoena Coverage

In the event the **Insured** receives a subpoena for documents or testimony arising out of **Legal Services**, the **Insured** may obtain the **Insurer's** assistance in responding to the subpoena by providing the **Insurer** with a copy of the subpoena. The **Insurer** will retain an attorney to provide advice regarding the production of documents, to prepare the **Insured** for sworn testimony, and to represent the **Insured** at the **Insured's** depositions, provided that:

(a)      the subpoena arises out of a lawsuit to which the **Insured** is not a party; and

(b)      the **Insured** has not been engaged to provide advice or testimony in connection with the lawsuit, nor has the **Insured** provided such advice or testimony in the past.

**App. 007**

The maximum amount payable under this Additional Coverage 4. is $2,500, regardless of the number of subpoenas or **Insureds**. Any payment made by the **Insurer** under this Additional Coverage 4. shall be in addition to the applicable Limit of Liability and shall not be subject to the Retention.

Any notice the **Insured** gives the **Insurer** of such subpoena shall be deemed notification of a potential **Claim** under Section IV., Condition I. 3.

2. Section IV. CONDITIONS, E. CONSENT TO SETTLE, is deleted in its entirety and replaced with the following:

    E.     **CONSENT TO SETTLE**

The **Insurer** shall not settle any **Claim** without the consent of the **Insured,** which consent shall not be unreasonably withheld. If, however, the **Insured** refuses to consent to any settlement recommended by the **Insurer** and acceptable to the claimant, then, subject to the Limits of Liability set forth in Item 3. of the Declarations, the **Insurer's** liability for **Damages** and **Claim Expenses** relating to such **Claim** shall not exceed:

1.    the amount for which the **Claim** could have been settled, plus all **Claim Expenses** incurred up to the time the **Insurer** made its recommendation (the "Settlement Amount"); plus

2.    fifty percent (50%) of any **Damages** and/or **Claims Expenses** in excess of the Settlement Amount.

The remaining fifty percent (50%) of **Damages** and/or **Claims Expenses** in excess of the Settlement Amount will be borne by the **Insured** at its own risk and remain uninsured.

If the **Insured** refuses to consent to any **Claim** settlement recommended by the **Insurer**, as described above, then once the **Insurer** has paid the Settlement Amount, the **Insurer** shall have the right to withdraw from the further investigation and defense of such **Claim** by tendering control of such investigation or defense to the **Insured**. The **Insured** agrees, as a condition of the issuance of this Policy, to accept such tender and proceed at its own cost and expense.

If the **Named Insured** has not paid any premiums due or satisfied any applicable Retentions, the **Insurer** has the right, but not the obligation, to settle any **Claim** without the consent of the **Insured**.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative



# Lawyers Professional Liability Insurance Policy

**THIS IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD, AND REPORTED IN ACCORDANCE WITH SECTION IV.I. OF THE POLICY.  THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES WILL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION AMOUNT.   IN NO EVENT WILL THE INSURER BE LIABLE FOR CLAIMS EXPENSES OR DAMAGES IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY.  PLEASE READ THE ENTIRE POLICY CAREFULLY.**

I.    **INSURING AGREEMENTS**

A.    **COVERAGE**

The **Insurer** will pay on behalf of an **Insured**, subject to the Limits of Liability shown in the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out a **Wrongful Act**, other than a **Non-Profit Director or Officer Wrongful Act**, that is first made during the **Policy Period** or any **Extended Reporting Period**. It is a condition precedent to coverage under this Policy that the **Wrongful Act** upon which the **Claim** is based occurred:

1.    during the **Policy Period**; or

2.    on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

(a)    the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and

(b)    prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

(c)    there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

Subject to the Limits of Liability, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent.

DRWN E4400 (9/2008)

**App. 009**

B.    **ADDITIONAL COVERAGES**

1.    Reimbursement for Lost Earnings

The **Insurer** shall reimburse each **Insured** up to $500 for personal earnings actually lost each day or part of a day such **Insured**, at the **Insurer's** express request, attends a trial, hearing or arbitration arising from a **Claim**, subject to a maximum amount payable of $5,000 per **Claim** for all **Insureds**. The maximum aggregate amount payable under this provision, regardless of the number of **Claims**, the number of **Insureds**, or the number of days attended, shall be $20,000. Any payment made by the **Insurer** under this provision shall be in addition to the applicable Limit of Liability and shall not be subject to the Retention.

This coverage shall not apply in the event of a **Disciplinary Proceeding**.

2.    Disciplinary Proceedings Coverage

The **Insurer** will pay on behalf of an **Insured**, reasonable fees, costs and expenses incurred in responding to a **Disciplinary Proceeding** both initiated against the **Insured** and reported to the **Insurer** during the **Policy Period** or any Extended Reporting Period. The maximum aggregate amount payable for all **Disciplinary Proceedings** covered under this Policy, regardless of the number of **Insureds**, shall be $20,000 total. Any payment made by the **Insurer** under this provision shall be in addition to the applicable Limit of Liability and shall not be subject to the Retention.

3.    Non-Profit Director and Officer Coverage

The **Insurer** will reimburse an individual **Insured** lawyer, subject to the Limit of Liability, all amounts that such **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out of a **Non-Profit Director or Officer Wrongful Act** that is first made during the **Policy Period** or any **Extended Reporting Period**.

The coverage provided under this Section I.B.3 is excess of, and shall not contribute with, any other insurance plan or program of insurance or self-insurance carried by the **Non-Profit Organization**, and any contribution and indemnification to which the individual **Insured** lawyer is entitled to from such **Non-Profit Organization**.

The most the **Insurer** shall pay for **Claims** for which coverage is provided under this Section I.B.3. shall be an amount equal to the Limit of Liability under the **Non-Profit Organization's** Directors and Officers Liability Insurance, or the Limit of  under this provision shall be part of, and not in addition to the Limit of Liability.

It will be a condition precedent to coverage under this Section I.B.3. that:
(a)    such individual **Insured** lawyer is serving as a director, officer or committee member of the **Non-Profit Organization** with the express consent or at the request of the **Named Insured**;

(b)    such **Non-Profit Organization** will have, in full force and effect during the **Policy Period** or any Extended Reporting Period, Directors and Officers Liability Insurance with Limits of Liability of at least $500,000 per claim and in the aggregate for all claims; and

(c)    no more than ten percent (10%) of the **Named Insured's** annual gross revenues are derived directly or indirectly from **Legal Services** performed by any **Insured** for the **Non-Profit Organization**.

In the event that a **Wrongful Act** or **Related Act or Omission** gives rise to a **Claim** or multiple **Claims** under both this Section I.B.3. and Insuring Agreement I.A. of the Policy, then only one per Claim Limit of Liability and one Retention shall apply to all such **Claims**.

## II.    DEFINITIONS

A.    **APPLICATION** means:

1.    the application and all prior applications submitted to the **Insurer**; or

2.    any application submitted to any competitor of the **Insurer**, which is provided to the **Insurer** for the purposes of  procuring coverage hereunder, and which shall be treated as if it were submitted directly  to the **Insurer**;

any and all materials and information submitted to the **Insurer** in connection with such applications, and all publicly available material that is created by the **Insured** about the **Insured** that the **Insurer** obtained prior to the Inception Date of the **Policy**, all of which are deemed to be on file with the **Insurer** and are deemed to be attached to, and form a part of, this **Policy**, as if physically attached.

B.    **BODILY INJURY** means injury to the body, sickness or disease sustained by any person, including death resulting from such injuries; including any mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person, whether or not resulting from injury to the body, sickness, disease or death of any person.

C.    **CLAIM** means:

1.    any written notice or demand for monetary relief or **Legal Services**;

2.    any civil proceeding in a court of law;

3.    any administrative proceeding, other than a **Disciplinary Proceeding**; or

4.    a request to toll or waive a statue of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act**.

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

D.    **CLAIM EXPENSES** means:

1.    reasonable fees, costs and expenses charged by attorneys retained or approved by the **Insurer** for a **Claim** brought against an **Insured**;

2.  reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim** including, but not limited to, premiums for any appeal bond, attachment bond or similar bond but without any obligation of the **Insurer** to apply for or furnish such bond.

**Claim Expenses** shall not include:

1.  salaries, loss of earnings, reimbursement for the **Insured's** time or attendance required in any investigation or defense;

2.  other remuneration by or to any **Insured**.

The determination by the **Insurer** as to the reasonableness of **Claim Expenses** shall be conclusive on all **Insureds**.

E.  **DAMAGES** means the monetary portion of any judgment, award or settlement, including pre- and post- judgment interest. **Damages** shall not include:

1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;

2.  punitive, exemplary or the multiplied portion of multiple damages;

3.  matters deemed uninsurable by law;

4.  the return or restitution of legal fees, costs and expenses, no matter how claimed; or

5.  any form of equitable or non-monetary relief.

F.  **DISCIPLINARY PROCEEDING** means any proceeding initiated by a regulatory or disciplinary official or agency to investigate charges made against an **Insured** alleging professional misconduct in rendering or failing to render **Legal Services**.

G.  **EXTENDED REPORTING PERIOD** means the extended reporting period elected by an **Insured**, pursuant to the terms and conditions described in Part IV – Conditions, Subsection G. of the Policy.

H.  **IMMEDIATE FAMILY** means:

1.  the **Insured**;
2.  the **Insured's** spouse;
3.  the **Insured's** parents, adoptive parents, or step-parents;
4.  the **Insured's** siblings or step-siblings;
5.  the **Insured's** children, adoptive children, or step-children.

I.  **INSURED** means:

1.  the **Named Insured**;

2.  any **Predecessor Firm**;

3.      any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;

4.      any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to  paragraph 5. below, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;

5.      any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**;

6.      any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;

7.      any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and

8.      the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

J.      **INSURER** means the insurance company shown in the Declarations.

K.      **LEGAL SERVICES** means those services performed on behalf of the **Named Insured** for others by an **Insured** as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee, escrow agent, or in any other fiduciary capacity, but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer.  **Legal Services** also includes services rendered by an **Insured** as a: (a) member of a formal accreditation, ethics, peer review or licensing board, standards review board, bar association, or any similar board or committee, or; (b) author, publisher or presenter of legal research or legal articles and papers, but only if the compensation received by the **Insured** annually from such services is less than $5,000.  **Legal Services** do not include services rendered as a real estate agent or broker or as an insurance agent or broker.

L.      **NAMED INSURED** means the entity named in Item 1 of the Declarations.

M.      **NON-PROFIT DIRECTOR OR OFFICER WRONGFUL ACT** means an actual or alleged act, error or omission by an individual **Insured** lawyer while serving in his or her capacity as a director, officer or committee member of a **Non-Profit Organization**.

N.  **NON-PROFIT ORGANIZATION** means a corporation or organization, other than an **Insured** entity, which is exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as the same may be amended from time to time.

O.  **NOTICE** means providing the following information to the **Insurer**, by an **Insured**, in writing:

1.  a description of the **Wrongful Act** and the date it occurred;

2.  the identities of the claimants or potential claimants;

3.  the identities of the alleged or potentially responsible **Insured(s)**,

4.  the alleged consequences or **Damages** which could result; and

5.  the date, and a description of how, the **Insured(s)** first became aware of the **Wrongful Act**.

P.  **PERSONAL INJURY** means libel, slander, violation of a right of privacy, false arrest, detention, imprisonment, wrongful entry, eviction, malicious prosecution or abuse of process, when insurable under the law pursuant to which this Policy shall be construed.

Q.  **POLICY PERIOD** means the period of time between the Inception Date to the Expiration Date as shown in Item 2 of the Declaration, or from the Inception Date to any earlier cancellation or termination date, if applicable.

R.  **PREDECESSOR FIRM** means any individual or entity engaged in **Legal Services** to whose financial assets and liabilities the **Named Insured** is the majority successor-in-interest.

S.  **RELATED ACT OR OMISSION** means all acts or omissions based on, arising out of, directly or indirectly resulting from, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

T.  **RETROACTIVE DATE** means the date set forth in Item 7 of the Declarations.

U.  **TOTALLY OR PERMANENTLY DISABLED** means the **Insured** is wholly prevented from rendering **Legal Services**, provided that the disability has continued for at least six (6) months, is reasonably expected to be continuous and permanent and the disability did not result from intentionally self-inflicted injury, attempted suicide, alcohol or drug abuse.

V.  **WRONGFUL ACT** means:

1.  an actual or alleged act, error or omission by an **Insured**, solely in the performance of or failure to perform **Legal Services**;

2.  an actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or

3.  a **Non-Profit Director and Officer Wrongful Act**.

### III.   EXCLUSIONS

A.   This Policy shall not apply to any **Claim** brought by or on behalf of, or in the name or right of, any **Insured**;

provided, however, that this Exclusion shall not apply to any **Claim** which arises out of **Professional Services** rendered by one **Insured** to another where an attorney-client relationship exists between such **Insureds**.

B.   This Policy shall not apply to any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:

1.   any intentional, criminal, fraudulent, malicious or dishonest act or omission by or at the direction of an **Insured**;

provided, however, that this Exclusion shall not apply unless there has been a finding, admission, or final adjudication, in a proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

2.   any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate;

3.   the **Insured's** capacity or status as:

(a)   an officer, director, partner, trustee, shareholder, manager or employee of a business enterprise, charitable organization or pension, welfare, profit sharing, mutual or investment fund or trust, except for such coverage provided under this Policy under Section I.B.3. for **Non-Profit Director or Officer Wrongful Acts**; or

(b)   a public official, or an employee of a governmental body, subdivision, or agency unless the **Insured** is privately retained solely to render **Legal Services** to the governmental body, subdivision or agency and the remuneration for the **Legal Services** is paid directly or indirectly to the **Named Insured**.

4.   any actual or alleged **Wrongful Acts** of an **Insured**, whether or not such **Legal Services** are performed with or without compensation, for any business enterprise, whether for profit or not-for-profit, in which any **Insured**, or a member of an **Insured's Immediate Family**, has a "Material Interest."

For purposes of this Exclusion, a "Material Interest" shall mean the right of an **Insured** or a member of an **Insured's Immediate Family** directly or indirectly to:
(a)   own 10% or more of an interest in an entity;
(b)   vote 10% or more of the issued and outstanding voting stock in an incorporated entity;
(c)   elect 10% or more of the directors of an incorporated entity;
(d)   receive 10% or more of the profits of an unincorporated entity; or

(e)     act as general partner of a limited partnership, managing general partner of a general partnership, or comparable positions in any other business enterprise.

5.     the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so.

6.     any alleged violations by an **Insured** of the Employment Retirement Income Security Act of 1974, its amendments, or any regulation or orders promulgated pursuant thereto, or of any similar provisions of federal, state or local law or regulation;

7.     liability assumed by an **Insured** under an indemnity, hold harmless or liquidated damages provision or agreement, or similar provisions or agreements;

provided, however, that this Exclusion shall not apply if such liability would have attached to the **Insured** by law in the absence of such provision or agreement;

8.     the notarized certification or acknowledgement of signature without the physical appearance before such notary public of the person who is or claims to be the person signing said instrument;

9.     **Bodily Injury**, and injury to, or destruction of, any tangible property, including the loss of use resulting therefrom;

provided however,  that the exclusion of **Bodily Injury** does not apply to that portion of a **Claim** for mental injury, mental anguish, mental tension, or emotional distress caused by:
(a)     **Personal Injury**; or
(b)     a **Non-Profit Director and Officer Wrongful Act**;

10.     the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds.

## IV.     CONDITIONS

### A.     LIMIT OF LIABILITY

Regardless of the number of **Insureds**, number of **Claims** or number of claimants who make a **Claim** against the **Insureds**, the **Insurer's** liability is limited as follows:

1.     Subject to the maximum aggregate Limit of Liability, the amount set forth in ITEM 3(a) of the Declarations shall be the maximum Limit of Liability of the **Insurer** for all **Damages** and **Claim Expenses**, in excess of the applicable Retention set forth in ITEM 4 of the Declarations, resulting from each **Claim** to which this Policy applies.

2. The amount set forth in ITEM 3(b) of the Declarations shall be the maximum aggregate Limit of Liability of the **Insurer** for all **Damages** and **Claim Expenses** resulting from all **Claims** to which this Policy applies.

3. **Claim Expenses** are part of and not in addition to the Limit of Liability. The Limit of Liability shall first be applied to **Claim Expenses** with the remainder, if any, being the amount available to pay as **Damages**.

4. The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses** or to defend or continue to defend any **Claim** after the Limit of Liability set forth in ITEM 3(b) has been exhausted. In such case, the **Insurer** shall have the right to withdraw from the further investigation or defense of any pending **Claim** by tendering control of such investigation or defense to the **Named Insured** and the **Named Insured** agrees, as a condition to the issuance of this Policy, to accept such tender and proceed solely at its own cost and expense.

B. **RETENTION**

The Retention amount stated in Item 4 of the Declarations shall apply to all **Damages** and **Claim Expenses** and shall apply to each and every **Claim**. It is the **Named Insured's** responsibility to pay **Damages** or **Claim Expenses** up to the amount of the Retention. The **Insurer** shall only be liable to pay, subject to the Limit of Liability provisions stated in this Section, for **Damages** and **Claim Expenses** in excess of such Retention and such Retention shall not be insured under this Policy.

Solely at the option of the **Insurer**, the **Insurer** may advance all or some portion of the Retention amount in the event that the **Named Insured** fails to do so in a timely manner. In such event, the **Named Insured** shall pay back the Retention to the **Insurer** no later than fifteen (15) days after demand by the **Insurer**.

C. **RELATED ACTS**

All **Claims** based upon or arising out of the same **Wrongful Act** or **Related Act or Omission** shall be considered a single **Claim** and shall be considered first made at the time the earliest **Claim** arising out of such a **Related Act or Omission** was first made. All **Damages** and **Claims Expenses** from such **Claims** shall be subject to one limit of liability.

D. **DEFENSE AND INVESTIGATION**

The **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy made against an **Insured** even if any of the allegations of the **Claim** are groundless, false or fraudulent. The **Insurer** shall have the right to select defense counsel for the investigation, defense or settlement of the **Claim** and the **Insurer** shall pay all reasonable **Claim Expenses** arising from the **Claim**.

The **Insurer** shall have the right to conduct such investigation or negotiation of any **Claim** as it deems expedient. The **Insurer** shall not be obligated to pay any **Damages** or **Claim Expenses**, or to defend or continue to defend any **Claim** after the **Insurer's** limit of liability has been exhausted by payment, or by deposit in a court having jurisdiction of sums reflecting the remaining applicable Limit of Liability of the Policy.

E. **CONSENT TO SETTLE**

The **Insurer** shall not settle any **Claim** without the consent of the **Insured,** which consent shall not be unreasonably withheld.  If, however, the **Insured** refuses to consent to any settlement recommended by the **Insurer** and acceptable to the claimant, then the **Insurer's** liability for **Damages** and **Claim Expenses** relating to that **Claim** shall not exceed the amount for which the **Claim** could have been settled plus all **Claim Expenses** incurred up to the time the **Insurer** made its recommendation.

If the **Insured** refuses to settle, once the total **Claim Expenses** equal the amount for which the **Claim** could have been settled plus all **Claim Expenses** incurred up to the time the **Insurer** made its recommendation, the **Insurer** shall have the right to withdraw from the further investigation and defense thereof by tendering control of such investigation or defense to the **Insured** and the **Insured** agrees, as a condition of the issuance of this Policy, to accept such tender and proceed solely at its own cost and expense.  If the **Named Insured** has not paid premiums or Retentions which are due, the **Insurer** has the right, but not the obligation, to settle any **Claim** without the consent of the **Insured**.

F.    **MULTIPLE POLICIES**

If this Policy and any other policy issued by **Insurer** including any **Extended Reporting Period** coverage afforded by such policy or policies, provides coverage for the same **Claim** against the **Insured**, the maximum limit of liability under all the policies shall not exceed the highest remaining per **Claim** limit of liability under any one policy.

G.    **EXTENDED REPORTING PERIOD OPTIONS**

1.    **AUTOMATIC EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, and if this Policy has been in force for at least six (6) months, or if it has been in force for fewer than six (6) months and the **Insurer** consents, the **Named Insured** shall have the right to a period of sixty (60) days immediately following the effective date of such cancellation of non-renewal, in which to give notice to the **Insurer** of **Claims** first made against the **Insured** during such sixty (60) day period for any **Wrongful Acts** committed prior to the effective date of such cancellation or non-renewal and otherwise covered by this Policy.

2.    **OPTIONAL EXTENDED REPORTING PERIOD**

In the event of cancellation or refusal to renew this Policy by the **Insurer** or the **Named Insured**, the **Named Insured**  has the right upon notification to the **Insurer** of its intent to purchase an Optional Extended Reporting Period Endorsement, and payment to the **Insurer** of an additional premium as set forth below within sixty (60) days of the cancellation or non-renewal, to extend the period for reporting **Claims** first made against an **Insured** after the termination of the **Policy Period** for any **Wrongful Acts** committed prior to the termination of the **Policy Period** and otherwise covered by this Policy.  For purposes of determining the availability of an Extended Reporting Period Endorsement, any change in the premium terms or terms on renewal shall not constitute a refusal to renew.

The **Named Insured** may select from the following Optional Extended Reporting Period options:

(a)    a one-year Optional Extended Reporting Period for an additional premium of 100% of the Annual Premium set forth in Item 6 of the Declarations;

(b)    a two-year Optional Extended Reporting Period for an additional premium of 150% of the Annual Premium set forth in Item 6 of the Declarations;

(c)    a three-year Optional Extended Reporting Period for an additional premium of 185% of the Annual Premium set forth in Item 6 of the Declarations;

(d)    a five-year Optional Extended Reporting Period for an additional premium of 210% of the Annual Premium set forth in Item 6 of the Declarations;

(e)    an unlimited Optional Extended Reporting Period for an additional premium of 300% of the Annual Premium set forth in Item 6 of the Declarations.

3.    **NON-PRACTICING EXTENDED REPORTING PERIOD**

If an individual **Insured** lawyer, other than a contract attorney, which is listed on the **Application** for this Policy and insured hereunder as of the Inception Date of this Policy, retires or otherwise ceases the private practice of law during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to purchase a Non-Practicing Extended Reporting Period Endorsement. Unless the **Insured** qualifies for a waiver of premium under Paragraph G.4. below, such **Insured** must make payment to the **Insurer** of an additional premium as set forth below within sixty (60) days of the **Insured's** date of retirement or cessation of the private practice of law. The Non-Practicing Extended Reporting Period will extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy. If an individual **Insured** lawyer shall resume the practice of law at any time for any reason, the Non-Practicing Extended Reporting Period elected by such **Insured** shall no longer be effective.

Coverage for any **Claim** first made during a Non-Practicing Extended Reporting Period shall be excess over and shall not contribute with any other insurance in effect on or after the effective date of the Non-Practicing Extended Reporting Period, which covers the **Insured** for such **Claim**.

The additional premium for a Non-Practicing Extended Reported Period shall be calculated using the per individual **Insured** lawyer rate in effect upon the Inception Date of this Policy, based on the number of lawyers with the **Named Insured** at the Inception Date of this Policy, as stated on the **Application** or most recent Renewal Application, multiplied by the percentage set forth below which corresponds to the number of years elected for the Non-Practicing Extended Reporting Period.

The **Insured** may select from the following Non-Practicing Extended Reporting Period options:

(a)  a one-year Non-Practicing Extended Reporting Period for an additional premium of 100%  of the Annual Premium set forth in Item 6 of the Declarations;

(b)  a two-year Non-Practicing Extended Reporting Period for an additional premium of 150%  of the Annual Premium set forth in Item 6 of the Declarations;

(c)  a three-year Non-Practicing Extended Reporting Period for an additional premium of 185%  of the Annual Premium set forth in Item 6 of the Declarations;

(d)  a five-year Non-Practicing Extended Reporting Period for an additional premium of 210%  of the Annual Premium set forth in Item 6 of the Declarations;

(e)  an unlimited Non-Practicing Extended Reporting Period for an additional premium of 300%  of the Annual Premium set forth in Item 6 of the Declarations.

4.  **WAIVER OF PREMIUM FOR NON-PRACTICING EXTENDED REPORTING PERIOD**

(a)  Waiver Upon Death

If an individual **Insured** lawyer, as described in Section IV.G.3. above, dies during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium, until the executor or administrator of the estate of such individual **Insured** lawyer is discharged, provided always that the death did not result from an intentionally self-inflicted injury, suicide or alcohol or drug abuse.  Written notification and written proof of death of the **Insured** must be provided within sixty (60) days of the date of death or prior to the end of the **Policy Period**, whichever is earlier. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of death and otherwise covered by this Policy.

(b)  Waiver Upon Disability

If an individual **Insured** lawyer, as described in Section IV.G.3. above, becomes **Totally and Permanently Disabled** during the **Policy Period**, such **Insured** shall be provided with a Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium, until the **Insured** is no longer **Totally and Permanently Disabled**.  It shall be a condition precedent to the Non-Practicing Extended Reporting Period  that the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years, the **Insured** or his or her legal guardian provides written notice of the disability to the **Insurer** within sixty (60) days or prior to the termination of the **Policy Period**, whichever is earlier, and the **Insured** or the **Insured's** legal guardian provides a

physician's written certification of the disability, including the date it began.  Such Non- Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of **Total and Permanent Disability** and otherwise covered by this Policy.

(c)    Waiver For Continuous Coverage

If an individual **Insured** lawyer, as described in Section IV.G.3. above, retires or otherwise ceases the private practice of law during the **Policy Period**, then such **Insured** has the right, upon notification to the **Insurer**, to elect an unlimited Non-Practicing Extended Reporting Period Endorsement, commencing after the termination of the **Policy Period**, at no additional premium.   A condition precedent to the Non-Practicing Extended Reporting Period shall be that the **Named Insured** has had continuous coverage with the **Insurer** for at least three (3) consecutive prior full years.  The **Insured** must provide written notice of the his or her request to elect the Non-Practicing Extended Reporting Period within sixty (60) days of the **Insured's** date of retirement or cessation of the private practice of law. Such Non-Practicing Extended Reporting Period shall extend the period for reporting **Claims** first made against such **Insured** after the termination of the **Policy Period** for any actual or alleged **Wrongful Act** occurring prior to the **Insured's** date of retirement or cessation of the private practice of law and otherwise covered by this Policy.

5.    **CONDITIONS APPLICABLE TO ALL EXTENDED REPORTING PERIOD OPTIONS**

(a)    The right to any of the Extended Reporting Period Endorsement options is not available to any **Insured** if:
(i)    cancellation or nonrenewal by the **Insurer** is due to either: nonpayment of premium, Retention or other money due to the **Insurer**; or misrepresentation in the **Application**; or the failure to comply with the terms and conditions of this Policy; or
(ii)    the **Insured's** right or license to practice law is suspended, surrendered or revoked.

(b)    The Limit of Liability available for any Extended Reporting Period is part of, and not in addition to, the Limit of Liability shown in Item 3 of the Declarations of the Policy.

(c)    The Retention, as shown on the Declarations, which is applicable to **Claims** first made during any Extended Reporting Period, will apply separately to each and every **Claim**.  The Retention will be waived for **Claims** first made during a Non-Practicing Extended Reporting Period in the event that an individual **Insured** lawyer qualifies for a Non-Practicing Extended Reporting Period based on: (i) the death of the **Insured**; (ii) or becoming **Totally and Permanently Disabled**.

(d)  None of the Extended Reporting Period options are cancelable or renewable.  Any additional premium, if applicable, for the Extended Reporting Period Endorsement is fully earned at the inception of the Extended Reporting Period.

H.  **POLICY TERRITORY**

The coverage afforded by this Policy applies to any **Wrongful Acts** that occur anywhere in the world, and **Claims** brought anywhere in the world.

I.  **NOTICE TO THE INSURER**

1.  Notice of any actual or potential **Claim** shall be made to the **Insurer** at <u>noticeofloss@darwinpro.com</u>.  All other notices shall be made to the **Insurer** at the address shown in Item 5 of the Declarations.

2.  **NOTICE OF AN ACTUAL CLAIM**

The **Insured**, as a condition precedent to this Policy, shall, as soon as practicable and no later than sixty (60) days after the termination of the **Policy Period**, provide **Notice** to the **Insurer** of any **Claim** made against an **Insured** during the **Policy Period**   The **Insured** shall provide the **Insurer** with **Notice** of any **Claim** made against an **Insured** during an **Extended Reporting Period** as soon as practicable and no later than the termination of the **Extended Reporting Period**.  In the event suit is brought against the **Insured**, the **Insured** shall immediately forward to the **Insurer** every demand, notice, summons or other process received directly or by an **Insured's** representative.

3.  **NOTICE OF A POTENTIAL CLAIM**

If during the **Policy Period** any **Insured** becomes aware of any **Wrongful Act** that may reasonably be expected to be the basis of a **Claim** against an **Insured**, and the **Insured**, as soon as practicable and no later than the termination of the **Policy Period**, provides **Notice** to the **Insurer** of such **Wrongful Act**, and the reasons for anticipating a **Claim**, then the **Insurer** will treat any such **Claim** that is subsequently made against the **Insured** and promptly reported to the **Insurer** to have been made and reported at the time such **Notice** was given.

4.  **FRAUDULENT CLAIM**

If any **Insured** shall commit fraud in proffering any **Claim** with regard to amount or otherwise, this Policy shall become void from the inception as to such **Insured**.

J.  **ASSISTANCE AND COOPERATION OF THE INSURED**

All **Insureds** shall cooperate with the **Insurer**, including providing all information requested by the **Insurer** regarding any **Claim**, and cooperating fully with the **Insurer** in the defense, investigation and settlement of any **Claim**.  Upon the **Insurer's** request, all **Insureds** shall submit to examination by a representative of the **Insurer**, under oath if required.  In addition, upon the **Insurer's** request, all **Insureds** shall attend hearings, depositions and trials, and shall assist in effecting settlements, securing and giving

**App. 022**

evidence, obtaining the attendance of witnesses, and in the conduct of suits, all without charge to the **Insurer**.

The **Insured** shall follow the **Insurer's** direction regarding whether to accept or reject a demand for arbitration of any **Claim** and shall not voluntarily agree to arbitrate a **Claim** without the **Insurer's** written consent. No **Insured** shall, except at the **Insured's** own cost, make any payment, make any admission, admit liability, waive any rights, settle any **Claim**, assume any obligation or incur any expense without the prior written consent of the **Insurer**.

K.    **PROTECTION FOR THE INNOCENT INSUREDS**

Whenever coverage under this Policy would be excluded, suspended or lost because of Part III – Exclusions, paragraph B.1., the **Insurer** agrees that such insurance as would otherwise be afforded under this Policy shall be applicable with respect to any **Insured** who did not acquiesce in or remain passive after having knowledge of such conduct.

L.    **SUBROGATION**

The **Insurer** shall be subrogated to all **Insureds'** rights of recovery against any person or organization. All **Insureds** shall assist the **Insurer** in effecting any rights of indemnity, contribution and apportionment available to any **Insured**, including the execution of such documents as are necessary to enable the **Insurer** to pursue claims in the **Insureds'** names and shall provide all other assistance and cooperation which the **Insurer** may reasonably require. All **Insureds** shall cooperate with the **Insurer** and do nothing to jeopardize, prejudice or terminate in any way such rights.

The **Insurer** shall not exercise any such rights against any **Insured** except as provided herein. Notwithstanding the foregoing, however, the **Insurer** reserves the right to exercise any rights of subrogation against any **Insured** with respect to any **Claim** brought about or contributed to by the intentional, criminal, fraudulent, malicious or dishonest act or omission of such **Insured**.

M.    **CANCELLATION; NO OBLIGATION TO RENEW**

1.    This Policy shall terminate upon the Expiration Date set forth in Item 2 of the Declarations, or upon any earlier cancellation.

2.    This Policy may be canceled by the **Named Insured** by mailing advance written notice to the **Insurer** stating when such cancellation shall take effect. If canceled by the **Named Insured**, the **Insurer** shall retain the earned premium, which shall be computed in accordance with the customary short rate table and procedure.

3.    This Policy may be canceled by the **Insurer** by written notice mailed to the **Named Insured** at its last known address at least sixty (60) days before the effective date of such cancellation, if for reasons other than nonpayment of premium. The **Insurer** may cancel this Policy for nonpayment of premium by written notice mailed to the **Named Insured** at its last known address at least ten (10) days before the effective date of such cancellation. The notice will state the reason for and the effective date of the cancellation. If the Policy is canceled by the **Insurer,** the **Insurer** shall retain the earned premium, which shall be computed on a pro rata basis.

4.  Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.  Failure to pay any premium adjustment at, on, or around the time of the effective date of cancellation shall not alter the effectiveness of cancellation.

5.  The **Insurer** will not be required to renew this Policy upon its expiration. If the **Insurer** elects not to renew this Policy, the **Insurer** will deliver or mail written notice, to the **Named Insured** at its last known address, to that effect, at least sixty (60) days before the Expiration Date set forth in Item 2 of the Declarations. Such notice shall state the specific reason(s) for non-renewal.

N.  **CHANGE IN RISK**

1.  If, during the **Policy Period**, any of the following events occur:

(a)  the merger into or acquisition of the **Named Insured** by another entity such that the **Named Insured** is not the surviving entity, or the acquisition of substantially all of the assets of the **Named Insured**;

(b)  the dissolution of, or appointment of a receiver, conservator, trustee, liquidator or rehabilitator or similar official for the **Named Insured**;

the **Named Insured** shall report the event to the **Insurer** immediately.

Coverage under this Policy will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed on or after such event. After any such event, this Policy may not be canceled by the **Insured** and the entire premium for this Policy will be deemed fully earned.

2.  If, during the **Policy Period**, the number of lawyers or professional corporations performing **Legal Services** on behalf of the **Named Insured** increases by 50% or more, the **Named Insured** shall immediately notify the **Insurer** in writing.  The **Insurer** shall have the right to modify the terms and conditions of the Policy, including premium, as it determines in its sole discretion is appropriate.

O.  **OTHER INSURANCE**

Subject to Part I – Insuring Agreement, A – Coverage, and Part IV – Conditions, Subsection A – Limit of Liability, this insurance will apply only as excess insurance over any other valid insurance.  This Policy is written as specific excess of coverage available under any extended reporting period.

P.  **ASSIGNMENT**

Neither this Policy nor any **Insured's** interest under this Policy may be assigned.

Q.  **ACTION AGAINST THE INSURER**

No action shall lie against the **Insurer** unless, as a condition precedent thereto, all **Insureds** have fully complied with all the terms of this Policy and not until the amount of all **Insured's** obligations to pay have been fully and finally determined either by

judgment against all **Insureds** after actual trial or by written agreement of the **Named Insured**, the claimant and the **Insurer**.

Nothing contained in this Policy shall give any person or organization any right to join the **Insurer** as a defendant in the action against any **Insured**.

R.    **APPLICATION**

By acceptance of this Policy, all **Insureds** affirm or reaffirm as of the Inception Date of this Policy that:

1.    the statements in the **Application** are true and accurate and are specifically incorporated herein, and are all **Insureds'** agreements, personal representations and warranties;
2.    all such communicated information shall be deemed material to the **Insurer's** issuance of this Policy;
3.    this Policy is issued in reliance upon the truth and accuracy of such representations;
4.    this Policy embodies all agreements existing between the **Insureds** and the **Insurer**, or any of its agents, relating to this insurance; and
5.    if any representation is false or misleading, this Policy shall be void from the inception.

S.    **ENTIRE AGREEMENT**

No change or modification of this Policy shall be effective except when made by a written endorsement to this Policy signed by an authorized representative of the **Insurer**. No representations by any person shall have any force or effect except as included in such endorsement.

T.    **WAIVER**

The **Insurer's** failure to insist on strict compliance with any terms, provisions or conditions to coverage of this Policy or the failure to exercise any right or privilege shall not operate or be construed as a waiver thereof or of any subsequent breach thereof or a waiver of any other terms, provisions, conditions, privileges or rights.

U.    **DEFINED TERMS**

Terms used in the Policy in bold faced type are defined herein.


**In Witness Whereof, the Insurer has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations page by a duly authorized representative of the Insurer.**

# D'Angelo & Eurell 30(b)(6) Deposition Testimony

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3    _____

4    D'ANGELO & EURELL, DAVID S.

5    D'ANGELO and DAVID S. D'ANGELO

6    and CHRISTOPHER S. D'ANGELO,

7    Co-Executors of the Estate of

8    GEORGE A. D'ANGELO, Deceased,

9    for Himself and Trading As

10   D'ANGELO & EURELL,

11           Plaintiffs,

12      v.                          Case No.

13   ALLIED WORLD SPECIALTY          2:23-cv-00397-

14   INSURANCE COMPANY,              JFM

15           Defendant.

16   _____

17                   DEPOSITION OF

18                  DAVID D'ANGELO

19   DATE:        Thursday, June 13, 2024

20   TIME:        12:45 p.m.

21   LOCATION:    Kennedys CMK, LLP

22                1600 Market Street, Suite 1410

23                Philadelphia, PA 19103

24   REPORTED BY:  Carlo Florio

25   JOB NO.:     6748530

Page 2

1                A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFFS D'ANGELO & EURELL, DAVID S.

3    D'ANGELO AND DAVID S. D'ANGELO AND CHRISTOPHER S.

4    D'ANGELO, CO-EXECUTORS OF THE ESTATE OF OF GEORGE A.

5    D'ANGELO, DECEASED, FOR HIMSELF AND TRADING AS

6    D'ANGELO & EURELL:

7         JOHN P. MCSHEA, ESQUIRE

8         McShea Law Firm, P.C.

9         1500 Market Street, Suite 3350 East Tower

10        Philadelphia, PA 19102

11        jmcshea@mcshealawfirm.com

12        (215) 599-0800

13

14   ON BEHALF OF DEFENDANT ALLIED WORLD SPECIALTY

15   INSURANCE COMPANY:

16        MICHAEL E. DIFEBBO, ESQUIRE

17        Kennedys Law, LLP

18        1600 Market Street, Suite 1410

19        Philadelphia, PA 19103

20        michael.difebbo@kennedyslaw.com

21        (267) 479-6713

22

23

24

25

Page 3

1                        I N D E X

2    EXAMINATION:                                   PAGE

3        By Mr. DiFebbo                               7

4

5                      E X H I B I T S

6    NO.            DESCRIPTION                     PAGE

7    Exhibit 1      Notice of Deposition             8

8    Exhibit 2      Application for Insurance        17

9    Exhibit 3      Letter, 06/12/12                 22

10   Exhibit 4      Letter, 08/30/12                 32

11   Exhibit 5      Letter, 09/25/12                 42

12   Exhibit 6      Letter, 10/05/12                 46

13   Exhibit 7      Letter to Warshawsky             48

14   Exhibit 8      Letter from Warshawsky           49

15   Exhibit 9      Initial Notice of Claim          54

16   Exhibit 10     Email Thread, D'Angelo and

17                  Warshawsky                       58

18   Exhibit 11     Markley's Exhibits In

19                  Opposition of Motion for

20                  Summary Judgment                 67

21   Exhibit 12     Email Thread                     71

22   Exhibit 13     Letter from Kochenki, 02/12/13   75

23   Exhibit 14     Letter from Dwyer                76

24   Exhibit 15     Email to Dwyer                   77

25

```
                                          Page 4
 1              E X H I B I T S (Cont'd)

 2   NO.            DESCRIPTION                    PAGE

 3   Exhibit 16     Email Thread, D'Angelo

 4                  and Mr. Warshawsky              80

 5   Exhibit 17     Letter, 03/13/13               83

 6   Exhibit 18     Defendants' Objections and

 7                  Responses to Second Set of

 8                  Interrogatories                87

 9   Exhibit 19     Letter, 03/29/13               90

10   Exhibit 20     Email, 03/13/13               93

11   Exhibit 21     Letter, 03/28/13               96

12   Exhibit 22     Letter, 04/03/23               97

13   Exhibit 23     Compilation of Emails          99

14   Exhibit 24     Letter, 04/18/23              103

15   Exhibit 25     Letter, 04/19/23              108

16   Exhibit 26     Email Thread, Jones and

17                  D'Angelo                      113

18   Exhibit 27     Markley Complaint             113

19   Exhibit 28     Letter, 11/16/24              117

20   Exhibit 29     Email Thread, Jones and

21                  D'Angelo                      119

22   Exhibit 30     Invoice from McShea Law Firm  125

23   Exhibit 31     Summary of Legal Expenses     121

24   Exhibit 32     Letter, 11/23/15              130

25   Exhibit 33     Letter, 01/05/16              132
```

Page 5

1                    E X H I B I T S (Cont'd)

2    NO.              DESCRIPTION                    PAGE

3    Exhibit 34      Email Thread, McShea and

4                    Barbin                         133

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                P R O C E E D I N G S

2                THE REPORTER:  Good afternoon.  My name

3       is Carlo Florio; I am the reporter assigned by

4       Veritext to take the record of this proceeding.  We

5       are now on the record at 12:45 p.m.

6                This is the deposition of

7       David D'Angelo taken in the matter of David D'Angelo

8       and Eurell, et al. vs. Allied World Specialty

9       Insurance Company on June 13, 2024, at 1600 Market

10      Street, Suite 1410, Philadelphia, Pennsylvania 19103.

11               I'm a notary authorized to take

12      acknowledgments and administer oaths in Pennsylvania.

13               Additionally, absent an objection on

14      the record before the witness is sworn, all parties

15      and the witness understand and agree that any

16      certified transcript produced from the recording of

17      this proceeding:

18                        - is intended for all uses permitted

19                          under applicable procedural and

20                          evidentiary rules and laws in the

21                          same manner as a deposition recorded

22                          by stenographic means; and

23                        - shall constitute written stipulation

24                          of such.

25               At this time will all counsel please

Page 7

1    identify yourself on record.  We'll begin with

2    Mr. DiFebbo, please.

3                    MR. DIFEBBO:  Michael DiFebbo of

4    Kennedy CMK, LLP, on behalf of Allied World Specialty

5    Insurance Company.

6                    MR. MCSHEA:  John McShea, McShea Law

7    Firm, representing D'Angelo & Eurell, whose designated

8    representative today is David D'Angelo.

9                    THE REPORTER:  Excellent.  Thank you.

10    Hearing no objection, I will now swear in the witness.

11                    Please raise your right hand.

12    WHEREUPON,

13                    DAVID D'ANGELO,

14    called as a witness and having been first duly sworn

15    to tell the truth, the whole truth, and nothing but

16    the truth, was examined and testified as follows:

17                    THE REPORTER:  Excellent.

18                    Counsel, you may proceed.

19                    MR. DIFEBBO:  All right.

20                    EXAMINATION

21    BY MR. DIFEBBO:

22        Q    Good afternoon, Mr. D'Angelo.  As I

23    mentioned a moment ago, my name is Mike DiFebbo, and

24    I'm here for Kennedy CMK on behalf of Allied World

25    Specialty Insurance Company.

Page 8

1          Allied World I believe was formerly known as

2     Darwin National Assurance Company, so if I refer to

3     Allied World or Darwin, you understand that I'm

4     referring to the same entity?

5          A    Yes.

6          Q    Okay.  And as Mr. McShea indicated, you're

7     here today as the designee of D'Angelo & Eurell law

8     firm.  Correct?

9          A    Yes.

10         Q    And that entity is the plaintiff in this

11    matter?

12         A    Yes.

13         Q    I'm going to hand you what we've pre-marked

14    as Exhibit 1, which is a copy of the notice of

15    deposition that brings you here today.  Have you seen

16    that document before, sir?

17                   (Exhibit 1 was marked for

18                    identification.)

19         A    Yes.

20         Q    Okay.  And if you'd turn to page 4 of the

21    document, you see that there is a list of topics for

22    the 30(b)(6) deposition?

23         A    Yes.

24         Q    Am I correct that you are here to testify as

25    to all five of the topics that are identified on page

Page 11

1    categories of documents?

2        A    Invoices.

3        Q    Okay.  Were those invoices from Mr. McShea?

4        A    Yes.

5        Q    Were there any other invoices that you

6    reviewed?

7        A    No.

8        Q    Any other categories of documents besides

9    those four categories?

10       A    I don't believe so.

11       Q    That's one other instruction, is that you

12   need to let me finish my question before you answer,

13   and I'll do my best to let you finish your answers

14   before asking another question.  You know it's hard to

15   do.

16            All right.  You're familiar with the lawsuit

17   that was brought by Lisa Markley against D'Angelo &

18   Eurell and yourself and others.  Correct?

19       A    Yes.

20       Q    Let me ask you this.  What is or was

21   D'Angelo & Eurell?

22       A    It's an association of lawyers.  Basically

23   an office.  Space.

24       Q    And the D'Angelo referred to in the name was

25   your father, George D'Angelo.  Correct?

Page 12

```
 1      A    Correct.
 2      Q    Okay.  Was D'Angelo & Eurell a partnership?
 3      A    It was a -- a partnership of convenience.
    It wasn't a separate entity of any sort.
 4
 5      Q    Did D'Angelo & Eurell hold itself out to the
 6  public as a partnership?
 7      A    No.
 8      Q    What was the relationship between your
 9  father and -- if it's okay, I'll refer to him as
10  George just --
11      A    Sure.
12      Q    -- to keep things clear.  What was the
13  relationship with George and Mr. Eurell?
14      A    Friends and associates.
15      Q    Did they consider each other partners in the
16  business of practicing law?
17      A    No.
18      Q    When did you graduate from law school?
19      A    '82.
20      Q    And did you take the bar in '82?
21      A    I'd say it's -- yes.
22      Q    Did you pass it that time?
23      A    I did.
24      Q    Okay.  And did you start to practice in
25  1982?
```

Page 13

```
 1        A    I did.

 2        Q    Where did you practice when you first

 3   started in 1982?

 4        A    At the Law Offices of D'Angelo & Eurell.

 5        Q    And what was your relationship to George,

 6   you know, your professional relationship?

 7        A    Shared office space.

 8        Q    Okay.  I've seen references in some of the

 9   documents in this case that you have represented that

10   you were an independent lawyer.  Is --

11        A    Correct.

12        Q    -- that accurate?

13        A    I'm sorry.  Correct.

14        Q    And what does it mean when you indicate that

15   you were an independent lawyer?

16        A    I worked on my own and had my own cases.

17        Q    You say you shared office space with

18   D'Angelo & Eurell.  Correct?

19        A    Yes.

20        Q    Were you employed by D'Angelo & Eurell?

21        A    No.

22        Q    Were you ever a partner of D'Angelo &

23   Eurell?

24        A    No.

25        Q    Were you ever of counsel with D'Angelo &
```

Page 17

1      Q    All right, Mr. D'Angelo.  I've handed you a

2  document that we've marked as Exhibit 2.  It's a

3  document Bates numbered Allied World 0000610 through

4  614.  And let me know when you've had a chance to look

5  over that document.

6                    (Exhibit 2 was marked for

7                    identification.)

8      A    I've looked it over.

9      Q    Okay.  Is this the application that was

10 submitted by D'Angelo & Eurell to Allied World for the

11 insurance policy that brings us here?

12     A    Yes.

13     Q    And if you turn to the last page of the

14 document, you see there's a signature dated

15 August 15, 2012?

16     A    Yes.

17     Q    And do you recognize that as your father,

18 George's, signature?

19     A    No, that's actually my signature at the

20 request of George.

21     Q    Okay.  And you're authorized to sign on his

22 behalf?

23     A    Yes.

24     Q    And if you turn back to the first page of

25 this document.  Who actually prepared this application

Page 18

1   form?  In other words, who filled out the application?

2        A    I don't recall if we actually typed it out

3   or was it the agent who typed it out and sent it to us

4   for signature.

5        Q    Okay.  You see that the email address that's

6   listed under Section 1 is ddsdangelo@cs.com?

7        A    Yes.

8        Q    That's your email address.  Correct?

9        A    Yes.

10       Q    And you're listed here as the contact

11  person?

12       A    Yes.

13       Q    So is it fair to say that regardless of

14  whether you actually typed it or the agent typed it,

15  that the information that was presented to Allied

16  World in this application is information that you

17  provided?

18       A    Yes.

19       Q    All right.  And in Section 4, Claims,

20  Circumstances, and Disciplinary Proceedings, Part C

21  says "Is any party aware of any claims against the law

22  firm or its attorneys or any incidents that could

23  result in a claim against the law firm or its

24  attorneys within the past five years?"

25            Do you see that?

1          A     Yes.

2          Q     And the firm indicated "No" in response to

3    that question.  Correct?

4          A     Correct.

5          Q     In Section 2, the Lawyer Information, do you

6    see that your name is listed there?

7          A     Yes.

8          Q     And it says "Admitted PA"?

9          A     Yes.

10         Q     Were you admitted in any other

11   jurisdictions?

12         A     No.  But I do see that there is an error

13   there.

14         Q     Is that the hire date?

15         A     It has 1980.  And I began working as an

16   attorney in '82.

17         Q     When you first began working as an attorney

18   in 1982, was that the first time that you had done any

19   work for your father?

20         A     And for myself.

21         Q     Okay.  In other words, did you work for your

22   father at all while you were in law school?

23         A     No.

24         Q     Okay.  What was your understanding, when you

25   filled out this application, of the reference to "hire

Page 20

1    date"?

2        A    When I started working as an attorney, when

3    Jack Eurell started working as an attorney, and

4    when -- well, I guess that wouldn't be the right --

5    let's see.

6            Because my father -- I guess when they

7    joined together.  Maybe that's when it was.  Or '72,

8    or 1972.  That's when they joined together at the Law

9    Offices of D'Angelo & Eurell.  And then it should be

10   1982 for me.

11       Q    Take a moment and look over this application

12   and let me know if you think that there's anything

13   else in it that, as you review it today, you think was

14   inaccurate at the time it was submitted.

15       A    No.  It appears to be accurate.

16       Q    Who is Lisa Markley?

17       A    She was a client of my father's.

18       Q    At the time of the application for coverage

19   for the Allied World policy, as reflected in Exhibit

20   2, what was the relationship between Ms. Markley and

21   D'Angelo & Eurell?

22       A    She was a client of my father's.

23       Q    Okay.  The application is dated August 2012.

24   Was she still a client of your father's as of August

25   of 2012?

Page 21

1        A    Yes.

2        Q    At some point in time, did your father or

3   the firm receive communication from new counsel for

4   Ms. Markley?

5        A    My father did.

6        Q    Okay.  And do you recall receiving that?

7        A    After my father received it, yes.

8        Q    Okay.  And what's your recollection of that

9   communication?

10       A    That my father was no longer employed.

11       Q    By Ms. Markley?

12       A    Correct.

13       Q    Do you recall when the firm received that

14   communication?

15       A    I do not.

16       Q    Okay.  And just to be clear.  When I say

17   "the firm," I'm going to use that as a shorthand for

18   D'Angelo & Eurell.  I'm not implying anything as to

19   its, you know, corporate status when I use that word.

20   I'm using it for convenience.  Okay?

21       A    Yes.  I heard it to mean my father.

22       Q    Sorry?

23       A    I heard it to mean my father received it.

24   But yes.

25              MR. DIFEBBO:  Off the record for one

Page 25

1      A     UBS is a brokerage house.

2      Q     And Morgan Stanley?

3      A     Maybe a brokerage house.  Bank.  Something.

4      Q     Was your father, as of the time of this June

5  2012 letter, providing any services to Ms. Markley

6  with respect to funds that she had at UBS or Morgan

7  Stanley?

8      A     Yes.

9      Q     What services was your father providing?

10     A     He was managing that account, I believe.

11     Q     Okay.  And what was the nature of that

12  account?

13     A     A brokerage account.

14     Q     So he was managing a brokerage account for

15  Ms. Markley.  Correct?

16     A     Yes.

17     Q     At that time, were you doing any work for

18  Ms. Markley?

19     A     No.

20     Q     Had you ever done any work for Ms. Markley?

21     A     No.

22     Q     Did you have any involvement of any nature

23  with the management of the brokerage account on behalf

24  of Ms. Markley?

25     A     No.

Page 27

1    himself.  Correct?

2        A    Yes.

3        Q    All right.  Sorry.  I'm trying to not

4    confuse D'Angelos here.  Do you have any understanding

5    of why Mr. Warshawsky gave that instruction in this

6    letter?

7        A    Only what I read in the letter.

8        Q    Okay.  And what is that?

9        A    Just in the first paragraph.  I think

10   it's -- "First and foremost, Ms. Markley expresses her

11   appreciation and gratitude for the legal and other

12   services which you have provided over the 25 years.

13           "However, circumstances regarding the -- the

14   relationship have -- have changed.  Ms. Markley no

15   longer wishes you to serve as her legal advisor or as

16   attorney in fact."

17       Q    Did the firm then retain counsel to

18   communicate with Mr. Warshawsky about the Markley

19   matter?

20       A    My father asked me to step in.

21       Q    Okay.  And did you thereafter act as counsel

22   for the firm with respect to Ms. Markley's matter?

23       A    I acted on behalf of my father,

24   George D'Angelo, yes.

25       Q    As counsel?

1      A    As counsel.

2      Q    When did you start acting as counsel for

3   your father with respect to Ms. Markley's matter?

4      A    Immediately.

5      Q    Okay.  So as of June 12, 2012?

6      A    Yes.

7      Q    Okay.  In the letter, Mr. Warshawsky writes

8   on behalf of Ms. Markley "We are also seeking an

9   accounting of your tenure as her attorney in fact but

10  not in any great level of detail, at last for now, of

11  the financial activities under your watch."  Do you

12  see that?

13     A    Yes.

14     Q    What did you understand Ms. Markley to be

15  requesting through that request?

16                MR. MCSHEA:  Objection to form.

17                You can answer.

18  BY MR. DIFEBBO:

19     Q    What did the firm understand?

20     A    Well, it's -- it's written, exactly what he

21  was requesting.  An accounting.

22     Q    Okay.  And what is an accounting?

23     A    Well --

24                MR. MCSHEA:  Objection to form.

25     A    It's -- it's I guess a record of receipts

Page 29

1    and disbursements.

2         Q    Did the firm have an understanding as of

3    June 12, 2012, as to why Ms. Markley was requesting an

4    accounting?

5         A    No.

6                   MR. MCSHEA:  Objection to form.

7         A    Sorry.  No.

8         Q    Did the fact that Ms. Markley requested an

9    accounting from the firm raise any concerns?

10        A    For me?  For George?

11        Q    For the firm.

12        A    Well, George is the -- the attorney for

13   Markley.  And with the change of counsel, one would

14   expect one to get an accounting.

15        Q    Okay.  Had the firm ever previously had a

16   client retain new counsel and request an accounting of

17   funds that were managed by the firm?

18        A    Not that I know.

19        Q    Okay.  So this was the first time, to your

20   knowledge, that that had ever happened?

21        A    Yes.

22        Q    Okay.  Did that raise any red flags?

23        A    No.

24                   MR. MCSHEA:  Objection to form.

25        A    I'm sorry.  No.

Page 31

1   case, and I believe in some of the briefing and
2   possibly interrogatory responses, that the reason that
3   you were retained to represent your father with
4   respect to Ms. Markley's request for an accounting was
5   to negotiate a settlement.  Is that generally a fair
6   statement?
7        A    No.
8        Q    Okay.  What was the purpose of the firm's
9   retention of you to represent it in connection with
10  Ms. Markley's matter?
11       A    Ms. Markley's new attorney requested that
12  all conversations be done through Counsel.  So
13  therefore, I was representing him as counsel.
14       Q    And at some point, did that representation
15  include attempting to negotiate a settlement with
16  Ms. Markley?
17       A    To resolve the accounting.
18       Q    And at any did you characterize that as a
19  settlement?
20       A    No.
21       Q    So you said that you were retained by your
22  father immediately upon receipt of this June 12, 2012,
23  letter.  What did you do next?
24       A    I contact -- I communicated -- I wrote a
25  letter, let's put it that way, to Mr. Warshawsky.

Page 32

1       Q    Okay.  Do you recall when that letter was?

2       A    Soon thereafter.

3       Q    All right, Mr. D'Angelo.  The document the

4    court reporter has handed you that we've marked

5    Exhibit Number 4 is a document that's Bates numbered

6    David D'Angelo 216.  It also has a Bates number

7    D'Angelo 2938.  Do you recognize this document?

8                   (Exhibit 4 was marked for

9                   identification.)

10      A    Yes.

11      Q    And is this a letter that you sent to

12   Mr. Warshawsky on August 30th of 2012?

13      A    It's a letter I sent to him.  Yes.

14      Q    Yes.  That was my question.  This is a

15   letter that you sent to him on that date.  Yes?

16      A    Right.

17      Q    So that's your signature on the document?

18      A    No.  It's actually my secretary's.

19      Q    It was signed on your behalf?

20      A    Yes.

21      Q    With your authorization?

22      A    Yes.

23      Q    All right.  Is this the first communication

24   that you had with Mr. Warshawsky in your capacity as

25   attorney for the firm?

Page 33

1        A     No.

2        Q     What was the first communication that you

3    had with Mr. Warshawsky?

4        A     A letter in response to his letter of

5    June 12th.

6        Q     What did your letter in response to his

7    letter of June 12th say?  Do you recall?

8        A     I don't recall.  Other than acknowledging

9    his letter and expressing -- well, if you have the

10   letter, I guess we can take a look at it.

11                   MR. DIFEBBO:  Let's go off the record

12   for a second.

13                   THE REPORTER:  It is 1:20 p.m., and

14   we're now off the record.

15                   (Off the record.)

16                   THE REPORTER:  It is 1:26 p.m., and

17   we're back on the record.

18                   You may proceed.

19   BY MR. DIFEBBO:

20       Q     Mr. D'Angelo, we'll come back to the letter

21   you referred to just before our short break.  But

22   turning back to Exhibit 4.

23                   This is now August of 2012, and you're

24   indicating to Mr. Warshawsky that the documentation is

25   with the accountants.  What documentation is it that

1  you were referring to there?

2      A    Basically pulling together the accounting

3  that they're requesting.

4      Q    Okay.  What documentation is it that you

5  sent to the accountants?

6      A    It would be all the records from UBS.

7      Q    What sort of records?

8      A    Statements.

9      Q    What accountants were you using for the

10  preparation of the accounting?

11      A    It was Steve -- Stephen Phillips.

12      Q    Was he someone that you retained

13  specifically for the purpose of preparing this

14  accounting, or did he do other work for you or your

15  father?

16      A    He had been doing work for my father, me, my

17  brother even, for years.

18      Q    Had he done any work prior to preparation of

19  the accounting that we're referring to with respect to

20  Lisa Markley?

21      A    I do not know.

22      Q    So as you sit here today, you just don't

23  recall one way or another whether he had ever done any

24  accounting work in conjunction with with the work that

25  your father did for Ms. Markley?

Page 35

1      A    I am unaware that he had done any accounting

2   work.  Maybe after the fact, I did find out that

3   Mr. Phillips did prepare maybe annual returns for

4   Lisa.  I think that's what it was.

5      Q    Okay.  Who was it that was the point of

6   contact with Mr. Phillips?  Was it you, your father,

7   someone else?

8      A    Both.

9      Q    And with respect to the Markley matter

10  specifically, who was it that retained Mr. Phillips to

11  prepare an accounting at Ms. Markley's request?

12     A    Both.

13     Q    When did you first contact Mr. Phillips in

14  that regard?

15     A    Soon after I received the letter.  The

16  original letter of June 12th.

17     Q    Okay.  So it would've been in June of 2012;

18  is that correct?

19     A    Yes.

20     Q    We'll go through the correspondence, but at

21  some point, you identified amounts that you came to

22  understand were owed to Ms. Markley.  Correct?

23     A    Yes.

24     Q    And was that in conjunction with the

25  accounting that was prepared by Mr. Phillips?

Page 38

1      Q    And I think that you said earlier that that

2  determination was made immediately, that amounts

3  needed to be paid back to Ms. Markley.  Correct?

4      A    No.

5      Q    Okay.  When did you determine that amounts

6  needed to be paid back to Ms. Markley?

7      A    It was an ongoing process.  As -- as we can

8  see in the letters, that we were going back and forth

9  with the accountants -- the accountant, and also with

10  Mr. -- Mr. Warshawsky.

11      Q    Okay.  And when did you first become aware

12  that any monies would need to repaid to Ms. Markley?

13      A    It's probably indicated in the

14  correspondence.

15      Q    We'll go through the correspondence.  I'll

16  return to this question.  Let's look back at Exhibit

17  4.  There's a handwritten note there, do you see that,

18  dated 10/4/12?

19      A    Yes.

20      Q    Do you recognize that handwriting?

21      A    It is mine.

22      Q    Okay.  Can you read that note for me?

23      A    "Spoke with Bruce.  Advised pending out

24  summary.  Advised shortfall will be reimbursed less

25  than 60 days.  Pleasant.  Glad resolved before year

Page 39

1    end."

2         Q    Okay.  What were you referring to in that

3    handwritten note by "shortfall"?

4         A    It had been determined that the accounting

5    showed that my father had taken more than apparently

6    the fees amount.

7         Q    Okay.  Do you recall as you sit here today

8    what the amount of shortfall was?

9         A    No.

10        Q    Okay.  All right.  So that handwritten note

11   is dated October 4, 2012.

12        A    Yes.

13        Q    Is it fair to say that by that point, you

14   had determined that there was a shortfall that needed

15   to be returned from your father to Ms. Markley?

16        A    That was the information I had.

17        Q    Okay.  When did you first become aware that

18   there was a shortfall that would need to be returned

19   to Ms. Markley?

20        A    I'd have to look at the correspondence with

21   the accountant.

22        Q    Has that been produced to us?

23        A    I don't know.

24        Q    Okay.

25                    MR. MCSHEA:  I don't know if it's been

Page 41

1   or your father and the accountant regarding

2   preparation of the accounting?  Accounting.

3      A    As -- as the accounting was being done, then

4   he would send me the accounting.  His conclusion.

5      Q    But aside from documents reflecting his

6   conclusions, was there correspondence between you and

7   the accountant regarding the process, regarding

8   additional information he needed, anything like that?

9      A    I don't recall specifically correspondence.

10   But there might've been conversations.

11      Q    Okay.  Do you recall any conversations with

12   the accountant where he advised you that there was a

13   shortfall that was going to need to be returned to

14   Ms. Markley?

15      A    He provided the accounting where it showed,

16   yes, that there was a shortfall.

17      Q    Okay.  And --

18      A    If you want to call it a shortfall.

19      Q    Well, you called it a shortfall.  Right?

20      A    I called it here in the letter.  Yes.

21      Q    Okay.  So I'm using your word.

22      A    Okay.

23      Q    All right.  When was the first time that you

24   learned that there was a shortfall?

25      A    Close to about the time of the letter.

Page 42

```
 1              MR. MCSHEA:  Well, I'm sorry.  There's

 2    two dates on the letter.

 3              THE WITNESS:  I -- oh.  I'm sorry.

 4    October 4, 2012.

 5    BY MR. DIFEBBO:

 6         Q    So it's your testimony that the first time

 7    you learned that there was a shortfall was close

 8    around the time of your handwritten October 4th note

 9    on Exhibit 4?

10         A    Yes.

11         Q    And do you recall how you first learned?

12    Whether it was in a conversation, in an email, in a

13    letter, something else?

14         A    Probably in an accounting that the

15    accountant had prepared.  A reconciliation, I guess.

16         Q    Did you, from time to time, have

17    conversations with Mr. Warshawsky about the status of

18    the preparation of the accounting?

19         A    I believe it was mostly in correspondence.

20         Q    All right, and the document we've marked as

21    Exhibit 5 is a one-page document with the Bates number

22    D'Angelo 2944.  Do you recognize this document?

23              (Exhibit 5 was marked for

24              identification.)

25         A    Not specifically, but it looks authentic.
```

Page 43

1        Q    Okay.  Does this appear to be a document or

2    a letter that you received on or about

3    September 25, 2012, from Mr. Warshawsky?

4        A    Yes.

5        Q    And you see that it's addressed to you.

6    Right?

7        A    Yes.

8        Q    Mr. Warshawsky writes that "It has been more

9    than over two months since we last spoke regarding the

10   accounting."  Do you see that?

11       A    Yes.

12       Q    So that suggests if he was writing this in

13   September, that you spoke with him about the

14   accounting sometime in July.  Do you have any

15   recollection of any such conversations?

16       A    No.  He may be referring to -- let's see.  I

17   wrote him in August.  So he -- the two-month period

18   might be referring back to his original letter.

19       Q    All right.  If you look at the third

20   paragraph, you'd see that Mr. Warshawsky writes "We

21   believe that something is terribly amiss, particularly

22   over the past few years."  Do you see that?

23       A    Yes.

24       Q    Did you have any understanding of what

25   Mr. Warshawsky was referring to when he wrote that?

Page 44

1      A    I didn't know what his intention was in

2    stating that.

3      Q    You see that he says "We require a review of

4    the accounting which we have requested to determine

5    what, if any, action we need to take"?  Do you see

6    that?

7      A    Yes.

8      Q    All right.  Was it your understanding, at

9    the time of this letter in September of 2012, that

10   Mr. Warshawsky was contemplating taking legal action

11   with regard to amounts that Ms. Markley believed were

12   due to her from your father or the firm?

13                MR. MCSHEA:  Objection, form.

14     A    I believe what we were trying to do is get

15   to an accurate accounting and transfer of

16   representation.

17     Q    Okay.  All right.  And you understood by

18   this time that -- well, strike that.

19          I think we saw in the last exhibit that by

20   about October 4th, which is about two or so weeks

21   after the September 25th letter, you had determined

22   that there were amounts that were due to Ms. Markley.

23   Correct?

24     A    Yes.

25     Q    And it's your understanding or was it your

Page 45

1   understanding that Ms. Markley was making a demand for

2   those monies?

3       A    She was entitled to those monies.

4       Q    And Mr. Warshawsky was writing to you and

5   saying we need to determine what action we need to

6   take.  Did you understand that to be a demand for a

7   return of monies that Ms. Markley believed to be due

8   to her?

9               MR. MCSHEA:  Objection.  You omitted

10  the words "if any."  Objection to form.

11      A    I'm sorry.  Ask the question again, please?

12      Q    Sure.  Mr. Warshawsky was writing to you in

13  September and saying that:  "Something is terribly

14  amiss, particularly over the past few years.  We

15  require a review of the accounting, which we have

16  requested to determine what, if any, action we need to

17  take."  Do you see that?

18      A    Yes.

19      Q    Was it your understanding, at the time you

20  received this, that Mr. Warshawsky was making a demand

21  for a return of monies that were due to Ms. Markley?

22      A    Yes.  He was impatient, as you can see from

23  his other letter, and he wanted to resolve this

24  promptly and get a true and accurate accounting.

25      Q    Exhibit 7 is a one-page document with Bates

Page 46

1  number D'Angelo --

2           MR. MCSHEA:  Six or 7?  Sorry.  Am I --

3  sorry.  Is that 6?

4           THE REPORTER:  This is 6.

5           MR. DIFEBBO:  Thank you.

6  BY MR. DIFEBBO:

7     Q    Exhibit 6 is a one-page document with Bates

8  number D'Angelo 0113.  Do you recognize this document,

9  sir?

10          (Exhibit 6 was marked for

11          identification.)

12    A    Yes.

13    Q    All right.  And what is this?

14    A    My correspondence to Mr. Warshawsky.

15    Q    Okay.  And this correspondence was on

16  October 5, 2012; is that right?

17    A    Yes.

18    Q    And in this letter, you're transmitting a

19  summary of disbursements prepared by the accountant.

20  And you say "As we discussed, this summary shows an

21  overpayment of commissions in the amount of

22  $499,135.32."  Do you see that?

23    A    Yes.

24    Q    All right.  When you say "summary of

25  disbursements," was that the accounting that we've

Page 47

1    been referring to?

2        A    Yes.

3        Q    And you say that that accounting showed an

4    overpayment of commissions in the amount of

5    499,135.32.  What were you referring to when you said

6    "commissions"?

7        A    It actually included legal fees,

8    commissions, all payments made to my father or that my

9    father had taken.

10       Q    Did you say -- I'm sorry.  Did you say

11   payments made to your father or that your father had

12   taken?  Or "and" that your father had taken?

13       A    And that my father had taken.

14       Q    Okay.  So this October 5th letter is the day

15   after the handwritten note that we saw on the prior

16   exhibit?

17       A    My handwritten note?

18       Q    Correct.  The handwritten note that we saw

19   on Exhibit --

20       A    Yes.

21       Q    -- 4.  Right?  Did you have any

22   conversations with Mr. Warshawsky in or around

23   October 4th or October 5th of 2012?

24       A    Yes.

25       Q    Okay.  And what was the nature of those

Page 48

1   conversations?

2       A    Just as stated in the record -- in the

3   letter.  The note -- in the note, I said he was

4   pleasant, glad to have this resolved before year end.

5   And we were talking about the shortfall.  And later

6   followed up that conversation the next day.

7       Q    Was there any point in and around this time

8   period, October 2012, September 2012, where

9   Mr. Warshawsky advised you that you should put your

10  carrier on notice of a potential claim?

11      A    No.  I don't recall that.

12      Q    Okay.  Do you recall Mr. Warshawsky ever

13  having a conversation where he advised you you should

14  put your carrier on notice?

15      A    I don't know about a conversation, but I

16  think he did in the letter.

17      Q    I have a document we've marked as Exhibit 7.

18  It is a one-page document, D'Angelo 1800, dated

19  June 28, 2012.  Have you had a chance to look at this

20  document, sir?

21                (Exhibit 7 was marked for

22                identification.)

23      A    Yes.

24      Q    All right.  And earlier I had asked you

25  about what your, you know, first communication and

Page 49

1    response to Mr. Warshawsky was following the

2    June 12, 2012, letter.

3                Is this document we've marked as Exhibit 7

4    your initial communication with Mr. Warshawsky?

5         A    Yes.

6         Q    And that's your signature on the document?

7         A    Yes.

8         Q    Okay.  Put that aside.

9                All right.  So the document that we've

10   marked Exhibit 8 is a two-page document.  The Bates

11   number is a little obscured.  Believe it's D'Angelo

12   1385, 1386.  Let me know when you've had a chance to

13   look over the document.

14                     (Exhibit 8 was marked for

15                      identification.)

16        A    Okay.

17        Q    All right.  Do you recognize this document?

18        A    Yes.

19        Q    All right.  What is this?

20        A    Oh, this is the document where you had made

21   reference to his advising us to put our malpractice

22   carrier on notice.

23        Q    All right.  And so this is a letter that you

24   received from Mr. Warshawsky in response to your

25   October 5, 2012, letter forwarding the accounting.

1    Correct?

2        A    Yes.

3        Q    All right.  Do you see that Mr. Warshawsky

4    was indicating that the information that you had

5    provided on October 5th was wholly insufficient for

6    them to conduct a meaningful analysis of the account?

7        A    Yes.

8        Q    And he also indicates that "The disclosures

9    reveal the apparent breach of a fiduciary duty

10   committed by your father."  Do you see that?

11       A    Yes.

12       Q    And at the end of that paragraph, as you

13   noted a moment ago, he indicates "I expect that you

14   will place your malpractice carrier on notice

15   regarding Ms. Markley's potential claim."  Do you see

16   that?

17       A    Yes.

18       Q    All right.  You didn't place Allied World on

19   notice of a potential claim in October 2012, did you?

20       A    I did previously.

21       Q    Previous to October 2012?

22       A    Yes.

23       Q    When did you first place Allied World on

24   notice?

25       A    June 12, 2012.

Page 51

1      Q    And how did you do that?

2      A    I communicated to the office.

3      Q    So it's your testimony today that June of

4    2012 was the initial notice that you provided to

5    Allied World of a potential claim?

6      A    I believe so.  Unless I'm mistaken.

7      Q    You applied for the Allied World policy in

8    August of 2012.  Correct?

9      A    Then maybe my dates are wrong.  Do you have

10    our -- do you have a copy of my letter to the carrier?

11      Q    I do.

12      A    Okay.

13      Q    We'll look at that in a moment.

14      A    Okay.

15      Q    But before we get there, let me ask you.

16    Did you provide notice to another carrier in June of

17    2012 upon receipt of the initial letter from

18    Mr. Warshawsky?

19      A    I -- I wouldn't have.

20      Q    Why not?

21      A    I would send it to the carrier that's

22    currently covering us.

23      Q    Well, in June of 2012, you had another

24    carrier.  Correct?

25      A    I guess it wasn't -- I'm -- I don't recall.

```
 1   BY MR. DIFEBBO:

 2        Q    All right, sir.  Exhibit 9 is a document

 3   with Bates number D'Angelo 3150.  Do you see that?

 4                 (Exhibit 9 was marked for

 5                  identification.)

 6        A    Yes.

 7        Q    All right.  And what is this document?

 8        A    It appears to be an email to Darwin National

 9   Assurance Company, notice of a potential claim.  So

10   this is what I was referring to.  I was mistaken.

11        Q    Okay.  So it's your testimony then that this

12   document that we've marked as Exhibit 9 is the initial

13   notice of claim that you presented to Darwin, now

14   known as Allied World, with respect to the Markley

15   matter.  Correct?

16        A    Yes.

17        Q    All right.  So getting back to my question

18   about documents and retention of documents.

19   Communications like this document that we've marked as

20   Exhibit 9, are those documents that you currently

21   maintain?

22        A    Yes.

23        Q    Okay.  How are they maintained?

24        A    In a file on the computer.

25        Q    Okay.  An electronic file, hard copy file,
```

Page 56

1    Exhibit 8, Mr. Warshawsky was advising you on

2    October 9, 2012, to place your malpractice carrier on

3    notice regarding Ms. Markley's potential claim.

4    Correct?

5         A    Yes.

6         Q    You did not place Allied World on notice of

7    a potential claim in October 2012, did you?

8         A    No.

9         Q    Okay.  And you didn't do it in November or

10   December of 2012.  Right?

11        A    No.

12        Q    You didn't do it in January of 2013?

13        A    No.

14        Q    Okay.  And you wanted until February 11th of

15   2013.  Right?

16        A    Yes.

17        Q    Okay.  Why didn't you place Allied World on

18   notice of this potential claim at the time of

19   Mr. D'Angelo -- I'm sorry -- Mr. Warshawsky's letter

20   in October of 2012?

21        A    We were resolving the accounting and the

22   transfer of the accounts.

23        Q    But Mr. Warshawsky's October 9, 2012, letter

24   indicated that there was an apparent breach of

25   fiduciary duty by your father.  Correct?

Page 57

1      A     That's what he stated.

2      Q     Okay.  Well --

3      A     In his letter.

4      Q     Is it surprising you that Ms. Markley

5   believed that there was a potential claim that went

6   beyond mere accounting; correct?

7                    MR. MCSHEA:  Objection to form.

8      A     We were resolving the accounts and the

9   transfer of the accounts.  I believe that's what we

10  were talking about.

11     Q     All right.  But as of October 9th,

12  Mr. Warshawsky was talking about a breach of fiduciary

13  duty.  Right?

14     A     I still believe we were working to get the

15  fair and correct accounts between the parties.

16     Q     So is it your testimony that even though

17  Mr. Warshawsky advised you that there was an apparent

18  breach of fiduciary duty and advised you to place your

19  carrier on notice, at that time you still understood

20  the nature of the dispute to be limited to an

21  accounting?

22     A     Yes.

23     Q     That's your testimony?

24     A     Yes.

25     Q     What changed in February of 2013?

Page 58

1      A    I -- I assume we received the summons.  But

2   that would be documented.

3      Q    All right.  The document that we have marked

4   as Exhibit 10 is a document with Bates number D'Angelo

5   3136 through 3144.

6            And as I look through it, I've noticed that

7   there's some gray highlighting on there, and I'll just

8   state for the record I believe that's my office's

9   highlighting and not part of the original as it was

10  produced to us.

11           Let me know when you've had a chance to look

12  through Exhibit 10.

13                    (Exhibit 10 was marked for

14                    identification.)

15     A    I see it.

16     Q    This document, as we've marked it, appears

17  to be a thread of emails back and forth between you

18  and Mr. Warshawsky.  Correct?

19     A    Yes.

20     Q    All right.  If we start from the back, there

21  is a December 22, 2012, email from Mr. Warshawsky to

22  you.  You see that?

23     A    Yes.

24     Q    It's on Bates page D'Angelo 3143.  Here,

25  Mr. Warshawsky writes:  "It seems pretty obvious to me

Page 59

1    that we have a rather significant problem on our

2    hands.  When we spoke in early autumn, I told you that

3    you needed to put your carrier on notice.  Have you

4    done so?"  Do you see that?

5                    MR. MCSHEA:  Where are you looking at,

6    Mike?

7    BY MR. DIFEBBO:

8        Q    I'm sorry.  It's on page 3143, roughly the

9    middle of the page.  The second and third paragraph of

10   Warshawsky's email.

11       A    Yes.

12       Q    Okay.  And again, you did not put Allied

13   World on notice at that time, did you?

14       A    No.

15       Q    Why not?

16       A    We were still resolving the accounting.  The

17   correct amount of the accounting.

18       Q    Okay.  Do you see later in that email that

19   Mr. Warshawsky writes -- it's in the second to last

20   paragraph of the email, highlighting by our office:

21   "Therefore, I think we can safely say that

22   approximately 1.7 million would be our claim."  Do you

23   see that?

24       A    Yes.

25       Q    That was substantially more than the amount

Page 60

1    reflected in the accounting.  Correct?

2          A    Yes.

3          Q    All right.  What was your understanding of

4    what Mr. Warshawsky's basis was for asserting that the

5    amount of their claim would be $1.7 million?

6          A    He disagreed.

7          Q    Okay.  Would you agree with me that

8    Mr. Warshawsky's December 22nd email was a request for

9    monetary compensation from or on behalf of Ms. Markley

10   to you as the attorney for your father?

11                    MR. MCSHEA:  Objection to form.

12   BY MR. DIFEBBO:

13         Q    Do you understand the question?

14         A    Yes.  The -- the whole thread, the import of

15   the whole thread, was to get a true and accurate

16   accounting between the parties.  The figures had still

17   not been determined.

18         Q    All right.  So December 22nd is about two

19   and a half months after Mr. Warshawsky had written to

20   you and advised you that there was an apparent breach

21   of fiduciary duty.  Right?

22         A    Yes.

23         Q    And now he's telling you as counsel for your

24   father, that Ms. Markley was owed $1.7 million.

25   Right?

1      A    That's what he writes.

2      Q    Okay.  At that point in December of 2012,

3   were you willing to pay Ms. Markley $1.7 million?

4      A    December 22nd?

5      Q    Yeah.

6      A    No.  That did not reflect a true and

7   accurate accounting between the parties.

8      Q    But you recognize that that's what they were

9   claiming was owed.  Right?

10     A    That's what he claims.

11     Q    And yet you still didn't provide notice to

12  Allied World even though Mr. Warshawsky had now twice

13  advised you to do so?

14     A    No.  Our goal was to get a -- again, a true

15  and accurate accounting between the parties.

16     Q    Did you have an understanding by that time,

17  December of 2012, that Mr. Warshawsky would or was

18  likely to implement a lawsuit on behalf of Ms. Markley

19  if you were unable to resolve that dispute?

20               MR. MCSHEA:  Can I hear that back?  I'm

21  sorry.

22               THE REPORTER:  Want me to play that

23  back?

24               MR. MCSHEA:  Please.

25               THE REPORTER:  Yes.  Please hold.

Page 62

1                    (The reporter repeated the record as

2                    requested.)

3                    THE REPORTER:  Is that sufficient?

4                    MR. DIFEBBO:  Was there an objection?

5                    MR. MCSHEA:  No.  I just wanted to hear

6      it back.

7                    MR. DIFEBBO:  Okay.

8                    THE WITNESS:  No.

9      BY MR. DIFEBBO:

10        Q     When did you first come to understand that

11     Mr. Warshawsky would -- I'm sorry.  Let me rephrase

12     it.

13            When did you first come to understand that

14     Ms. Markley would institute a lawsuit against your

15     father or D'Angelo & Eurell?

16        A     When we received the summons.

17        Q     Not before?

18        A     Not before.

19        Q     On the page with Bates Number D'Angelo 3144,

20     right underneath the paragraph we were just looking

21     at, there's a paragraph that starts with "At this

22     juncture."  Let me know when you're there.

23        A     Yeah.  The very last paragraph.  Okay.

24        Q     Mr. Warshawsky writes or wrote "At this

25     juncture, I'll await your response, but we cannot wait

Page 63

1    much longer before proceeding."  Do you see that?

2         A    Yes.

3         Q    And you read that when you received it.

4    Right?

5         A    Yes.

6         Q    And you understood that when he said "before

7    proceeding," that he meant commencing a lawsuit.

8    Right?

9         A    He meant we want to get some resolution of

10   the accounting.

11        Q    And that if you didn't resolve the

12   accounting, that he would be proceeding with a

13   lawsuit.  Right?

14        A    I don't know what his intention was insofar

15   as using the words "proceeding."  Nor do I know that

16   he had an actual -- had an actual intention of

17   proceeding in whatever form that would take.

18             What our interests were, our common

19   interests were, were to get the correct figures

20   between the parties.

21        Q    All right.  So if we turn to page 3142.

22   You wrote back to Mr. Warshawsky on December 27th, and

23   you said that you would get back to him after you had

24   reviewed them with the appropriate parties.  Do you

25   see that?

Page 64

1       A    Yes.

2       Q    Who were the appropriate parties that you

3    were referring --

4       A    I don't know which -- what was his -- the

5    appropriate parties would be my father,

6    George D'Angelo, and the accountant.

7       Q    Okay.  And that was Mr. Phillips.  Right?

8       A    Yes.

9       Q    Is Mr. Phillips still alive?

10      A    Yes.

11      Q    Do you still use him as an accountant?

12      A    Yeah.

13      Q    All right.  Without going through each of

14   these emails line by line, is it fair to say that over

15   the course of December and January '23, you had a

16   back-and-forth with Mr. Warshawsky?

17      A    Yes.

18      Q    Okay.  And the back-and-forth was over a

19   dispute at least in part related to a return of fees

20   that had been collected by your father.  Correct?

21      A    Yes.

22      Q    There is reference in this back-and-forth

23   about the closing of the house.  Do you have a

24   recollection of what that was about?

25      A    Just from the back-and-forth.

Page 65

1    Q    Okay.  Do you have an independent

2  recollection of that?

3    A    No.

4    Q    So is it then fair to say that whatever

5  information D'Angelo & Eurell has regarding the

6  closing of the house is what is reflected in the

7  documents that have been produced in this case?

8    A    Yes.

9    Q    All right.  Let's look at page 3138.  You

10  see the line that we've highlighted there is in a

11  January 16, 2013, email from Mr. Warshawsky, and it

12  says "I have been very patient, but that patience is

13  wearing thin"?

14    A    Yes.

15    Q    All right.  Did you understand by

16  January 16th of 2013, that this matter was likely to

17  end up in litigation if you didn't reach a resolution?

18    A    No.

19              MR. MCSHEA:  Objection to form.

20    A    Sorry.  No.

21    Q    What was your understanding of

22  Mr. Warshawsky's statement "I have been very patient,

23  but that patience is wearing thin"?

24    A    With all the back-and-forth, we were trying

25  to get the accurate figures.  You could see the whole

Page 66

1   string had to do with different figures.  So we had to

2   arrive at the accurate figures before we can do a -- a

3   transfer.

4       Q    Do you recall what the figure was that you

5   ultimately arrived at?

6       A    I believe it was referenced earlier.  But it

7   turned out that that figure was incorrect.

8       Q    We saw a figure earlier that the initial

9   accounting had showed roughly 499,000 was due to

10  Ms. Markley.

11      A    Yes.  And that was back in October or so.

12  And then now, related to Exhibit D'Angelo 10, shows

13  more back-and-forth, back-and-forth, on figures,

14  because we found out that the figures were not

15  correct.  So Mr. Warshawsky and I were trying to

16  arrive at the correct figures.

17      Q    And Mr. Warshawsky was also indicating that

18  there had been apparent breach of fiduciary duty.

19  Correct?

20      A    He -- he --

21              MR. MCSHEA:  Objection, asked and

22  answered.

23      A    He -- he made that statement in a -- an

24  email or letter.

25              MR. DIFEBBO:  Let's mark the page with

Page 67

1   the text on it, not the page that says Exhibit 10.

2   And then I'll explain.

3                   THE REPORTER:  Wait --

4                   MR. DIFEBBO:  Mark it on this side.

5                   THE REPORTER:  Right here.  Good?

6                   MR. DIFEBBO:  Yeah.

7   BY MR. DIFEBBO:

8       Q    All right.  So in the interest of hopefully

9   avoiding confusion, what we've marked as deposition

10  Exhibit 11 is, I believe, from your production, and I

11  believe it was an exhibit to summary judgment briefing

12  in the underlying case.

13          And so the first page of the document says

14  Exhibit 10, but it is our deposition Exhibit 11.  And

15  it is -- on the page that has Bates Number D'Angelo

16  one four -- I believe it's eight five, it says

17  "Markley's exhibits in opposition of summary judgment

18  000131."

19          On that page, there is a February 6, 2013,

20  email from Mr. -- I'm sorry -- from Mr. D'Angelo to

21  Mr. Warshawsky.  Do you see that, Mr. D'Angelo?

22                  (Exhibit 11 was marked for

23                  identification.)

24                  MR. MCSHEA:  So just to clarify, this

25  is a document that was used by Lisa Markley's counsel

Page 68

```
 1   as an exhibit to Markley's opposition to my client's
 2   motion for summary judgment in the Philadelphia County
 3   Court of Common Pleas.
 4               MR. DIFEBBO:  And that's where the
 5   Exhibit 10 designation comes from.  Right?
 6               MR. MCSHEA:  Correct.
 7               MR. DIFEBBO:  Okay.  I just want it to
 8   be clear on this record that that's not our deposition
 9   exhibit.
10               MR. MCSHEA:  Right.
11   BY MR. DIFEBBO:
12       Q    All right.  Have you had a chance to look at
13   the email, sir?
14       A    Yes.
15       Q    All right.  Can you tell me what this
16   document represents?
17       A    It represents -- well, we had come to a
18   conclusion as to how -- how the accounting -- what --
19   what the accounting showed, as to how much monies are
20   due.
21       Q    And if you look at the fifth paragraph of
22   the email, which is a single line, that says "The
23   outline of the settlement proposal is as follows."  Do
24   you see that?
25       A    Yes.
```

Page 71

1      A     That's what he referenced at that -- at that

2  time.

3      Q     And you were trying to resolve that dispute

4  by way of a settlement that's reflected in Exhibit 11.

5  Correct?

6                    MR. MCSHEA:  Objection to form, asked

7  and answered.

8      A     Yes.  We -- we were trying to -- yes,

9  insofar as we were trying to get the accurate figures.

10  That's why we kept going back and forth.

11      Q     Exhibit 12 is an email string.  The document

12  Bates number is D'Angelo 3147 through D'Angelo 3149.

13  Let me know when you've had a chance to read through

14  it, sir.

15                    (Exhibit f12 was marked for

16                    identification.)

17      A     Yes.

18      Q     All right.  So do you see that at the end of

19  this document is the same February 6th email from you

20  to Mr. Warshawsky that we've been looking at

21  previously?  That was Exhibit 11.

22      A     The -- yes.

23      Q     And then on February 7th, at 10:24, there is

24  a response from Mr. Warshawsky to you.  Correct?

25      A     Yes.

Page 72

1      Q    And he notes in that February 7th,

2   10:24 a.m. email that your quote/unquote offer has

3   decreased from 563,000 to about 315,000.  Do you see

4   that?

5      A    Yes.

6      Q    All right.  Was that an accurate statement

7   on his part of what you were willing to pay to resolve

8   your dispute?

9      A    I don't know the figure specifically, but it

10  sounds correct.

11     Q    Okay.  And then he goes on to say "Our claim

12  is 1.7 million as set forth in my email of 12/22 at

13  9:22 a.m."  Do you see that?

14     A    Yes.

15     Q    All right.  So we had talked a little bit

16  about whether he was making a demand.  Does seeing

17  this sentence where he says "Our claim is 1.77 [sic]

18  million" -- would you agree that Mr. Warshawsky was

19  making a demand on behalf of Ms. Markley for

20  $1.7 million?

21          MR. MCSHEA:  And just for the record,

22  the point of my objection earlier was that the date of

23  the claim that you alluded to was December 12, 2012,

24  in which the sender of the email says approximately

25  1.7 million would be their claim.

Page 73

1                        MR. DIFEBBO:  Okay.

2                        MR. MCSHEA:  And this is now two months

3     later --

4                        THE REPORTER:  Is this also an

5     objection?  Yes?

6                        MR. MCSHEA:  Yeah, that was just

7     clarifying a comment I made on the record earlier,

8     just so you understand the basis of my objection.

9                        THE REPORTER:  Okay.

10                       MR. MCSHEA:  I'm not trying to make

11    speaking objections.  I'm just trying to understand

12    that claims are asserted at different times.

13    BY MR. DIFEBBO:

14        Q    Mr. D'Angelo.

15        A    Yes.

16        Q    Do you agree with me that as of February 7th

17    of 2013, there was a claim being asserted against your

18    client for $1.7 million?

19        A    He certainly states our claim is

20    1.7 million.

21        Q    And then on the -- turning back to the first

22    page of the exhibit, on February 8th, he writes "We

23    are at the end of the line in negotiating a global

24    resolution and are prepared to act accordingly."  Do

25    you see that?

Page 74

1      A     Yes.

2      Q     All right.  Did you understand by

3    February 8, 2013, that this matter was likely to

4    result in litigation?

5      A     He had made many different assertions along

6    the way, and we continued to try and resolve it and

7    get the correct -- get the correct figures.  So at

8    this point, I really didn't know what he was going to

9    do.

10                MR. DIFEBBO:  We've been going for a

11    while.  Do you want to take a short break?

12                MR. MCSHEA:  Yeah, I'm trying to get a

13    brief filed.  I'm listening, but I've got to let

14    people be alerted to what's going on.

15                THE REPORTER:  Okay.  It is 2:27 p.m.,

16    and we are now off the record.

17                (Off the record.)

18                THE REPORTER:  The time is 2:49 p.m.,

19    and we're back on the record.

20                You may proceed.

21    BY MR. DIFEBBO:

22      Q     All right.  Mr. D'Angelo, just before our

23    break, we had been looking at Exhibit 12, and we had

24    been looking at the statement in Mr. Warshawsky's

25    February 7th email that their claim was 1.7 million.

Page 75

1           Then in the last email in that thread from
2   February 8, 2013, Mr. Warshawsky wrote to you and said
3   "We are at the end of the line in negotiating a global
4   resolution and are prepared to act accordingly."  Do
5   you see that?
6       A   Yes.
7       Q   Earlier today we had looked at Exhibit 9,
8   which was your Monday, February 11th, notice to Allied
9   World.  Does this February 8th email from
10  Mr. Warshawsky refresh your recollection as to why you
11  elected to provide notice on February 11, 2019?
12      A   No.  No.
13      Q   Exhibit 13 is a document Bates numbered
14  Allied World 0000758, and it's a February 12, 2013,
15  letter from Allied World to Mr. D'Angelo.  And my only
16  question to you sir, is:  Do you recognize this as a
17  letter you received on or about February 12, 2013 from
18  Allied World?
19                  (Exhibit 13 was marked for
20                  identification.)
21      A   Yes.
22      Q   All right.  This was an acknowledgment that
23  you had submitted notice of a potential claim.  Right?
24      A   Yes.
25      Q   I'm sorry.  I lied.  I do have one other

1    question.  Do you see in the letter, it says "This

2    matter has been assigned to Gale S. Dwyer for review

3    and handling"?

4         A    Yes.

5         Q    All right.  So that was your understanding,

6    that was the claims handling that Allied World had

7    assigned?

8         A    Yes.

9         Q    And Exhibit 14 is a document with Bates

10   Number Allied World 0001018.  Do you see that this is

11   an email from Gale Dwyer to you?

12                   (Exhibit 14 was marked for

13                    identification.)

14        A    Yes.

15        Q    All right.  And it says:  "Please call me at

16   your earliest convenience.  I would like some more

17   information related to this claim."

18        A    Yes.

19        Q    Did you have that telephone conversation?

20        A    I don't recall.

21        Q    Just keep Exhibit 14 in front of you for one

22   moment.

23        A    Sure.

24        Q    And we've handed you what's been marked as

25   Exhibit 15, which is Bates numbered Allied World

Page 77

1   0001027 through 1039.  And this is an email from you

2   to Gale Dwyer.  Do you see that?

3                    (Exhibit 15 was marked for

4                    identification.)

5       A    The first page?

6       Q    Yeah.

7       A    Okay.

8       Q    In Exhibit 14, which is the prior exhibit,

9   that document says "Please forward any relevant

10  documents to my attention, demand letter, grievance,

11  complaint, and/or civil complaint, and/or any other

12  correspondence from Ms. Markley or her attorney."

13          Was what we've marked as Exhibit 15 your

14  response to that request?

15      A    Appears to be.

16      Q    All right.  So if you look through what you

17  submitted to Allied World on Thursday,

18  February 21, 2013, as reflected in Exhibit 15, it's

19  the same emails that we have been looking at in the

20  prior exhibits.  Right?

21      A    Yes.

22      Q    No complaint or written summons at this

23  stage.  Correct?

24      A    Correct.

25      Q    All right.  Am I correct that you had

Page 78

1    determined, based on the state of your correspondence

2    with Mr. Warshawsky, that you had determined, based on

3    that correspondence, to submit notice of a potential

4    claim to Allied World?

5        A    I don't recall.  When was the -- the summons

6    served?

7        Q    I can find that for you, but I believe it

8    was after February of 2013.  I believe I've seen

9    the -- this is from my memory, so don't -- I believe

10   April 5th?

11       A    April 5th?

12       Q    Yeah, I was going to say, I think I remember

13   seeing the summons reissued in April of 2013.

14       A    Okay.

15            MR. MCSHEA:  Well, it was filed

16   April 5th, but you reissued it in June.

17            MR. DIFEBBO:  Okay.

18            THE WITNESS:  Okay.  I'm sorry.  What

19   was your question?

20   BY MR. DIFEBBO:

21       Q    Am I correct, based on the documentation

22   that we've marked as Exhibit 15, that you had

23   determined to submit a claim to Allied World based on

24   the state of the correspondence between you and

25   Mr. Warshawsky?

1       A    That's what I did.

2              MR. MCSHEA:  Yeah, I think your earlier

3    question used the term "potential claim."

4    BY MR. DIFEBBO:

5       Q    In Exhibit 9, which is your email to Allied

6    World, you said "I am writing to provide notice of a

7    potential claim for damages."  Correct?

8       A    Where are we?  Hold on.  Yes.

9       Q    But then if you look further down in Exhibit

10   9 in the last paragraph, you'd said "Kindly provide

11   coverage and a defense to this claim."  Correct?

12      A    Yes.

13      Q    All right.  So when you submitted notice to

14   Allied World in February of 2013, February 11th, was

15   it your expectation that Allied World would assign

16   counsel to defend the matter as it stood at that time?

17      A    Yes.

18      Q    And you expected Allied World to handle this

19   as a claim.  Correct?

20      A    I guess it's a -- a definition of what

21   "claim" is.  But step in.

22      Q    In your notice email in Exhibit 9, you used

23   a capital C when you said "Kindly provide coverage and

24   a defense to this claim."  What were you referring to

25   when you used the word "claim" there?

Page 80

1      A    Maybe the policy.

2      Q    Was your intention to characterize "Claim"

3   with a capital C as being the equivalent of the way

4   the policy defined "claim"?

5      A    It probably has a capital C.  Yeah.

6      Q    And you expected Allied World to provide a

7   defense at that time.  Right?

8      A    Yes.

9      Q    The document we've marked as Exhibit 16 has

10  a Bates number of Allied World 0000929 through 930.

11  Let me know when you've had a chance to review it.

12                (Exhibit 16 was marked for

13                identification.)

14     A    Yes.  I -- I just see the one email from

15  Warshawsky.

16     Q    Right.  It's a two-page --

17     A    Oh, uh-huh.

18     Q    -- document.

19     A    It's double-sided.  All righty.

20     Q    So it starts with a February 13th email from

21  you to Mr. Warshawsky and then another email from you

22  and then an email from Mr. Warshawsky?

23     A    Right.  Okay.

24     Q    All right.  Let's look at your February 13th

25  email.  This was two days after you provided notice to

1    World?

2         A    No.

3         Q    Did Allied World assign defense counsel?

4         A    I -- I -- no.

5         Q    And do you know why not?

6         A    They -- they didn't.

7         Q    The document we have marked as Exhibit 17

8    bears a Bates number of D'Angelo 6485 through 6489 and

9    is a March 13, 2013, letter from Allied World.  Let me

10   know when you've had a chance to review this letter,

11   sir.

12              (Exhibit 17 was marked for

13              identification.)

14        A    I reviewed it.

15        Q    Okay.  You've seen this letter before.

16   Correct?

17        A    Yes.

18        Q    This is a letter that you received from

19   Allied World via email on March 13, 2013?

20        A    Yes.

21        Q    Okay.  And do you recognize that this is

22   Allied World's coverage determination with respect to

23   the Markley matter?

24        A    Yes.

25        Q    And in the first paragraph of this letter,

Page 84

1    Gale, G-A-L-E, Dwyer writes to you and says

2    "Regretfully, we must inform you that coverage is not

3    available for this matter for the reasons set forth

4    below."  Do you see that?

5        A    Yes.

6        Q    All right.  And you understood that this was

7    a declination of coverage by Allied World for the

8    Markley matter.  Correct?

9        A    At that point.

10       Q    And you understood that based on this

11   declination of coverage, that Allied World would not

12   be assigning counsel for that matter.  Correct?

13       A    At that point.

14       Q    So is that a "yes"?  You understood that

15   when you received this?

16       A    At that point.  However, it was evolving.

17   The issue was evolving.  They wanted more information.

18   If you look at -- sorry.

19       Q    No, there's no question pending.

20       A    Okay.

21       Q    My question to you is --

22            MR. MCSHEA:  Well, he can complete his

23   answer, though.

24   BY MR. DIFEBBO:

25       Q    Did you complete your answer, sir?

Page 90

1        A    Yes.  And -- and more.

2        Q    And the first of those listed in this

3    interrogatory was March 29, 2013.  Right?

4        A    That's what it has here.

5        Q    Well, was that interrogatory response

6    accurate at the time it was made?

7        A    Yes.

8        Q    All right, sir.  Exhibit 19 is a

9    March 29, 2013, letter from Wiley Rein, Bates Number

10   D'Angelo 3154 through D'Angelo 3159.  Let me know when

11   you've had a chance to look at that.

12                 (Exhibit 19 was marked for

13                  identification.)

14       A    I have.

15       Q    And that is the March 29, 2013, letter from

16   Wiley Rein that is indicated in the interrogatory

17   responses that we've marked as Exhibit 18 as a denial

18   of coverage.  Correct?

19       A    Yes.

20       Q    And so would you agree with me that the

21   March 29, 2013, letter that we've marked as Exhibit 19

22   is a denial of coverage from Allied?

23       A    No.  It's a -- an invitation to continue

24   sending information so that they can evaluate whether

25   they should cover the -- the action.

Page 91

1        Q    So am I to understand, sir, that you told

2    the Markley plaintiffs in the interrogatory responses

3    that we've marked as Exhibit 13 that Allied World had

4    denied coverage via this March 29, 2013, letter, but

5    that you are testifying today that the March 29, 2013,

6    letter was not a denial of coverage?

7        A    It was a denial at that time.  However,

8    there was still an invitation to send information to

9    see whether coverage could apply.  I'll direct your

10   attention to the last page.  Conclusion.

11       Q    The interrogatory responses that we're

12   looking at as Exhibit 18 were from six years after the

13   March 29th letter.  Right?  They're served on

14   April 16, 2019.  Correct?

15       A    It is what it is.

16       Q    Okay.  So six years after the

17   March 29, 2013, letter was sent, you characterized the

18   interrogatory responses that you verified as a denial

19   of coverage.  Correct?

20       A    Yes.

21       Q    Your interrogatory response did not make any

22   reference to any ongoing investigation or any

23   indication that the claim was still open, did it?

24       A    No, I disagree.

25              MR. MCSHEA:  Objection to form.

Page 93

1      A     The letters, yes.  Those letters and others.

2                MR. DIFEBBO:  Twenty?

3                THE REPORTER:  Yes.

4    BY MR. DIFEBBO:

5      Q     All right, sir.  Exhibit 20 is a document

6    bearing -- Bates numbered Allied World 0000931 through

7    932.  Let me know when you've had a chance to review

8    it.

9                (Exhibit 20 was marked for

10               identification.)

11     A     I reviewed it.

12     Q     All right.  And you see at the bottom of

13   this exhibit is a March 13th letter from Gale -- I'm

14   sorry -- email from Gale Dwyer to you.  Do you see

15   that?

16     A     Yes.

17     Q     And in that letter -- actually, why don't

18   you just read the first sentence of that email?

19     A     "David, as we discussed, attached please

20   find our denial letter and a copy of your policy.  If

21   you have any questions, please call me.  Thank you."

22     Q     All right.  So you see that the email

23   attached a denial letter.  Is that the same letter

24   that we marked Exhibit 17, the March 13th letter?

25     A     It -- it's not attached here, but ...

Page 94

1      Q    Right.  But it's your recollection that this

2  March 13th letter was attached to the email that was

3  marked as --

4      A    I don't specifically recall.

5                MR. MCSHEA:  Referring to Exhibit 17.

6  BY MR. DIFEBBO:

7      Q    Do you have any reason to believe that

8  Exhibit 17 was not the letter attached?

9      A    No.

10     Q    On March 21, 2013, you then emailed

11  Gale Dwyer and said:  "In addition to his claim for

12  mismanagement of the Markley account, Mr. Warshawsky

13  is threatening to file a disciplinary complaint.

14          "I believe your early discussions with him

15  would be advisable and help to obviate undue process."

16  What did you mean when you referred to his claim for

17  mismanagement of the Markley account?

18     A    He had a claim for mismanagement of the

19  Markley account.

20     Q    Is that the UBS account that we were --

21     A    Yes.

22     Q    -- referring to?  And you were looking to

23  Allied World to do what at this stage?

24     A    Step in.

25     Q    Okay.  Provide defense counsel?

Page 95

1      A    Yes.  And -- and other counsel.

2      Q    Well, what other counsel would Allied World

3  have provided?

4      A    To help their insured, who is being -- or

5  having a claim asserted against them.

6      Q    Okay.  So there was a claim asserted against

7  Allied World's insured, and you had an expectation in

8  March of 2013 that Allied World would assign counsel

9  to handle that claim.  Correct?

10     A    Well, I think at this point it was still a

11  potential claim.  And is it correct that we didn't

12  have the summons yet?

13     Q    You did not, as far as I know, have the

14  summons --

15     A    Right.

16     Q    -- yet, but you had a --

17     A    So --

18     Q    -- demand.  Correct?

19     A    My understanding of the policy and the

20  obligations of the insurance company would be to step

21  in try and held the insured if there were even a

22  potential claim.

23     Q    So you expected Allied World to assign

24  counsel to represent the insureds.  Correct?

25     A    Yes.

Page 96

1      Q    Allied World did not do so.  Correct?

2      A    No, they did not.

3      Q    All right.  The document we've marked as

4  Exhibit 21 has Bates number D'Angelo 3153.  It also

5  apparently was another one of those that was an

6  exhibit from an underlying set of motion briefings, so

7  it says Exhibit 13, but it is Exhibit 21 to our

8  deposition.  And let me know if you --

9                (Exhibit 21 was marked for

10                identification.)

11     A    Yes.

12     Q    -- have reviewed this.

13     A    Yes.

14     Q    All right.  Is this a March 28, 2013, letter

15  that you sent to Mr. Warshawsky?

16     A    Yes.

17     Q    All right.  There's a copy of a check on the

18  letter.  Is that a check that was enclosed with the

19  letter?

20     A    Yes.

21     Q    What does the $328,752.40 check represent?

22     A    That was the figure that the accountants

23  came up with to being the value of the account.

24     Q    Okay.  Was this an attempt by you as counsel

25  for your father to settle the ongoing dispute with

1  Ms. Markley?

2      A    That was the amount that the accountants

3  came up with.

4      Q    Did you have any communication with Allied

5  World regarding the fact that you were proffering a

6  payment to Ms. Markley of 328-plus thousand dollars?

7      A    No.

8      Q    Did Ms. Markley accept this check?

9      A    No.  Well, yes, she cashed the check.

10     Q    So you hesitated when I asked if she

11  accepted the check.  What was your hesitation?

12     A    They carried on with litigation.

13              MR. MCSHEA:  Oh, boy.

14  BY MR. DIFEBBO:

15     Q    I won't ask you to read the whole thing.

16  You're --

17     A    Thank you.

18     Q    -- welcome to.  Let me identify it for the

19  record fist.  Exhibit 22 to your deposition is Bates

20  Number D'Angelo 3166 through 3179, and it is an

21  April 3, 2013, letter from Andrew W. Barbin to you.  I

22  think there's actually two copies of the letter in the

23  exhibit.  I'm not --

24              (Exhibit 22 was marked for

25              identification.)

Page 100

1    when you --

2        A    Oh, I'm sorry --

3        Q    Yeah.  Going to the third sheet of paper in

4    the packet, at the bottom, the Bates number is Allied

5    World 000024.

6        A    Oh.  Okay.  Oh.  So I did forward it.

7        Q    Okay.  The letter that you were -- and this

8    is an April 9, 2013, email from you to Leland Jones at

9    Wiley Rein and Gale Dwyer at Allied World.  Correct?

10       A    Dwyer and Jones.

11       Q    Right.  Yeah.  That's what I said.

12       A    Okay.

13       Q    And you're forwarding a copy of the

14   April 5th letter that we marked as deposition Exhibit

15   22.  Correct?

16       A    Yes.

17       Q    In that cover email, you said, in the last

18   sentence of the first paragraph "She is continuing to

19   press malpractice claims which are clearly covered by

20   our policy."  Do you see that?

21       A    Yes.

22       Q    What malpractice claims were you referring

23   to?

24       A    Well, we'd have to read through that letter

25   of Andrew Barbin -- Barbin.  It references everything

Page 102

1    of 7.  Do you see there's a series of bullet points?

2        A    Yes.

3        Q    One of those bullet points towards the

4    bottom says "David and the firm have materially aided

5    in the deception and have intermingled funds

6    improperly secured from Lisa's funds with the funds of

7    the firm."

8            Is that one of the allegations that you were

9    referring to as a malpractice claim?

10       A    That is stated here.

11       Q    Is that one of the allegations that you took

12   to be a malpractice claim?

13       A    Potential.

14       Q    And the next bullet point.  "David and the

15   firm materially facilitated the deception by

16   forwarding false communications regarding false

17   accountings, false assurances that insurance counsel

18   had been contacted, and would be taking over

19   communications and false promises of imminent payment

20   of $500,000, which was acknowledged in writing to be

21   wrongfully taken."

22           Is that one of the allegations that you

23   referred to as malpractice?

24       A    Another potential from this fellow.

25       Q    You can put Exhibit 23 aside for the moment.

Page 103

1    Exhibit 24 is a document with Bates number D'Angelo

2    3188 through 3191.  Let me know when you've had a

3    chance to look at the document, sir.

4                   (Exhibit 24 was marked for

5                   identification.)

6         A    I've looked at it.

7         Q    Do you recognize this as an April 18, 23rd

8    [sic] letter that you received from Wiley Rein?

9         A    Yes.

10        Q    And am I correct that this April 18th letter

11   is one of the letters that you cited in your response

12   to interrogatory Number 3, which we looked at in

13   Exhibit 18 as a denial of coverage?

14        A    Yes.

15        Q    We saw earlier that the April 5th letter

16   from Mr. Barbin that we marked as Exhibit 22 indicated

17   that Markley had commenced litigation by writ of

18   summons.  Correct?

19        A    Yes.

20        Q    Was it your and your father's expectation

21   that Allied World would provide defense counsel to

22   defend it in that litigation?

23        A    Yes.

24        Q    And did Allied World do so?

25        A    No.

1      Q    In fact, Allied World advised you on

2    April 18th, after the filing of that writ, that it was

3    reaffirming its previous determination that no

4    coverage was available for the Markley matter.

5    Correct?

6      A    Actually, again, they invited us to send in

7    further information, that they would review their

8    decision.  The letters, very much like the previous

9    one, without much thought.

10     Q    My question to you, sir, was:  Had Allied

11   World advised you in the April 18th letter that it was

12   reaffirming its previous determination that no

13   coverage is available under the policy for the Markley

14   matter?  Correct?

15     A    Correct.  And they also stated, as they did

16   in the previous letters:  "To the extent that the firm

17   disagrees with Darwin's understanding of the facts or

18   Darwin's conclusion that no coverage available or if

19   the firm has additional information relevant to

20   Darwin's analysis of coverage with respect to this

21   matter, please provide the additional information for

22   Darwin's consideration.

23         "If Ms. Markley filed suit against

24   George D'Angelo or the firm, please provide a copy to

25   us, and Darwin will carefully evaluate availability of

1    coverage based upon the allegations of the complaint.

2         "In the meantime, Darwin continues to

3    reserve all of its under the policy and applicable

4    law."

5         Q    Did you, at that time, provide any

6    indication to Allied World that the firm disagrees

7    with Darwin's understanding of the facts?

8         A    We sent them the complaint when it arrived.

9         Q    Okay.  That wasn't my question, sir.  At the

10   time that you received the April 18, 2013, letter from

11   Wiley Rein, did you respond at the time with any

12   indication that the firm disagrees with Darwin's

13   understanding of the facts?

14        A    I responded to what they asked for, which

15   was when you receive the complaint, send it.  That's

16   what I did.

17        Q    I'll ask a third time.  At that time, did

18   you provide any response to Allied World indicating

19   that the firm disagrees with Darwin's understanding of

20   the facts?

21        A    I did.  I sent them the complaint.

22        Q    When did you send them the complaint?

23        A    It's in the record.

24        Q    Okay.  Did you at any time indicate --

25   strike that.

```
1          Did you, at or around the time of receiving
2     your April 18th letter, write to Allied World and
3     indicate that you disagreed with Darwin's
4     understanding of the facts?
5          A    Again, I sent --
6               MR. MCSHEA:  Objection --
7               THE WITNESS:  -- them the complaint --
8               MR. MCSHEA:  -- to form.  I'm just
9     objecting to the use of the word "facts."
10              THE WITNESS:  I sent the complaint.
11    BY MR. DIFEBBO:
12         Q    Did you take any issue with the
13    characterization of the facts set forth in the
14    April 18, 2013, letter?
15         A    Yes.
16         Q    And you did so by sending the complaint --
17         A    Yes.
18         Q    -- that's your answer?  Is that the only
19    manner in which you contested the firm -- I'm sorry --
20    Darwin's understanding of the facts?
21         A    Is there any other conversation --
22    correspondence before sending the complaint?
23         Q    I don't have any.
24         A    Okay.
25         Q    Do you?
```

1       A    Then if it -- it's not there, then yes, the

2    complaint is what I sent back to them.

3       Q    Following your receipt of the

4    April 18, 2013, letter, did you send any indication to

5    Allied World disputing Darwin's conclusion that no

6    coverage was available?

7       A    Yes.

8       Q    How did you do that?

9       A    I sent them the complaint.

10      Q    Okay.  Did you, at any time between

11   receiving the April 18, 2013, letter and sending the

12   complaint, send any correspondence disputing Darwin's

13   conclusion that no coverage was available?

14      A    I don't recall --

15               MR. MCSHEA:  Objection.

16      Q    Right.  Your answer was "I don't recall

17   any"?

18      A    I don't recall any.

19      Q    At any time between the April 18, 2013,

20   letter from Wiley Rein and the time you sent the

21   complaint to Allied World, did you send Allied World

22   any additional information relevant to Darwin's

23   analysis of coverage with respect to this?

24      A    I do not recall.  What I did is just -- was

25   respond to Allied, asking for a copy of the complaint.

1  That was the next event.

2      Q    You're saying that the next event was when

3  Allied World requested a copy of the complaint, then

4  you responded by providing a copy?

5      A    I -- I sent a copy of the complaint as per

6  the request of Allied.

7      Q    Okay.  What request of Allied?

8      A    That I send the complaint.

9              MR. DIFEBBO:  Since there's a photocopy

10  of an exhibit sticker on there, I propose we put our

11  sticker over that.  Put it over that sticker.

12              THE REPORTER:  Yes, sir.

13              MR. DIFEBBO:  It's from a different

14  proceeding.

15  BY MR. DIFEBBO:

16      Q    Exhibit 25 is Bates numbered D'Angelo 3664

17  through 3668.  And it is another letter from

18  Mr. Barbin to you, Mr. D'Angelo.  This one is dated

19  April 13, 2013.

20              (Exhibit 25 was marked for

21              identification.)

22      A    April 29?

23      Q    Sorry.  April -- that's my birthday.  I

24  should get that correct.  April 29, 2013.

25      A    He makes reference to Niccolo Machiavelli.

Page 109

1       Q    All right.  Have you had a chance to review

2   it?

3       A    Yes.

4       Q    And this is a letter you received from

5   Mr. Barbin.  Right?

6       A    Yes.

7       Q    And in this letter, he has cut and pasted an

8   April 9th email that you sent to him.  Correct?  You

9   see that on the first page?

10      A    Yes.  Yes.

11      Q    All right.  And that email, April 9th, that

12  is in fact an email that you sent to Mr. Barbin on

13  April 9th?  Do you recognize that as an email that you

14  sent?

15      A    Yes.

16      Q    And in your email to Mr. Barbin, you write

17  "Among these misstatements."  You're referring to what

18  you characterized as the misstatements of his

19  April 5, 2013, letter.  Correct?

20      A    Yes.

21      Q    "Among these misstatements is the fact that

22  I did contact the insurance company with

23  Mr. Warshawsky's emails.  Upon review, they sent a

24  letter denying the claim.  I asked for

25  reconsideration, which they did, and denied the claim

1    again last."

2          When you say you did contact the insurance

3    company, and upon review, they sent a letter denying

4    the claim, were you referring in that sentence to the

5    initial denial from Gale Dwyer?

6          A    Yes.  I assume so.  Yes.

7          Q    And then "I asked for reconsideration, which

8    they did, and denied the claim again last."  In that

9    sentence, were you referring to the letters that we've

10   looked at from Wiley Rein?

11         A    I assume so.

12         Q    And, actually, let me ask you a better

13   question than that one.  Because in your email, your

14   April 5th email, that predates the April 18th letter

15   from Wiley Rein.  Correct?

16         A    Okay.

17         Q    All right.  So is it fair to assume then

18   that your April 5th email, when you said "I asked for

19   a reconsideration, which they did, and denied the

20   claim again last," that you're referring to the

21   March 29th letter from Wiley Rein that we've marked as

22   Exhibit 19?

23         A    I assume so.

24         Q    And then you say "I am now forwarding them a

25   copy of your letter, which may further explain for

Page 111

1    them the claims presented are covered by our policy of

2    insurance."  You say that?

3        A    Yes.

4        Q    Okay.  So if we flip to page 4 of the

5    letter, D'Angelo 3667, Mr. Barbin writes "Transmitted

6    herewith is an acceptance of service form."  Do you

7    recall what it was he was transmitting to you for

8    service?

9        A    No.

10       Q    Was it the writ of summons?

11       A    No.  I don't recall.

12       Q    Do you know whether you provided a copy of

13   this April 29th letter to Allied World?

14       A    I -- I stated that I did.

15       Q    Well, I think that what you stated and the

16   email that we just looked at is, that was from your

17   April 9th email, where you said that you were

18   forwarding a copy of Mr. Barbin's April 5th letter.

19            And we saw that you did submit the April 5th

20   letter to Allied World.  My question to you is:  Did

21   you ever submit this April 29th letter to Allied

22   World?

23       A    I don't recall.  There would be a -- a

24   writing to that effect.

25       Q    Okay.  You don't recall one way or the

Page 112

1    other?

2         A    I don't.

3         Q    All right.

4              THE WITNESS:  Sorry.  I've got terrible

5    allergies.

6              MR. DIFEBBO:  Yes.  Let's go off the

7    record for a moment.

8              MR. MCSHEA:  -- letters or is there --

9              THE REPORTER:  It is now --

10             MR. MCSHEA:  -- something else?

11             THE WITNESS:  I got that too.  To --

12             THE REPORTER:  It is --

13             THE WITNESS:  -- Niccolo Machiavelli.

14   Oh, sorry.

15             THE REPORTER:  It is now 3:51 p.m., and

16   we are off the record.

17             (Off the record.)

18             THE REPORTER:  It is now 4:03 p.m., and

19   we are back on the record.

20   BY MR. DIFEBBO:

21        Q    All right, sir.  We have marked Exhibits 26

22   and 27.  Exhibit 26 is an email thread with Bates

23   Number Allied World 0000003 through 05.  And then

24   Exhibit 27 is Bates number starting at zero zero --

25   I'm sorry -- D'Angelo 0067 through 0102, and it is the

Page 113

1   complaint in the Markley action.

2          Have you had a chance to look at those

3   exhibits?

4                 (Exhibit 26 and Exhibit 27 were marked

5                 for identification.)

6      A   Yes.

7      Q   All right.  So let's start with Exhibit 26.

8   If we start off from the bottom of the email thread,

9   there is an April 18, 2013, email from Leland Jones to

10  you saying, "Mr. D'Angelo, please see the attached

11  letter."  Do you see that?

12     A   Yes.

13     Q   And that was the email that attached the

14  letter from Mr. Jones that we've marked as Exhibit 24.

15  Correct?

16     A   Yes.

17     Q   And then the next email in this thread is

18  dated June 12, 2013, and it's from you to Mr. Jones,

19  saying "Attached please find the summons served on us

20  today by the attorneys for Lisa Markley."  Do you see

21  that?

22     A   Yes.

23     Q   We talked earlier about whether you had any

24  communications with Allied World in between the time

25  of the April 18th letter and when you got the

Page 114

1   complaint.

2          Was this June 12, 2013, email forwarding the

3   summons, was that the most communication you had with

4   Allied World after your receipt of the April 18th

5   letter?

6      A    I assume so.

7      Q    All right.  And then Mr. Jones asks you if a

8   complaint was served with the summons.  And that was

9   on June 13, 2013.  Correct?

10     A    Where are you?  I'm sorry.

11     Q    The next email up in the thread --

12     A    June 13th?

13     Q    -- June 13th from Mr. Jones to you.

14     A    Yes.

15     Q    All right.  So he asked you if a complaint

16  was served with the summons or did they only serve a

17  summons.  And then he says Darwin will need a copy of

18  the complaint.  Do you see that?

19     A    Yes.

20     Q    All right.  And then the next email in the

21  thread is November 11, 2014.  Do you see that?

22     A    Yes.

23     Q    I'm sorry.  Did you answer?

24     A    November 11th?

25     Q    Yeah.

Page 115

1      A    Yes.

2      Q    Okay.  And then, just to cut to the chase

3  here, it looks like you did send a PDF to Mr. Jones,

4  but it was blank.  He asked you to fax the complaint,

5  and you did.

6          So my question to you is:  Is the document

7  that we've marked as Exhibit 27 the complaint that you

8  faxed to Mr. Jones?

9      A    Yes.

10     Q    All right.  Do you recall whether there was

11 any communication between you and Mr. Jones in

12 response to his email asking whether a complaint was

13 served with the summons?

14     A    He had -- he had written -- let's see.  He

15 had written in June 13, in that email, "As we stated

16 in our April 18, 2013, correspondence, Darwin will

17 need a copy of the complaint or any other

18 communications you have received since our April 18th

19 correspondence to assess the availability of coverage

20 under the policy for this matter."

21     Q    Right.  And that was June 13th.  The next --

22     A    Right.

23     Q    -- email in this thread is when you sent him

24 the complaint in November.  My question to you is

25 simply:  Do you recall whether there was any other

1    communication between the two of you in the

2    intervening time?

3         A    In your exhibit, I don't see any.

4         Q    Do you recall there being any?

5         A    No.

6         Q    So in your November 11th email to Mr. Jones

7    where you transmitted the first couple pages of the

8    complaint and said that you would fax the rest, you

9    say "There are many issues which need to be addressed

10   immediately, including, inter alia, statue of

11   limitations, laches, estoppel, failure to state a

12   claim, settlement according to satisfaction venue, and

13   others."  Do you see that?

14        A    Let me go down here.  November 11.  Yes.

15        Q    All right.  So is it fair to say that you

16   were requesting in this November 11, 2014, email that

17   Allied World provide a defense to the defendants in

18   the complaint?

19        A    Yes.

20        Q    Okay.  Do you recall what Allied World's

21   response was?

22        A    No.  Well, I -- generally, but I -- not --

23   not specifically.

24        Q    What's your general recollection?

25        A    It's a note.

```
 1                   THE WITNESS:  -- throughout the
 2    complaint.
 3                   MR. MCSHEA:  Yeah.  I object to the
 4    form.
 5                        But go ahead.
 6    BY MR. DIFEBBO:
 7         Q    Yeah, well, let me ask you this way.  When
 8    you received the complaint in November of 2014, did
 9    you understand Count 1 to be asserting a malpractice
10    claim?
11         A    I understood the whole complaint to be
12    asserting a malpractice claim.
13         Q    All right.  And you see that Count 1 is
14    asserted against all Defendants.  Right?
15         A    Yes.
16         Q    And that includes you.  Right?
17         A    Yes.
18         Q    So you understood, as of November 2014, that
19    the complaint asserted a claim against you for
20    malpractice?
21         A    Yes.
22         Q    And it also asserted causes of action for
23    breach of fiduciary duties.  Correct?
24         A    Yes.
25         Q    And those causes of action arose from your
```

Page 129

1    father's handling of Lisa Markley's trust.  Right?

2              MR. MCSHEA:  Object to form.

3        A    It does include all Defendants.

4        Q    Right.  But that's not question.  The breach

5    of fiduciary duty count included -- I'm sorry.  The

6    complaint included a cause of action for breach of

7    fiduciary duties arising out of your father's handling

8    of Lisa Markley's trust.  Right?

9        A    I don't think exclusively, because it says

10   against all Defendants, and -- and it goes on to make

11   many allegations.

12       Q    Okay.  So you understood this complaint to

13   assert causes of action against all of the defendants

14   for the way that Lisa Markley's trust was handled.

15   Right?

16       A    That's what it says.

17       Q    All right.  At some point in time, there was

18   an amended complaint filed in the Markley action.

19   Correct?

20       A    Yes.

21       Q    All right.  Do you recall what the nature of

22   the amendment was?

23       A    No.

24       Q    And do you recall after the filing of the

25   original complaint, that you and your Co-Defendants --

```
                                                      Page 130
 1   strike that.
 2                  MR. DIFEBBO:  Thirty-two?
 3                  THE REPORTER:  Yes.  Thirty-two.
 4   BY MR. DIFEBBO:
 5        Q    All right.  The document we've marked as
 6   Exhibit 32 is Bates numbered Allied World 000216
 7   through 305.  And it is a cover letter from Mr. McShea
 8   dated November 23, 2015, enclosing a copy of the
 9   amended complaint and certificates of merit.
10            All right.  Let me know when you've had a
11   chance to look at the exhibit, sir.
12                  (Exhibit 32 was marked for
13                   identification.)
14        A    Yes.
15        Q    Is this a copy of the amended complaint that
16   was filed in the Markley action?
17        A    Yes.
18        Q    And did you review this complaint at the
19   time it was filed?
20        A    At the time.
21        Q    All right.  And this was the operative
22   complaint when this matter went to trial.  Correct?
23        A    Yes.
24        Q    There were no further amendments to the
25   complaint between the time of the filing of this
```

Page 131

1    complaint and the rendering of the jury's verdict.

2    Right?

3         A    Yes.

4         Q    And this complaint also contains in Count 1

5    a count for professional negligence, legal and

6    financial, against all Defendants.  Correct?  It's

7    Bates page Allied World 246.

8         A    What paragraph are you, 246?  Oh.  Yes.

9         Q    And so as with the original complaint, it's

10   your understanding that this complaint asserted a

11   cause of action against you and the other Defendants

12   for malpractice.  Correct?

13        A    Yes.

14        Q    And in fact, if you look at page Bates page

15   274, there is a supplemental certificate of merit that

16   is specific to the claims as against you individually

17   that indicates that there's a reasonable probability

18   that the care, skill, and/or knowledge exercised or

19   exhibited towards Plaintiff Lisa Markley by Defendant

20   David S. D'Angelo fell outside of the applicable

21   statutory, regulatory, and professional standards and

22   that such conduct was a cause in bringing the harm

23   alleged in the complaint.  You see that?

24        A    Yes.

25        Q    And you reviewed that at the time this was

Page 132

1    filed?

2        A    I -- I assume so.

3        Q    And you understood that the complaint was

4    asserting a cause of action against you for

5    malpractice.  Correct?

6        A    Yes.

7        Q    Okay.  Go ahead and put that aside.

8                THE REPORTER:  Which side -- this?

9                MR. DIFEBBO:  The side with the --

10    well, the one you put the Via Certified Mail.

11                THE REPORTER:  Got it.

12    BY MR. DIFEBBO:

13        Q    Exhibit 33 is Bates numbered D'Angelo 0025

14    through 26.  And it is a January 5, 2016, letter from

15    Leland Jones to Mr. McShea.  Do you see that?

16                (Exhibit 33 was marked for

17                identification.)

18        A    Yes.

19        Q    All right.  And by this time, Mr. McShea was

20    representing you.  Correct, sir?

21        A    Yes.

22        Q    And so he's the one who sent the amended

23    complaint to Allied World via Mr. Jones.  And would

24    you agree that this was Allied World's response to the

25    submission of the amended complaint?

Page 133

1      A    It appears to be.

2      Q    Right.  And if you look at the second page

3   of the letter, Bates Number D'Angelo 26, you see that

4   Mr. Jones writes "For the same reasons as set

5   forth" -- strike that.  I'll start again.

6           On the second page, D'Angelo 26, Mr. Jones

7   writes "Thus, for the same reasons as set forth in the

8   November 26, 2014, letter, no coverage is available

9   under the policy for the Markley action."  Do you see

10  that?

11     A    Yes.

12     Q    All right.  You understood that Allied World

13  was denying coverage for the amended complaint.

14  Correct?

15     A    I hadn't seen this letter before.  But I

16  read it as you read it.

17     Q    And this January -- strike that.

18          Exhibit 34 is another email thread.  This

19  one bears Bates Numbers D'Angelo 4835 through 4839.

20  Let me know when you've had a chance to take a look.

21               (Exhibit 34 was marked for

22               identification.)

23     A    Yes.

24     Q    Have you ever seen the emails that are

25  contained in this -- I'll note that they are emails

Page 135

1    that time.

2        Q    Mr. Barbin writes to Mr. McShea on

3    January 14, 2016, and I'll paraphrase the first

4    paragraph.  He says that he disagrees with the

5    coverage determination.

6             And then in the second paragraph, he writes

7    "I believe that declaratory action could be pursued

8    here where the defense is to be provided and that it

9    would likely receive expedited treatment in Dauphin

10   County as there is a judge familiar with the matter."

11            Do you see that?

12       A    Yes.

13       Q    Okay.  Were you aware that Plaintiff's

14   counsel had indicated to Mr. McShea in January of 2016

15   his belief that declaratory action against Allied

16   World could be pursued at that time?

17       A    No.

18       Q    If you look at the next email in the thread,

19   that's from Mr. McShea to Mr. Barbin, dated

20   January 14, 2016.

21       A    Yup.

22       Q    And Mr. McShea says to Mr. Barbin "Please

23   see the attached letter we received last week from my

24   client's professional liability carrier."

25            And then later in the paragraph, he goes on

Page 136

1    to say:  "Clearly the carrier's counsel is unpersuaded

2    that Plaintiff's amended complaint moves this case

3    closer to coverage.  As a result, my clients have

4    authorized us to file a declaratory judgment action."

5            Do you see that?

6    A    I'm -- I'm lost.

7    Q    Okay.

8    A    Sorry.

9    Q    I'm on Bates page 4838 at the very top.

10   A    All right.  At the very top.  Okay.  It's a

11   different font.

12   Q    It is.  It's a little hard to see.

13   A    All right.  Yes.

14   Q    All right.

15   A    I see it.

16   Q    Is Mr. McShea's statement that you had

17   authorized filing of a declaratory judgment action

18   against Allied World as of January 14, 2016, is that

19   statement accurate?

20   A    Yes.

21   Q    Did you file a declaratory judgment against

22   Allied World at that time?

23   A    We did at some point.

24   Q    And that was in 2019.  Correct?

25              MR. MCSHEA:  Eighteen.

# David D'Angelo Underlying Deposition Testimony

Page 1

IN THE COURT OF COMMON PLEAS

OF PHILADELPHIA COUNTY, PA

CIVIL DIVISION

\* \* \* \* \* \* \* \* \*

LISA MARKLEY,               \*

    Plaintiff        \* Case No.

    vs.              \* 00611

LAW OFFICES OF              \*

D'ANGELO & EURELL,      \* June Term, 2017

DAVID S. D'ANGELO,      \*

and DAVID S.                \*

D'ANGELO, and           \*

CHRISTOPHER S.              \*

D'ANGELO, Co-           \*

Executors of the        \*

Estate of GEORGE A.     \*

D'ANGELO, Deceased,     \*

    Defendants        \*

      \* \* \* \* \* \* \* \* \*

VIDEOTAPED DEPOSITION OF

DAVID S. D'ANGELO, ESQUIRE

May 6, 2019

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

**Markley Exhibits in Opposition of Summary Judgment   000056**

**App. 123**

Page 2

```
 1              VIDEOTAPED DEPOSITION
 2                      OF
 3      DAVID S. D'ANGELO, ESQUIRE, taken on
 4      behalf of the Plaintiff herein,
 5      pursuant to the Rules of Civil
 6      Procedure, taken before me, the
 7      undersigned, Stephanie Lukacs, a Court
 8      Reporter and Notary Public in and for
 9      the Commonwealth of Pennsylvania, at
10      law offices of Conrad O'Brien, 1500
11      Market Street, Centre Square, West
12      Tower, Suite 3900, Philadelphia,
13      Pennsylvania, on Monday, May 6, 2019
14      beginning at 12:39 p.m.
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                I N D E X
 2
 3      DISCUSSION AMONG PARTIES
 4      WITNESS: DAVID S. D'ANGELO, ESQUIRE
 5      EXAMINATION
 6        By Attorney Barbin        10 - 275
 7      CERTIFICATE                      276
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2
 3      ANDREW W. BARBIN, ESQUIRE
 4      Andrew W. Barbin, PC
 5      5 Kasey Court, Suite 203
 6      Mechanicsburg, PA  17055
 7          COUNSEL FOR PLAINTIFF
 8
 9      BRUCE J. WARSHAWSKY, ESQUIRE
10      Cunningham, Chernicoff &
11      Warshawsky, PC
12      2320 North 2nd Street
13      P.O. Box 60457
14      Harrisburg, PA  17110
15          COUNSEL FOR PLAINTIFF
16
17      JOHN P. MCSHEA, III, ESQUIRE
18      McShea Law Firm, PC
19      1500 Market Street
20      Centre Square
21      West Tower, Suite 4000
22      Philadelphia, PA  19102
23          COUNSEL FOR DEFENDANTS
24
25
```

Page 5

```
 1              EXHIBIT PAGE
 2
 3                                   PAGE
 4      NUMBER     DESCRIPTION    IDENTIFIED
 5      D'A Deposition:
 6      Exhibit 1  Complaint and
 7                 Notice                42
 8      Exhibit 2  Defendant's
 9                 Objections and
10                 Responses to
11                 Plaintiff, Lisa
12                 Markley's First
13                 Set of
14                 Interrogatories
15                 Addressed to All
16                 Defendants            84
17      Exhibit 3* Second Set of
18                 Interrogatories      120
19      Exhibit 4  Montgomery County
20                 Orphans' Court
21                 Cover Sheet and
22                 Attachments for
23                 George D'Angelo,
24                 2018-X1466           124
25
```

2 (Pages 2 to 5)

**Markley Exhibits in Opposition of Summary Judgment   000057**

**App. 124**

Page 14

1     to the question that I ask. And when
2     I ask you a question, will you please
3     say yes, rather than uh-huh or uh-uh, which
4     is ambiguous on the record?
5     A.   Yes.
6         ATTORNEY MCSHEA:
7         Or no?
8 BY ATTORNEY BARBIN:
9     Q.   Or no, yeah. Or no, yeah.
10         With regard to requesting to
11 consult with your attorney, I would
12 ask that you not ask for a break
13 between the question and the answer,
14 unless there is a legitimate question
15 of attorney/client privilege.
16         Is that acceptable?
17     A.   Yes.
18         ATTORNEY BARBIN:
19         Counsel?
20         ATTORNEY MCSHEA:
21         Not my deposition.
22         ATTORNEY BARBIN:
23         Okay.
24         That was a ground rule
25 issue, regardless.

Page 15

1 BY ATTORNEY BARBIN:
2     Q.   I'm going to jump right into
3 the deposition --- no, one more
4 question.
5         Are you taking any medications
6 that would in any way affect your
7 ability to remember or report
8 information accurately?
9     A.   No.
10     Q.   Thank you.
11         Could you explain for me, in
12 summary fashion, the firm structure as
13 it existed from 1982 to the present
14 date, in terms of what attorneys were
15 working there and what their principal
16 responsibilities were with the firm?
17     A.   My father was a sole
18 practitioner at the firm. He used the
19 name D'Angelo & Eurell. And it was a
20 name that was used by him Jack Eurell
21 --- John B. Eurell for
22 convenience, ---
23     Q.   Okay.
24     A.   --- and sharing office space.
25     Q.   So Mr. Eurell was not actually

Page 16

1 part of the firm?
2         ATTORNEY MCSHEA:
3         Objection.
4         THE WITNESS:
5         There is no firm. There
6 is no entity D'Angelo & Eurell.
7 BY ATTORNEY BARBIN:
8     Q.   And I'm correct, that your
9 letterhead regularly used the term ---
10 the letterhead used by the firm was
11 D'Angelo & Eurell?
12     A.   Yes.
13     Q.   And did the letterhead also
14 contain the names of the attorneys in
15 the firm, including Mr. Eurell?
16     A.   I don't recall.
17     Q.   Okay.
18         You said your father was a solo
19 practitioner. Did he --- was he
20 incorporated or was he an
21 unincorporated individual?
22     A.   Unincorporated.
23     Q.   Okay.
24         You eventually --- you became
25 an attorney in 1982.

Page 17

1         Is that correct?
2     A.   Yes.
3     Q.   Okay.
4         Did you ever practice
5 separately from your father?
6     A.   No.
7     Q.   Okay.
8         When you began to practice with
9 your father, did you have a --- an
10 understanding or agreement as to what
11 your role was, in terms of whether you
12 were a partner, or an associate or
13 anything like that?
14     A.   I was independent.
15     Q.   You were independent? And you
16 were also sharing the same letterhead?
17     A.   Yes.
18     Q.   Okay.
19         Did you ever communicate in a
20 written form to any of your clients,
21 that there was not, in fact, a
22 corporation, there was not, in fact, a
23 partnership?
24         ATTORNEY MCSHEA:
25         Did Mr. D'Angelo?

5 (Pages 14 to 17)

**Markley Exhibits in Opposition of Summary Judgment   000060**

**App. 125**

Page 106

1  A.   Identify and explain any
2  Defendants reasons for issuing checks
3  from Plaintiff's PaineWebber resource
4  management account to David D'Angelo
5  in the amounts owed, $184,275 and
6  $160,000 --- sorry, $166,824 in
7  December 2000.
8       Please provide any and all
9  documents which you believe authorized
10 you to issue such checks.
11 Q.   Stop there.
12      Do you recall me asking you
13 earlier if you had been involved in
14 any transfers between the investment
15 account and your firm's account?
16 A.   Yes.
17 Q.   Okay.
18      Is this one of those --- is
19 this two of those transactions?
20 A.   I have no knowledge ---
21      ATTORNEY MCSHEA:
22      Objection to form.
23      THE WITNESS:
24      --- about these
25 transactions.

Page 107

1  BY ATTORNEY BARBIN:
2  Q.   Okay.
3       Did you have occasion, when
4  answering these Interrogatories, to
5  review the PaineWebber Resource
6  Management account, to determine
7  whether or not your name appears as
8  the authorizing party on those
9  transfers?
10      ATTORNEY MCSHEA:
11      Objection to form.
12      THE WITNESS:
13      You mean as the payee?
14 BY ATTORNEY BARBIN:
15 Q.   Yeah.
16 A.   I did see that.
17 Q.   Okay.  And --- and do you have
18 any recollection of ever received such
19 a check?
20 A.   No.
21 Q.   Is there any reason, that you
22 can fathom why you should have
23 received such a check?
24      ATTORNEY MCSHEA:
25      Objection to form.

Page 108

1       THE WITNESS:
2       No.
3  BY ATTORNEY BARBIN:
4  Q.   Would you agree, that if your
5  father was owed fees, that it should
6  have been drawn to your father rather
7  than you?
8       ATTORNEY MCSHEA:
9       Objection to form.
10      THE WITNESS:
11      I have no knowledge
12 about these checks.
13 BY ATTORNEY BARBIN:
14 Q.   Well, am --- am --- am I
15 correct, that you were an independent
16 law firm?  You and your dad didn't
17 have a partnership, you weren't a
18 shareholder?  His fees were not your
19 fees.
20      Right?
21 A.   Correct.
22 Q.   So did you ever receive that
23 check?
24 A.   No.
25      ATTORNEY MCSHEA:

Page 109

1       Objection, asked and
2  answered.
3  BY ATTORNEY BARBIN:
4  Q.   So if we get the check from the
5  bank, or we --- and they say it was
6  endorse and paid out, would it be your
7  representation that the signature on
8  such a check would have to have been a
9  forgery, because you would have signed
10 it?
11      ATTORNEY MCSHEA:
12      Objection to form.
13      THE WITNESS:
14      I don't know anything
15 about those checks, if indeed
16 there were checks.
17 BY ATTORNEY BARBIN:
18 Q.   Did you have --- going to
19 paragraph 16 of the Interrogatories.
20      Did you have occasion to review
21 the record, and determine whether or
22 not there were, in fact, additional
23 checks drawn to G.A.D., George
24 D'Angelo and Jorge A. D'Angelo, with
25 Jorge spelled with a J?

28  (Pages 106 to 109)

**Markley Exhibits in Opposition of Summary Judgment  000083**

**App. 126**

# Brief in Support of Summary Judgment Motion in Underlying Action

By: John P. McShea
jmcshea@mcshealawfirm.com
Identification No. 34562
By:  Conrad O. Kattner
ckattner@mcshealawfirm.com
Identification No. 35468
**McSHEA LAW FIRM, P.C.**
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102
(215) 599-0800

Attorneys for Defendants, David S. D'Angelo
and Christopher S. D'Angelo, Co-Executors
of the Estate of George A. D'Angelo,
Deceased

|  |  |
|---|---|
| **LISA MARKLEY,**<br><br>               Plaintiff,<br><br>v.<br><br>**LAW OFFICES OF D'ANGELO &<br>EURELL, DAVID S. D'ANGELO, and<br>DAVID S. D'ANGELO and<br>CHRISTOPHER S. D'ANGELO, CO-<br>EXECUTORS OF THE ESTATE OF<br>GEORGE A. D'ANGELO, DECEASED,**<br><br>               Defendants. | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>TRIAL DIVISION - CIVIL<br><br>JUNE TERM, 2017<br><br>No. 00611<br><br><br>Oral Argument Requested |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Law Offices of D'Angelo & Eurell, David S. D'Angelo, and David S.
D'Angelo and Christopher S. D'Angelo, Co-Executors of the Estate of George A. D'Angelo,
Deceased (together "Defendants"), through their undersigned counsel, and in accordance with
Phila. Civ. Div. R. *210, submit this brief in support of their foregoing Motion for Summary
Judgment.

Case ID: 170600611
Control No.: 19070113

**App. 128**

Interrogatories at General Objection No. 3, and Ex. 18, David D'Angelo Deposition Transcript Excerpts.[3]

In the absence of a professional relationship between David D'Angelo and Plaintiff, Counts I (Professional Negligence), II (Breaches of Fiduciary Duties), and IV (Breach of Contract) of the Amended Complaint are not legally cognizable against David D'Angelo because he owed no duty to her. *See, e.g.,* Seidner v. Finkelman, No. 121002883, 2017 WL 2734218 (C.P. Phila, June 12, 2017) ("Plaintiff did not present evidence of the existence of a contract between Finkelman, individually[,]" so as to support any legal malpractice claims against him. "Further, Plaintiff provided no legal support for her contention that a breach of contract claim can exist against a non-party to the contract.")

The record also lacks any evidence to establish the requisite intent or scienter to cause harm to Plaintiff on the part of David D'Angelo. (See Paragraphs 63 and 64 of Defendants' Motion and accompanying record citations.) As such, the claims set forth in Counts III (Fraud), V (Theft and/or Conversion), and VI (Vicarious Liability/Civil Conspiracy) of the Amended Complaint, each of which require such intent or scienter, are not viable as to David D'Angelo. *See Commc'ns Network,* 187 A.3d at 961 (to establish a fraud there must be "(1) a misrepresentation, (2) scienter on behalf of the misrepresenter, (3) an intention by the maker that

---

[3]    See Ex. 18, David D'Angelo Dep. Tr. at 145:13-146:23, especially 146:11-23 ("Okay. Would it be accurate to say, that as of the date of receipt of that letter [Warshawsky June 12, 2012 Letter], that you were acting in a capacity as attorney for your father? A. When I received it? Q. Yeah. A. Yes. Q. Okay. And you were acting in capacity as attorney for your father when you responded to it? A. Yes."); see also *id.* 20:25-21:4 ("Q. Okay. Did you perform any services under your father's auspices for Lisa Markley at any time? A. No."); 40:1-7 ("Q. With regard to the communications that you sent, your attorney has indicated that you were acting in an attorney capacity for your father. Is that correct? A. Yes."), 84:3-21 and 120:3-121:7 (confirming David D'Angelo's signature and verification on Defendants' interrogatory objections and responses), and 108:14-21 ("Q. Well, am --- am --- am I correct, that you were an independent law firm? You and your dad didn't have a partnership, you weren't a shareholder? His fees were not your fees. Right? A. Correct.").

Case ID: 170600611
Control No.: 19070113

**App. 129**

the recipient will be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient."); *Roman v. Swartz*, No. 1243 C.D. 2012, 2013 WL 3982813, at *2 (Pa. Commw. May 15, 2013) (noting, "Indeed conversion is an intentional tort, and it is distinguished from the tort of negligent disposition...."); and *Rutherfoord*, 612 A.2d at 508-09 ("Malice, the intent to injure and a lack of justification for this intent, are essential parts of a civil conspiracy cause of action.").

The record also does not support a finding of vicarious liability on the part of David D'Angelo, an independent lawyer, based on any alleged conduct of George D'Angelo or D'Angelo & Eurell. (See Paragraphs 63 and 64 of Defendants' Motion and accompanying record citations.) Consequently, the vicarious liability claim set forth Count VI of the Amended Complaint against David D'Angelo must be dismissed.

Additionally, since Plaintiff cannot sustain any of the predicate torts claims she alleged against David D'Angelo, her derivative civil conspiracy claim against him (Count VI) must be dismissed on this additional basis. *See Rutherfoord*, 612 A.2d at 509 (rejecting plaintiff's civil conspiracy claim after upholding trial court's grant of summary judgment on the predicate tort); *see also Pyle v. Meritor Sav. Bank*, Nos. 92-cv-7361 & 7362, 1996 WL 115048, *6 (E.D. Pa. Mar. 13, 1996) (applying Pennsylvania law and citing to *Rutherfoord*, 612 A.2d at 509, court concluded: "Whereas this Court has already decided in favor of the defendants on the plaintiff's [underlying tort claims], any claim that the defendants conspired to commit these predicate torts must also fail.").

Summary judgment must therefore be entered in favor of David D'Angelo on these additional grounds with respect to all claims asserted against him in the Amended Complaint.

DAngelo-0993

Case ID: 170600611
Control No.: 19070113

**App. 130**

# Plaintiffs' Answer to Markley's Amended Complaint

<u>NOTICE TO PLEAD</u>   *Filed and Attested by the Office of Judicial Records 25 OCT 2018 04:55 pm*

**TO THE PLAINTIFFS:**
You are hereby notified to file a written response
to the enclosed New Matter within twenty
(20) days from the date of service hereof or a
judgment may be entered against you.

**/s/ John P. McShea**
**Attorney for Defendants**

**McSHEA LAW FIRM, P.C.**
BY: John P. McShea
Identification No. 34562
BY: Conrad O. Kattner
Identification No. 35468
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102
(215) 599-0800
jmcshea@mcshealawfirm.com
ckattner@mcshealawfirm.com

Attorneys for Defendants,
Law Offices of D'Angelo & Eurell,
David S. D'Angelo, and
David S. D'Angelo and Christopher S.
D'Angelo, Co-Executors of the Estate of
George A. D'Angelo, Deceased

---

| | |
|---|---|
| LISA MARKLEY,<br><br>                    Plaintiff,<br><br>v.<br><br>LAW OFFICES OF D'ANGELO &<br>EURELL, DAVID S. D'ANGELO, and<br>DAVID S. D'ANGELO and CHRISTOPHER<br>S. D'ANGELO, CO-EXECUTORS OF THE<br>ESTATE OF GEORGE A. D'ANGELO,<br>DECEASED,<br>                    Defendants | COURT OF COMMON PLEAS<br>PHILADELPHIA, PENNSYLVANIA<br><br>Civil Action<br><br>JUNE TERM. 2017<br><br>NO. 00611 |

---

### DEFENDANTS' ANSWER AND NEW MATTER
### TO PLAINTIFF'S AMENDED COMPLAINT[1]

Defendants, Law Offices of D'Angelo & Eurell, David S. D'Angelo, and David S.

D'Angelo and Christopher S. D'Angelo, as Co-Executors of the Estate of George A. D'Angelo

---

[1] Plaintiff filed her original complaint on October 29, 2014. On April 8, 2015, plaintiff filed a second complaint, also entitled "Complaint," evidently intended to amend the original complaint. Defendants' Answer and New Matter responds to the April 8, 2015 pleading, which may be referred to as plaintiff's Amended Complaint.

Case ID: 170600611

**App. 132**

("George"), deceased (together, "Defendants"), by and through its undersigned attorneys, answer the Amended Complaint filed by plaintiff Lisa Markley ("plaintiff" or "Ms. Markley") in the above-captioned action as follows:

## DEFENDANTS' ANSWER

1.     Denied.  After reasonable investigation, Defendants are without knowledge or information sufficient to form a belief as the truth or falsity of the averments of the corresponding paragraph of the Amended Complaint, and therefore such averments are deemed denied.

2.     Denied.  It is denied that Law Offices of D'Angelo & Eurell is or at all relevant times was a Pennsylvania business or common law partnership between George D'Angelo ("George"), David S. D'Angelo ("David"), and John B. Eurell.  To the contrary, D'Angelo & Eurell was a tradename under which George, and Mr. Eurell, each solo practitioners, once practiced law.  David occasionally worked for George as an independent contractor attorney.

3.     The averments of the corresponding paragraph of the Amended Complaint constitute conclusions of law to which no response is required.  To the extent that they are averments of fact, Defendants state:  It is admitted only that plaintiff's Amended Complaint alleges that plaintiff is asserting a professional liability claim against David, and that David is a licensed lawyer, Pa. Atty. I.D. 37347, admitted November 9, 1982.  It is denied that David has a place of business at the stated address.  To the contrary, he does not.

4.     The averments of the corresponding paragraph of the Amended Complaint constitute conclusions of law to which no response is required.  To the extent that they are averments of fact, Defendants state:  It is admitted only that plaintiff's Amended Complaint alleges that plaintiff is asserting a professional liability claim against George.  It is denied that

Case ID: 170600611

**App. 133**

# June 12, 2012 Correspondence Warshawsky to David

JORDAN D. CUNNINGHAM
ROBERT E. CHERNICOFF
MARC W. WITZIG
BRUCE J. WARSHAWSKY
TRACY L. UPDIKE
NICHOLAS A. JANELLI

### CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW
P.O. BOX 60457
HARRISBURG, PENNSYLVANIA 17106-0457

TELEPHONE (717) 238-6570
FAX (717) 238-4809

HERSHEY TELEPHONE
(717) 534-2833

IRS NO. 23-2274135

Street Address:
2320 N. 2nd Street
Harrisburg, PA 17110

*Writer's Direct Email:*
bjw.recclawpc.com

June 12, 2012

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

George A. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

      RE:   Lisa Markley
            File No: 908212

Dear Mr. D'Angelo:

    Please be advised that I represent Lisa Markley.

    First and foremost, Ms. Markley wishes to express her appreciation and gratitude for the legal (and other) services which you have provided over the last 25+ years. However, circumstances regarding your relationship have changed and Ms. Markley no longer wishes for you to serve as her legal advisor or as Attorney-in-Fact.

    Enclosed herewith is a Revocation of Power of Attorney which Ms. Markley executed in my presence on June 5, 2012. As you can see, the Revocation cancels any and all Powers of Attorney previously granted to you by Ms. Markley.

    Also enclosed herewith is a Release and Authorization to provide the entire contents of her legal files to me.

    I do not believe that she owes you for legal services rendered up through and including the end of the calendar year, 2011, as she advises that the sum of $15,000.00 was paid to you on or about that time. She also advises (although she could not produce a copy of any documentation to support) that your annual fee is 1.5% of her net worth. By extrapolation, this



David D'Angelo 205
Case ID: 17060061
Control No.: 19110305

**App. 135**

CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW

George A. D'Angelo, Esquire
June 12, 2012
Page 2

means that her net worth as of December 31, 2011 should have been $1,000,000.00. If you believe that any additional sums are due and owing for your services for the first half of 2012, you may submit an invoice for same (along with an invoice for the reasonable costs of transferring the file) and I will review same with Ms. Markley and respond accordingly.

A copy of the Revocation of Power of Attorney and the attached Release of Records and Right to Deal Authorization have been sent to UBS and to Morgan Stanley along with the enclosed correspondence advising them that your authorization for trading in her account has been cancelled, and that you should not receive duplicate statements in the future. If you receive any statements after you have transferred the file to me, I would appreciate it if you would forward them.

Any and all communication regarding this matter must be through counsel. Ms. Markley has advised that she is very concerned that while she believes her net worth to be approximately $1,000,000.00 (based on representations you have repeatedly made regarding "hard assets" which are owned by her), but her Resource Management Account has dwindled over $575,000.00 since December, 2008.

She reports that she has repeatedly requested that you provide information regarding her holdings which you have failed to do. Further, she reports that she has no rapport or relationship with your son (with whom you practice law) and does not wish for him to be her successor counsel as you are advancing in age and the distance between you and Ms. Markley has made it difficult to communicate recently.

We are also seeking an Accounting of your tenure as her Attorney-in-Fact, (but not in any great level of detail, at least for now) of the financial activities under your watch. I do not anticipate discovering anything untoward or inappropriate because I am acquainted with the high ethics of your practice. Please understand that Ms. Markley has merely lost confidence in her ability to understand her financial situation and in her relationship with you.

I also wish to inform you that, as you might suspect, the Will you prepared and sent to her under cover of letter dated May 8, 2012, has been destroyed. A new Will has been executed and you are not named as the Executor of her Estate.

David D'Angelo 206
Case ID: 190060061
Control No.: 1911039

**App. 136**

CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW

George A. D'Angelo, Esquire
June 12, 2012
Page 3

We hope to complete everything by no later than June 30, 2012 so your prompt attention to this matter is greatly appreciated.

With professional respect, I am

Very truly yours,

CUNNINGHAM & CHERNICOFF, P.C.

Bruce J. Warshawsky

BJW/ja
Enclosure
cc    Lisa Markley
F:\Horst\BJW\DOC30MARKLEY LISA\L003112.wpd

Markley v D'Angelo

David D'Angelo 207
7060061
Control No.: 1911035

**App. 137**

# June 28, 2012 Correspondence David to Warshawsky

LAW OFFICES

D'ANGELO AND EURELL

TWENTY-SECOND FLOOR

LAND TITLE BUILDING

PHILADELPHIA, PA, 19110

(215) 564-5022
FAX (215) 567-7651

June 28, 2012

Bruce J. Warshawsky, Esquire
Cunningham & Chernicoff, P.C.
P.O. Box 60457
Harrisburg, PA 17106

RE:    Lisa Markley

Dear Mr. Warshawsky:

I am in receipt of your letter of June 12, 2012 directed to my father.

He is disappointed that, after 46 years of representation of Lisa and her mother in a myriad of professional and very personal affairs and the close bond that they had, that she would retain you to contact him and that she, herself, would not have given him that courtesy, caring and respect.

From your request to UBS Financial, you will be receiving records of all financial transactions conducted on Lisa's behalf. That will serve as your precise and accurate accounting. If you require any further information, or explanation, please do not hesitate to contact me.

Also, if there is something you need from her file and I have it, I will forward it to you forthwith.

Very truly yours,

DAVID S. D'ANGELO

DSD/cms

DAngelo-1800

EXHIBIT
DAngelo 7

Case ID: 17060061
Control No.: 1907011

**App. 139**

# Application



**DARWIN NATIONAL ASSURANCE COMPANY**
**9 Farm Springs Road, Farmington, CT 06032 ·Tel. (860) 284-1300 · Fax (860) 284-1301**

## LAWYERS PROFESSIONAL LIABILITY
### INSURANCE APPLICATION

**NOTICE: THE POLICY BEING APPLIED FOR IS A CLAIMS MADE POLICY WHICH APPLIES ONLY TO CLAIMS FIRST MADE DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES WILL BE REDUCED AND MAY BE EXHAUSTED BY CLAIMS EXPENSES AND CLAIMS EXPENSES WILL BE APPLIED AGAINST THE RETENTION AMOUNT. IN NO EVENT WILL THE INSURER BE LIABLE FOR CLAIMS EXPENSES OR DAMAGES IN EXCESS OF THE APPLICABLE LIMIT OF LIABILITY. READ THE ENTIRE APPLICATION CAREFULLY BEFORE SIGNING.**

### 1. APPLICANT INFORMATION

| | | | |
|---|---|---|---|
| Firm Name: | D'Angelo & Eurell | Contact Person: | David D'Angelo |
| Address*: | 100 South Broad St | City/State/Zip: | Philadelphia, PA, 19110 |
| Website: | | Year Established: | 1972 |
| Email: | ddsdangelo@cs.com   Phone: 2155645022 | Annual Gross Revenues: | $300,000 |

*Physical Address required

### 2. LAWYER INFORMATION (including contract attorneys, counsel and of counsel)

### 3. CURRENT INSURANCE

| Attorney Name | Admitted | Hire Date | Hours Per Year |
|---|---|---|---|
| George A. D'Angelo | PA | 1972 | Less then 1040 |
| John B Eurell | PA | 1972 | Less then 1040 |
| David S D'Angelo | PA | 1980 | About 2000 |
| | | | |
| | | | |

| | MLM |
|---|---|
| Carrier | |
| Policy Term: | 8-20-2011-2012 |
| Policy Limit: | 300/900 |
| Retention: | |
| Premium: | |
| Retroactive Date: | FPA |

*If additional space is needed, please attach a separate sheet.*

Non-attorney staff: Legal Secretaries/Assistants __2__  Paralegals _____  *Other (describe):*

### 4. CLAIMS/CIRCUMSTANCES/DISCIPLINARY PROCEEDINGS

(a) Has any attorney been the subject of any bar complaint, investigation or disciplinary proceeding within the past 5 years? *If "Yes", please attach details, including status/resolution of the matter.*   ☐ Yes   X No

(b) Has any attorney been disbarred or refused admission to the bar by any bar association, court or administrative agency? *If "Yes", please attach details on a separate sheet, including the nature and date of the disbarment.*   ☐ Yes   ☒ No

(c) Is any attorney aware of any claims against the law firm or its attorneys, or any incidents that could result in a claim against the law firm or its attorneys within the past 5 years?   ☐ Yes   ☒ No

*If "Yes", how many?* _____

Page 1 of 5

ALLIEDWORLD00000610

*If any, please complete Claim Supplement(s).*

**5.    RISK MANAGEMENT**

Does the law firm:

| | | | |
|---|---|---|---|
| (a) | File lawsuits for the collection of its own unpaid legal fees?<br>*If "Yes", how many within the past two (2) years?* _____ | ☐ Yes | ☒ No |
| (b) | Currently have more than 25% of billings more than 120 days past due?<br>*If "Yes", what percentage?* _____ | ☐ Yes | ☒ No |
| (c) | Derive more than 50% of gross annual billings from any one client? | ☐ Yes | ☒ No |
| (d) | Have any office locations outside of your primary state?<br>*If "Yes", please complete Office Location Supplement.* | ☐ Yes | ☒ No |
| (e) | Share cases, legal staff or letterhead with any other law firm or attorney? | ☐ Yes | ☒ No |
| (f) | Have any attorneys rendering services as a CPA, Real Estate Agent, Financial or Investment Advisor? | ☐ Yes | ☒ No |

**6.    AREAS OF PRACTICE**

Indicate below the percentage of gross revenue from each area of practice; *must equal 100%.*

NOTE: For the areas in **BOLD CAPS**, please complete the *Area Of Practice Supplement* and/or Section 7 for Real Estate.

| | % | | % |
|---|---|---|---|
| **ENTERTAINMENT** | % | **SECURITIES** | |
| **ENVIRONMENTAL** | % | NON-EXEMPT | % |
| **INTELLECTUAL PROPERTY** | % | EXEMPT (i.e. Private Placements) only | % |

| CORPORATE and GOVERNMENTAL | % | | % |
|---|---|---|---|
| Administrative Law | % | Immigration | % |
| Banking | % | International Law | % |
| Bankruptcy | % | Mergers & Acquisitions | % |
| Commercial Law / Business Transactions | % | Public Utilities | % |
| Communications (FCC) | % | Taxation – Corporate | % |
| Corporate – General | % | Taxation – Individual | % |
| Corporate – Formation | % | Taxation – Opinions (please provide details) | % |
| Government – Federal & State | % | Taxation – Other (please provide details) | % |
| Government – Municipal (no bonds) | % | *Other (please provide details on separate sheet)* | % |

| GENERAL PRACTICE | % | | % |
|---|---|---|---|
| Admiralty / Maritime | % | Family Law | % |
| Antitrust / Trade Regulation | % | Insurance Coverage Opinions | % |
| Collections | % | Labor Law – Management | % |
| Criminal | % | Labor Law – Union | % |
| Elder Law / Social Security | % | Real Estate (including Foreclosure) | % |
| Employment | % | Trust & Estates / Probate / Wills | 95% |
| ERISA | % | *Other (please provide details on separate sheet)* | % |

| LITIGATION | *Plaintiff* | Defense | Other |
|---|---|---|---|
| Arbitration/Mediation | % | % | % |
| Bodily Injury & Property Damage | % | % | % |
| Class Action & Mass Torts | % | % | % |
| Commercial | % | % | % |
| Construction | % | % | % |
| Civil Rights/Discrimination | % | % | % |
| General Civil | 5% | % | % |
| Insurance | % | % | % |
| Legal Malpractice | % | % | % |
| Medical Malpractice | % | % | % |
| Workers Compensation | % | % | % |

ALLIEDWORLD00000611

**App. 142**

7. **REAL ESTATE:**

Of the percentage indicated in Section 6, please break down according to the following areas based on the firm's work over the past 12 months:

| Practice | Percentage | Total Transactions | Average Value | Maximum Value |
|---|---|---|---|---|
| a. Purchase & Sale – Commercial | % | | $ | $ |
| Residential | % | | $ | $ |
| b. Development (Syndications/Limited or General Partnerships/Condo or Co-ops/Property Valuation) | % | | $ | $ |
| c. Mortgages, Refinancing and Loan Workouts | % | | $ | $ |
| d. Foreclosures | % | | $ | $ |
| e. Title Searches / Document Preparation | % | | | |
| f. Landlord/Tenant | % | | | |
| g. Litigation (non-foreclosure) | % | | | |
| h. Municipal Zoning and Tax Appeals | % | | | |
| i. *Other (please describe in space provided)* | % | | | |
| **TOTAL (must equal 100%)** | % | | | |

The undersigned authorized representative of the Applicant declares that the statements set forth herein are true, and reasonable effort has been made to obtain sufficient information from all persons proposed for this insurance to facilitate the accurate completion of the Application.

The undersigned authorized representative agrees that if the information supplied on this Application changes between the date of this Application and the effective date of the insurance, he/she will, in order for the information to be accurate on the effective date of the insurance, immediately notify the Insurer of such changes, and the Insurer may withdraw or modify any outstanding quotations or agreement to bind insurance.

The submission of this Application by the Applicant to the Insurer or signing of this Application by or on behalf of the Applicant does not obligate the Insurer to issue the insurance requested.   It is agreed that this Application shall be the basis of the contract if a policy is issued and shall be deemed to be attached to, incorporated into and become a part of, the policy.

ALL WRITTEN STATEMENTS AND MATERIALS FURNISHED TO THE INSURER IN CONJUNCTION WITH THIS APPLICATION ARE HEREBY INCORPORATED BY REFERENCE INTO THIS APPLICATION AND MADE A PART HEREOF. NOTHING CONTAINED HEREIN OR INCORPORATED HEREIN BY REFERENCE SHALL CONSTITUTE NOTICE OF A CLAIM OR POTENTIAL CLAIM SO AS TO TRIGGER COVERAGE UNDER ANY CONTRACT OF INSURANCE.

**NOTICE TO ARKANSAS APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO COLORADO APPLICANTS**: "IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY.   PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES.  ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES."

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:** "WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT."

ALLIEDWORLD00000612

**App. 143**

**NOTICE TO FLORIDA APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE."

**NOTICE TO HAWAII APPLICANTS**: "FOR YOUR PROTECTION, HAWAII LAW REQUIRES YOU TO BE INFORMED THAT PRESENTING A FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT IS A CRIME PUNISHABLE BY FINES OR IMPRISONMENT, OR BOTH."

**NOTICE TO KENTUCKY APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME."

**NOTICE TO LOUISIANA APPLICANTS**: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO MAINE APPLICANTS**: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO NEW JERSEY APPLICANTS**: "ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO NEW MEXICO APPLICANTS**: "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES."

**NOTICE TO NEW YORK APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION."

**NOTICE TO OHIO APPLICANTS**: "ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD."

**NOTICE TO OKLAHOMA APPLICANTS**: "WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY" (365:15-1-10, 36 §3613.1).

**NOTICE TO OREGON APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD OR SOLICIT ANOTHER TO DEFRAUD AN INSURER: (1) BY SUBMITTING AN APPLICATION, OR (2) BY FILING A CLAIM CONTAINING A FALSE STATEMENT AS TO ANY MATERIAL FACT, MAY BE VIOLATING STATE LAW."

**NOTICE TO PENNSYLVANIA APPLICANTS**: "ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES."

**NOTICE TO TENNESSEE APPLICANTS**: "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

Page 4 of 5

ALLIEDWORLD00000613

**App. 144**

**NOTICE TO WASHINGTON APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**NOTICE TO WEST VIRGINIA APPLICANTS:** "ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR THE PAYMENT OF A LOSS OR THE BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON."

**NOTICE TO ALL OTHER APPLICANTS:** "IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS."

**This application must be signed and dated by an Owner, Partner or Principal as duly authorized on behalf of the Applicant.**

Signature of Owner, Partner or Principal

Print Name _____ George A. D'Angelo,

Date _____ 8/15/12

Partner _____                    Title _____

Licensed Agent _____                    License Number _____

Page 5 of 5

ALLIEDWORLD00000614

**App. 145**

# August 17, 2012 Correspondence Warshawsky to David

JORDAN D. CUNNINGHAM
ROBERT E. CHERNICOFF
MARC W. WITZIG
BRUCE J. WARSHAWSKY
TRACY L. UPDIKE
NICHOLAS A. FANELLI

**CUNNINGHAM & CHERNICOFF, P.C.**
ATTORNEYS AT LAW
P.O. BOX 60457
HARRISBURG, PENNSYLVANIA 17106-0457

——

TELEPHONE (717) 238-6570
FAX (717) 238-4809

HERSHEY TELEPHONE
(717) 534-2833

IRS NO. 23-2274135

Street Address:
2320 N. 2nd Street
Harrisburg, PA 17110

**Writer's Direct Email:**
bjw@cclawpc.com

August 17, 2012

David M. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

RE:   Lisa Markley
       File No: 908212

Dear Mr. D'Angelo:

When we last spoke, over a month ago, you indicated that your father was in the process of preparing the requested Accounting and that you needed four (4) weeks to do so. More than four (4) weeks has now passed and we still have no Accounting.

I am in receipt of statements from UBS, but those statements, alone, are wholly insufficient to constitute a full disclosure of the activities taken by your father as Lisa Markley's Power of Attorney. Please kindly provide the requested accounting by no later than August 31, 2012.

Very truly yours,

CUNNINGHAM & CHERNICOFF, P.C.

Bruce J. Warshawsky

BJW/ja
cc    Lisa Markley
F:\Home\BJW\DOCS\MARKLEY.LISA\L081712.wpd

DAngelo-2937

**App. 147**

# August 30, 2012 Correspondence David to Warshawsky

LAW OFFICES

D'ANGELO AND EURELL

TWENTY-SECOND FLOOR

LAND TITLE BUILDING

PHILADELPHIA, PA. 19110

(215) 564-5022

FAX (215) 557-7651

August 30, 2012

Bruce J. Warshawsky, Esquire
Cunningham & Chernicoff, P.C.
P.O. Box 60457
Harrisburg, PA 17106

RE:   Lisa Markley

Dear Mr. Warshawsky:

I am in receipt of your letter of August 17, 2012. Please be advised that the documentation is with the accountants. I anticipate having the accounting in the next couple of weeks. I will forward it to you promptly when I receive it.

Very truly yours,

DAVID S. D'ANGELO

DSD/cms

10/4/12 Spoke w/ Bruce
Advised settling out summary
Advised that bill will be 60 days
result < 60 days
Pleasant, glad resolved before year end.


EXHIBIT
DAngelo 4

DAngelo-2938

Markley v D'Angelo

David D'Angelo 216

**App. 149**

# September 25, 2012 Correspondence Warshawsky to David

JORDAN D. CUNNINGHAM
ROBERT E. CHERNICOFF
MARC W. WITZIG
BRUCE J. WARSHAWSKY
TRACY L. UPDIKE
NICHOLAS A. FANELLI

### CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW
P.O. BOX 60457
HARRISBURG, PENNSYLVANIA 17106-0457

HERSHEY TELEPHONE
(717) 534-2833

IRS NO. 23-2274135

Street Address:
2320 N. 2nd Street
Harrisburg, PA 17110

TELEPHONE (717) 238-6570
FAX (717) 238-4809

Writer's Direct Email:
bjw@cclawpc.com

September 25, 2012

David M. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

RE:    Lisa Markley
File No: 908212

Dear Mr. D'Angelo:

It has been more than over two (2) months since we last spoke regarding the Accounting. When I contacted your office at the end of August, I was advised that an accounting firm was preparing the Accounting and that we would be receiving it shortly. Another thirty (30) days has now passed.

We have also just learned that Ms. Markley's 2010 state income tax return was either never filed or payments were never made. Prior to 2010, your father took care of all the tax filings, estimated payments, etc.

Our patience is wearing thin. While Ms. Markley very much appreciates the diligent work your father provided to her in the past as her Attorney-in-Fact and advisor, we believe that something is terribly amiss, particularly over the past few years. We require a review of the Accounting which we have requested to determine what, if any, action we need to take.

We all hope this is just a "tempest in a teapot" but as more time passes, the more skeptical we become.

Your immediate attention to this matter is required.

Very truly yours,

CUNNINGHAM & CHERNICOFF, P.C.

Bruce J. Warshawsky

BJW/ja
cc    Lisa Markley
F:\Home\BJW\DOCS\MARKLEY LISA\L092512.wpd

DAngelo-2944



EXHIBIT
DAngelo 5
PENGAD 800-631-6989

Markley v D'Angelo

David D'Angelo 222

**App. 151**

# October 5, 2012 Correspondence David to Warshawsky

LAW OFFICES

D'ANGELO AND EURELL

TWENTY-SECOND FLOOR

LAND TITLE BUILDING

PHILADELPHIA, PA. 19110

(215) 564-5022

FAX (215) 557-7651

October 5, 2012

Bruce J. Warshawsky, Esquire
Cunningham & Chernicoff, P.C.
P.O. Box 60457
Harrisburg, PA 17106

      RE:   Lisa Markley

Dear Mr. Warshawsky:

      Further to our conversation, enclosed please find a copy of the Summary of Disbursements prepared by the accountant. As we discussed, the Summary shows an overpayment of commissions in the amount of $499,135.32. This amount will be sent to you within 60 days from the date of this letter.

      I am enclosing a copy of the letter dated April 14, 2011 with the PA-40 2010 tax return sent to Lisa via Federal Express.

      If you have any questions, please do not hesitate to contact me. I look forward to a prompt resolution of this matter and thank you for your courtesies.

                Very truly yours,

                DAVID S. D'ANGELO

DSD/cms
Enclosures



# October 9, 2012 Correspondence Warshawsky to David

JORDAN D. CUNNINGHAM
ROBERT E. CHERNICOFF
MARC W. WITZIG
BRUCE J. WARSHAWSKY
TRACY L. UPDIKE
NICHOLAS A. RANELLI

CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW
P.O. BOX 60457
HARRISBURG, PENNSYLVANIA 17106-0457

HERSHEY TELEPHONE
(717) 534-2833

IRS NO. 23-2274135

Street Address:
2920 N. 2nd Street
Harrisburg, PA 17110

TELEPHONE (717) 238-6570
FAX (717) 238-4809

Writer's Direct Email:
bjw@cclawpc.com

October 9, 2012

**VIA FEDERAL EXPRESS**

David M. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

RE:   Lisa Markley
      File No: 908212

Dear Mr. D'Angelo:

Thank you for your October 5, 2012 correspondence with enclosures. It appears that the 2010 tax return issue may fall on Ms. Markley, although it is possible that she never received the Federal Express. We are still in communications with the Pennsylvania Department of Revenue regarding same.

With respect to the two (2) page summary of disbursements and investment account calculations, such information is wholly insufficient for us to conduct a meaningful analysis of the account. At the very least, we need all the information which the Accountant provided to your father with respect to Lisa Markley's account.

I do not understand how a 33.33% compensation can be levied (without documentation to support same) and a flat fee of $15,000.00 for services, which I can only assume to be for the services as acting as Ms. Markley's Attorney-in-Fact. She has advised me previously that she believed the "investment advisor fee" has to be a percentage of the assets which your father was managing and not a flat fee. Of particular concern are the Trustee payments made in 2009 and 2010, which appear to be clearly excessive under any measure, even the measure set forth in the documentation.

Markley Exhibits in Opposition of Summary Judgment  000033
D'Angelo-Summary

CUNNINGHAM & CHERNICOFF, P.C.
ATTORNEYS AT LAW

David M. D'Angelo, Esquire
October 9, 2012
Page 2

Quite frankly, these disclosures reveal the apparent breach of a fiduciary duty committed by your father. While we are certainly expecting a prompt payment of $499,135.32, the inquiry cannot end there. While I am willing to review all of the attendant documentation before asserting any claim and/or reporting to the Disciplinary Board (as I am required by the Rules of Professional Conduct), the exchange of information to resolve the situation should be accelerated and completely investigated. Therefore, I will expect that you will place your malpractice carrier on notice regarding Ms. Markley's potential claim.

Thank you for your attention.

Very truly yours,

CUNNINGHAM & CHERNICOFF, P.C.

Bruce J. Warshawsky

BJW/ja
cc     Lisa Markley
       Robert E. Chernicoff, Esquire
F:\Home\BJW\DOCS\MARKLEY,LISA\L100812.wpd

**App. 156**

# December 22, 2012 to January 28, 2013 Email Correspondence

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Mon, Jan 28, 2013 3:58 pm
Subject: RE: Proof

David:

The Real Estate agent involved in the deal to buy Lisa's Mother's house provided the following information:

Rosalie S Markley bought the subject property on 10/29/1998 for $119,000.

So the 100K had nothing to do with that transaction. Have you checked your own financial records?

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** Bruce J. Warshawsky
**Sent:** Friday, January 25, 2013 11:45 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** RE: Proof
**Importance:** High

David:

Thank you for your email response.

While we are certainly sympathetic to your father's claim that he was never paid by Lisa's mother for his representation in her divorce, my response is as follows:

1.     Your claim of fees pursuant to your fee agreement with Lisa makes no mention of such representation, even though it had concluded long before the fee agreement was signed.
2.     Lisa's mother was not a signatory to the Fee Agreement.
3.     Any claim should have been raised during the administration of Lisa's mother's estate, which didn't occur.
4.     The statute of limitations on claiming these fees has passed.
5.     There was no consideration for Lisa to assume the debt of her mother, and it wasn't in writing, so it's unenforceable against Lisa.
6.     Even if enforceable, which it is not, the measure of fees would be based on an hourly rate, not a contingency fee based on the net proceeds of Lisa's mother's estate.

DAngelo-3136

EXHIBIT
PENGAD 800-631-6989
D'Angelo 10

Markley v D'Angelo

David D'Angelo 414

That having been said, I assume you can produce a signed fee agreement with Lisa's mother (or some indicia that she accepted the fee arrangement, even just a letter to her from your father), time records for your father and his regular hourly rate during the relevant time period. Interest wouldn't accrue for a variety of reasons, none of which I need to state here. We will consider an appropriate adjustment for such fees, but with the above circumstances regarding the legality of the obligation in mind.

As for the travel costs to pursue the Trust monies (which are part of Lisa's fee agreement), I agree that your father should be reimbursed, if the costs can be documented and without interest. Please advise.

I am asking Lisa to confirm the date of her mother's home purchase, though I doubt it was late 2000/early 2001 and has nothing to do with the 100K we are discussing.

At this juncture, it is imperative that you make a bona fide proposal.

Thank you.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Friday, January 25, 2013 11:15 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

My father represented Lisa's mother in an appeal from a decree against her in the divorce, support and visitation action filed by her father in 1962. After briefing and argument, two decisions were rendered in 1986 cited at 207 Pa. Super 296 and 207 Pa. Super 758. My father was not paid at that time as Lisa's mother had no money and it was agreed that my father would be paid from her estate. The money came in from her estate in 2006, forty years later. Lisa is aware of that agreement. Therefore, it is appropriate that my father receive a fee from those monies.

I have also attached a copy of the letter from local counsel in California regarding the Sidney & Marjorie Markley Trust matter which extended from 1991 through 1994. Both he and my father waited until the 2000's to get paid their fees. The costs of travel were paid by my father, which included flights and lodging for approximately eleven hearings in California . These costs are to be included in the amounts paid to my father.

Does Lisa know when her mother purchased her house. That check to "Pugh and Hughes" remains a mystery, but if it is unrelated to purchase or support of Lisa's mother, we are prepared to reimburse. I believe we are close to concluding this matter.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>

To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: ' Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky
<BJW@cclawpc.com>
Sent: Thu, Jan 17, 2013 1:45 pm
Subject: RE: Proof
David:

Lisa indicates that there was no payment made of 100K to or for her mother in late 2000/early 2001 (or at any other time).

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** Bruce J. Warshawsky
**Sent:** Wednesday, January 16, 2013 4:12 PM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** RE: Proof
**Importance:** High

No----it doesn't relate to the house, we vetted that issue and have no proof that Lisa deposited it and wouldn't be able to verify that it was for her mother, but I will ask Lisa, again, to consider this (new) possibility. However, we are fairly certain (and if you will look back at your own financial records, we believe that this will be proven) that the money was paid to your firm.

I don't mean to belabor the point, but that is only one (100K) contested issue and nearly a month ago, I presented you with a detailed spreadsheet, identifying a Million Dollar plus set of issues and have no other substantive response.

Please re-read that email, as I communicated certain "conclusions" and "positions" to which we could not (yet) commit, but with each passing day without further explanation, our position becomes more clear.

I have been very patient, but that patience is wearing thin.

Please advise.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

Markley v D'Angelo

David D'Angelo 416

**App. 160**

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Wednesday, January 16, 2013 2:13 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

I have discussed the matter of the $100,000.00 payable to Pugh and Hughes which cleared on January 3, 2001, which means it was probably dated and sent late December 2000. This may have been money sent for the benefit of Lisa's mother for her support and/or to buy a house. Please confirm with Lisa.

Thank you.

David
-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: ' Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Fri, Jan 11, 2013 9:34 am
Subject: RE: Proof
David:

Lisa has provided, and I have reviewed all the documents pertinent to the house purchase in AZ.  It was in late August and the wire amount matches.

We also confirmed with the broker that no copies of checks were provided over 7 years old.

The Pugh/Holmes firm in AZ must be coincidental, but if you want to track them down and see if their records reflect a 100K inflow from Lisa in Jan, 2001, please do so.  However, I think it easier for you to check your own financial records at the end of 2000/start of 2001 to determine if you received the 100K.  If needed, we would be asking for that in discovery anyway.

Please advise.  Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** Bruce J. Warshawsky
**Sent:** Thursday, January 10, 2013 10:28 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** RE: Proof

Will do.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff,
P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any
disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly
prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, January 10, 2013 11:19 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

I just looked at the statement and do see the wire transfer of the funds on August 27, 2001, which could
be for the house. Please look at the deed for further information and confirmation. The check for Pugh A
Dhughes is still unknown, but a search does reveal lawyers with such a name in Arizona .
-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: ' Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky
<BJW@cclawpc.com>
Sent: Tue, Jan 8, 2013 2:36 pm
Subject: RE: Proof
David:

The broker told us that they already sent copies of all the checks to you. Will you please forward copies
at your earliest convenience? Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff,
P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any
disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly
prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** Bruce J. Warshawsky
**Sent:** Tuesday, January 08, 2013 10:08 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** ' Lisa Markley (lsmarkley@comcast.net)'; Bruce J. Warshawsky
**Subject:** RE: Proof
**Importance:** High

David:

We will contact the broker to obtain copies of all checks that were paid to your firm, however, Lisa advises
that the money to buy the house in AZ was for 113845.76, wired (Federal Funds) on 8/27/2001. Thus, we
stand by our belief that the $100000 on 1/3/2001 was indeed paid to your firm.

DAngelo-3140

Lisa also assures me that the money from her Mother's estate was not derivative of anything left by her father or the Trusts identified in the fee agreement.

Please give me a timeframe for your substantive response.

Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** Bruce J. Warshawsky
**Sent:** Monday, January 07, 2013 4:37 PM
**To:** 'ddsdangelo@cs.com'; Bruce J. Warshawsky
**Cc:** Lisa Markley (lsmarkley@comcast.net)
**Subject:** RE: Proof
**Importance:** High

David:

I think we need to get a copy of the check at issue, although I will follow up with Lisa on this point.

The money that came into the account from Lisa's mother is not subject to the 1/3 contingency fee (which I think we discussed on a prior telephone call). I don't read the fee agreement to encompass her mother's estate, unless you have proof that such monies were derivative of her father's estate (and that this was a remainder interest flowing to Lisa).

If either or both of these issues are resolved in your favor, I will be happy to revise the proof accordingly.

Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Monday, January 07, 2013 3:07 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Dear Bruce,

I have your comments being reviewed. With the holidays, there has been some delay.

In the meantime, as a point of clarification, the payment in early 2001 to "Pugh A DHughes" was for Lisa to purchase the house in Arizona . I assume Hughes was the local agent. Please confirm this with Lisa and and me after.

Also you did not account for attorney's fees earned by my father out of the payment into the account in August, 2006, of $286,422.04 from the mother's estate.

Thank you.

David
-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Bruce J. Warshawsky <BJW@cclawpc.com>; Lisa Markley (lsmarkley@comcast.net) <lsmarkley@comcast.net>
Sent: Wed, Jan 2, 2013 11:19 am
Subject: RE: Proof
David:

I need some kind of a timeframe for your response, as you can appreciate, I cant let this sit for very long.  Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE. This email contains information from the law firm of Cunningham & Chernicoff,
P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any
disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly
prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, December 27, 2012 12:28 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

I acknowledge receipt of your emails and will get back to you after I have reviewed them with the appropriate parties. Thank you.

David
-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'David D'Angelo (ddsdangelo@cs.com)' <ddsdangelo@cs.com>
Cc: ' Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Wed, Dec 26, 2012 4:40 pm
Subject: RE: Proof
David:

DAngelo-3142

One additional element which should have been factored into my analysis are my fees, which are only about $5,000 to date. Obviously, they will only increase from here. Please acknowledge receipt of my email of December 22, 2012 and of this email. Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** Bruce J. Warshawsky
**Sent:** Saturday, December 22, 2012 9:22 AM
**To:** David D'Angelo (ddsdangelo@cs.com)
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** Proof
**Importance:** High

David:

Please see the attached spreadsheet, which I alluded to in our brief telephone conversation yesterday.

As we have previously discussed, I had not yet meticulously reviewed the statements and your summary attached to your 12/4/12 correspondence, but now that I have done so, it seems pretty obvious to me that we have a rather significant problem on our hands.

When we spoke in the early autumn, I told you that you needed to put your carrier on notice. Have you done so?

Also, now that I have completed my analysis, unless you can persuade me otherwise, I believe that your father may have violated the Rules of Professional Conduct, however, at this juncture, I have not reached a final determination of same since I do not yet "know" such and have not yet concluded same within the requirements of Rule 8.3 (a). Also, I haven't reached any conclusion about whether this situation needs to be reported to law enforcement.

Please note the following:

You failed to recognize that an additional 999,763.83 was received into the account in August, 2000 for which your firm was entitled to a one-third fee. By early, 2002, the amount your firm had taken in fees was very close to the amount earned (the discrepancy was likely due to the fact that your father managed the assets for only 6 months in 2000, but took a fee for an entire year). A check for $100,000 in early 2001 (identified as "Pugh A DHughes"), was likely paid to your firm as part of the "initial" 1/3 fee-you had listed this in the "other" column. This is the 100K difference.

The amounts "paid back" in 2010-2012 have been "netted" against the amounts paid to your firm-which explains the remaining difference between what you reported.

I break down the "deficiencies" in Lisa's account in 2 areas---"Excess Payments" (390K) and "Performance" (494K).

With respect to Performance, I note the following:

I don't have any fee agreement or writing to substantiate the 15000 per year fee your father was paid. I don't have any proof that he was a licensed registered investment advisor. He is subject to the Prudent Investor Rule and obviously did not adhere to it. In 2000, when the tech bubble was still positive, he sold securities and realized a loss of over 92K (see sheet 2). Until 1/1/2003, the portfolio lost another 272K under his watch. Interest should be paid on these losses. From 2003-2007, the investment portfolio recovered and almost regained its diminished value----then the bloodbath began in 2008. Unbeknownst to Lisa, she paid interest on a margin account until her portfolio went to zero in 2012.

Had the corpus of her money been safely invested (earning a paltry 1.5%), her portfolio would have still been a net of more than 1MM today, even if your father received 180000 in fees. Without factoring in the excess payments, she should have 1.2MM in assets-as any investment fees should properly be disgorged.

As for the excess fees, I certainly cannot explain them, though it is interesting to note that for the most part the payments made to your firm were in 5K or 10K increments. From 2003-2207, the differences are minimal. Perhaps due to the good performance, your father felt "entitled" to more or perhaps he discussed it with Lisa and she agreed (although she denies this). In 2008, we see more "small" payments (3-5K) growing in frequency after the market tanked and accelerating in 2009 in frequency and in 2010, amount (a few 10K, 15K and a 20K)---a disturbing and perhaps defining pattern. I believe that it was around this time, that he assuaged Lisa with representations that he was using her account to buy precious metals and other impervious investments.

The fact of the matter is that from late 2008 to 2012, he took about 300K from her which clearly must be returned (plus the additional 90K previously overpaid), plus interest. I would calculate the total to be returned at about 500K.

Therefore, I think we can safely say that approximately 1.7MM would be our claim. Perhaps precious metals were purchased on Lisa's behalf and he can produce them?

At this juncture, I will await your response, but we cannot wait much longer before proceeding. Any information you can provide to address my ethical and criminal concerns is most appreciated ASAP.

Thank you.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

Markley v D'Angelo

David D'Angelo 422

**App. 166**

# Motion in Limine Hearing Transcript in Underlying Action

1

```
 1    IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

 2         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

 3              CIVIL TRIAL DIVISION

 4                       - - -

 5

 6    LISA MARKLEY              :   No. 1706-00611
           (Plaintiff)         :
 7                             :
                               :
 8         vs.                  :
                               :
 9                             :
      LAW OFFICES OF D'ANGELO AND :
10    EURELL, et. al.           :
           (Defendants)        :
11

12

13                       - - -

14          City Hall, CR 446
15        Philadelphia, Pennsylvania

16                       - - -

17              April 19, 2021

18                       - - -

19           Jury Trial Hearing

20                       - - -

21            Motions in Limine

22

23    BEFORE:   THE HONORABLE MICHAEL ERDOS, J.

24

25
```

DAngelo-4693

App. 168

2

```
 1   APPEARANCES:

 2              ANDREW W. BARBIN, ESQ.
               Attorney for Plaintiff
 3

 4              JOHN P. MCSHEA, ESQ.
               Attorney for Defendants
 5

 6              CONRAD KATTNER, ESQ.
               Attorney for Defendants
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

DAngelo-4694

**App. 169**

42

```
 1              personally as well.  So I think this matter
 2              does concern them.  So that may be a blanket
 3              exception to the Dead Man's rule.  That
 4              doesn't mean that individual statements by the
 5              defendant would necessarily come in.  What it
 6              means is that she can certainly -- unless
 7              there was some other exception, but it
 8              certainly means that the plaintiff can testify
 9              to this matter as a competent witness.
10                        Furthermore, it's my opinion
11              that in terms of what might be considered
12              pretrial discussions or negotiations,
13              settlement discussions, a claim ripened on
14              December 22nd, 2012 where I believe there was
15              an email from prior counsel actually saying
16              that this is the claim we're making, before
17              that it was in my opinion no more than
18              undertaking to get information.  So anything
19              from that point on is out with respect to if
20              it's coming in particularly through prior
21              counsel.
22                        MR. BARBIN:  Your Honor.
23                        THE COURT:  Yes.
24                        MR. BARBIN:  One minor detail,
25              the check that was sent without a release on
```

DAngelo-4734

**App. 170**

57

```
 1                      I am happy to hear argument
 2           because your motion about Mr. Warshawsky is
 3           granted in part and denied in part.  It's
 4           going to be granted to the extent that there
 5           are opinions or things that he wasn't
 6           personally privy to with possibly some
 7           exceptions and he has to authenticate some
 8           things.  And it's denied with respect to
 9           things where he was personally involved prior
10           to or right up until this became a claim.
11                      MR. MCSHEA:  Up until December,
12           whatever the date was?
13                      MR. BARBIN:  December 22nd.
14                      THE COURT:  12/22/12.
15                      MR. MCSHEA:  So because we
16           haven't had a chance to discuss with Your
17           Honor our concerns about Mr. Warshawsky,
18           particularly the many opinions that are
19           throughout his affidavits, but really it's
20           because Mr. Warshawsky represents or has
21           represented Ms. Markley in three distinct
22           respects.
23                      One as her counsel beginning in
24           June of 2012, as I appreciate it, as her
25           general counsel for estate planning.  That is
```

**App. 171**

58

```
1        one thing, and that would cover what Your
2        Honor has already addressed right up to
3        December of 2012, and the back and forth
4        between him and Mr. D'Angelo relative to
5        gathering information.
6                    The second part is that he was
7        formally counsel of record when this action
8        started in April of 2013.  His name is on the
9        writ of summons.  When the case was
10       transferred to Philadelphia, he entered his
11       appearance along with an associate from his
12       firm in November of 2018.  He was involved
13       and was present during David D'Angelo's
14       deposition.  He has been in this case until a
15       month after we argued the summary judgment
16       motion before Judge Massiah-Jackson when it
17       was mentioned in open court for the first time
18       that he was going to testify as an expert in
19       this case.
20                   We have never received an expert
21       report.  We haven't received an affidavit,
22       only because it was used initially to support
23       Ms. Serratelli's report and then he withdrew.
24       But he is also currently counsel in the
25       Montgomery County Orphan's Court matter
```

**App. 172**

# February 6, 2013 to February 8, 2013 Email Correspondence

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Bruce J. Warshawsky <BJW@cclawpc.com>; Lisa Markley (lsmarkley@comcast.net)
<lsmarkley@comcast.net>
Sent: Fri, Feb 8, 2013 11:52 am
Subject: RE: Status

Yes, her resolve and agreement with the position I have stated is clear. We are at the end of the line in
negotiating a global resolution and are prepared to act accordingly, without something further from you
that leads us back to the table and/or assuages our concerns about your father's conduct.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff,
P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any
disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly
prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Friday, February 08, 2013 11:03 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Status

Bruce,

I am sorry I missed your call. Does your position as stated in this email remain the same after meeting
with Lisa?

Thank you.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Bruce J. Warshawsky <BJW@cclawpc.com>; Lisa Markley (lsmarkley@comcast.net)
<lsmarkley@comcast.net>
Sent: Thu, Feb 7, 2013 10:24 am
Subject: RE: Status
David:

Please confirm that your "offer" does not include either the reimbursement of the 15K per year, any of the
losses incurred in the account, or any interest (except possibly the margin interest paid. If this is the
case, and based on your proposal, I preliminarily calculate your "offer" to be about 300K for the
overpayment, less roughly 20K for "travel", plus about 30K for margin fees and my fees (at this point,
roughly 7K). Recall that your original "Calculation of Amounts Due for Advisor Fees" didn't include the
additional 1MM in the "second wave" of investments, so your "offer" has decreased from 536K to about
315K.

EXHIBIT

DAngelo 12

PENGAD 800-631-6989

DAngelo-3147

Markley v D'Angelo

David D'Angelo 425

**App. 174**

Our claim is 1.7MM as set forth in my email of 12/22 at 922am, although we are willing to discuss the "interest" component and a "reasonable" amount for "travel" as a means of reaching a resolution. Any settlement must surely be 7 figures, even if it means we need terms and security.

You have completely ignored my ethical/criminal concerns, so I must presume (unless you can persuade me otherwise, but the window on that opportunity is closing) that they are real.   I am meeting with Lisa at 4pm. I will advise Lisa that we must move ahead as necessary.

Your prompt response is appreciated.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Wednesday, February 06, 2013 10:44 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Status

Bruce,

For the purposes of resolution only, the ▇▇▇▇▇▇▇ apparently made payable to Pugh & Hughes will be added to the payments to my father.

As discussed earlier, my father represented Lisa's mother and Lisa from 1962. In the divorce, support and custody proceedings, there were thousands of pages of testimony and evidence which my father had to review and present a rigorous appeal. I have indicated to you the citations of the cases. Lisa is aware that my father was not paid for his representation, as her mother had no money but agreed that the fee would be paid out of her estate, over forty years later. The fee agreement with Lisa is inclusive and does cover the proceeds of her mother's estate, even if not legally enforceable, which is not conceded here, at least, morally and in equity.

The close relationship continued for fifty years. My father was involved in many varied aspects of Lisa's mother's and Lisa's life, including supporting and attending her graduation from Smith. The breadth, depth and meaning of that relationship should not be discarded or discounted because of the recent circumstances.

The annual fee of $15,000.00 had been paid and claimed in the tax returns each year for the twelve year period. The amount has been adjusted, as you point out in your prior letter, to reflect just the twelve year period.

The outline of the settlement proposal is as follows:

Reimbursement of the overpayment.
Inclusion of the $100,000.00 as being paid to my father.
Reduction for reasonable expenses in travel, eleven times, estimated conservatively at $2000.00 a trip or as we agree.
Inclusion of Rosalie Markley's estate proceeds for the purposes of calculating fees.

DAngelo-3148

Reimbursement of margin fees to be determined.
Payment of your attorney's fees to be determined.

Unfortunately, in 2004, our office suffered a loss of files, furniture, etc because of a flood in the building. Many files were lost, including several feet of Markley files. Therefore, there is no documentation regarding the above matters. However, there is sufficient public record and testimony to substantiate the facts.

I look forward to hearing from you. Payment of the settlement will be made immediately upon agreement.

David
-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Lisa Markley (lsmarkley@comcast.net) <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Mon, Feb 4, 2013 2:55 pm
Subject: Status
David:

Please update me on the status of your review/proposal to resolve.

Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St .
Harrisburg , PA 17110
717-238-6570
717-238-4809 (Fax)
CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

# February 11, 2013 Notice to Allied World

2/11/13                                          Policy #0307-7741

**From:** ddsdangelo <ddsdangelo@cs.com>
   **To:** noticeofloss <noticeofloss@darwinpro.com>
**Subject:** Policy #0307-7741
   **Date:** Mon, Feb 11, 2013 1:20 pm

CONFIDENTIAL AND PRIVILEGED
ATTORNEY-CLIENT PRIVILEGE – ATTORNEY WORK PRODUCT

Darwin National Assurance Company
9 Farm Springs Road
Farmington, CT 06032
noticeofloss@darwinpro.com

Re:   D'Angelo & Eurell
      George A. D'Angelo
      Policy Number 0307-7741

Dear Sir/Madam:

I am writing to provide Notice of a Potential Claim for Damages made against D'Angelo & Eurell and George A. D'Angelo, insureds under the above-referenced Policy.

The claimant, Lisa Markley, through her counsel, Bruce Warshawsky, Esquire, is asserting that due to the acts, errors or omissions of your insured in the exercise of his responsibilities in providing Legal Services, including without limitation as attorney and otherwise as a fiduciary, claimant's assets were administered negligently or improperly, resulting in losses.

Kindly provide coverage and a defense to this Claim. I look forward to hearing from you and to discuss who should be appointed as counsel to handle the matter.

David S. D'Angelo

DAngelo-3150



EXHIBIT

D'Angelo 9

Markley v D'Angelo

David D'Angelo 428

**App. 178**

# February 12, 2013 Claim Acknowledgement



Gail Kochanski
Team Coordinator

V (860)264-1382
F (860)264-1383
E Gail.Kochanski@awac.com

February 12, 2013

David S. D'Angelo
D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA 19110
ddsdangelo@cs.com

Re:  Insured:          D'Angelo & Eurell
     Policy No.:       0307-7741
     Policy Period:    8/20/2012 to 8/20/2013
     Insurer:          Darwin National Assurance Company
     Subject:          Markley, Lisa
     Claim/Ref. No.:   2013002782

Dear Mr. D'Angelo:

Allied World National Assurance Company, claims manager for Darwin National Assurance Company, has established a file for the above matter based on material recently received in this office.

This matter has been assigned to Gale S. Dwyer for review and handling. You may reach Gale by phone at (860)284-1528 or by e-mail at Gale.Dwyer@awac.com. Please use the above-noted reference number in any future communications relating to this matter.

Please understand that this letter is not a confirmation of coverage. Darwin National Assurance Company respectfully reserves all of its rights and defenses concerning this matter.

Very truly yours,

Gail Kochanski

EXHIBIT
D'Angelo 13

ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.    1690 New Britain Avenue    T. 860 284 1300    E. info@awac.com
Farmington, CT 06032    F. 860 284 1301    www.awac.com
U.S.A.

ALLIEDWORLD00000758

App. 180

# February 15, 2013 Email Dwyer to David

Message

| | |
|---|---|
| From: | awac-claimmail@ventivcloud.com [awac-claimmail@ventivcloud.com] |
| Sent: | 1/11/2023 8:00:03 PM |
| To: | Bouchard, Cindy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e07e8c626477497d81aa8f9486c95673-Cindy Bouch] |
| Subject: | FW: New claim- Lisa Markley/D'Angelo & Eurell |

**CAUTION: External Email**

-----Original Message-----
**From:** Gale.Dwyer@awac.com
**Sent:** 2013-02-15 11:05:39.0
**To:** ClaimInfo@awac.com
**Subject:** FW: New claim- Lisa Markley/D'Angelo & Eurell

**From:** Dwyer, Gale S
**Sent:** Friday, February 15, 2013 11:05 AM
**To:** 'ddsdangelo@cs.com'
**Subject:** New claim- Lisa Markley/D'Angelo & Eurell (Claim No. 2013002782)

David: We received your email, putting us on notice of a claim involving Lisa Markley. Please call me at your earliest convenience- I would like some more information relating to this claim.

In the mean time, please forward any relevant documents to my attention (demand letter, grievance complaint, and/or civil complaint and/or any other correspondence from Ms. Markley or her attorney). I look forward to hearing from you soon.

Thank you.

Regards,

Gale



ALLIEDWORLD00001018

Gale S. Dwyer, Esq.

Senior Claims Analyst

E&O Claims

**Allied World National Assurance Company**

1690 New Britain Ave., Suite 101, Farmington, CT 06063 U.S.A

T: 860-284-1528

F: 860-284-1529

E: gale.dwyer@awac.com

W: www.awac.com

# February 21, 2013
# Email David to Dwyer

Message

| From: | awac-claimmail@ventivcloud.com [awac-claimmail@ventivcloud.com] |
|---|---|
| Sent: | 1/11/2023 8:00:03 PM |
| To: | Bouchard, Cindy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e07e8c626477497d81aa8f9486c95673-Cindy Bouch] |
| Subject: | FW: Proof |

**CAUTION: External Email**

-----Original Message-----
**From:** Gale.Dwyer@awac.com
**Sent:** 2013-03-06 14:20:46.0
**To:** ClaimInfo@awac.com
**Subject:** FW: Proof

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, February 21, 2013 11:04 AM
**To:** Dwyer, Gale S
**Subject:** Fwd: Proof

Dear Gale,

I have forwarded the thread of emails emanating from Lisa's attorney's 'Proof'. I believe it presents a clear indication of his position and our efforts to resolve the matter.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Mon, Jan 28, 2013 3:58 pm
Subject: RE: Proof

David:



EXHIBIT
D'Angelo 15

ALLIEDWORLD00001027

**App. 185**

The Real Estate agent involved in the deal to buy Lisa's Mother's house provided the following information:

Rosalie S Markley bought the subject property on 10/29/1998 for $119,000.

So the 100K had nothing to do with that transaction. Have you checked your own financial records?

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i
s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib
ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately
if you receive this transmission in error. Thank you.

---

**From:** Bruce J. Warshawsky
**Sent:** Friday, January 25, 2013 11:45 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** RE: Proof
**Importance:** High

David:

Thank you for your email response.

While we are certainly sympathetic to your father's claim that he was never paid by Lisa's mother for his representati
on in her divorce, my response is as follows:

1.    Your claim of fees pursuant to your fee agreement with Lisa makes no mention of such representation, even t
hough it had concluded long before the fee agreement was signed.

2.    Lisa's mother was not a signatory to the Fee Agreement.

3.    Any claim should have been raised during the administration of Lisa's mother's estate, which didn't occur.

4.    The statute of limitations on claiming these fees has passed.

5.    There was no consideration for Lisa to assume the debt of her mother, and it wasn't in writing, so it's unenforc
eable against Lisa.

ALLIEDWORLD00001038

**App. 186**

6.      Even if enforceable, which it is not, the measure of fees would be based on an hourly rate, not a contingency fee based on the net proceeds of Lisa's mother's estate.

That having been said, I assume you can produce a signed fee agreement with Lisa's mother (or some indicia that s he accepted the fee arrangement, even just a letter to her from your father), time records for your father and his regul ar hourly rate during the relevant time period.  Interest wouldn't accrue for a variety of reasons, none of which I need to state here.  We will consider an appropriate adjustment for such fees, but with the above circumstances regarding the legality of the obligation in mind.

As for the travel costs to pursue the Trust monies (which are part of Lisa's fee agreement), I agree that your father sh ould be reimbursed, if the costs can be documented and without interest.  Please advise.

I am asking Lisa to confirm the date of her mother's home purchase, though I doubt it was late 2000/early 2001 and has nothing to do with the 100K we are discussing.

At this juncture, it is imperative that you make a bona fide proposal.

Thank you.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Friday, January 25, 2013 11:15 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

ALLIEDWORLD00001029

My father represented Lisa's mother in an appeal from a decree against her in the divorce, support and visitation acti
on filed by her father in 1962. After briefing and argument, two decisions were rendered in 1966 cited at 207 Pa. Sup
er 296 and 207 Pa. Super 758. My father was not paid at that time as Lisa's mother had no money and it was agreed
that my father would be paid from her estate. The money came in from her estate in 2006, forty years later. Lisa is a
ware of that agreement. Therefore, it is appropriate that my father receive a fee from those monies.

I have also attached a copy of the letter from local counsel in California regarding the Sidney & Marjorie Markley Trus
t matter which extended from 1991 through 1994. Both he and my father waited until the 2000's to get paid their fees.
The costs of travel were paid by my father, which included flights and lodging for approximately eleven hearings in C
alifornia. These costs are to be included in the amounts paid to my father.

Does Lisa know when her mother purchased her house. That check to 'Pugh and Hughes' remains a mystery, but if it
is unrelated to purchase or support of Lisa's mother, we are prepared to reimburse. I believe we are close to conclud
ing this matter.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com
>
Sent: Thu, Jan 17, 2013 1:45 pm
Subject: RE: Proof

David:

Lisa indicates that there was no payment made of 100K to or for her mother in late 2000/early 2001 (or at any other ti
me).

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i
s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib
ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately
if you receive this transmission in error. Thank you.

**From:** Bruce J. Warshawsky
**Sent:** Wednesday, January 16, 2013 4:12 PM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky

**Subject:** RE: Proof
**Importance:** High

No----
It doesn't relate to the house, we vetted that issue and have no proof that Lisa deposited it and wouldn't be able to verify that it was for her mother, but I will ask Lisa, again, to consider this (new) possibility. However, we are fairly certain (and if you will look back at your own financial records, we believe that this will be proven) that the money was paid to your firm.

I don't mean to belabor the point, but that is only one (100K) contested issue and nearly a month ago, I presented you with a detailed spreadsheet, identifying a Million Dollar plus set of issues and have no other substantive response.

Please re-
read that email, as I communicated certain 'conclusions' and 'positions' to which we could not (yet) commit, but with each passing day without further explanation, our position becomes more clear.

I have been very patient, but that patience is wearing thin.

Please advise.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Wednesday, January 16, 2013 2:13 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

I have discussed the matter of the $100,000.00 payable to Pugh and Hughes which cleared on January 3, 2001, whi ch means it was probably dated and sent late December 2000. This may have been money sent for the benefit of Lis a's mother for her support and/or to buy a house. Please confirm with Lisa.


Thank you.


David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com >
Sent: Fri, Jan 11, 2013 9:34 am
Subject: RE: Proof

David:


Lisa has provided, and I have reviewed all the documents pertinent to the house purchase in AZ.  It was in late Augu st and the wire amount matches.


We also confirmed with the broker that no copies of checks were provided over 7 years old.


The Pugh/Holmes firm in AZ must be coincidental, but if you want to track them down and see if their records reflect a 100K inflow from Lisa in Jan, 2001, please do so.  However, I think it easier for you to check your own financial rec ords at the end of 2000/start of 2001 to determine if you received the 100K.  If needed, we would be asking for that in discovery anyway.


Please advise.  Thanks.


Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

ALLIEDWORLD00001033

**From:** Bruce J. Warshawsky
**Sent:** Thursday, January 10, 2013 10:28 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** RE: Proof

Will do.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i
s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib
ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately
if you receive this transmission in error. Thank you.

---

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, January 10, 2013 11:19 AM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

I just looked at the statement and do see the wire transfer of the funds on August 27, 2001, which could be for the ho
use. Please look at the deed for further information and confirmation. The check for Pugh A Dhughes is still unknown
, but a search does reveal lawyers with such a name in Arizona.

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com
>
Sent: Tue, Jan 8, 2013 2:36 pm
Subject: RE: Proof

David:

The broker told us that they already sent copies of all the checks to you.  Will you please forward copies at your earli
est convenience?  Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110

ALLIEDWORLD00001033

**App. 191**

717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** Bruce J. Warshawsky
**Sent:** Tuesday, January 08, 2013 10:08 AM
**To:** 'ddsdangelo@cs.com'
**Cc:** 'Lisa Markley (lsmarkley@comcast.net)'; Bruce J. Warshawsky
**Subject:** RE: Proof
**Importance:** High

David:

We will contact the broker to obtain copies of all checks that were paid to your firm, however, Lisa advises that the m oney to buy the house in AZ was for 113845.76, wired (Federal Funds) on 8/27/2001. Thus, we stand by our belief t hat the $100000 on 1/3/2001 was indeed paid to your firm.

Lisa also assures me that the money from her Mother's estate was not derivative of anything left by her father or the Trusts identified in the fee agreement.

Please give me a timeframe for your substantive response.

Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

ALLIEDWORLD00001034

**App. 192**

**From:** Bruce J. Warshawsky
**Sent:** Monday, January 07, 2013 4:37 PM
**To:** 'ddsdangelo@cs.com'; Bruce J. Warshawsky
**Cc:** Lisa Markley (lsmarkley@comcast.net)
**Subject:** RE: Proof
**Importance:** High

David:

I think we need to get a copy of the check at issue, although I will follow up with Lisa on this point.

The money that came into the account from Lisa's mother is not subject to the 1/3 contingency fee (which I think we discussed on a prior telephone call). I don't read the fee agreement to encompass her mother's estate, unless you h ave proof that such monies were derivative of her father's estate (and that this was a remainder interest flowing to Lis a).

If either or both of these issues are resolved in your favor, I will be happy to revise the proof accordingly.

Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which i s confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distrib ution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Monday, January 07, 2013 3:07 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Dear Bruce,

ALLIEDWORLD00001035

**App. 193**

I have your comments being reviewed. With the holidays, there has been some delay.

In the meantime, as a point of clarification, the payment in early 2001 to 'Pugh A DHughes' was for Lisa to purchase the house in Arizona. I assume Hughes was the local agent. Please confirm this with Lisa and me after.

Also you did not account for attorney's fees earned by my father out of the payment into the account in August, 2006, of $286,422.04 from the mother's estate.

Thank you.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Bruce J. Warshawsky <BJW@cclawpc.com>; Lisa Markley (lsmarkley@comcast.net) <lsmarkley@comcast.net>
Sent: Wed, Jan 2, 2013 11:19 am
Subject: RE: Proof

David:

I need some kind of a timeframe for your response, as you can appreciate, I cant let this sit for very long.  Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, December 27, 2012 12:28 PM
**To:** BJW@cclawpc.com
**Subject:** Re: Proof

Bruce,

ALLIEDWORLD00001036

I acknowledge receipt of your emails and will get back to you after I have reviewed them with the appropriate parties. Thank you.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'David D'Angelo (ddsdangelo@cs.com)' <ddsdangelo@cs.com>
Cc: 'Lisa Markley (lsmarkley@comcast.net)' <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Wed, Dec 26, 2012 4:40 pm
Subject: RE: Proof

David:

One additional element which should have been factored into my analysis are my fees, which are only about $5,000 to date. Obviously, they will only increase from here. Please acknowledge receipt of my email of December 22, 2012 and of this email. Thanks.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

---

**From:** Bruce J. Warshawsky
**Sent:** Saturday, December 22, 2012 9:22 AM
**To:** David D'Angelo (ddsdangelo@cs.com)
**Cc:** Lisa Markley (lsmarkley@comcast.net); Bruce J. Warshawsky
**Subject:** Proof
**Importance:** High

David:

Please see the attached spreadsheet, which I alluded to in our brief telephone conversation yesterday.

**App. 195**

As we have previously discussed, I had not yet meticulously reviewed the statements and your summary attached to your 12/4/12 correspondence, but now that I have done so, it seems pretty obvious to me that we have a rather significant problem on our hands.

When we spoke in the early autumn, I told you that you needed to put your carrier on notice. Have you done so?

Also, now that I have completed my analysis, unless you can persuade me otherwise, I believe that your father may have violated the Rules of Professional Conduct, however, at this juncture, I have not reached a final determination of same since I do not yet 'know' such and have not yet concluded same within the requirements of Rule 8.3 (a).  Also , I haven't reached any conclusion about whether this situation needs to be reported to law enforcement.

Please note the following:

You failed to recognize that an additional 999,763.83 was received into the account in August, 2000 for which your firm was entitled to a one-
third fee.  By early, 2002, the amount your firm had taken in fees was very close to the amount earned (the discrepancy was likely due to the fact that your father managed the assets for only 6 months in 2000, but took a fee for an entire year).  A check for $100,000 in early 2001 (identified as 'Pugh A DHughes'), was likely paid to your firm as part of t he 'initial' 1/3 fee-you had listed this in the 'other ' column.  This is the 100K difference.

The amounts 'paid back' in 2010-2012 have been 'netted' against the amounts paid to your firm-
which explains the remaining difference between what you reported.

I break down the 'deficiencies' in Lisa's account in 2 areas---'Excess Payments' (390K) and 'Performance' (494K).

With respect to Performance, I note the following:

I don't have any fee agreement or writing to substantiate the 15000 per year fee your father was paid.

I don't have any proof that he was a licensed registered investment advisor.

He is subject to the Prudent Investor Rule and obviously did not adhere to it.

In 2000, when the tech bubble was still positive, he sold securities and realized a loss of over 92K (see sheet 2).  Unt il 1/1/2003, the portfolio lost another 272K under his watch.  Interest should be paid on these losses. From 2003-2007, the investment portfolio recovered and almost regained its diminished value----
then the bloodbath began in 2008.  Unbeknownst to Lisa, she paid interest on a margin account until her portfolio went to zero in 2012.

ALLIEDWORLD00001038

**App. 196**

Had the corpus of her money been safely invested (earning a paltry 1.5%), her portfolio would have still been a net of more than 1MM today, even if your father received 180000 in fees. Without factoring in the excess payments, she should have 1.2MM in assets-as any investment fees should properly be disgorged.

As for the excess fees, I certainly cannot explain them, though it is interesting to note that for the most part the payments made to your firm were in 5K or 10K increments. From 2003-2207, the differences are minimal. Perhaps due to the good performance, your father felt 'entitled' to more or perhaps he discussed it with Lisa and she agreed (although she denies this). In 2008, we see more 'small' payments (3-5K) growing in frequency after the market tanked and accelerating in 2009 in frequency and in 2010, amount (a few 10K, 15K and a 20K)---
a disturbing and perhaps defining pattern. I believe that it was around this time, that he assuaged Lisa with representations that he was using her account to buy precious metals and other impervious investments.

The fact of the matter is that from late 2008 to 2012, he took about 300K from her which clearly must be returned (plus the additional 90K previously overpaid), plus interest. I would calculate the total to be returned at about 500K.

Therefore, I think we can safely say that approximately 1.7MM would be our claim. Perhaps precious metals were purchased on Lisa's behalf and he can produce them?

At this juncture, I will await your response, but we cannot wait much longer before proceeding. Any information you can provide to address my ethical and criminal concerns is most appreciated ASAP.

Thank you.

Bruce J. Warshawsky, Esq.
Cunningham & Chernicoff, P.C.
2320 N. Second St.
Harrisburg, PA 17110
717-238-6570
717-238-4809 (Fax)

CONFIDENTIALITY NOTICE: This email contains information from the law firm of Cunningham & Chernicoff, P.C., which is confidential and/or legally privileged. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited. Please notify us immediately if you receive this transmission in error. Thank you.

# March 4, 2013 Email David to Dwyer

Message

| | |
|---|---|
| **From:** | awac-claimmail@ventivcloud.com [awac-claimmail@ventivcloud.com] |
| **Sent:** | 1/11/2023 8:00:02 PM |
| **To:** | Bouchard, Cindy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e07e8c626477497d81aa8f9486c95673-Cindy Bouch] |
| **Subject:** | FW: Lisa Markley |

---

**CAUTION:** External Email

---

-----Original Message-----
**From:** Gale.Dwyer@awac.com
**Sent:** 2013-03-04 14:03:29.0
**To:** ClaimInfo@awac.com
**Subject:** FW: Lisa Markley


**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Monday, March 04, 2013 10:59 AM
**To:** Dwyer, Gale S
**Subject:** Fwd: Lisa Markley


FYI

----Original Message-----
From: Bruce Warshawsky-C+C <bjw@cclawpc.com>
To: ddsdangelo <ddsdangelo@cs.com>
Cc: Work <bjw@cclawpc.com>; Lsmarkley <Lsmarkley@comcast.net>
Sent: Sat, Mar 2, 2013 10:04 am
Subject: Re: Lisa Markley

Ok, but our patience is wearing thin and we are pursuing other options. The sooner the better.

Bruce Warshawsky-Sent via BlackBerry


**From:** 'ddsdangelo@cs.com' <ddsdangelo@cs.com>

**Date:** Fri, 1 Mar 2013 15:57:10 -0500 (EST)

**To:** <bjw@cclawpc.com>

**Subject:** Re: Lisa Markley



EXHIBIT
D'Angelo 16
ALLIEDWORLD00000929

**App. 200**

Bruce,

I spoke again with the carrier. They are reviewing the various issues and will be back in touch with me next week. At that time, I should have the identity of the assigned representative/attorney.

I will contact you next week.

David

-----Original Message-----
From: Bruce Warshawsky-C+C <bjw@cclawpc.com>
To: ddsdangelo <ddsdangelo@cs.com>
Cc: Work <bjw@cclawpc.com>
Sent: Thu, Feb 14, 2013 8:49 pm
Subject: Re: Lisa Markley

I want the claim reps info please. tx.

Bruce Warshawsky-Sent via BlackBerry

_____

**From:** 'ddsdangelo@cs.com' <ddsdangelo@cs.com>

**Date:** Wed, 13 Feb 2013 13:22:01 -0500 (EST)

**To:** <BJW@cclawpc.com>

**Subject:** Lisa Markley

Bruce,

I have contacted the carrier and I or the representative will get back to you shortly.

David

!DSPAM:5131115c232481265714162!

# March 13, 2013 Denial



Gale S. Dwyer
Senior Claims Analyst

V (860)284-1528
F (860)284-1529
E Gale.Dwyer@awac.com

**VIA E-MAIL**

March 13, 2013

Mr. David D'Angelo
D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA 19110

| Re: | Insured: | DAngelo & Eurell |
|-----|----------|------------------|
|     | Insurer: | Darwin National Assurance Company |
|     | Policy No.: | 0307-7741 |
|     | Policy Period: | 8/20/2012 to 8/20/2013 |
|     | Limit: | $500,000 |
|     | Retention: | $5,000 |
|     | Subject: | Markley, Lisa |
|     | Ref. No.: | 2013002782 |

Dear David:

I am writing on behalf of Allied World National Assurance Company, the claims manager for Darwin National Assurance Company ("Darwin"), with respect to the above-referenced Lawyers Professional Liability Insurance policy ("Policy"). The purpose of this letter is to provide our coverage evaluation under the Policy that Darwin issued to D'Angelo & Eurell ("Firm") for the Policy Period of August 20, 2012 to August 20, 2013 ("Policy Period"). Regretfully, we must inform you that coverage is not available for this matter for the reasons set forth below.

We recommend that you review the Policy in conjunction with this letter. This letter does not modify any of the terms and conditions of the Policy. Please note that the words that appear in **bold** print below are defined in the Policy.

Based on our telephone conversations and your email to Mr. Warshawsky dated February 6, 2013, your father, George D'Angelo, has represented Lisa Markley and her deceased mother since 1962. Your father represented Ms. Markley's mother in divorce, support and custody proceedings. Your father was allegedly never paid for his representation since Ms. Markley's mother didn't have the money at the time. However, Ms. Markley's mother allegedly agreed that your father's fee would be paid out of her estate, over 40 years later. Pursuant to this fee agreement, your father and Ms. Markley allegedly agreed that

**ALLIED WORLD** ASSURANCE COMPANY (U.S.) INC.

1690 New Britain Avenue  T.  860 284 1300
Farmington, CT 06032    F.  860 284 1301
U.S.A.
DAngelo-6485

E. info@awac.com
www.awac.com



**App. 203**

March 13, 2013
Page 2 of 2

your father would receive an annual fee of $15,000 from her trust account, which your father allegedly claimed in the tax returns each year for a 12-year period.

From approximately 2008-2012, your father used or took funds from Ms. Markley's trust account on the mistaken belief that he was taking funds from another account. It is our understanding based on our telephone conversations that your father and/or your firm did not do an annual accounting of Ms. Markley's account. Only recently, your firm retained an accountant to review Ms. Markley's trust account.

The exact amount of money that your father took from Ms. Markley's trust account is in dispute. In an email dated December 22, 2012, Ms. Markley's attorney, Bruce Warshawsky alleges that your father "took about $300,000 from her. . . plus the additional $90,000 previously overpaid, plus interest." Mr. Warshawsky further states that the total amount to be returned is about $500,000, and that Ms. Markley's claim is for $1.7 million.

Insuring Agreement I.A provides that Darwin:

> ...will pay on behalf of the Insured, subject to the Limits of Liability shown in the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** because of a **Claim** arising out of a **Wrongful Act**, other than a **Non-Profit Director** or **Officer Wrongful Act**, that is first made during the **Policy Period** or any **Extended Reporting Period**. It is a condition precedent to coverage under this Policy that the **Wrongful Act** upon which the **Claim** is based occurred:
>
> 1. during the **Policy Period**; or
> 2. on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:
>    (a) the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and
>    (b) prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and
>    (c) there is no policy that provides insurance to the **Insured** for such liability or **Claim**.

In addition to the Limits of Liability, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy and made against an Insured even if any of the allegations of the **Claim** are groundless, false or fraudulent.

Policy Section II.C. defines **Claim** to include:

1. any written notice or demand for monetary relief or **Legal Services;** or
2. any civil proceeding in a court of law;

DAngelo-6486

**App. 204**

March 13, 2013
Page 3 of 3

    3.  any administrative proceeding, other than a **Disciplinary Proceeding**; or
    4.  a request to toll or waive a statute of limitations;

made to or against any **Insured** seeking to hold such **Insured** responsible for damages for a **Wrongful Act.**

A **Claim** does not include criminal proceedings of any type, or any proceeding that seeks injunctive, declaratory, equitable or non-pecuniary relief or remedies of any type.

Policy Section II.V. defines **Wrongful Act** as,

    1.    an actual or alleged act, error or omission by an **Insured**, solely in the performance of or failure to perform **Legal Services**;
    2.    an actual or alleged **Personal Injury** committed by any **Insured**, solely in the performance of or failure to perform **Legal Services**; or
    3.    a **Non-Profit Director and Offices Wrongful Act**.

Pursuant to Section II.I, **Insured** is defined as:

    1.    the **Named Insured**;
    2.    any **Predecessor Firm;**
    3.    any lawyer or professional corporation listed in the **Application**, on the day the **Policy Period** incepts until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;
    4.    any lawyer or professional corporation who becomes a partner, officer, director, stockholder or shareholder or employee of the **Named Insured** during the **Policy Period** until such time as the lawyer or professional corporation ceases to be a member of the **Named Insured** subject to paragraph 5. below, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;
    5.    any lawyer or professional corporation who is a former partner, officer, director, stockholder or shareholder or employee of the **Named Insured** or **Predecessor Firm** but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured** or **Predecessor Firm**;
    6.    any person or entity who is designated by the **Named Insured** as counsel or of counsel in the **Application**, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured**;
    7.    any other person who is employed or retained by the **Named Insured** as a legal secretary, paralegal, contract attorney or other legal office staff member, but only in rendering or failing to render **Legal Services** on behalf of the **Named Insured** and also only within the scope of such employment or retention agreement; and
    8.    the estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Policy.

**App. 205**

March 13, 2013
Page 4 of 4

As a named partner at D'Angelo & Eurell, your father, George D'Angelo, is considered an **Insured** under Section II.I.

The email from Bruce Warshawsky of Cunningham & Chernicoff, P.C. dated December 22, 2012, demanding $1.7 million and advising you to put your carrier on notice, constitutes a **Claim** against an **Insured** arising out of a **Wrongful Act**, that is first made during the **Policy Period**.

Although this email from Attorney Warshawsky constitutes a **Claim**, Darwin must nevertheless deny coverage since this **Claim** is specifically excluded under the Policy. Pursuant to Sections III(B)(2) and (10) of the Policy, there is no coverage for any " **Claim**. . . based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:

> 2. any act whatsoever of an **Insured** in connection with a trust or estate when an Insured is a beneficiary or distribute of the trust or estate.

> 10. the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds."

Ms. Markley, through her attorney, alleges that your father took funds from her trust account from approximately 2008- 2012, and therefore violated the Rules of Professional Conduct. This trust fund was in your father's care, custody and control. The exact amount of funds that your father took from Ms. Markley's account is in dispute.

As such, Darwin denies this **Claim** in its entirety because this **Claim** is specifically excluded under Sections III.B.2 and/or III.B.10 of the Policy

In addition, certain sections of your Policy may also apply to this **Claim,** and **Darwin** respectfully reserves its rights accordingly.

Policy Section II.E., as amended by Endorsement No. 1, defines "**Damages**" as "the monetary portion of any judgment, award or settlement, including post-judgment interest. **Damages** shall not include:

> 1. criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;
> 2. punitive, exemplary or the multiplied portion of multiple damages;
> 3. matters deemed uninsurable by law;
> 4. *the return or restitution of legal fees, costs and expenses, no matter how claimed;*
> 5. any form of equitable or non-monetary relief; or
> 6. pre-judgment interest

[Emphasis added].

To the extent that Ms. Markley through her attorney is seeking the return or restitution of attorneys' fees, costs and expenses, Darwin reserves its rights based on the above definition of "**Damages**."

**App. 206**

March 13, 2013
Page 5 of 5

Based on this threshold bar to coverage under Sections III(B)(2) and (10) of this Policy, Darwin has not undertaken an in-depth analysis of all other coverage issues presented by this matter at this time. Darwin continues to reserve all of its rights under the Policy and applicable law. Darwin's position with respect to this matter is based on the information provided to date, and is subject to further evaluation as additional information becomes available. Darwin respectfully reserves all of its rights and defenses under the Policy and available at law, including the right to assert additional policy terms and provisions which may become applicable as new information is learned.

If you have any questions regarding our position or if you feel there is additional information we should consider, please feel free to contact me.

Very truly yours,

Gale S. Dwyer

cc:    Kurt Taylor
       Willis of Delaware, Inc.
       222 Delaware Avenue, Suite 1000
       Wilmington, DE 19801

DAngelo-6489

**App. 207**

# March 21, 2013 Email David to Dwyer

Message

| | |
|---|---|
| From: | awac-claimmail@ventivcloud.com [awac-claimmail@ventivcloud.com] |
| Sent: | 1/11/2023 8:00:03 PM |
| To: | Bouchard, Cindy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=e07e8c626477497d81aa8f9486c95673-Cindy Bouch] |
| Subject: | FW: Lisa Markley/D'Angelo & Eurell (Claim No. |

**CAUTION:** External Email

-----Original Message-----
**From:** Gale.Dwyer@awac.com
**Sent:** 2013-03-25 10:07:46.0
**To:** ClaimInfo@awac.com
**Subject:** FW: Lisa Markley/D'Angelo & Eurell (Claim No.

**From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
**Sent:** Thursday, March 21, 2013 11:57 AM
**To:** Dwyer, Gale S
**Subject:** Re: Lisa Markley/D'Angelo & Eurell (Claim No. 2013002782)

Gale,

In addition to his claim for mismanagement of the Markley account, Mr. Warshawsky is threatening to file a disciplina
ry complaint. I believe your early discussions with him would be advisable and helpful to obviate undue process.

David

-----Original Message-----
From: Dwyer, Gale S <Gale.Dwyer@awac.com>
To: ddsdangelo <ddsdangelo@cs.com>
Sent: Wed, Mar 13, 2013 2:08 pm
Subject: Lisa Markley/D'Angelo & Eurell (Claim No. 2013002782)

David: As we discussed, attached please find our denial letter and a copy of your policy. If you have any questions,
please call me. Thank you.

Regards,



# March 28, 2013 Correspondence David to Warshawsky



LAW OFFICES

D'ANGELO AND EURELL

TWENTY-SECOND FLOOR
LAND TITLE BUILDING
PHILADELPHIA, PA, 19110

(215) 564-5022
FAX (215) 557-7851

March 28, 2013

Bruce J. Warshawsky, Esquire
Cunningham & Chernicoff, P.C.
P.O. Box 60457
Harrisburg, PA 17106

RE:    Lisa Markley

Dear Bruce:

Enclosed please find a check from my father made payable to Lisa Markley in the amount of $328,752.40 representing the net overpayments and margin interest charged on the account. This figure includes the check amount of $100,000.00 shown as payable to "Pugh A Dhughes" paid on January 3, 2001.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

DAVID S. D'ANGELO

DSD/cms
Enclosures

---

GEORGE A. D'ANGELO & DAVID S. D'ANGELO
IOLTA ACCOUNT                                                    1046
100 S. BROAD ST., STE. #2226
PHILADELPHIA, PA 19110                                    3-7818/360
                                                                         536

PAY
TO THE
ORDER OF   Lisa Markley                         DATE   March 28, 2013

                                                              $ 328,752.40

Three Hundred Twenty-Eight Thousand Seven Hundred Fifty-Two————— 40/100 DOLLARS

Citizens Bank
Pennsylvania

FOR

⑈001046⑈ ⑈036076150⑈ 620169597811⑈

DAngelo-3153

Markley v D'Angelo

David D'Angelo 431

**App. 211**

# March 29, 2013 Denial



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX    202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX    703.905.2820

www.wileyrein.com

Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Leland H. Jones IV
202.719.7178
lhjones@wileyrein.com

March 29, 2013

**VIA EMAIL AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

David D'Angelo, Esq.
D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA  19110

| Re: | Insured: | **D'Angelo & Eurell** |
|-----|----------|------------------------|
|     | Insurer: | **Darwin National Assurance Company** |
|     | Policy No.: | **0307-7741** |
|     | Policy Period: | **8/20/2012 to 8/20/2013** |
|     | Claim No.: | **2013002782** |

Dear Mr. D'Angelo:

This firm has been retained to represent Allied World National Assurance Company, claim manager for its affiliate, Darwin National Assurance Company (collectively, "Darwin"), in connection with this matter. We write to supplement Darwin's earlier reservation of rights correspondence regarding the December 22, 2012 letter from counsel for Lisa Markley and provides Darwin's current views regarding the availability of coverage under the above-referenced policy for this matter. Based on its further review of the information previously provided, Darwin must reaffirm its previous determination that no coverage is available under the policy for the Markley matter.

## I.    BACKGROUND

Counsel for Lisa Markley sent a December 22, 2012 e-mail to you and made certain allegations concerning the representation of Ms. Markley and her deceased mother by your father, George D'Angelo. Your father apparently represented Ms. Markley's mother in divorce proceedings in 1962, and because Ms. Markley's mother could not pay your father's fees and costs, your father agreed to be paid out of the estate of Ms. Markley's mother. Ms. Markley alleges that your father removed more assets from the estate than he was entitled to receive. In addition, your father and Ms Markley purportedly agreed that your father would be paid $15,000 per year from Ms. Markley's trust account, and Ms. Markley's counsel alleged that, between 2008 and 2012, your father removed over $300,000 from Ms. Markley's account to which he was not entitled. In addition, Ms. Markley's counsel asserted that your father

**EXHIBIT**
D'Angelo 19



David D'Angelo, Esq.
March 29, 2013
Page 2

mismanaged Ms. Markley's portfolio of assets, causing Ms. Markley to suffer over $1 million in investment losses.

## II.    COVERAGE ANALYSIS

Darwin issued Lawyers Professional Liability Policy No. 0307-7741 to D'Angelo & Eurell (the "Firm") for the **Policy Period** August 20, 2012 to August 20, 2013 (the "Policy").[1]  The Policy has a $500,000 per **Claim** and $1 million aggregate limit of liability for all **Claims**, inclusive of **Claims Expenses**.  The Policy also has a $5,000 per **Claim** retention.

### A.    Insuring Agreement I.A

Insuring Agreement I.A provides:

> The **Insurer** will pay on behalf of an **Insured**, subject to the Limits of Liability shown in the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a Claim arising out a **Wrongful Act**, other than a **Non-Profit Director or Officer Wrongful Act**, that is first made during the **Policy Period** or any **Extended Reporting Period**.  It is a condition precedent to coverage under this Policy that the **Wrongful Act** upon which the **Claim** is based occurred:
>
> 1.    during the **Policy Period**; or
>
> 2.    on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:
>
>> (a)    the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and

---

[1] Terms in bold are defined in the Policy.

Markley v D'Angelo

David D'Angelo 433

**App. 214**



David D'Angelo, Esq.
March 29, 2013
Page 3

      (b)    prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

      (c)    there is no policy that provides insurance to the Insured for such liability or **Claim**.

Policy, §I.A. The Policy defines **Wrongful Act**, in relevant part, as "an actual or alleged act, error or omission by an **Insured**, solely in the performance of or failure to perform **Legal Services**." Policy, § II.V.1. **Legal Services** means "those services performed on behalf of the **Named Insured** for others by an **Insured** as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee, escrow agent, or in any other fiduciary capacity, but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer." *Id.*, § II.K.

Darwin reserves its rights to the extent that Ms. Markley alleges that George D'Angelo did not commit an actual or alleged act, error, or omission solely in the performance of or failure to perform **Legal Services** for Ms. Markley or her mother. In addition, Darwin reserves its rights to the extent any **Insured**, prior to the inception date of the first policy issued by Darwin to the Firm, had any basis to believe that any **Insured** had breached a professional duty or had any basis to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**.

    **B.**    **Section III.B.5**

The Policy bars coverage for any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part, "the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so." Policy, § III.B.5. Ms. Markley's counsel alleges that George D'Angelo



David D'Angelo, Esq.
March 29, 2013
Page 4

rendered investment advice to Ms. Markley without adhering to the prudent investor rule and caused Ms. Markley to lose the entire value of her portfolio based on investment decisions made by George D'Angelo. Accordingly, Section III.B.5 of the Policy bars coverage for the Markley matter.

## C.    Section III.B.10

The Policy excludes coverage for any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part, "the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds." Policy, § III.B.10. The December 22, 2012 correspondence from Ms. Markley's counsel alleged that George D'Angelo paid himself fees from Ms. Markley's account to which he was not entitled; removed in excess of $300,000 in asserts from Ms. Markley's account without her approval; and caused Ms. Markley to lose the entire amount of her portfolio, which should have been in excess of $1 million. Darwin must deny coverage for the Markley matter because Ms. Markley alleges the loss of value of any asset in the **Insured's** care, custody, or control and alleges the misappropriation, conversion, and/or embezzlement of client funds.

## D.    Section III.B.2

Section III.B.2 of the Policy bars coverage for "any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate." Ms. Markley's counsel alleges that George D'Angelo entered into a fee arrangement for his representation of Ms. Markley's mother in a divorce proceeding in 1962 in which he was to receive a portion of the assets of the estate of Ms. Markley's mother. Ms. Markley's counsel alleges that George D'Angelo received more from the estate under that fee arrangement than he was entitled. Section III.B.2 of the Policy therefore bars coverage for the Markley matter because it arises out of any act whatsoever of an Insured in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate.



David D'Angelo, Esq.
March 29, 2013
Page 5

**E.    Section III.B.1**

Section III.B.1 of the Policy provides:

> This Policy shall not apply to any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:
>
> any intentional, criminal, fraudulent, malicious or dishonest act or omission by or at the direction of an **Insured**; provided, however, that this Exclusion shall not apply unless there has been a finding, admission, or final adjudication, in a proceeding constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

Policy, Section III.B.1. Darwin reserves the right to deny coverage for the Markley matter to the extent that this exclusion applies.

**F.    Damages**

The Policy defines "**Damages**" as:

> the monetary portion of any judgment, award or settlement, including post-judgment interest. **Damages** shall not include:
>
> 1.    criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;
> 2.    punitive, exemplary or the multiplied portion of multiple damages;
> 3.    matters deemed uninsurable by law;
> 4.    the return or restitution of legal fees, costs and expenses, no matter how claimed;
> 5.    any form of equitable or non-monetary relief; or
> 6.    pre-judgment interest.

Policy, §II.E., as amended by Endorsement No. 1. Darwin reserves its rights to deny coverage for amounts that constitute the return or restitution of legal fees, costs and expenses, no matter how claimed; pre-



David D'Angelo, Esq.
March 29, 2013
Page 6

judgment interest; and matters deemed uninsurable by law, including
amounts to which any **Insured** was not legally entitled.

## III.    CONCLUSION

For the reasons discussed above, Darwin has concluded that there is no coverage
under the Policy for the Markley matter. To the extent that the Firm disagrees
with Darwin's understanding of the facts or Darwin's conclusion that no
coverage is available or if the Firm has additional information relevant to
Darwin's analysis of coverage with respect to this matter, including the
December 4, 2012 correspondence and spreadsheet referenced in the December
22, 2012 e-mail from Ms. Markley's counsel, please provide that information to
us for Darwin's consideration. In the meantime, Darwin continues to reserve all
of its rights under the Policy and applicable law.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Leland H. Jones IV

cc:    Gale S. Dwyer, Esq. (via email)

# Plaintiffs Discovery Responses in the Underlying Action

**McSHEA LAW FIRM, P.C.**
BY: John P. McShea
Identification No. 34562
BY: Conrad O. Kattner
Identification No. 35468
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102
(215) 599-0800
jmcshea@mcshealawfirm.com
ckattner@mcshealawfirm.com

Attorneys for Defendants,
Law Offices of D'Angelo & Eurell,
David S. D'Angelo and David S.
D'Angelo and Christopher S. D'Angelo,
Co-Executors of the Estate of George A.
D'Angelo, Deceased

---

| | |
|---|---|
| LISA MARKLEY,<br><br>                    Plaintiff,<br><br>        v.<br><br>LAW OFFICES OF D'ANGELO &<br>EURELL, DAVID S. D'ANGELO, and<br>DAVID S. D'ANGELO and<br>CHRISTOPHER S. D'ANGELO, CO-<br>EXECUTORS OF THE ESTATE OF<br>GEORGE A. D'ANGELO, DECEASED,<br><br>                    Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA, PENNSYLVANIA<br><br>Civil Action<br><br>JUNE TERM, 2017<br><br>NO. 00611 |

---

**DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF, LISA MARKLEY'S SECOND SET OF INTERROGATORIES
ADDRESSED TO DEFENDANTS D'ANGELO & EURELL, DAVID S. D'ANGELO,
AND CO-EXECUTORS OF THE ESTATE OF GEORGE A. D'ANGELO, DECEASED**

Defendants by and through his undersigned attorneys, supply these Objections and

Responses to Plaintiff, Lisa Markley's ("plaintiff's" or "Ms. Markley's") Second Set of

Interrogatories Addressed to Defendants D'Angelo & Eurell, David S. D'Angelo, and Co-

Executors of the Estate of George A. D'Angelo, Deceased,[1] in the above-captioned action as

follows:

---

[1] As the insurance information requested in each of Plaintiff's three sets of Second Sets of Interrogatories is the same at this time for each of the Defendants, namely D'Angelo & Eurell, David S. D'Angelo, and Co-Executors of the Estate of George A. D'Angelo, Deceased, Defendants provide this set of Objections and Reponses to reduce clutter, while reserving all objections, defenses, and rights to supplement.

DAngelo-1324

## OBJECTIONS

1.     Defendants generally object to these interrogatories on the grounds and to the extent that they are overly broad, unreasonably burdensome, oppressive, expansive, not reasonably tailored to this case and the issues therein.  Discovery should be addressed to specifically identified circumstances concerning the incidents and events alleged.  To the extent such specificity may be lacking, it is impossible for Defendants to respond and the discovery is simply a fishing expedition.

2.     Defendants have each been engaged in the practice of law over a number of years.  The allegations of Plaintiff's Complaint span decades and a multiplicity of events.  As noted, at least one of the individual defendants, George D'Angelo, has passed away.  Thus, there is no central repository for information relating to all subjects of inquiry.  Defendants may no longer have, or maybe never had, documents relating to all subjects of inquiry.

3.     Defendants each object to any interrogatory that seeks to conflate or confuse the respective roles of each Defendant.  Defendants each answer and respond in their separate capacities. D'Angelo and Eurell, although named as insured of Darwin Insurance, and appearing on letterhead or for similar uses, was not and is not a separately registered or constituted legal entity. George D'Angelo, Esq., deceased, had served, in his personal capacity as lawyer, as legal counsel for plaintiff, Lisa Markley, over a number of years, prior to being discharged, and replaced by substitute counsel, Bruce Warshawsky, Esq., on or about June 12, 2012. David D'Angelo, Esq., who did not represent Lisa Markley, nor have any involvement her affairs, at any time prior to or after June 12, 2012, is sued in this litigation for his role as a lawyer in representing his father, George D'Angelo, as counsel, after June 12, 2012, in settlement negotiations, in accord with the demand of Bruce Warshawsky's Letter of June 12, 2012,

2

DAngelo-1325

requesting an accounting as to George D'Angelo's representation of Lisa Markley, and that all communications be "through counsel," a role filled by David D'Angelo, Esq., for those negotiations. No answer or response shall be construed to waive or diminish any privileges or defenses attended to the separate and limited roles of each of the Defendants.

    4.     Defendants object to the extent any interrogatory seeks any information protected by the Dead Man's Act, including but not limited to any interrogatory that seeks discovery of oral statements of George D'Angelo, deceased. No answer or response by or on behalf of David S. D'Angelo and Christopher S. D'Angelo, Co-Executors of the Estate of George A. D'Angelo, Deceased, individually or jointly, in their respective capacities as co-executors, or any other capacity, or by or on behalf of any other Defendant, shall be construed to waive or diminish any privileges or defenses under the Dead Man's Act.

    5.     Defendants object to any interrogatories for attorney-client privileged material, communications between David S. D'Angelo, Esq. and George D'Angelo, deceased, attorney notes, mental impressions, tactics, strategy, trial preparation material, or work-product, related to, occurring during, or arising from David D'Angelo, Esq.'s, representation of George D'Angelo, deceased, after June 12, 2012, as noted above.

    6.     Defendants each object to any interrogatories that seek documents or information created before or outside, and not directly relevant to events within, the statute of limitations period for this lawsuit first filed on April 5, 2013. Thus, for any tort claim, Defendants object to any interrogatory seeking any information or documents prior to the two-year statute of limitations date of April 5, 2011; and for any contract claim prior to April 5, 2009. This objection is interposed without admission of the validity of any tort or contract claim alleged, the

3

Case ID: 170600611
Control No.: 19070113

**App. 222**

potential applicability of any shorter statute of limitations or laches period, and is without waiver of, and subject to all other privileges, defenses, and objections.

7.    Defendants object to the interrogatories as set forth below to the extent plaintiff has not provided sufficient information for Defendants to conduct a reasonable investigation and to the extent that they go beyond plaintiff's properly pled allegations, if any, and the defenses thereto. Defendants object to each discovery interrogatory seeking information that relates to time periods, geographical locations, or activities outside the scope of the allegations of the claims made, on the basis that such interrogatory is irrelevant, overly broad, and would impose an unnecessary burden on Defendants to seek out, review, organize, and produce information and documents which are not relevant to any issue in this lawsuit. Further, it would be harassing and oppressive to require Defendants to do so.

8.    Defendants object to Plaintiff's instructions and definitions as overly broad, unreasonably burdensome, oppressive, expansive, not reasonably tailored to this case and the issues therein. Defendants further object to Plaintiff's definitions and instructions to the extent they seek information beyond that required by the Pennsylvania Rules of Civil of Procedure, or prior to, prematurely, or in advance of the times required by the Court's applicable case management orders and rules of court.

9.    Defendants object to each and every interrogatory to the extent that any interrogatory calls for information which was prepared in anticipation of litigation or for trial, or calls for information and materials covered by the attorney-client privilege, the confidential trade secrets privilege, counsel's notes or mental impressions, including any interrogatories for such information or materials related to David D'Angelo, Esq.'s, representation of George D'Angelo, deceased, after June 12, 2012, as noted above, or the work product doctrine, and Defendants

4

Case ID: 170600611
Control No.: 19070113

**App. 223**

reserve the right not to supply or render any information or materials protected from discovery by virtue of these privileges, or other law or rule of court.

10.    Defendants object to each and every interrogatory on the grounds that Plaintiffs already possesses, or has equal access to, the information sought by the interrogatory or interrogatory.

11.    Defendants object to each and every interrogatory on the grounds that it seeks information protected against disclosure as the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of Defendant.

12.    Defendants incorporates these general objections into each and every response below. To the extent that there is a specific citation or reference to one of these general objections in Defendants' responses below, it is done only to highlight the particular relevance of a particular objection and is in no way intended as a waiver of any of the other general objections. To the extent any answer or response refers to any other answer or response, or to documents produced, such reference is without limitation, without waiver of any objections, privileges, or defenses, and is without admission of any characterization in Plaintiff's interrogatories or requests.

13.    Defendants reserve the right to modify, alter, amend and/or supplement these general objections and to provide additional and specific objections.

14.    Defendants reserve the right to modify, alter, amend and/or supplement their responses as they may deem necessary or appropriate and/or as required by the applicable rules of civil procedure.

To the extent not subject to the foregoing objections and any objections stated below, and without waiving any such objections, Defendants respond as follows:

5

Case ID: 170600611
Control No.: 19070113

**App. 224**

## ANSWERS TO INTERROGATORIES

1.    Identify each person who participated in the preparation of your answers to these Interrogatories.

**ANSWER:**

Defendants, with assistance of counsel.


2.    Advise whether you or your law firm has retained personal counsel for any excess verdict. If so, identify said counsel.

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein.

For further information, Defendants refer Plaintiff to the objections and response to Interrogatory No. 3, below.


3.    Please state whether you were covered by or were the subject of any malpractice, liability, umbrella or other insurance policies for the claims arising out of the instant case.

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein. Without waiver of these objections, and to the extent not subject to them, Defendants state as follows:

Defendants maintained professional liability insurance under a claims-made policy with Darwin National Assurance Company, Policy Number 0307-7741. Defendants submitted

**App. 225**

Plaintiff's claims to Darwin for coverage. *See, e.g.,* E-mail Feb. 11, 2018 to Darwin, and

subsequent submissions. In response, Darwin, through its counsel, denied coverage for Plaintiff

Markley's claims. *See, e.g.* Letters from Wiley Rein, Mar. 29, 2013, Apr. 18, 2013, Nov. 26,

2014. The Policy, submissions to Darwin, and Darwin's Responses, are included in the

documents produced in connection with Defendants Response Nos. 1 and 2 to Plaintiff's First

Request for Production of Documents. Defendants have instituted an action with respect to

insurance coverage under caption *D'Angelo & Eurell, et al., v. Darwin National Assurance Co.,*

Phila. Pa. CCP 1810-3585.

　　　　For further information, Defendants refer Plaintiff to the documents produced in

connection with Defendants Response Nos. 1 and 2 to Plaintiff's First Request for Production of

Documents.

　　　　4.　　If your answer to the preceding Interrogatory is in the affirmative, please state the
following:

　　　　　a. Name and address of the company issuing each policy;
　　　　　b. Policy number of each such policy;
　　　　　c. Names and addresses of the persons' insured under each such policy;
　　　　　d. Limits of liability;
　　　　　e. Whether the insurance company issuing each policy has denied or reserved
　　　　　　　coverage with respect to the claim for any reason; if so, the nature and
　　　　　　　reason given for such denial;
　　　　　f. Whether the insurance company issuing each policy has required the
　　　　　　　execution of any agreement by you or on your behalf before the
　　　　　　　undertaking to investigate and/or defend this action; and if so, the nature
　　　　　　　of such agreement, the reason the agreement was required and whether
　　　　　　　or not you or any other person acting on behalf of Defendants has
　　　　　　　executed agreement; and;
　　　　　g. Whether or not each of said polices provide coverage for the damages
　　　　　　　named in the Complaint and was in full force and effect on the date of
　　　　　　　the indecent; and if not, state in fi1ll detail why said polices were not
　　　　　　　in effect, specifically listing each such policy or polices on each and
　　　　　　　every person.
　　　　　h. Whether you are protected against the type of risk which is the subject
　　　　　　　of this action by any:
　　　　　　　　i. Reinsurance;
　　　　　　　　ii. Excess insurance;

7

DAngelo-1330

Case ID: 170600611
Control No.: 19070113

**App. 226**

      iii. Umbrella policy;
      iv. Self-owned or closely-held business insurance; and
      v. Employer's liability insurance, if relevant.

  i.    Whether you gave a recorded statement to your insurance carrier.

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein. Without waiver of these objections, and to the extent not subject to them, Defendants state as follows:

Defendants refer Plaintiff to the objections and response to Interrogatory 3 above.

5.    If the answer to Interrogatory Three (3) is in the affirmative, state whether any exclusion under the policy is or may be applicable to any claim presented by Plaintiff's Complaint.

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein. Without waiver of these objections, and to the extent not subject to them, Defendants state as follows:

Defendants refer Plaintiff to the objections and response to Interrogatory 3 above.

6.    If the answer to the preceding Interrogatory is in the affirmative, state the precise language of each exclusion which is or may be applicable, and in summary form, the facts on the basis of which it is contended each such exclusion is or may be applicable.

DAngelo-1331

Case ID: 170600611
Control No.: 19070113

**App. 227**

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein. Without waiver of these objections, and to the extent not subject to them, Defendants state as follows:

Defendants refer Plaintiff to the objections and response to Interrogatory 3 above.


7.    State whether this case is being defended by the attorney who has entered his/her appearance on your behalf subject to a reservation of rights agreement between you and your insurance carrier.

**ANSWER:**

Defendants object to this interrogatory as overly broad, unreasonably burdensome, not reasonably tailored to this case and the issues therein, and otherwise beyond the scope of Pa.R.C.P. 4003.1 and 4003.2. Defendants incorporate by reference the above Objections as if set forth fully herein. Without waiver of these objections, and to the extent not subject to them, Defendants state as follows:

Defendants refer Plaintiff to the objections and response to Interrogatory 3 above.


Date: April 16, 2019                           Respectfully submitted,

                                               **McSHEA LAW FIRM, P.C.**

                          By:      _____
                                   John P. McShea
                                   Conrad O. Kattner

                                   Attorneys for Defendants


9

DAngelo-1332

## VERIFICATION

I, David D'Angelo, individually and as a co-Executor of the Estate of George A. D'Angelo, deceased, hereby verify and state that the facts set forth in the foregoing responses to Plaintiff, Lisa Markley's Second Set of Interrogatories are true and correct to my knowledge or information and belief.

The undersigned understands that the statements herein made are subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

_____
DAVID S. D'ANGELO

DAngelo-1333

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of April 2019, a true and correct copy of the

foregoing Objections and Responses to Plaintiff, Lisa Markley's ("plaintiff's" or "Ms.

Markley's") Second Set of Interrogatories Addressed to Defendants D'Angelo & Eurell, David

S. D'Angelo, and Co-Executors of the Estate of George A. D'Angelo, Deceased was served upon

counsel of record by first-class mail and electronic mail:

Andrew W. Barbin
ANDREW W. BARBIN, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055

Veronica N. Range
Cunningham, Chernicoff & Warshawsky, P.C.
2320 North 2nd Street
Harrisburg, PA 17110

Attorneys for Plaintiff


John P. McShea
Conrad O. Kattner

DAngelo-1334

Case ID: 170600611
Control No.: 19070113

**App. 230**

# April 5, 2013 Correspondence Barbin to David

# ANDREW W. BARBIN, P.C.

A PROFESSIONAL CORPORATION

5 Kacey Court, SUITE 102
MECHANICSBURG, PA 17055
(717) 506-4670
Andrewbarbin@ aol.com
**www.awbpclaw.com**

FAX (717) 506-4672

**ANDREW W. BARBIN**
**RYAN A. WEBBER**

April 5, 2013

**Via Email and Certified US Mail**
David S. D'Angelo, Esquire
George A. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

RE:    **Lisa Markley**
       **For Settlement Purposes Only**

**Dear Messrs. D'Angelo and D'Angelo:**

This will acknowledge receipt of your letter of March 28, 2013, with a check for $328,752.40. *Partial* disgorgement is duly noted.

**New Counsel, New Perspective**

This firm has been retained as *litigation counsel* for Lisa Markley. Attorney Bruce J. Warshawsky and his firm will remain as co-counsel, as their expertise in the accounting aspects of this matter will remain necessary. My involvement arises from the plethora of ethical issues which arise from a variety of legal and ethical lapses of you and your firm:

➢ George misrepresented the nature of the divorce proceedings, neglected them, and then wrongly traduced the local judiciary to cover his neglect and to distract Lisa's mother then Lisa from the actual rulings on appeal. The split decision on the appeal which he used to cover his neglect, related only to the appeal of the decision to allow divorce on indignities grounds. The Appeals Court decision on the support issue was a 5-1 decision which affirmed the decision of the Trial Court:

The applicable legal principles are well settled. The purpose of a support order is to secure such an allowance to the wife and child as is reasonable, having in mind the husband's property and earning capacity and the station in life of the parties:...

[...] In the instant case the court below took into consideration the fact that appellant and her daughter are living in a substantial home, completely furnished, on which appellee pays $2,124.00 annual carrying charges, that appellee has created a $15,000.00 trust fund for the daughter's future education, and has agreed to pay tuition and other charges for the daughter at private school, summer camp,

**EXHIBIT**
D'Angelo 22
PENGAD 800-631-6989

Markley v D'Angelo

David D'Angelo 444

**App. 232**

ANDREW W. BARBIN, P.C.

Via attachment to email

April 5, 2013
Page 2 of 7

dancing and piano lessons. *The record discloses that the amounts awarded for maintenance of the wife and daughter coincide almost exactly with the total required, as established by the testimony. Moreover, the order below could not have been so grossly inadequate as is now alleged, since appellant permitted this appeal to rest unargued for over two years, and then argued it only because her request for a further continuance was denied.*

The principal complaint of present counsel for appellant is directed to the finding of the court below that appellee's net income after taxes and expenses is only $30,000.00 per year. *Appellant's trial counsel had before him a copy of appellee's income tax return, and was afforded full opportunity to cross-examine with regard thereto.* The effect of income tax upon the parties is a proper matter for consideration: *Commonwealth ex rel. Kallen v. Kallen*, 202 Pa. Superior Ct. 500, 198 A. 2d 331. *There is nothing in the testimony which justifies any material question concerning appellee's estimate of his net income.* In brief, we perceive no basis on this record for charging the lower court with an abuse of discretion.

*Markley v. Markley*, 207 Pa. Super. 294, 297; 218 A.2d 84, 85 (1966). It is far from clear why an appeal was even undertaken. However, it is quite clear the results had been repeatedly misrepresented to Lisa *and her mother*. This was not the only deceit.

➢ George misrepresented the difficultly and reasonableness of his failure to depose the out of state witness with respect to her father's income.

➢ Repeatedly, George had falsely justified his claims for fees from Lisa's mother's estate on the premise that she had not been able to pay attorney's fees for the divorce and had orally promised to pay from her estate. Given the availability of alimony *pendent lite*, the claim made no sense when it was first communicated to me. Interestingly, the Appeals decision expressly confirms that:

As to the third count, an opinion was filed in the lower court on August 5, 1963, *allowing interim counsel fees*, temporarily refusing alimony, costs and expenses, and making an order for the wife's maintenance in the sum of $ 125.00 per week, and for the daughter's maintenance in the sum of $ 35.00 per week.

George was paid attorney's fees for the divorce case. If any were unpaid it was because George either failed to make a request to the court or the court properly found them not to be reasonable. Given the opinion of the Court it is doubtful he actually earned the fees. What is plain is that there was no basis for the alleged undocumented oral agreement. Also interestingly, George was counsel in an appeal regarding the failure to reduce terms of a legal services agreement in writing, and the unenforceability of claimed additional terms.

➢ George provided *unlicensed*, *regulated* financial services *through the law firm*, without

Markley v D'Angelo

David D'Angelo 445

**App. 233**

**ANDREW W. BARBIN, P.C.**

Via attachment to email

April 5, 2013
Page 3 of 7

written agreement, on patently unreasonable terms, and without ensuring that Lisa had the benefit of independent counsel;

➢ George cultivated a special relationship of trust augmenting existing fiduciary obligations and repeatedly breached the obligations;

➢ George secured a Power of Attorney and improperly exercised it repeatedly for his own benefit, contrary to legal and ethical obligations;

➢ George mismanaged the funds and then repeatedly mislead Lisa regarding the amount and nature of assets remaining, and Lisa remained unaware of the decrease in net assets because of the complexity of the statements, her trust in George and various assurances made throughout;

➢ The deception was facilitated by George continuing to charge a fee on management of the assets at $15,000 (1.5%) which would create the false impression that $1,000,0000 worth of assets were still being managed, despite the fact that the fees were simply depleting the mismanaged funds;

➢ George made false representations that funds had been moved from brokers assets to precious metals or similar durable assets, to forestall discovery of the defalcations, David contributed to this by stating that he was not familiar with the assets but would have George follow up when he returned;

➢ There was no basis whatsoever for George to charge attorney's fees as to Lisa for funds received from the mother's estate;

➢ The accounting to date from George, David and the firm has been materially false and wilfully deceptive;

➢ David and the firm have materially aided in the deception and have intermingled funds improperly secured from Lisa's funds with the funds of the firm;

➢ David and the firm materially facilitated the deception by forwarding false communications regarding false "accountings," false assurances that insurance counsel had been contacted and would be taking over communications, and false promises of imminent payment of $500,000 which was acknowledged in writing to have been wrongfully taken.

➢ The amounts wrongfully taken far exceeds the amounts returned.

➢ The actual amounts owed were reasonably estimated by Mr. Warshawsky in the December 22, 2012 communication.

Markley v D'Angelo

David D'Angelo 446

**App. 234**

**ANDREW W. BARBIN, P.C.**

Via attachment to email

April 5, 2013
Page 4 of 7

> George has engaged in statutory misconduct, theft by deception, theft by unlawful disposition, breach of multiple provisions of the disciplinary code, as well as actionable malpractice, negligence and serial breaches of fiduciary duties;

> David and the firm share potential liability for much of the misconduct jointly and severally.

**New Realities**

Initially, Lisa and Attorney Warshawsky had been working under a mistaken assumption that George had acted in good faith during his representation of Lisa's mother and had merely engaged in misconduct of a financial nature when he was unable to properly manage Lisa's assets. There was no real desire at that time to do anything more than secure return of a reasonable portion of the improvidently managed and misappropriated funds.

Had appropriate action been taken when Mr. Warshawsky first contacted you, Lisa would likely have been far more amenable to partial restitution. However, repeated false assurances, false explanations, broken promises and serial delays have exhausted what good will had remained. The delay was beneficial only in the sense that it made it impossible to maintain the illusion of good faith and excusable neglect and revealed the conduct for what it was – theft and/or fraud.

Negligence, nonfeasance, misfeasance, breach of fiduciary duties, statutory and regulatory violations, malpractice and fraud permeate the relations throughout. Punitive damages would be entirely appropriate in this case.

George has repeatedly improperly taken funds from Lisa, and has lost through neglect substantial additional funds in his *unlicensed* investment activities. From my own personal perspective, I found the feigned injury at Lisa having contacted counsel without first informing George to be both highly offensive and highly unethical. It was only slightly less offensive than his attempt to get her to sell her home and deposit the funds in his hands (which would have made her abjectly dependent on his dubious "beneficence"). The fact that he was misappropriating funds at the time calls into question the motivation of that advice.

**Forced Choice**

I had begun this letter two weeks ago; but apparently, providence staid my hand. That fortuitous delay apparently emboldened one or both of you to view the patience of Lisa and Mr. Warshawsky as a lack of resolve. Perhaps you felt your brethren at the bar would not be willing to hold you to account. For whatever reason, you made a bold $328,752.40 gambit.

One may conjecture that you clung to the hope (delusion) that a partial, pittance, payment might induce Lisa to drop the matter or at least become more tractable and pliant. Alas for you; it was too little, and far too late. Instead, partial disgorgement of the ill-gotten gains acts to provide Lisa the financial wherewithal to *effectively* seek *appropriate* restitution.

**ANDREW W. BARBIN, P.C.**

Via attachment to email

April 5, 2013
Page 5 of 7

    **The only question now remaining is whether you will accept my offer of a prompt face to face meeting to discuss prompt appropriate restitution; or whether request failing, constraint will be required.** It is important to note, as you should have gathered from the above content, litigation will not be limited to George in either his legal or financial capacity; but includes him in all capacities as well as David and the firm. Eurell, individually, remains an open question. He is not included on the summons, but could be included on the Complaint.

    While I have been brought in primarily as a litigator of these types of matters and for my experience in disciplinary and ethics matters; I am also a co-founder of the mediation programs in Montgomery, Dauphin and Cumberland Counties. In the grand scheme of things, I remain of the belief that George and his potential co-defendants should have a *final* opportunity to do the right thing. Honest contrition and *prompt, appropriate* restitution could begin the healing process for Lisa, who had viewed George as a surrogate father figure.

    The worst part of this matter that George, *who claimed to care for and champion Lisa*, re-victimized her knowing that her biological father had treated her shabbily, and that she viewed George as surrogate father figure and protector. George attended various important life events and played the role well, if superficially. If George had the good faith intent he claimed, and the principles he avowed, then he should welcome this last chance to settle accounts; before his race is run and the time for his final accounting arrives.

    I doubt it will be of much solace, but the recent partial disgorgement did not create this forced choice. With or without the funds disgorged, Lisa had already secured commitment for my services. My family have been in this *profession* for generations. Under these facts, I would have considered it a moral imperative to vindicate Lisa's rights and compel an account, for the honor of our profession. I would have done this with or without security for compensation of such services, though I do appreciate your funding my fees. My experience is that doing the right thing pays in the net balance.

    In researching the matter, I came across various clippings regarding the Franklin bust theft, many of which included interviews of George. I was struck by the Karmic irony. While I would prefer prompt voluntary resolution for Lisa's sake; I have to say that personally and professionally, it would be interesting to see if a jury was as struck by the hypocrisy in George's moral indignation regarding that theft as much as I was. Whose conduct would be thought worse? I wonder.

    To put the matter in perspective, a literary allusion seems appropriate. You are playing the roles of the French antagonists in Henry the Fifth (though I suspect the roles of the King and Dauphin have been cast contra to the relative ages of the respective roles). While I may yet play other parts before the play concludes, my current roll is that of the Duke of Exeter:

D'Angelo.    And what of my [client Lisa]?

Barbin.      She wills you in the name of the God Almighty, [your former relation and

Markley v D'Angelo

David D'Angelo 448

**App. 236**

ANDREW W. BARBIN, P.C.

Via attachment to email

April 5, 2013
Page 6 of 7

your professional honor] that you divest yourself and lay aside the borrowed [funds], that by [law and right] 'long to her …'tis no awkward or sinister claim [nor mean amount]….

D'Angelo.   Or else what follows?

Barbin.   Bloody constraint; for if you hide the [funds], even in your heart, there will [we] rake for it; therefore, in fierce tempest [we are] coming, in thunder, and in earthquake, like a Jove, that if requiring fail, [w]e will compel. This is [her] claim [our] threatening, and [my] message….

Your prior responses and evasions were the moral equivalent of the Dauphin's ill-served gift of tennis balls. During my decade long sojourn in the Philadelphia area from the mid-80's to mid-90's, I was often struck by how much like *the Dauphin* many Main Line attorneys were apt to be in dealing with "meat and potato" attorneys.

Mr. Warshawsky and I are willing to come to Sullivan's of King of Prussia, 700 West Dekalb Pike, King of Prussia for a final effort to resolve the matter amicably. I note that I have neither patience nor stomach for any further Fabian delays or facile protestations. Such protests or excuses would warrant only reference to the continuation of Exeter's address in that scene, and then a quick cut to the siege of Harfleur….

Wearily the King of France replied, "A night is but small breath and little pause, to answer matters of this consequence." Mindful of both the import of the consequences of the choice presented, and your prior serial delays, **I act and require of you as follows:**

> ➢ I have forborn to file a Complaint at this time, and have instead issued a Writ of Summons this date.

> ➢ If arrangements to meet with us within the next ten days are made within the next three, we will continue to hold the filing of a detailed Complaint pending the outcome of such a meeting.

> ➢ If arrangements are not made, the Writ will be supplanted by a Complaint.

Your fates, for a little space, remain in your own hands. Regarding this the Bard offers this further counsel:

There is a tide in the affairs of men.
Which, taken at the flood, leads on to fortune;
Omitted, all the voyage of their life
Is bound in shallows and in miseries.
On such a full sea are [you] now afloat,

ANDREW W. BARBIN, P.C.

Via attachment to email

April 5, 2013
Page 7 of 7

> And [you] must take the current when it serves,
> Or lose [y]our ventures.

I concede there are no good choices for you. Actions have consequences and when a parent borrows against fortuity, interest is often paid by progeny. George lived higher on the hog than true right would allow. His conduct exposed would sully not merely his own name but also his firm, his son, and possibly other family members. He can clean the stain or face its exposure.

We stand "like greyhounds in the slips, straining upon the start." By inaction you shall have loosed the dogs of war upon yourselves to havoc what they will. Take heed, Priam's glory was lost by Paris' misappropriation, Hector's hubris, and the inability of Troy to hear Cassandra's warning.

The writ was filed today. If I do not receive satisfactory response by close of business Tuesday, the Complaint will follow.

Sincerely,

Andrew W. Barbin

c    Bruce Warshawsky, Esquire
     Lisa Markley

DAngelo-3172

David D'Angelo 450

**App. 238**

# April 9, 2013 Email David to Dwyer



Richard A. Simpson | Attorney At Law | **Wiley Rein LLP** | 1776 K Street NW | Washington, DC 20006
(Tel) 202.719.7314 | (Fax) 202.719.7049 | RSimpson@wileyrein.com

**From:** Dwyer, Gale S [mailto:Gale.Dwyer@awac.com]
**Sent:** Tuesday, April 09, 2013 12:37 PM
**To:** Simpson, Richard
**Subject:** Fwd: D'Angelo & Eurell -- Claim No. 2013002782



Begin forwarded message:

**From:** "ddsdangelo@cs.com" <ddsdangelo@cs.com>
**Date:** April 9, 2013, 12:06:28 PM EDT
**To:** <LJonesIV@wileyrein.com>,
<gale.dwyer@awac.com>
**Subject: D'Angelo & Eurell -- Claim No. 2013002782**

Dear Ms. Dwyer and Mr. Jones:

I am forwarding the latest letter from Ms. Markley's other attorney asserting claims against my father, me, the law firm and, possibly, the other named insured, John B. Eurell. The inadvertent overpayments have been paid and accepted, at least partially, by Ms. Markley. She is continuing to press malpractice claims, which are clearly covered by our policy.

Kindly contact me to discuss proceeding in this matter before her counsel continues to another step.

Very truly yours,

David S. D'Angelo, Esquire

-----Original Message-----
From: Maxine E. Goodman <megawbpclaw@aol.com>
To: ddsdangelo <ddsdangelo@cs.com>
Sent: Fri, Apr 5, 2013 4:00 pm
Subject: Lisa Markley

NOTICE: This message (including any attachments) from Wiley Rein LLP may constitute an attorney-client communication and may contain information that is PRIVILEGED and CONFIDENTIAL and/or ATTORNEY WORK PRODUCT. If

you are not an intended recipient, you are hereby notified that any dissemination of this message is strictly prohibited. If you have received this message in error, please do not read, copy or forward this message. Please permanently delete all copies and any attachments and notify the sender immediately by sending an e-mail to Information@wileyrein.com. As part of our environmental efforts, the firm is WILEY GREEN(TM). Please consider the environment before printing this email.

The information contained in this e-mail and any attachments hereto is confidential. If you are not the intended recipient, you must not use or disseminate any of this information.
If you have received this e-mail in error, please immediately notify the sender by reply e-mail and permanently delete the original e-mail (and any attachments hereto) and any copies
or printouts thereof. Although this e-mail and any attachments hereto are believed to be free of any virus or other defect that might affect any computer system into which it is received
and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Allied World Assurance Company Holdings, AG or its subsidiaries or
affiliates, either jointly or severally, for any loss or damage arising in any way from its use.

ALLIEDWORLD00000012

# April 9, 2013 Email David to Barbin

4/9/13                                                    Lisa Markley

**From:** ddsdangelo <ddsdangelo@cs.com>
   **To:** Andrewbarbin <Andrewbarbin@aol.com>
**Subject:** Lisa Markley
   **Date:** Tue, Apr 9, 2013 12:55 pm

Mr. Barbin,

I am in receipt of your letter of April 5, 2013, in which there are several misstatements of which you should be aware.

Among these misstatements is the fact that I did contact the insurance company with Mr. Warshawsky's emails. Upon review, they sent a letter denying the claim. I asked for reconsideration, which they did and denied the claim again last. I am now forwarding to them a copy of your letter which may further explain for them that the claims presented are covered by our policy of insurance. I will advise you of their response or you will be contacted by them directly.

Also, you seem to overlook the fact that my father handled the appeal of the divorce issues for Mrs. Markley. When he received the case, the record was closed. So your accusations of malpractice in the prosecution of the underlying case, in the form of trial tactics, preparation or otherwise, are misplaced.

Finally, the amount tendered was the conclusion of review of the emails and the matters agreed upon. Kindly advise me specifically the items for which you are seeking payment and your current demand to resolve the matter.

I look forward to hearing from you.

David S. D'Angelo

# April 18, 2013 Denial



**Wiley Rein** LLP

1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Leland H. Jones IV
202.719.7178
lhjones@wileyrein.com

April 18, 2013

**VIA EMAIL AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

David D'Angelo, Esq.
D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA 19110

| Re: | Insured: | **D'Angelo & Eurell** |
|-----|----------|------------------------|
|     | Insurer: | **Darwin National Assurance Company** |
|     | Policy No.: | **0307-7741** |
|     | Policy Period: | **8/20/2012 to 8/20/2013** |
|     | Claim No.: | **2013002782** |

Dear Mr. D'Angelo:

As you know, this firm has been retained to represent Allied World National
Assurance Company, claim manager for its affiliate, Darwin National Assurance
Company (collectively, "Darwin"), in connection with this matter. We write in
response to your April 9, 2013 correspondence forwarding an April 5, 2013
letter from counsel for Lisa Markley. Based on its review of the additional
information provided and the allegations in the April 5, 2013 letter from Ms.
Markley's counsel, Darwin must reaffirm its previous determination that no
coverage is available under the policy for the Markley matter. If, however, Ms.
Markley does file the lawsuit threatened in the April 5 letter, please provide a
copy to us immediately so that Darwin may evaluate the availability of coverage
for the lawsuit in light of its specific allegations.

## I.   THE APRIL 5, 2013 CORRESPONDENCE

The April 5, 2013 letter from Ms. Markley's counsel alleges that George
D'Angelo misrepresented to Ms. Markley's mother the results of the 1966
appeal of a divorce decree, his efforts to depose witnesses regarding the income
of Ms. Markley's father, and falsely justified payment of attorneys' fees from
the estate of Ms. Markley's mother. Ms. Markley's counsel also asserts that
George D'Angelo was not entitled to attorneys' fees from the estate of Ms.
Markley's mother because he was already paid for his legal representation and
because the undocumented, oral fee agreement between George D'Angelo and
Ms. Markley is unenforceable.

**EXHIBIT**
D'Angelo 24
PENGAD 800-631-6989

DAngelo-3188



David D'Angelo, Esq.
April 18, 2013
Page 2

In addition, the April 5 letter contends that George's D'Angelo provided unlicensed and unregulated investment advice to Ms. Markley, mismanaged Ms. Markley's assets, charged investment fees to which he was not entitled, and misappropriated Ms. Markley's investment funds.

## II.    COVERAGE ANALYSIS

Darwin issued Lawyers Professional Liability Policy No. 0307-7741 to D'Angelo & Eurell (the "Firm") for the **Policy Period** August 20, 2012 to August 20, 2013 (the "Policy").[1]  The Policy has a $500,000 per **Claim** and $1 million aggregate limit of liability for all **Claims**, inclusive of **Claims Expenses**.  The Policy also has a $5,000 per **Claim** retention.

### A.    Damages

Insuring Agreement I.A provides that "[t]he **Insurer** will pay on behalf of an **Insured**, subject to the Limits of Liability shown in the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages and Claim Expenses** because of a **Claim** arising out a **Wrongful Act** . . . ." Policy, §I.A.  The insuring agreement also provides that "[s]ubject to the Limits of Liability, the **Insurer** shall have the right and duty to defend any **Claim** seeking **Damages** that are covered by this Policy . . . ." *Id.*

No coverage is available for the Markley matter because Ms. Markley does not seek **Damages** for George D'Angelo's alleged malpractice in his representation of Ms. Markley's mother in the divorce proceeding.  The Policy defines "**Damages**" as:

> the monetary portion of any judgment, award or settlement, including post-judgment interest.  **Damages** shall not include:
>
> 1.  criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;
> 2.  punitive, exemplary or the multiplied portion of multiple damages;
> 3.  matters deemed uninsurable by law;

---

[1] Terms in bold are defined in the Policy.

**App. 246**



David D'Angelo, Esq.
April 18, 2013
Page 3

    4.      the return or restitution of legal fees, costs and
            expenses, no matter how claimed;

    5.      any form of equitable or non-monetary relief; or

    6.      pre-judgment interest.

Policy, §II.E., as amended by Endorsement No. 1. Ms. Markley's counsel
alleges that George D'Angelo was not entitled to payment of his fees for the
representation of Ms. Markley's mother. But, the return of these amounts does
not constitute **Damages** because they represent the return or restitution of legal
fees, costs and expenses.

**B.     Other Exclusions**

As outlined in our March 29, 2013 letter, which is incorporated by reference,
several exclusions in the Policy bar coverage for the Markley matter:

- Section III.B.5 (no coverage for any **Claim** arising out of "the
  alleged rendering of investment advice, including advice given
  by any **Insured** to make any investment or to refrain from doing
  so")

- Section III.B.10 (no coverage for any **Claim** arising out of "the
  loss of value of any asset in the Insured's care, custody or
  control, misappropriation, conversion, embezzlement, failure to
  give an accounting, or commingling of client funds")

- Section III.B.2 (no coverage for any **Claim** arising out of "any
  act whatsoever of an Insured in connection with a trust or estate
  when an Insured is a beneficiary or distributee of the trust or
  estate").

**III.    CONCLUSION**

For the reasons discussed above, Darwin has concluded that there is no coverage
under the Policy for the Markley matter. To the extent that the Firm disagrees
with Darwin's understanding of the facts or Darwin's conclusion that no
coverage is available or if the Firm has additional information relevant to
Darwin's analysis of coverage with respect to this matter, please provide that
information to us for Darwin's consideration. If Ms. Markley files suit against



David D'Angelo, Esq.
April 18, 2013
Page 4

George D'Angelo or the Firm, please provide a copy to us, and Darwin will
carefully evaluate the availability of coverage for the suit based on the
allegations in the complaint. In the meantime, Darwin continues to reserve all
of its rights under the Policy and applicable law.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Leland H. Jones IV

cc:    Gale S. Dwyer, Esq. (via email)

**App. 248**

# April 29, 2013 Correspondence Barbin to David

**ANDREW W. BARBIN, P.C.**

A PROFESSIONAL CORPORATION

5 Kacey Court, SUITE 102
MECHANICSBURG, PA 17055
(717) 506-4670
Andrewbarbin@aol.com
www.awbpclaw.com

FAX (717) 506-4672

ANDREW W. BARBIN
RYAN A. WEBBER

April 29, 2013

Via Email
David S. D'Angelo, Esquire
George A. D'Angelo, Esquire
Law Offices D'Angelo and Eurell
Land Title Building
Twenty-Second Floor
Philadelphia, PA 19110

RE:   Lisa Markley
For Settlement Purposes Only

Dear Messrs. D'Angelo and D'Angelo:

I am in receipt of your email of April 9, 2013. I needed to speak with both Ms. Markley and Mr. Warshawsky prior to making reply. I have done so and offer the following reply in two parts.

Road Map

Because I am more interested in settling a case than winning the debate trophy, this letter is written in two sections. Immediately below, I cut and paste your most recent email, reply and renew my meeting invitation, with observations on the art of the possible.

Part II addresses the Acceptance of Service form transmitted herewith and touches lightly on your best and worst alternatives to a negotiated settlement, (your BATNA and WATNA predicaments).

From: ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
Sent: Tuesday, April 09, 2013 12:56 PM
To: Andrewbarbin@aol.com
Subject: Lisa Markley

Mr. Barbin,

I am in receipt of your letter of April 5, 2013, in which there are several misstatements of which you should be aware.

Among these misstatements is the fact that I did contact the insurance company with Mr. Warshawsky's emails. Upon review, they sent a letter denying the claim. I asked for reconsideration, which they did and denied the claim again last. I am now forwarding to them a copy of your letter which may further explain for them that the claims presented are covered by our policy of insurance. I will advise you of their response or you will be contacted by them directly.

DAngelo-3664

EXHIBIT
D'Angelo 25
PENDAD 500-631-6989

**App. 250**

ANDREW W. BARBIN, P.C.

Via attachment to email

April 29, 2013
Page 2 of 5

*[AWB]*

You claim to have communicated with your carrier. To date, you have provided neither a copy of the applicable policy or any corroboration of any communication. Pardon me if I do not take these matters on faith *alone*.

Also, you seem to overlook the fact that my father handled the appeal of the divorce issues for Mrs. Markley. When he received the case, the record was closed. So your accusations of malpractice in the prosecution of the underlying case, in the form of trial tactics, preparation or otherwise, are misplaced.

*[AWB]*

Respectfully, I am not in the habit of "overlooking" such matters. My prior comments stand. As I recall, you previously extolled the virtues of your father in doggedly pursuing Rosalie's rights. The Appeals Court found there was *no basis for the appeal* at 218 A2d 84, and that your father had allowed the case to go *un-argued on appeal for 2 years.* 218 A2d at 86.

It is far from clear that the appeals should have been taken or were timely prosecuted, and at least as to Lisa the explanations of the defeats was ethically suspect *at best.* Pa.R.Prof.C. 1.3, 3.3 (diligence); 3.1 (frivolity, as to the second appeal); 8.2 (aspersions cast upon the trial court in explaining defeats). But this is beside the point. The excerpt and prior discussion go to the "moral/ethical" aspect of claim for attorney fees. The fee claim is neither moral, nor ethical.

As noted in my prior letter and previous emails of Mr. Warshawsky, there was no written fee agreement regarding Rosalie's appeals. Such matters are required to be in writing. Pa.R.Prof.C. 1.5 (c). A contingent fee as to an appeal of the denial of alimony or the amount of support is probably prohibited. Pa.R.Prof.C. 1.5 (d)(1). Your father had actually litigated an appeal unsuccessfully on just such an *undocumented fee* claim. 245 A2d 457. Unilateral self-help for an inchoate fee claim would have been a conflict of interest and breach of fiduciary duty in any event. Pa.R.Prof.C. 1.8 (a), (c), (g)

There is no moral high ground for you here. Your father took two appeals, which he delayed inordinately and lost. He apparently failed to seek or obtain continued fees for the appeal. There is no written agreement with Rosalie regarding the fees. Rosalie's estate was closed without claim by him under any alleged agreement. There was no agreement with Lisa individually or as executrix of her mother's estate regarding her mother's fees. The written contingent agreement with Lisa regarding her father's estate does not reference any such fees, and none of the funds of her mother's estate were derived from the husband/father's estate. This is a *post hoc* rationalization of prior *ad hoc* withdrawals.

February 6, 2013 you claimed that a percentage of Rosalie's estate was owed to your father for his appeal services. You blithely claim "moral or ethical" justification while grudgingly noting *legal unenforceability.* I agree that your father had a close relationship with Lisa and Rosalie; but you overlook the *legal* significance of that relationship. Rather than creating a "*get out of defalcation free*" card; it created an *enhanced fiduciary duty,* which he breached. He breached an unenhanced one as well.

DAngelo-3665

ANDREW W. BARBIN, P.C.

April 29, 2013
Page 3 of 5

Via attachment to email

Per your January 7, 2013 email, Lisa received $284,422.04 from her mother's estate. You claim "*a moral and ethical right*" to a fee of $93,859.27, for the losing efforts. My practice includes appeals. The fee claimed is ludicrously, *actionably* excessive. Pa.R.Prof.C. 1.5 (a). No fee was owed *by Lisa*, period.

Finally, the amount tendered was <u>the conclusion of review of the emails and the matters agreed upon.</u> Kindly advise me specifically the items for which you are seeking payment and your current demand to resolve the matter.

[AWB]

The characterization of the payment being "*the conclusion of a review of the emails and matters agreed upon*" may be viewed in two lights.

**In one light**, it may be seen as a denial of all other amounts claimed and an assertion that, through some mystic alchemy, you have transmuted Mr. Warshawsky's repeated unequivocal demands of higher amounts into an acquiescence to a considerably smaller amount.

Such a position would be specious. Mr. Warshawsky outlined a considerably greater claim, and has not withdrawn any portion of those claimed amounts. Nothing in his emails supports any such characterization. His February 7, 2013 email renders any claim of agreement as to an accounting of amounts owed ludicrous. In the same vein, my missives bore no such acquiescence. A philosopher's stone may transmute lead to gold; but it cannot transmute "no" to "yes."

October 5, 2012 you admitted $499k was owed and would be repaid. December 3, 2012 you calculated the amount at $536k. January 7, 2013, you provided a false and baseless claim to justify exclusion of another $100k owed in relation to the "Pugh A. D'Hughes" ledger item; in the February 6, 2013 concedes this amount. Based on this concession, *and without regard to other disputes*, the disgorgement of undisputed wrongfully taken funds should have been $635,000, not $328,752.40.

February 8, 2013, Mr. Warshawsky confirmed that the accounting claim remained at $1.7 million; and that *any settlement would require seven figures*. He also noted with disapproval your reduction in acknowledged amounts owed from $536k to about $315k. Payment of $328k tolled accumulating interest as to that portion of the actual amount owed; but it did little else.

As noted in my prior letter, and in several of Mr. Warshawsky's prior emails, his $1.7 million number does not include the compensatory or punitive claim amounts which arise naturally and probably from the myriad breaches of fiduciary and ethical duties.

I calculate the baseline as follows: $536k + $100k + $94k = $730k. In my opinion, this is the amount owed which could not credibly be contested. Somewhere between $730k and $1.7 million lies a rationale settlement amount which would reflect the benefit to both parties in avoiding the expense and uncertainty of litigation. Mr. Warshasky signaled flexibility as to the accounting amount by setting a 7 figure floor creating a $700k discussion zone. All claims were previously detailed; none withdrawn.

Feigned ignorance as to *amounts claimed* would not advance amicable resolution. Such a position would preclude any basis for rational discussion, and would compel litigation.

DAngelo-3666

**App. 252**

Andrew W. Barbin, P.C.

Via attachment to email

April 29, 2013
Page 4 of 5

**In another, more productive light,** the payment may be deemed a payment of part of the previously undisputed amount owed, with the net from the previously admitted $536k held back in anticipation of *further negotiations*. In such a light, formalization of the assessment of the art of the possible implied in Mr. Warshawsky's prior email as clarified above would provide a basis for a number rather than claim based negotiation.

The claims are known. On my side, the number I could accept is a fraction of the number I could credibly claim and expect to recover. We have past the point where fact acquisition and or legal research are necessary to a reasonable assessment of best and worst case scenarios.

We have reached a point where we pass numbers back and forth across a dinner table a Sullivan's in King of Prussia ( http://sullivanssteakhouse.com/location/king-of-prussia/ );or we mail pleadings back and forth to the Dauphin County Court of Common Pleas.

I prefer a good meal and a palatable settlement; but the choice remains yours.

I look forward to hearing from you.
David S. D'Angelo

I have Mr. Warshawsky's schedule for the next two weeks, and would be happy to schedule a face to face at Sullivan's by email or phone. I look forward to hearing from you.

### Part II BATNA & WATNA (superfluous if a meeting is desired)

Transmitted herewith is an acceptance of service form. Execution and return is a condition precedent to any continued negotiations.

If you are not interested in face to face negotiation along the lines proposed, then we will proceed with litigation. Execution and return of the acceptance of service form will obviate the necessity of Sheriff service which I prefer to avoid as a professional courtesy, but which I will process promptly if acceptance is not promptly forthcoming.

If we are not proceeding to settlement, I will be filing a Complaint against you, your father and your firm, and issuing notices of video deposition concurrently, consistent with the rules. Because of your dad's age, I will request prompt appearance and agreement that it shall be treated *de bene esse*. If written consent and compliance are not promptly forthcoming, I will file an appropriate Motion to compel compliance.

The initial depositions will identify contentions and focus document discovery. **Please accept this as formal notice to suspend any paper or electronic record destruction or archival process as to any document in any way related to services to Ms. Markley, as well as any other client for which you or your father administered a trust or held a power of attorney or other fiduciary responsibility as to funds of a third party.** While I expect the scope of such discovery to be either negotiated or determined in Motion Court, any potential dispute with regard to the scope of discovery would not relieve you of the interim burden of preservation and non-spoliation.

If the insurance policy is not voluntarily provided, it too will be required.

DAngelo-3667

ANDREW W. BARBIN, P.C.

Via attachment to email

April 29, 2013
Page 5 of 5

Finally, Mr. Warshawsky very delicately avoided reaching a conclusion as to whether Disciplinary Report under Pa. R. Prof. Conduct 8.3 is required, because of Pa. R. Prof. Conduct 8.4 violations admitted and discovered, and/or whether we should advise our client to seek supplemental redress through the district attorney's office. I share Mr. Warshawsky's assessment that until formal responses are received in discovery, we do not have *a duty to report* to either forum. However, this state of cautious limbo cannot be maintained indefinitely.

Your June 28, 2012 letter and the February 6, 2013 email, attempt to trade on a grace claimed from the close association between your father and Lisa Markley directly and through his prior association with her mother.

From my perspective, it is a double edged sword which cuts, rather than parries. You, your father, and your firm had legal and financial fiduciary duties which were not merely broken but shattered. Your father defalcated substantial funds and mismanaged *epically* the remainder, leaving Lisa virtually destitute. Your father made false representations that investments had been made in precious metals and impervious assets. You personally aided and abetted the defalcation by providing a series of false and misleading accountings, and engaging in what can reasonably be characterized as Fabian delaying tactics. In that regard, I must confess more than mild curiosity regarding the recent disclosure of a *suspiciously convenient* alleged flood and "loss of files."

All the grace to which your father could plausibly lay claim has been fully consumed by Lisa's *current* patience and restraint. I would caution that further presumption on that topic could prove to be the final straw. One cannot un-break a camel's back; mystic cords of memory can be overburdened.

I wrote previously, "Your fates, for a little space, remain in your own hands." Time continues to slip through the hourglass, apparently unheeded. The wound festers under Band-Aids.

Niccolo Machiavelli cautioned, "The more sand has escaped from the hourglass of our life, the clearer we *should* see through it." Unfortunately, familial relations can throw sand in our eyes. I would counsel you to discuss the matter with a trusted colleague *outside the family* before you cross this Rubicon. In dogged defense you may irreparably damage that which you seek to preserve.

I come from a family of attorneys, four siblings, two uncles, one grandfather and several cousins and ancestors. It does not require much empathy to appreciate: the temptation of denial and avoidance; the paralyzing fear arising from the natural and probable consequences to your family name; and your concern regarding the impact of any action on your father. The wound was self-inflicted, and delay has only deepened and spread the infection. It is not mercy to withhold the surgeon's knife from infected tissue.

There are no "good" choices. Actions have consequences. When a parent borrows against fortuity, the principle and interest due is often left to be paid by progeny. Indeed, it is a proverb that "when a father gives to his son, both laugh; but when a son gives to his father, both cry." This has long ceased to be a laughing matter.

Sincerely,

/s/ Andrew W. Barbin

Andrew W. Barbin

c    Bruce Warshawsky, Esquire
     Lisa Markley

DAngelo-3668

**App. 254**

# June 12, 2013 to June 13, 2013 Email Correspondence

County, Pennsylvania. The Certificate of Service by mail states October 29, 2014. As you are aware, this action was commenced by Writ of Summons last year.

The whole document is too large to attach. I will attempt to fax it to you. Kindly confirm that you have received it or that you have obtained a copy directly from the courthouse.

There are many issues which need to be addressed immediately, including, inter alia, statutes of limitations, laches, estoppel, failure to state a claim, settlement, accord and satisfaction, venue and others.

After you have reviewed the attached, please contact me to discuss this. Thank you.

David S. D'Angelo

-----Original Message-----
From: Jones, Leland <LJonesIV@wileyrein.com>
To: ddsdangelo <ddsdangelo@cs.com>
Cc: Simpson, Richard <RSimpson@wileyrein.com>
Sent: Thu, Jun 13, 2013 10:29 am
Subject: RE: D'Angelo & Eurell -- Claim No. 2013002782

Mr. D'Angelo,

Thank you for providing this information.  Was a complaint served with the summons?  Or, did they only serve a summons?

As we stated in our April 18, 2013 correspondence, Darwin will need a copy of the complaint, or any other communications you have received since our April 18 correspondence, to assess the availability of coverage under the Policy for this matter.

Sincerely,
Leland Jones

Leland H. Jones IV | Attorney At Law | **Wiley Rein LLP** | 1776 K Street NW | Washington, DC 20006
(Tel) 202.719.7178 | (Fax) 202.719.7049 | LJonesIV@wileyrein.com

> **From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
> **Sent:** Wednesday, June 12, 2013 12:26 PM
> **To:** Jones, Leland
> **Subject:** Re: D'Angelo & Eurell -- Claim No. 2013002782
>
> Mr. Jones,
>
> Attached please find the Summons served on us today by the attorneys for Lisa Markley.
>
> Kindly advise what steps, if any, should be taken at this time.
>
> Thank you.
>
> David S. D'Angelo
>
> -----Original Message-----
> From: Jones, Leland <LJonesIV@wileyrein.com>
> To: ddsdangelo <ddsdangelo@cs.com>
> Cc: Gale.Dwyer <Gale.Dwyer@awac.com>; Simpson, Richard <RSimpson@wileyrein.com>
> Sent: Thu, Apr 18, 2013 11:17 am
> Subject: D'Angelo & Eurell -- Claim No. 2013002782
>
> Mr. D'Angelo,
>
> Please see the attached letter.

# November 26, 2014 Email David to Allied World



**Message**

| From: | ddsdangelo@cs.com [ddsdangelo@cs.com] |
|---|---|
| Sent: | 11/26/2014 3:16:25 PM |
| To: | LJonesIV@wileyrein.com; Dwyer, Gale S [/o=AWAC Global/ou=First Administrative Group/cn=Recipients/cn=gadwyer] |
| Subject: | Re: D'Angelo & Eurell -- Claim No. 2013002782 |

Dear Mr. Jones and Ms. Dwyer,

I have not received any information. Kindly contact me for an update on this claim.

Thank you.

David D'Angelo

-----Original Message-----
From: ddsdangelo <ddsdangelo@cs.com>
To: LJonesIV <LJonesIV@wileyrein.com>
Cc: gale.dwyer <gale.dwyer@awac.com>
Sent: Fri, Nov 21, 2014 7:09 am
Subject: Re: D'Angelo & Eurell -- Claim No. 2013002782

Dear Mr. Jones,

Any developments on this claim? Thank you.

David D'Angelo

-----Original Message-----
From: Jones, Leland <LJonesIV@wileyrein.com>
To: ddsdangelo <ddsdangelo@cs.com>
Cc: gale.dwyer <gale.dwyer@awac.com>
Sent: Tue, Nov 11, 2014 12:54 pm
Subject: RE: D'Angelo & Eurell -- Claim No. 2013002782

Mr. D'Angelo,

The PDF pages you sent were blank. We look forward to receipt of the complaint via fax.

Sincerely,
Leland Jones

Leland H. Jones IV | Attorney At Law | **Wiley Rein LLP** | 1776 K Street NW | Washington, DC 20006
(Tel) 202.719.7178 | (Fax) 202.719.7049 | LJonesIV@wileyrein.com

From: ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
Sent: Tuesday, November 11, 2014 12:26 PM
To: Jones, Leland
Cc: gale.dwyer@awac.com
Subject: Re: D'Angelo & Eurell -- Claim No. 2013002782

Dear Mr. Jones,

Attached please find a copy of the first two pages of the complaint which has been filed in the above claim against George A. D'Angelo, Esquire, David S. D'Angelo, Esquire and Law Offices of D'Angelo and Eurell on October 29, 2014 in Dauphin

ALLIEDWORLD00000003

**App. 258**

County, Pennsylvania. The Certificate of Service by mail states October 29, 2014. As you are aware, this action was commenced by Writ of Summons last year.

The whole document is too large to attach. I will attempt to fax it to you. Kindly confirm that you have received it or that you have obtained a copy directly from the courthouse.

There are many issues which need to be addressed immediately, including, inter alia, statutes of limitations, laches, estoppel, failure to state a claim, settlement, accord and satisfaction, venue and others.

After you have reviewed the attached, please contact me to discuss this. Thank you.

David S. D'Angelo

-----Original Message-----
From: Jones, Leland <LJonesIV@wileyrein.com>
To: ddsdangelo <ddsdangelo@cs.com>
Cc: Simpson, Richard <RSimpson@wileyrein.com>
Sent: Thu, Jun 13, 2013 10:29 am
Subject: RE: D'Angelo & Eurell -- Claim No. 2013002782

Mr. D'Angelo,

Thank you for providing this information.  Was a complaint served with the summons?  Or, did they only serve a summons?

As we stated in our April 18, 2013 correspondence, Darwin will need a copy of the complaint, or any other communications you have received since our April 18 correspondence, to assess the availability of coverage under the Policy for this matter.

Sincerely,
Leland Jones

Leland H. Jones IV | Attorney At Law | **Wiley Rein LLP** | 1776 K Street NW | Washington, DC 20006
(Tel) 202.719.7178 | (Fax) 202.719.7049 | LJonesIV@wileyrein.com

> **From:** ddsdangelo@cs.com [mailto:ddsdangelo@cs.com]
> **Sent:** Wednesday, June 12, 2013 12:26 PM
> **To:** Jones, Leland
> **Subject:** Re: D'Angelo & Eurell -- Claim No. 2013002782
>
> Mr. Jones,
>
> Attached please find the Summons served on us today by the attorneys for Lisa Markley.
>
> Kindly advise what steps, if any, should be taken at this time.
>
> Thank you.
>
> David S. D'Angelo
>
> -----Original Message-----
> From: Jones, Leland <LJonesIV@wileyrein.com>
> To: ddsdangelo <ddsdangelo@cs.com>
> Cc: Gale.Dwyer <Gale.Dwyer@awac.com>; Simpson, Richard <RSimpson@wileyrein.com>
> Sent: Thu, Apr 18, 2013 11:17 am
> Subject: D'Angelo & Eurell -- Claim No. 2013002782
>
> Mr. D'Angelo,
>
> Please see the attached letter.

ALLIEDWORLD00000004

# Markley's Complaint, October 29, 2014

Andrew W. Barbin, Esquire
Atty I.D. 43571
ANDREW W. BARBIN, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
717-506-4670                                            Attorney for Plaintiff

| | |
|---|---|
| **LISA MARKLEY** | **: IN THE COURT OF COMMON PLEAS** |
| **1724 Verbeke Street** | **: DAUPHIN COUNTY, PENNSYLVANIA** |
| **Harrisburg, PA 17103,** | : |
| **Plaintiff** | : |
| | : |
| **v.** | : **CIVIL ACTION - LAW** |
| | : |
| **LAW OFFICES OF D'ANGELO AND** | : **No. 2013-CV-3010-CV** |
| **EURELL** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
| **And** | : |
| **DAVID S. D'ANGELO, ESQUIRE** | : |
| **Law Offices of D'Angelo and Eurell** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
| **And** | : |
| **GEORGE A. D'ANGELO, ESQUIRE** | : |
| **Law offices of D'Angelo and Eurell** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
| **Defendants** | : |



## COMPLAINT

    Plaintiff, Lisa Markley, by and through counsel, Andrew W. Barbin, P.C., hereby files

this Complaint against Defendant Law Offices of D'Angelo and Eurell, Defendant David S.

D'Angelo, Esquire, and Defendant George A. D'Angelo, Esquire (collectively "Defendants"),

and avers as follows:

**PARTIES**

1.    Plaintiff, Lisa Markley. (Hereinafter "Plaintiff" or "Lisa Markley"), is an adult female resident of Pennsylvania residing at 1724 Verbeke Street, Harrisburg (Dauphin County), PA 17103. Effective August 27, 2013, Plaintiff moved from the address listed on the Writ of Summons issued in this matter to her present address set forth in the Caption above after issuance of the Writ of Summons. The caption here provides the current address.

2.    Defendant, Law Offices of D'Angelo and Eurell (hereinafter the "Firm"), is a Pennsylvania business with a principal place of business located at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110, it is believed and averred that they are a common law partnership between George A. D'Angelo, David S. D'Angelo, John B. Eurell at the times relevant to this Complaint, and not an incorporated entity.

3.    Defendant, David S. D'Angelo, Pa. Atty. I.D. 37347 admitted November 9, 1982 (hereinafter "David"), is an adult male citizen of Pennsylvania with a principal place of business at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110.

4.    Defendant, George A. D'Angelo, Pa. Atty. No. 12326 admitted January 1, 1950 (hereinafter "George"), is an adult male citizen of Pennsylvania with a principal place of business at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110.

**JURISDICTION AND VENUE**

5.    Plaintiff lives and resides in Dauphin County, Pennsylvania.

6.    Within the limitation period, George, acting as authorized agent of the Firm, provided legal and financial professional services to Lisa Markley who resided in Dauphin County during the past decade, in a fraudulent and grossly negligent manner, and in breach of fiduciary obligations.

7.    Within the limitation period, David, son of George and an attorney with the Firm, acting on behalf of himself, the Firm and his father George, either intentionally or grossly negligently made false and fraudulent statements to Lisa Markley and her counsel Bruce Warshawsky, Esquire regarding the deficiencies in prior services of himself, George and the Firm through false and fraudulent communications directed to Mr. Warshawsky at his office in Dauphin County, each of which involved a continuing course of conduct involving breaches of legal and fiduciary duties of George, David and the Firm.

8.    It is believed and averred that David also knowingly participated in the fraudulent conduct, grossly negligent services and breaches of fiduciary responsibility referenced in Paragraph 6 above, as a protective son, associate counsel of the Firm, and eventually as managing attorney of the Firm.

9.    It is believed and averred that George and David acted as authorized agents of the Firm and it is further believed and averred that other members and attorneys of the Firm knew or should have known of the misconduct, and condoned it by either direct support or inaction, and in any event shared in the fruit of the ill-gotten gains which were commingled with Firm assets.

10.    While earlier services, relevant to the *res gestae* of the claims, had been provided to Lisa Markley when she resided in other jurisdictions; all services provided in the past decade, which are the basis for the claims herein, where provided while she was a resident of Dauphin County, PA.

11.    It is believed and averred that All Defendants have periodically appeared in appeals courts located in Dauphin County and purposefully sought and provided services in this County, including services to Lisa Markley.

12.    Jurisdiction and venue over all claims set forth in this Complaint are proper in the Court of Common Pleas of Dauphin County, Pennsylvania.

**FACTS COMMON TO ALL COUNTS**

13.    The conduct in question involves the denouement of a concealed course of fraudulent conduct which began when the Plaintiff was a young child and continued into her adulthood, culminating in her discovery that Defendants had mismanaged or misappropriated more than a million dollars' worth of her inheritance from her parents, leaving her with no funds in the accounts they managed.

### Summary of the Basis of the Fraud and Professional Liability Actions

14.    While there are multiple claims and theories of liability, the essence of the action is that over a period of decades George D'Angelo used his position as counsel for Lisa Markley's mother and then Lisa Markley herself to develop a special relationship of trust and a highly irregular Power of Attorney (discussed in detail and attached as an exhibit, see Paragraph 92 below) which he used to secure improper fees and control over Lisa Markley's assets, which he then systematically mismanaged and misappropriated, while making continuously false and fraudulent statements regarding his rights with respect to fees, the amount and status of her funds and the reasons for delay in providing accountings and back-up documentation.

15.    George's son David assisted George in perpetrating and attempting to conceal the fraudulent conduct, all of which was done through the Firm; David's name appears in various transfers from the account and David had communications with Lisa Markley's attorney concerning the accounting for Lisa Markley's funds which contained false and deceptive statements; the full extent of his knowledge and involvement in Lisa Markley's finances generally, the excessive fees claimed, misappropriated and/or comingled is not yet known.

16.     The Firm knew or should have known of the grossly unethical and wrongful conduct being done in its name and that George and David were at all times authorized agents of the Firm so as to make the Firm responsible for their respective misconduct.

**Background Conduct Outside the Applicable Limitations Period**

17.     Significant conduct occurred outside the applicable limitations periods for the claims asserted which are relevant to issues such as the existence of a special relationship and the reasonableness of reliance of Lisa Markley on the assurances of George in relation to the continuing fraudulent conduct which continued and culminated in discovery of the misappropriations during the applicable limitations periods; David attempted to conceal the conduct by providing materially misleading statements to Lisa's counsel Bruce and by failing to disclose material facts to Lisa.

18.     The professional relationship between Lisa Markley and Defendants goes back over a period of decades to a point where George had first represented her through her mother in divorce, support and alimony proceedings when Lisa Markley was still a minor (hereinafter "Prior Representation").

19.     While no cause of action is asserted here as to conduct in the Prior Representation, the facts of the Prior Representation are relevant to current claims with regard to the existence of a special relationship of trust with regard to fiduciary obligations related to the financial transactions at issue.

20.     The Prior Representation is also relevant as to false and fraudulent offset credits claimed by George, David, and the Firm, when providing their false, materially fraudulent "accounting" as to monies admitted to have been improperly diverted as detailed below.

21.     The degree to which George had insinuated himself into a position of trust and control *vis-à-vis* Lisa Markley and her mother is also relevant to the claims below with respect to both the existence and scope of fiduciary duties arising from a special relationship of trust and as to the reasonableness of Lisa Markley's reliance upon the serial misrepresentations, and Lisa Markley's delay in discovery of the multifaceted continuing course of fraudulent misrepresentations pertaining to outright misappropriations and gross negligence in the management and nearly complete dissipation of the Trust assets of Lisa Markley.

### GEORGE'S PRIOR REPRESENTATION OF LISA MARKLEY'S MOTHER

22.     George is a named partner in the Firm, and has been practicing law since 1950.

23.     Defendants knew Lisa Markley from the long-standing legal relationship George had with Lisa Markley's mother, which dated back to at least 1965.

24.     His initial contact with Lisa Markley's mother began with his legal representation of her during her divorce appeal, discussed above and below.

25.     Lisa Markley was a minor child at the time of the divorce proceedings.

26.     During the divorce proceedings and for years afterwards, George, unethically and without any apparent basis, contended that adverse determinations in those proceedings arose from improper and unethical conduct of others, *including the Common Pleas Court*.

27.     These baseless allegations were designed to cloak him in the false mantle of noble champion, and to allow him to insinuate himself into a close personal relationship with the Markley family, notwithstanding his singular lack of success in the appeals actually pursued.

28.     The appellate decisions issued in those proceedings reveal that George misrepresented the nature of the divorce proceedings, that he (or his predecessor) neglected

them, and then he wrongly traduced the local judiciary to cover his (or his predecessor's) neglect.

29.    It is believed and averred that neither Lisa Markley nor her mother were ever shown the actual decisions.

30.    The split decision on the appeal which George used to cover his or his predecessor's neglect, related only to the appeal of the decision to allow divorce on indignities grounds.  The Appeals Court decision on the support issue which was the focal point of George's discussions with Lisa Markley and her mother was a 5-1 decision which affirmed the decision of the Trial Court which stated in pertinent part:

> The applicable legal principles are well settled.  The purpose of a support order is to secure such an allowance to the wife and child as is reasonable, having in mind the husband's property and earning capacity and the station in life of the parties:…
>
> […]  In the instant case the court below took into consideration the fact that appellant and her daughter are living in a substantial home, completely furnished, on which appellee pays $2,124.00 annual carrying charges, that appellee has created a $15,000.00 trust fund for the daughter's future education, and has agreed to pay tuition and other charges for the daughter at private school, summer camp, dancing and piano lessons. *The record discloses that the amounts awarded for maintenance of the wife and daughter coincide almost exactly with the total required, as established by the testimony. Moreover, the order below could not have been so grossly inadequate as is now alleged, since appellant permitted this appeal to rest unargued for over two years, and then argued it only because her request for a further continuance was denied.*
>
> The principal complaint of present counsel for appellant is directed to the finding of the court below that appellee's net income after taxes and expenses is only $30,000.00 per year. *Appellant's trial counsel had before him a copy of appellee's income tax return, and was afforded full opportunity to cross-examine with regard thereto.* The effect of income tax upon the parties is a proper matter for consideration: *Commonwealth ex rel. Kallen v. Kallen*, 202 Pa. Superior Ct. 500, 198 A. 2d 331. *There is nothing in the testimony which justifies any material question concerning appellee's estimate of his net income.* In brief, **we perceive no basis on this record for charging the lower court with an abuse of discretion.**

*Markley v. Markley*, 207 Pa. Super. 294, 297; 218 A.2d 84, 85 (1966).

31.   It is far from clear why an appeal regarding support was even undertaken.

32.   Lisa Markey first learned of the actual rulings of the appeals courts after securing new counsel for this matter within the limitation periods and was surprised by the content of the rulings, as it was materially different from what she had been told by George on all prior occasions.

33.   The results and rationale had been repeatedly materially misrepresented to Lisa Markley (and it is believed and averred her mother as well) in order to create and foster dependence on George and to evade discovery of the deficiencies in that Prior Representation.

34.   Despite request, George has produced no records as to the date on which he undertook the Prior Representation or the state of the pleadings at that time.

35.   However, even assuming all material errors identified by the Appeals Court opinion had been committed by his predecessor, that would still not justify misrepresentations as to the true state of the case, advisability of pursuing the appeals, and/or his serial misrepresentation as to the actual basis for the Court's separate decisions.

36.   Despite request, George has produced no records which would in any way justify the aspersions cast upon the local judiciary in the divorce case; this not only involves a serious ethical violation, but was the foundation upon which George systematically insinuated himself into legal, financial and personal matters of the Markley family.

37.   George intentionally, fraudulently and unethically infected Lisa Markley and her mother with distrust for any other participant in the legal system as well as the local judiciary and encouraged dependence upon himself as "their *Champion*," with the chimera of corruption as the convenient excuse for any adverse developments.

### GEORGE A. D'ANGELO'S SPECIAL RELATIONSHIP WITH LISA MARKLEY

38.     Despite the profound lack of success in the divorce and support litigation appeals, George managed to deceive Lisa Markley and her mother into a false belief that his services had been "heroic" despite his having lost, and convinced them to have him act as their regular counsel and general adviser.

39.     George cultivated mistrust of the system and dependence upon him in Lisa Markley, during the time before she reached majority and thereafter.

40.     George sought to establish himself as a surrogate "father figure" to Lisa Markley after the acrimonious and litigious divorce proceedings in which George played an active role.

41.     George continued to address issues regarding support items throughout Lisa Markley's minority, particularly as to implementation of the ongoing support obligations related to camps and other miscellaneous matters.

42.     In January 1976, George sent Lisa Markley a note:

Dear Lisa,

Your mother has spoken to me in reference to a recent legacy which you are about to receive. Your mother was of the thought that I could be of assistance to you. If you would like to consult with this office please call me and we shall discuss the matter.

43.     In and around April 1976 George provided legal services to Lisa Markley regarding an inheritance from a friend of her father, under a will which gave her father trustee status as to the funds regarding which George encouraged confrontation, described innocuous conduct regarding a relatively small amount as "reprehensible" and "unforgivable" on the part of both her father and a local attorney who had indicated that her father respected her privacy and had agreed that she could discuss the trust and any disbursements with the local counsel rather than her estranged father who had been designated the Trustee. Even after all but $1,835.97 had

been distributed, he advised, "… I think that it would be very unwise to have these (trust) monies remain with Sidney M. Markley (her estranged father)."

44.     The relationship continued for the next two decades and was sufficiently close that George attended Lisa Markley's out of state, college graduation in 1998; Lisa Markley's friends who were present at the time were struck by the fatherly demeanor George exhibited toward her at that event.

45.     The graduation picture reflects his efforts to establish a surrogate paternal relationship with Lisa Markley, as does George's follow up note which declared:

> Dear Lisa,
>
> What an exciting time. I am so proud of you and delight in your friends.
>
> Your letters to Sylvia and Mel and Elaine are charming. The French touch reflects the very subtle qualities of kindness and love that is in you.
>
> I wish you all the best and you are instructed to stay in touch

46.     To the great detriment of Lisa Markley, she did as *instructed* and George proceeded to take improper advantage of the trust he had so carefully cultivated.

47.     George continued to represent Lisa Markley regarding various legal issues and provided legal services and financial management services as a trusted father figure from the date of her majority until he was discharged by new counsel, Mr. Warshawsky, in June 2012.

48.     The "special relationship" of George in relation to Lisa Markley was admitted on behalf of the Firm, David and George, when in June 2012, David, on behalf of George and the Firm, responded to new counsel Mr. Warshawsky's request for initial documentation regarding the trust funds by stating:

> I am in receipt of your letter of June 12, 2012 directed to my father. *He is disappointed that, after 46 years of representation of Lisa and her mother in a myriad of professional and very personal affairs and the close bond that they had,*

that she would retain you to contact him and that she, herself, *__would not have given him that courtesy, caring and respect__*.

From your request to UBS Financial, you will be receiving records of all financial transactions conducted on Lisa's behalf. That will serve as your precise and accurate accounting. (Emphasis added.)

49.     Rather than providing a "precise and accurate accounting," the third party records in fact disclosed that George had misappropriated and/or squandered more than a million dollars.

50.     While Lisa Markley was generally aware that the account balances on certain investment reports had declined after the general downturn in 2008, George had explained to Lisa Markley that he had taken money out of the "volatile market" and "invested it in non-volatile physical investments," and in 2010 had a particular conversation about the appreciation of gold and other metals during the time period.

51.     Lisa Markley reasonably understood from various conversations with George that the trust account funds had been moved to investments in gold and/or other precious metals which would not be reported on the stock type trading account reports; he had indicated that the metals were "private sale" items, and that he could provide an inventory (which never materialize) or show them to her; but on the occasion when Lisa Markley indicated her ability and desire to do so, George apologized and explained that unfortunately he would be "out of town."

52.     Because she trusted George, she reasonably accepted what she thought was a truthful and reasonable explanation of a prudent investment move made for her benefit by a trusted advisor and family friend; while his avoidance may be apparent in hindsight, his conduct at the time seemed reasonable and convincing to Lisa Markley in light of their relationship.

53.     Lisa Markley did not have cause to question the explanations provided until delay in providing requested documentation caused her to consult new counsel in 2012, when she was

shocked to learn that her *entire* Trust was gone, there were *no precious metals investments* and *no accounting was forthcoming*.

54.    At the same time, she first learned that several prior seemingly reasonable explanations for fees and withdrawals had been false fraudulent, improper and unethical.

55.    Inconsistent and incomplete explanations by all Defendants make specific attribution of precise missing amounts to specific pretextual justifications problematic, but the entire amount missing and apparently misappropriated exceeds a million dollars.

56.    Details regarding various false, fraudulent and pretextual explanations for declining balances are detailed topically below.

57.    The conduct as a whole was false fraudulent and egregious and warrants punitive damages under multiple theories of liability set forth in the various Counts below.

**MISAPPROPRIATIONS**

58.    George initially withdrew from the account money roughly proportionate to the 1/3 fee he claimed as to money received from her father's estate, which is discussed further below.

59.    George indicated that he would charge a 1.5% management fee for management of the remaining funds as a financial manager and for investment services discussed below; however, thereafter without further discussion with Lisa Markley, George made regular and irregular withdrawals from the account which did not correlate to any specific agreement or justification shared or explained at the time of the withdrawals, and which did not reflect reductions in the amount managed over time.

60.    Based on documents received it is believed and averred that upon the death of Lisa Markley's mother December 14, 2005, Lisa Markley received approximately $283,723.75

from her mother's estate in Arizona and deposited with George's investment account on or about August 16, 2006.

61.    George did not make Lisa Markley aware of any claim that he had taken additional monies based upon an alleged agreement with her mother that he would receive "a 1/3 contingency fee" on the money Lisa Markley had received from her mother's estate because her mother could not pay for the prior legal services he had provided as long as 40 years earlier, until after Mr. Warshawsky became involved in the effort to secure an accounting discussed below.

62.    As of December 12, 2012, David admitted in a telephone conversation that the mother's estate was not included in the Power of Attorney Contingent Fee claim, and stated that he did not believe that 1/3 of the money from the mother's estate had been taken. (*See* Paragraph 92 below).

63.    However, after receiving spreadsheets demonstrating that the amounts taken exceeded the amounts the prior position could justify, David reversed his position in a January 7, 2013 email and claimed that there had been an agreement, of which Lisa Markley was aware, that George was also to receive 1/3 of her mother's estate; in February 2013 he further reversed his position to claim that the 1/3 fee from the mother's estate was included in the Power of Attorney despite the fact that her estate was not included in those specifically identified.

64.    George had been the long-term attorney first for Lisa Markley's mother, and then for Lisa Markley herself; furthermore Lisa Markley had no independent knowledge of either the law or norms of the legal community in matters at issue herein; and so Lisa had no reason to question his false and fraudulent assertions.

65.    It is believed and averred that no such contingent fee agreement ever existed.

66.     It is separately believed and averred that if such an agreement did exist with Lisa Markley's mother, such a fee would have been contrary to numerous ethics provisions, fraudulent, and a patently excessive and prohibited fee as to Lisa Markley's mother.

67.     The contingent fee alleged by George would have been patently excessive for the limited services rendered relating to either the divorce or estate, particularly in light of the issues discussed above regarding extent, quality, and efficacy/advisability of the appeals services in the divorce matter and virtually non-existent involvement in the administration of her Arizona estate which was completed by Lisa as her mother's personal representative. Pa.R.Prof.C. 1.5.

68.     Any such alleged contingent fee agreement with Lisa Markley's mother also would have been contrary to several applicable ethics rules, in that it would have: 1) not been reduced to writing as required, 2) involved prohibited self-dealing without documentation of advice to consult separate counsel, 3) been patently excessive, and 4) involved a prohibited contingent fee in an alimony and divorce matter. *See* Pa.R.Prof.C. 1.5 (a), (1-7); 1.5 (c); 1.5(d); and 1.8.

69.     The claim also amounts to an unethical testamentary gift from a client to counsel in an agreement originated, but not even memorialized in writing, by counsel. Pa.R.Prof.C. 1.8 (c).

70.     The representation that Lisa Markley's mother could not and/or did not pay fees is believed and averred to be fraudulent and false as the Appeals Court decision specifically noted:

> As to the third count, an opinion was filed in the lower court on August 5, 1963, ***allowing interim counsel fees***, temporarily refusing alimony, costs and expenses, and making an order for the wife's maintenance in the sum of $ 125.00 per week, and for the daughter's maintenance in the sum of $ 35.00 per week.

Had *any* appeal been appropriate, George was free to petition the court for payment of any fees deemed reasonable and proportionate to the services provided; no record of such a request

appeared in the file provided by the Firm, and no Defendant has explained why such a Petition was not or could not be filed.

71.    Attorney's fees, if any were warranted, should have been received by petition to the Court for additional attorney's fees *pendente lite*. *Markley v. Markley*, 207 Pa. Super. 294, 297; 218 A.2d 84, 85 (1966). Both related Markley Divorce Appeal decisions are attached hereto as Exhibit "A."

72.    In a February 6, 2013 email from David to Attorney Bruce Warshawsky, David claimed that "several feet of Markley files" were "lost in a flood," and so "there is no documentation regarding the above matters. However, there is sufficient public record and testimony to substantiate the facts." *See* Exhibit "B."

73.    No portion of the alleged public record was provided to justify the fees claimed, nor was any detail supplied as to what "testimony" could justify such a fee.

74.    From the records available, it does not appear that George asserted or reported *any* fee claim in the administration of the estate of Lisa Markley's mother.

75.    Any obligation for attorney's fees relating to representation of Lisa Markley's mother was personal to Lisa Markley's mother, and subject to claim *in the administration of the estate, with supervision of the probate court*; and not by self-help, self-dealing, patent conflict of interest, misrepresentation and misappropriation by George.

76.    It is believed and averred that no such fee could have or would have been approved by any Court, had any claim been asserted against Lisa Markley's mother's estate.

77.    It is believed and averred that George and David knew that any alleged agreement was unenforceable as to Lisa Markley, unethical and in breach of fiduciary duties by misrepresenting the existence and enforceability of the claimed obligation.

78.     It is believed and averred that George and David also knew that assertion of the adverse claim against Lisa Markley in relation to the alleged fee owed by her mother from the estate was in gross violation of the patently unwaivable conflict involved in assertion of such a claim while representing Lisa Markley and/or the estate, particularly without advising her in writing to consult separate counsel.

79.     Taking the improper fee related to services claimed to have been rendered to the mother decades earlier from the funds inherited by Lisa Markley was false and fraudulent and violated the fiduciary, ethical and contractual duties of George and the Firm as to Lisa Markley; particularly with respect to his duty to communicate truthfully with Lisa Markley regarding the existence, propriety and enforceability of any such alleged oral agreement. Pa.R.Prof.C. 1.4; 1.8.

80.     Assertion of such an obligation as to Lisa Markley by George, while representing Lisa Markley, constituted a gross impermissible and unwaivable conflict of interest, impermissible self-dealing, improper solicitation of a testamentary gift, and impermissible attempt to have a third party pay fees of litigation without required disclosures. Pa.R.Prof.C. 1.8 (a), (b), (c), (e), (f).

81.     Lisa Markley reasonably relied upon the representations of George who consistently provided explanations sufficient to allay any concerns of an individual in which he had fostered a relationship of special trust over a period of decades.

82.     George knowingly and intentionally fostered a relationship of special trust with Lisa Markley, and then used that special trust to perpetrate a series of fraudulent misappropriations, and to evade discovery of the misappropriations.

83.     George made false and misleading statements to Lisa Markley in an attempt to evade discovery throughout; George and David, both knowingly and intentionally made false

and fraudulent statements regarding the status of the assets and the amounts and reasons for withdrawals for the benefit of George and/or the Firm after Lisa Markley had consulted new counsel Mr. Warshawsky.

84.    It is believed and averred that additional sums, *beyond the amounts referenced above,* may also have been misappropriated, and that George is believed to have taken a total amount equal to 1/3 of all funds received from Lisa Markley's mother's estate.

85.    Accurate, complete disclosures by Defendants are required to determine the full amount misappropriated on this basis.

86.    Despite request, Defendants provided no accounting of the totals received from either estate, nor did they make a specific attribution of specific withdrawals for specific reasons.

87.    It is believed all justifications are false, pretextual, and *post hoc* rationalizations.

**IMPROPER FEES: LISA MARKLEY'S FATHER'S ESTATE LITIGATION**

88.    Lisa Markley was estranged from her natural father after the acrimonious and litigious divorce in which George represented her mother, and in which George took pains to fuel fires of acrimony and mistrust, without ever adequately documenting any basis for the aspersions cast on the other participants.

89.    The misrepresentations of George regarding the state of the evidence, the proof offered, the regularity of proceedings and the outcomes exacerbated the estrangement of Lisa Markley from her natural father and complicated any efforts at reconciliation; George reinforced this mistrust in the 1976 representation discussed above.

90.    In 1988, following the death of Lisa Markley's natural father July 21, 1986, there was litigation concerning Lisa Markley's share in her father's estate.

91.     Despite the fact that the litigation was pending in California, George and the Firm abused the special relationship between George and Lisa Markley to have her hire his Firm in addition to the active counsel in California; thereby creating an unjustified duplication of effort, unwarranted travel expenses, and patently unreasonable and unethical fees.

92.     Again, contrary to standard and usual practice, and various applicable ethical rules, George did not enter into anything vaguely approximating a proper or lawful *contingent fee agreement*, as that term is used in Pa.R.Prof.C. 1.5 (c).

93.     George also did not maintain any records regarding the extent of his claimed "assistance" in the matter.

94.     Instead, George drafted a document for Lisa Markley to sign and have notarized which was deceptively styled "*a Power of Attorney*" and purported to give George an "***irrevocable***" Power of Attorney which covered any and all matters pertaining to Lisa Markley, *including but expressly not limited to* the Estate Trust matters relating to her deceased, estranged father. *See* Exhibit "C."

95.     George then used the power of attorney to retain and pay local counsel in California.

96.     The inartfully drafted document also purported to authorize a 33 1/3% contingent fee regarding the father's estate claim, even though at the outset the only disputed issue was whether the language left her a ½ share or a 1/3 share in the portion for his children.

97.     Given the nature of the litigation, it is averred and contended that the fee was excessive, unreasonable and unethical.

98.     By letter dated January 13, 2013, California counsel Kenneth G. Compton, Esquire, indicated that his file had been shredded, that he had represented Lisa Markley in

hearings in 1991 and 1992, and that counsel only recalled George attending one appellate argument in 1994.

99.    No records were proffered by defendants to Mr. Warshawsky indicating any other actual work by George, and so it reasonably appears the net result was receipt of what had originally been conceded, the 1/3 share of the Trust, *less contingent and local counsel fees*.

100.    It is believed and averred that the February 6, 2013 email indicating loss of records relating to "these matters" applied equally to this second alleged representation.

101.    There is no record that Lisa Markley was consulted regarding the hiring of California counsel or was consulted, consented to, or was ever informed of any agreement as to how any fee would be split between California counsel and George; the only known communication appears to have materially misrepresented George's actual role as lead counsel and directing the litigation though California counsel has indicated otherwise.

102.    Any such conduct would be contrary to applicable ethical requirements regarding payments to third parties and sharing of fees.

103.    It is believed and averred that the fee claimed by George in connection with the Estate and Trusts of Lisa Markley's deceased father were unconscionable, disproportionate, and unethical.

104.    It is believed and averred that the fee splitting arrangement was unauthorized and unethical, that the combined fee was unreasonable and unethical, and that the Power of Attorney was void and voidable as an unethical, unreasonable, and disproportionate fee agreement gained through serial ethical violations including particularly self-dealing, inadequate disclosure, and gross overreaching, particularly as to the "irrevocable" nature of the grant as drafted by George.

105.    Based upon a March 2001 letter of Kenneth Brandt, CPA regarding distributions made by the estate and trusts, it is believed and averred that George received approximately $1,000,000 on behalf of Lisa Markley on or about August 30, 2000, and an additional distribution of approximately $176,114 sometime after that date, though access to original and third party records would be required to confirm the precise actual amounts.

106.    It is believed and averred that additional amounts were later distributed, and that an accounting is required to determine the total amount received by George, as a 2001 letter specifically referenced escrows for contingencies presumably subject to final distribution in the event of net balances; it is believed and averred that additional sums were in excess of $50,000.

107.    It is believed and averred that George withdrew from the funds received on behalf of Lisa Markley an unreasonable fee of at least 33 1/3% of all such monies received; and that such fee was grossly disproportionate to the value of services rendered.

108.    In June 2000, after money was received from Lisa Markley's father's estate, George supplemented his prior unethical and unconscionable "Irrevocable Power of Attorney" by having Lisa execute a "General Trading Authorization" with Paine Webber which gave him full power as "broker" or "dealer" to make trades on her account and "to transfer funds to her or others."

109.    The December 2000 Paine Webber Resource Management Account Report for Lisa Markley's funds also indicates that checks totaling $446,599 were issued to defendants in 2000, with checks in the amounts of $184,275 and $166,824 drawn to "David S. D'Angelo" and $25,000, $15,000 and $55,000 drawn to "GAD" (presumably George), "George DeAnglelo," and "Jorge A Dangelo."

110.    While it is not known what amount was paid to California counsel, it is believed and averred that the Firm and George had a legal and ethical obligation to ensure that the net fee in the representation was reasonable; and that the amount to be disgorged as unreasonable should be equal to the difference between the amount paid to all counsel and the amount deemed to be reasonable, rather than merely in reference to the amount received by the Firm and/or George.

111.    Lisa Markley does not know the amount(s) paid to the California firm, but does not imply any misconduct on their part.

112.    David and all Defendants have claimed entitlement for undocumented, alleged travel expenses of George for multiple alleged, unspecified, and undocumented trips to California.

113.    This claim is inconsistent with the communication of the California counsel who recalled only a single trip; and in no way explains why such duplicative services were necessary or reasonable for attendance at argument.

114.    The Power of Attorney, pursuant to which already improper and excessive fees were claimed, had no provision for payment of additional "expenses" beyond the excessive and highly irregular contingent fee claimed.

115.    All Defendants engaged in continued unethical conduct and exacerbated the adverse effects of prior unethical conduct by acting in concert to evade disclosure of known gross violations of contractual, legal, fiduciary and ethical duties of all Defendants throughout.

116.    David and the Firm became accessories after the fact and co-conspirators as to all the prior misconduct by their joint and systematic effort to mislead Lisa Markley as to the amount and nature of the withdrawals made from the funds of Lisa Markley deposited with the Firm, and the actual net balance of funds held by the Firm.

117.    It is believed and averred that David knew of, condoned, failed to disclose, and participated in some, part, or all of the misconduct of his father regarding the excessive fees and false and fraudulent accountings of funds held in trust for Lisa Markley; belief is based in part on the fact that funds were withdrawn from her account and recorded as being disbursed to David as well as George.

118.    It is believed and averred that the misappropriated funds were comingled with Firm funds, and that all Defendants improperly benefited financially from the misappropriations; there are also checks with "no designee," payment to taxing authorities and to "OSayle & Eurell" which are also without any appropriate accounting and appear improper.

### FINANCIAL MANAGEMENT AND INVESTMENT SERVICES

119.    George also used his status as counsel, and the special relationship he had cultivated with Lisa Markley to take absolute control of her investments as financial manager.

120.    No written agreement regarding fees for such services was provided to or executed by Lisa Markley, and none of the Defendants acquitted themselves of the obligation to recommend consultation with separate counsel regarding such self-dealing with a client.

121.    Neither the Power of Attorney nor the "General Trading Authorization" with Paine Webber in any way set forth or authorized fees for financial management services.

122.    Upon information and belief, Lisa Markley avers that financial services were provided through the Firm by both George and David, prior to the express revocation of the Power of Attorney in June 2012 and termination of services of the Defendants after the near complete dissipation of assets was discovered.

123.    George was the primary financial manager, and generally acted without notice or solicitation of opinion or approval from Lisa Markley as to investment decisions and/or fee

claims, and checks drawn to George, David or other third parties for which no accounting has been provided.

124.    No Defendant was licensed within the Commonwealth of Pennsylvania as a financial advisor, "broker," "dealer" or otherwise.

125.    George informed Lisa Markley that he would charge a 1.5% fee for management of her funds, again without reducing any agreement to writing or advising Lisa Markley of the propriety of having another attorney review any such agreement.

126.    Defendants continued to charge Lisa Markley $15,000 per year for management of the assets even after George's misappropriations and disastrous investments had substantially depleted the amount managed by Defendants below the million dollar trust corpus which had been the theoretical justification for the original improper and excessive 1.5% fee claimed.

127.    Defendants falsely and fraudulently concealed both misappropriations and losses due to the misappropriations and incompetent financial services provided.

128.    The fees actually taken were irregular, unauthorized and excessive.

129.    George provided financial services in a profoundly negligent and incompetent manner resulting in dramatic depletion of funds.

130.    George concealed the losses from Lisa Markley and continued to withdraw sums as fees which were reflective of an undiminished balance despite the fact that the fees represented dramatic increases in the percentage of assets managed, and were patently unreasonable in amount even had services been competent, which they were not.

### GROSS PROFESSIONAL INCOMPETENCE AND FRAUD

131.    George provided unlicensed financial management services through the Firm, and upon information and belief it is averred David assisted him in providing such services by acting as a conduit for communications and recipient of funds on a periodic basis.

132.    George provided these unlicensed, financial management services through the Firm, without written agreement, on patently unreasonable terms, and without ensuring that Lisa Markley had the benefit of advice of independent counsel as required for attorney business transactions with clients.

133.    All Defendants owed Lisa Markley a duty of professional and fiduciary care regarding the financial services.

134.    All Defendants knew or should have known that George was unqualified to provide such services.

135.    George provided epically incompetent investment management services which caused a dramatic decrease in the funds supervised.

136.    All Defendants knew or should have known that George had made a continuing series of bad investments and improvident asset liquidations causing losses to Lisa Markley which should have been disclosed, but were not.

137.    When Lisa Markley noted that broker account balance reports had decreased, George falsely and fraudulently stated to Lisa Markley that he had taken funds out of the "volatile broker accounts" and had provided her a hedge against the market uncertainty by purchasing secure durable assets and precious metals.

138.    Because she had agreed to the 1.5% fee and Defendants continued to withdraw an annual $15,000.00 fee, and because of the relationship of special trust George had carefully

cultivated, Lisa Markley reasonably believed that the net value of the brokerage investments and the separate precious metal/durable goods investments together remained at or above $1,000,000.

139.    Lisa Markley was repeatedly told by George that the $15,000 fee was a 1.5% commission for Defendants' management of the assets.

140.    By continuing to report a $15,000 per year fee, Defendants knowingly and intentionally deceived Lisa Markley as to the amount of funds still under management and effectively concealed from her the dramatic losses incurred as the result of George's incompetence as a financial manager and dishonesty as their custodian.

141.    It is believed and averred that David knew of the losses and misrepresentations and knowingly and intentionally participated in the misrepresentations and stalling activities to prevent or delay discovery of the full extent of the incompetence, fraud and misappropriations.

142.    David falsely and fraudulently claimed that there was an alleged written agreement, but that it was destroyed in the 2004 flood.

143.    There was never a written agreement.

144.    No action was taken by Defendants between 2004 and 2012 to replace the falsely alleged "lost" agreement; and such a file should have been available on an electronic back-up.

145.    Even if such an agreement existed, an agreement which required $15,000 in annual fees regardless of how much money George had lost through gross incompetence, would be unconscionable, patently excessive and unreasonable.

146.    The management fee charged was grossly exorbitant and excessive.

147.    By May 2012, George had squandered virtually all of the approximately 1.5 million dollar sum placed under his dubious financial management, through incompetent investment and his excessive, irregular, and unethical fee practices.

UNAUTHORIZED WITHDRAWALS FROM INVESTMENT ACCOUNTS

148.    Based upon records supplied by Defendants, in addition to charging excess fees to Lisa Markley's investment accounts, George simply misappropriated funds without any semblance of justification.

149.    Beginning in 2003, George made several intermittent, unexplained, and unauthorized withdrawals, in increments ranging from $5,000 to $10,000.

150.    This practice continued through 2008, at which point the frequency of such withdrawals increased.

151.    Withdrawals at the increased pace continued through 2010, when both the frequency and the amount of such withdrawals again increased.

152.    From 2010 until 2012 when Defendants' access to the accounts was revoked, amounts withdrawn ranged from $10,000 to $20,000.

153.    While they were consistent with the assurance that money was being withdrawn from volatile markets and put in durable assets and precious metals, none were accounted for or transferred and no other justification has been proffered for these withdrawals; it retrospect. It appears that George simply decided to use the funds of Lisa Markley as a personal ATM.

154.    Despite plundering Lisa Markley's funds held in trust; in May 2012, George had the gall to prepare for Lisa Markley a one-page will which named George Executor, gave him extraordinary powers over estate assets, and relieved him of the burden of posting a bond.

155.    At that point, George knew Lisa Markley had extremely limited assets and little need of a will; but it is believed and averred that in providing one, George sought to fraudulently preserve the false illusion that Lisa Markley still had a substantial estate requiring administration.

156.    Continued failure to provide documentation regarding the precious metal investment eventually overcame the ingrained trust which George cultivated in Lisa Markley.

**App. 286**

157.    Written notice was provided on June 12, 2012 that *any* Power of Attorney was revoked, and that new counsel was seeking a *voluntary accounting* of funds and transfer of all assets held by Defendants, including the precious metals and durable goods George claimed to have purchased on behalf of Lisa Markley.

158.    Even after new counsel intervened, Defendants attempted to misrepresent the state of affairs and cause(s) of reductions in principal, while systematically delaying any meaningful disclosures.

159.    David participated actively and knowingly in that deception after that point.

160.    As noted above, the initial response by David feigned hurt feelings and claimed as to the brokerage reports already requested from third parties:

> From your request to UBS Financial, you will be receiving records of all financial transactions conducted on Lisa's behalf. ***That will serve as your precise and accurate accounting. (Emphasis added).***

161.    Defendants knew the brokerage reports in no way contained a "precise and accurate accounting;" intentionally declined to provide anything approximating an actual accounting; and instead engaged in an active campaign of delay, denial, and deception.

162.    David made a series of knowingly false statements designed to prevent new counsel from discovering the full nature and scope of the misconduct of his father, George, himself, and the Firm.

163.    On October 5, 2012, after a series of communications from new counsel documenting *known* discrepancies, David sent a letter on behalf of himself, his father, George, and the Firm admitting *euphemistically* that George had "*made overpayments*" to himself in an amount they calculated as totaling approximately $500,000 from Lisa Markley's investment accounts from 2003 through 2012. *See* "Exhibit D."

164.    Defendants made an *unconditional assurance* that payment *would be made within 60 days*; but no such payment was forthcoming.

165.    While present counsel have never had sufficient information to determine the precise amounts wrongfully taken, Mr. Warshawsky documented to Defendants discrepancies and amounts presumed to be owed in excess of $1,000,000.

166.    Defendants continued to make a series of false and misleading statements to support a fraudulently deflated claimed amount owed.

167.    In specific instances, claims were made and documented to be false, without Defendants then acknowledging any increase in the previously admitted net balance.

168. Eventually, Defendants forwarded a partial disgorgement of misappropriated funds in the amount of $328,752.40 drawn on the Firm's IOLTA account, without any accompanying accounting which could in any way justify either the reduction from the amount admitted to be owed in October 2012, or refutation of any of the additional amounts identified as due in December 2012.

169.    Individually and collectively the serial breaches of contractual, ethical, and fiduciary obligations are outrageous and warrant imposition of punitive damages.

170.    A significant portion of the misappropriations amount to brazen theft by unlawful disposition; and likewise warrant imposition of punitive damages for outrageous intentional tortious conduct.

171.    While the conduct of George is the most egregious, it is respectfully submitted that by facilitating, condoning, and retaining the tainted fruit of the intentional misconduct of George, and by actively aiding and abetting the conduct in a failed attempt to coverup its nature

and extent after the fact, the conduct of the Firm and David is sufficiently egregious that punitive damages are warranted against them as well.

172.    Similarly, attorney's fees should be awarded against all Defendants on the fraud, intentional tort, and breach of fiduciary obligation counts below and/or as part of punitive damages regarding such counts.

### COUNT I – PROFESSIONAL NEGLIGENCE - LEGAL AND FINANCIAL
### Against All Defendants

173.    Plaintiff incorporates Paragraphs 1 through 172 by reference as if restated verbatim herein.

174.    Defendants entered into a contractual relationship with Lisa Markley in which they contracted to provide competent professional legal and financial services.

175.    Defendants owed a duty of care to Lisa Markley to provide legal and financial services in a competent and professional manner.

176.    As detailed in Paragraphs 1 through 172, all Defendants collectively and individually provided materially deficient services and engaged in serial intentional breaches of legal, ethical, and fiduciary obligations relating to the professional services.

177.    George intentionally, grossly, and/or negligently misappropriated to himself and to his Firm funds of Lisa Markley.

178.    The Firm and David intentionally, grossly, and/or negligently assisted and/or unreasonably failed to prevent, disclose, or remedy the wrongful conduct of George.

179.    The negligence and/or gross negligence of Defendants directly and proximately caused financial injury, ordinary distress, and unreasonable expense to Lisa Markley.

180.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make full restitution of all misappropriated funds.

181.    The conduct was reckless, outrageous, egregious, and warrants punitive damages.

**WHEREFORE**, Plaintiff respectfully requests compensatory and punitive damages in an unliquidated amount in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

### COUNT II – BREACHES OF FIDUCIARY DUTIES
### Against All Defendants

182.    Plaintiff incorporates Paragraphs 1 through 181 by reference as if restated verbatim herein.

183.    As to legal and financial services, all Defendants had fiduciary duties to Lisa Markley.

184.    Because funds were held in trust regarding compensated services, all Defendants had a fiduciary duty to Lisa Markley.

185.    George cultivated a close relationship of personal trust as to the professional and financial services provided and owed a special heightened fiduciary duty as to Lisa Markley regarding all services.

186.    As detailed in Paragraphs 1 through 181 above, all Defendants engaged in intentional, grossly negligent and/or negligent conduct which materially breached their respective fiduciary responsibilities.

187.    All Defendants' breaches of fiduciary duties, directly and proximately, caused financial injury, ordinary distress and unreasonable expense to Lisa Markley.

188.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make full restitution of all misappropriated funds.

189.    The conduct was reckless, outrageous, egregious, and warrants imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

## COUNT III - FRAUD
### Against All Defendants

190.    Plaintiff incorporates Paragraphs 1 through 189 by reference as if restated verbatim herein.

191.    All Defendants participated in the serially fraudulent conduct detailed in Paragraphs 1 through 189.

192.    The conduct of Defendants was intentional, fraudulent, and designed to defraud Lisa Markley of substantial sums of money.

193.    Lisa Markley actually and reasonably relied upon communications of Defendants which were materially false and incomplete.

194.    As a direct and proximate result of the wrongful and fraudulent misrepresentations, Lisa Markley was injured financially, suffered ordinary distress and was forced to incur unreasonable expense after having been rendered impecunious by the wrongful conduct of Defendants.

195.    George, in particular, intentionally and systematically cultivated and took advantage of a special relation of trust arising from his representation of Lisa Markley since she was a minor child; his conduct was particularly reprehensible in that respect.

196.    Defendants' conduct was intentional, wrongful, and outrageous and warrants the award of punitive damages and legal fees.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

### COUNT IV – BREACH OF CONTRACT
### Against All Defendants

197.   Plaintiff incorporates Paragraphs 1 through 196 by reference as if restated verbatim herein.

198.   Lisa Markley contractually engaged Defendants to provide competent legal and financial services.

199.   All Defendants serially breached all contractual obligations as detailed in Paragraphs 1 through 196 above.

200.   As a direct and proximate result of Defendants' serial breaches of legal and financial services obligations, Plaintiff suffered monetary damages in an amount in excess of the local arbitration limits.

201.   The breaches were sufficiently pervasive and egregious as to warrant disgorgement of all fees paid to all defendants.

202.   Defendants should be compelled to make full restitution of all amounts lost in the investment process and/or misappropriated by defendants.

203.   The breaches of financial duties resulted in both actual losses and lost opportunities which should be included in compensatory damages.

204.   In order to make Lisa Markley whole and to prevent an improper windfall to Defendants, prejudgment interest should be awarded as to all sums determined to be owed as a result of the breaches.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with pre and post judgment interest, attorneys' fees and such other relief as this Court may deem just.

## COUNT V – THEFT AND/OR CONVERSION
### Against All Defendants

205.    Plaintiff incorporates Paragraphs 1 through 204 by reference as if restated verbatim herein.

206.    Defendants knowingly and intentionally converted to their own use and benefit, without consent by Lisa Markley and without justification, significant amounts of money rightfully belonging to Lisa Markley.

207.    The conduct amounts to the common law tort of theft by unlawful disposition.

208.    The wrongful conversion by Defendants was outrageous and malicious, willful and wanton, and warrants the award of punitive damages.

209.    The theft and/or intentional wrongful conversion of Defendants directly and proximately caused financial injury, ordinary distress, and unreasonable expense to Lisa Markley.

210.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make a full accounting with full restitution of all misappropriated funds.

211.    The conduct was reckless, outrageous, egregious, and warrants imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in her favor and against Defendants in an amount in excess the local arbitration amounts, together with punitive damages, interest, costs, attorneys' fees, and such other relief as this Court deems just.

## COUNT VI – VICARIOUS LIABILITY / CIVIL CONSPIRACY
### Against All Defendants

212.    Plaintiffs incorporate Paragraphs 1 through 207 by reference as if restated verbatim herein.

213.    George and David acted in concert in furtherance of all the wrongful conduct detailed in the counts above.

214.    Each acted on behalf of the Firm and the Firm received and retained the illicit fruit of their wrongful conduct.

215.    David and the Firm are vicariously liable for the negligent acts, fraud, and misrepresentations of George, who was at all times acting on behalf of the Firm under the theories of *respondeat superior*.

216.    George and the Firm are vicariously liable for the negligent acts, fraud, and misrepresentations of David, who was at all times acting on behalf of the Firm under the theories of *respondeat superior*.

217.    David knowingly and intentionally acted in furtherance of the general scheme to defraud Lisa Markley by repeatedly dodging accounting questions or inquiries by indicating he was not familiar with Lisa Markley's assets and would have to talk to his father, George.

218.    He engaged in delay tactics designed to cover up George's conduct and defalcations.

219.    David has also materially aided in deceiving Lisa Markley out of substantial sums of money by improperly intermingling Lisa Markley's funds with those of the Firm.

220.    In response to repeated requests for accounting on Lisa Markley's investments, David made material misrepresentations and was wilfully deceptive.

221.    David and the Firm materially facilitated the deception by forwarding false communications regarding false "accountings," false assurances that insurance counsel had been contacted, and would be taking over communications, and false promises of imminent payment of $500,000 which was acknowledged in writing to have been wrongfully taken by George.

222.    Amounts taken far exceed amounts returned by Defendants to Lisa Markley.

223.    All Defendants engaged in concerted wrongful conduct which directly and proximately caused the injuries set forth in each individual count above.

224.    All Defendants acted in furtherance of the unprivileged, wrongful civil conspiracy and therefore should be deemed to share joint and several liability for the above referenced misconduct under both *respondeat superior* and civil conspiracy theories of joint liability.

225.    The conduct was egregious and outrageous and warrants punitive damages.

**WHEREFORE,** Plaintiff respectfully requests this Court to enter judgment in her favor and against all Defendants jointly and severally as to any amount awarded on any claim herein in an amount of unliquidated compensatory damages in excess the local arbitration amounts, together with punitive damages, interest, costs, attorneys' fees, and such other relief as this Court deems just.

**Respectfully submitted,**

By: _____

Andrew W. Barbin, Esquire
Atty. No. 43571
**ANDREW W. BARBIN, P.C.**
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
(717) 506-4670

DATED:  October 29, 2014                    Attorney for Plaintiff

Andrew W. Barbin, Esquire
Atty I.D. 43571
**ANDREW W. BARBIN, P.C.**
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
717-506-4670                                                    Attorney for Plaintiff

| | |
|---|---|
| **LISA MARKLEY** | : IN THE COURT OF COMMON PLEAS |
| 1724 Verbeke Street | : DAUPHIN COUNTY, PENNSYLVANIA |
| Harrisburg, PA 17103, | : |
|           **Plaintiff** | : |
| | : |
|     v. | :    **CIVIL ACTION - LAW** |
| | : |
| **LAW OFFICES OF D'ANGELO AND** | :    No. 2013-CV-3010-CV |
| **EURELL** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
|           And | : |
| **DAVID S. D'ANGELO, ESQUIRE** | : |
| **Law Offices of D'Angelo and Eurell** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
|           And | : |
| **GEORGE A. D'ANGELO, ESQUIRE** | : |
| **Law offices of D'Angelo and Eurell** | : |
| **Land Title Building, 22nd Floor** | : |
| **Philadelphia, PA 19110,** | : |
|           **Defendants** | : |

## VERIFICATION

I, Lisa Markley, do hereby state that the statements made in the foregoing Complaint are

true and correct based upon my knowledge information and belief. I understand that false

statements are made subject to penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to

authorities.

<br>

                                         _Lisa Markley_

Dated:      October 27, 2014

# November 26, 2014 Denial



**Wiley Rein** LLP

1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Leland H. Jones IV
202.719.7178
lhjones@wileyrein.com

November 26, 2014

**VIA EMAIL AND CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

David D'Angelo, Esq.
D'Angelo & Eurell
100 South Broad Street
Philadelphia, PA  19110

Re:  **Insured:**          **D'Angelo & Eurell**
     **Insurer:**          **Darwin National Assurance Company**
     **Policy No.:**      **0307-7741**
     **Policy Period:**  **8/20/2012 to 8/20/2013**
     **Claimant:**       **Lisa Markley**
     **Claim No.:**      **2013002782**

Dear Mr. D'Angelo:

As you know, this firm has been retained to represent Allied World National
Assurance Company, claim manager for its affiliate, Darwin National Assurance
Company (collectively, "Darwin"), in connection with this matter. Darwin
issued Lawyers Professional Liability Policy No. 0307-7741 to D'Angelo &
Eurell (the "Firm") for the **Policy Period** August 20, 2012 to August 20, 2013
(the "Policy").[1] The Policy has a $500,000 per **Claim** and $1 million aggregate
limit of liability for all **Claims**, inclusive of **Claims Expenses**. The Policy also
has a $5,000 per **Claim** retention.

We write to acknowledge receipt of your November 11, 2014 e-mails and
facsimile transmissions forwarding the October 29, 2014 complaint filed by Lisa
Markley (the "Markley Action") and to provide you with Darwin's position
regarding coverage under the Policy for the Markley Action.

Based on its review of the allegations in the complaint, Darwin has concluded
that no coverage is available under the Policy for the Markley Action for the
reasons set forth below and in Darwin's prior coverage letters dated March 13,
2013, March 29, 2013, and April 18, 2013, which are incorporated by reference.
To the extent that you disagree with Darwin's position, Darwin invites you to

---

[1] Terms in bold are defined in the Policy.


EXHIBIT
D'Angelo 28

**App. 298**



David D'Angelo, Esq.
November 26, 2014
Page 2

provide it with any additional information that you believe impacts coverage for this matter, and Darwin will give that information careful consideration.

## I.    THE MARKLEY ACTION

On October 29, 2014, Lisa Markley filed a complaint against the Law Offices of D'Angelo and Eurell, David S. D'Angelo, and George A. D'Angelo in the Court of Common Pleas for Dauphin County, Pennsylvania, No. 2013-CV-310-CV. The complaint alleges that George D'Angelo represented Ms. Markley and her deceased mother for a number of years during which he purportedly overcharged fees for services and "mismanaged or misappropriated more than a million dollars' worth of [Ms. Markley's] inheritance from her parents . . . ." Complaint, ¶ 13.

George D'Angelo allegedly represented Ms. Markley's mother in divorce proceedings in the 1960s, and because Ms. Markley's mother could not pay his fees and costs, George D'Angelo agreed to be paid out of the estate of Ms. Markley's mother. The complaint alleges that George D'Angelo paid himself a 1/3 contingency fee from the amounts Ms. Markley received from her mother's estate for services he provided to Ms. Markley's mother in the divorce proceedings. Ms. Markley alleges that "[t]aking the improper fee related to services claimed to have been rendered to the mother decades earlier from the funds inherited by Lisa Markley was false and fraudulent . . . ." Complaint, ¶ 79. In addition, the complaint alleges that George D'Angelo charged a 1/3 contingent fee to represent Ms. Markley during her father's probate proceeding, which Ms. Markley alleges was "excessive, unreasonable and unethical." Id., ¶ 97.

Ms. Markley asserts that George D. Angelo "used the special relationship that he had cultivated with Lisa Markley to take absolute control of her investments as [her] financial manager" and made investment decisions and fee withdrawals from Ms. Markley's assets. Complaint, ¶¶ 119, 123. His investment advice was allegedly provided in "in a profoundly negligent and incompetent manner resulting in dramatic depletion of funds." Id., ¶ 129. George D'Angelo allegedly "made a continuing series of bad investments and improvident asset liquidations causing losses to Lisa Markley which should have been disclosed, but were not." Id., ¶ 136. Further, the complaint asserts that the $15,000 annual fee for management of Ms. Markley's assets was "exorbitant and excessive."



David D'Angelo, Esq.
November 26, 2014
Page 3

*Id.*, ¶ 146. George D'Angelo also allegedly misappropriated funds from Ms. Markley's investment accounts.

The complaint in the Markley Action alleges causes of action for legal and financial professional negligence, breach of fiduciary duty, fraud, breach of contract, theft, and civil conspiracy. The complaint seeks relief in the form of compensatory and punitive damages, restitution of misappropriated funds, interest, and attorneys' fees and costs.

## II.    COVERAGE ANALYSIS

### A.    Threshold Coverage Issues

There is no coverage under the Policy for the Markley Action for three separate and independently sufficient reasons.

First, the Policy bars coverage for any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part, "the alleged rendering of investment advice, including advice given by any **Insured** to make any investment or to refrain from doing so." Policy, § III.B.5 (the "Investment Advice Exclusion"). The Complaint has myriad allegations regarding George D'Angelo's provision of financial management services to Ms. Markley, including allegations that he gave poor investment advice resulting in a significant loss of her assets. Thus, the Investment Advice Exclusion bars coverage for the Markley Action.

Second, the Policy excludes coverage for any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part, "the loss of value of any asset in the **Insured's** care, custody or control, misappropriation, conversion, embezzlement, failure to give an accounting, or commingling of client funds." Policy, § III.B.10 (the "Misappropriation Exclusion."). The Complaint asserts that George D'Angelo wrongfully took portions of Ms. Markley inheritance from the estate of her mother and father without proper authorization and that he misappropriated her investment assets. The Policy precludes coverage for the Markley Action because the complaint alleges the loss of value of any asset in the **Insured's** care, custody, or control and because it alleges the misappropriation, conversion, embezzlement, failure to give an accounting, and commingling of client funds

**App. 300**



David D'Angelo, Esq.
November 26, 2014
Page 4

Third, Section III.B.2 of the Policy bars coverage for "any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, or in any way involving, in whole or in part any act whatsoever of an **Insured** in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate." The complaint alleges that George D'Angelo entered into a fee arrangement for his representation of Ms. Markley's mother in a divorce proceeding, in which he was to receive a portion of the assets of the estate of Ms. Markley's mother. Ms. Markley alleges that George D'Angelo received more from the estate under that fee arrangement than he was entitled to by taking 1/3 of the amounts that Ms. Markley received from her mother's estate. Section III.B.2 of the Policy therefore bars coverage for the Markley Action because it arises out of any act whatsoever of an Insured in connection with a trust or estate when an **Insured** is a beneficiary or distributee of the trust or estate.

**B.**    <u>Additional Coverage Issues</u>

In addition to these three threshold coverage bars, this **claim** raises additional significant coverage issues.

First, Insuring Agreement I.A provides:

> The **Insurer** will pay on behalf of an **Insured**, subject to the Limits of Liability shown in the Declarations, all amounts in excess of the Retention shown in the Declarations, that an **Insured** becomes legally obligated to pay as **Damages** and **Claim Expenses** because of a **Claim** arising out a **Wrongful Act**, other than a **Non-Profit Director or Officer Wrongful Act**, that is first made during the **Policy Period** or any **Extended Reporting Period**. It is a condition precedent to coverage under this Policy that the **Wrongful Act** upon which the **Claim** is based occurred:

> 1.    during the **Policy Period**; or

> 2.    on or after the **Retroactive Date** and prior to the **Policy Period**, provided that all of the following three conditions are met:

DAngelo-0004

**App. 301**



David D'Angelo, Esq.
November 26, 2014
Page 5

(a) the **Insured** did not notify any prior insurer of such **Wrongful Act** or **Related Act or Omission**; and

(b) prior to the inception date of the first policy issued by the **Insurer** if continuously renewed, no **Insured** had any basis (1) to believe that any **Insured** had breached a professional duty; or (2) to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**; and

(c) there is no policy that provides insurance to the Insured for such liability or **Claim**.

Policy, §I.A. The Policy defines **Wrongful Act**, in relevant part, as "an actual or alleged act, error or omission by an **Insured**, solely in the performance of or failure to perform **Legal Services**." Policy, § II.V.1. **Legal Services** means "those services performed on behalf of the **Named Insured** for others by an **Insured** as a licensed lawyer in good standing, arbitrator, mediator, title agent, notary public, administrator, conservator, receiver, executor, guardian, trustee, escrow agent, or in any other fiduciary capacity, but only where such services were performed in the ordinary course of the **Insured's** activities as a lawyer." *Id.*, § II.K.

Darwin reserves its rights to the extent that the complaint alleges that George D'Angelo did not commit an actual or alleged act, error, or omission solely in the performance of or failure to perform **Legal Services**. In addition, Darwin reserves its rights to the extent any **Insured**, prior to the inception date of the first policy issued by Darwin to the Firm, had any basis to believe that any **Insured** had breached a professional duty or had any basis to foresee that any such **Wrongful Act** or **Related Act or Omission** might reasonably be expected to be the basis of a **Claim** against any **Insured**.

**App. 302**



David D'Angelo, Esq.
November 26, 2014
Page 6

Second, the Policy provides coverage for amounts that constitute **Damages**. The Policy defines "**Damages**" as:

> the monetary portion of any judgment, award or settlement, including post- judgment interest.  **Damages** shall not include:
>
> 1. criminal or civil fines, taxes, penalties (statutory or otherwise), fees or sanctions;
> 2. punitive, exemplary or the multiplied portion of multiple damages;
> 3. matters deemed uninsurable by law;
> 4. the return or restitution of legal fees, costs and expenses, no matter how claimed;
> 5. any form of equitable or non-monetary relief; or
> 6. pre-judgment interest.

Policy, §II.E., as amended by Endorsement No. 1.  In the Complaint, Ms. Markley seeks the return of fees charged by the **Insureds**, punitive damages, and pre-judgment interest.  However, no coverage is available under the Policy for amounts that constitute the return or restitution of legal fees, costs and expenses, no matter how claimed; pre-judgment interest; punitive damages; and matters deemed uninsurable by law, including amounts to which any **Insured** was not legally entitled. Darwin therefore reserves all its rights with respect to whether the Markley Action seeks any amount that constitutes **Damages** under the Policy.

Third, section III.B.1 of the Policy provides:

> This Policy shall not apply to any **Claim** or **Disciplinary Proceeding** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving, in whole or in part:
>
> any intentional, criminal, fraudulent, malicious or dishonest act or omission by or at the direction of an **Insured**; provided, however, that this Exclusion shall not apply unless there has been a finding, admission, or final adjudication, in a proceeding



David D'Angelo, Esq.
November 26, 2014
Page 7

constituting the **Claim** or in a proceeding separate from or collateral to the **Claim**.

Policy, Section III.B.1. Darwin reserves the right to deny coverage for the Markley Action to the extent that this exclusion applies.

### III.    CONCLUSION

For the reasons discussed above, Darwin has concluded that there is no coverage under the Policy for the Markley Action. To the extent that the Firm disagrees with Darwin's understanding of the facts or Darwin's conclusion that no coverage is available, or if the Firm has additional information relevant to Darwin's analysis of coverage with respect to this matter, please provide that information to us. Darwin will give it careful and prompt consideration.

In the meantime, Darwin continues to reserve all of its rights under the Policy and applicable law.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Leland H. Jones IV

cc:    Gale S. Dwyer, Esq. (via email)

DAngelo-0007

**App. 304**

# **Markley's Amended Complaint, April 8, 2015**

# McShea Law Firm



November 23, 2015

Richard A. Simpson, Esq.
Leland H. Jones IV, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, D.C. 20006

**RE:**   **Insured: D' Angelo & Eurell**
     **Insurer: Darwin National Assurance Company**
     **Policy No.: 0307-7741**
     **Policy Period: 8/20/2012 to 8120/2013**
     **Claimant: Lisa Markley**
     **Claim No.: 2013002782**

Dear Messrs. Simpson and Jones:

Enclosed please find an Amended Complaint and Certificates of Merit received in this matter stating professional liability claims covered by the above-referenced policy.

Please provide the insureds, including George D'Angelo and David D'Angelo, with full defense and coverage under the policy.

Should you have any questions, please do not hesitate to contact me.

Sincerely,

John P. McShea

JPM/plr
Enclosures

McShea Law Firm, P.C.
1500 Market Street, Centre Square
West Tower, Suite 4000
Philadelphia, PA 19102-2100
215.599.0800 tel
215.599.0288 fax

ALLIEDWORLD00000216

**App. 306**

LISA MARKLEY,
                 Plaintiff

v.

LAW OFFICES OF D'ANGELO AND
EURELL, DAVID S. D'ANGELO, Esquire
and GEORGE A. D'ANGELO,
                 Defendants

: IN THE COURT OF COMMON PLEAS
: DAUPHIN COUNTY, PENNSYLVANIA
:
: NO. 2013-CV-3010-CV
:
:
:
:
:

## NOTICE

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 North Front Street
Harrisburg, PA 17101
(717) 232-7536

## AVISO

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defenderse de las demandas que se presentan más adelante en las siguientes páginas, debe tomar acción dentro de los próximos veinte (20) días después de la notificación de esta Demanda y Aviso radicando personalmente o por medio de un abogado una comparecencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aquí en contra suya. Se le advierte de que si usted falla de tomar acción como se describe anteriormente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamación o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin más aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

ALLIEDWORLD00000217

**App. 307**

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE UN ABOGADO, LLAME O VAYA A LA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACION A CERCA DE COMO CONSEGUIR UN ABOGADO.

SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN SERVICIOS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN.

DAUPHIN COUNTY LAWYER REFERRAL SERVICE
213 North Front Street
Harrisburg, PA 17101
(717) 232-7536

Respectfully Submitted;

Andrew W. Barbin, Esquire
Atty. ID 43571
Andrew W. Barbin, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
717-506-4670

Attorney for Lisa Markley

DATED:      April 8, 2015

2

ALLIEDWORLD00000218

**App. 308**

Andrew W. Barbin, Esquire
Atty I.D. 43571
ANDREW W. BARBIN, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
717-506-4670                                                        Attorney for Plaintiff

| | |
|---|---|
| LISA MARKLEY<br>1724 Verbeke Street<br>Harrisburg, PA 17103,<br>              Plaintiff | : IN THE COURT OF COMMON PLEAS<br>: DAUPHIN COUNTY, PENNSYLVANIA<br>:<br>: |
|     v. | :<br>: CIVIL ACTION - LAW<br>: |
| LAW OFFICES OF D'ANGELO AND<br>EURELL<br>Land Title Building, 22nd Floor<br>Philadelphia, PA 19110,<br>             And<br>DAVID S. D'ANGELO, ESQUIRE<br>Law Offices of D'Angelo and Eurell<br>Land Title Building, 22nd Floor<br>Philadelphia, PA 19110,<br>             And<br>GEORGE A. D'ANGELO, ESQUIRE<br>Law offices of D'Angelo and Eurell<br>Land Title Building, 22nd Floor<br>Philadelphia, PA 19110,<br>            Defendants | : No. 2013-CV-3010-CV<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT

Plaintiff, Lisa Markley, by and through counsel, Andrew W. Barbin, P.C., hereby files this

Complaint against Defendant Law Offices of D'Angelo and Eurell, Defendant David S. D'Angelo,

Esquire, and Defendant George A. D'Angelo, Esquire (collectively "Defendants"), and avers as

follows:

ALLIEDWORLD00000219

**App. 309**

**PARTIES**

1.    Plaintiff, Lisa Markley. (Hereinafter "Plaintiff" or "Lisa Markley"), is an adult female resident of Pennsylvania residing at 1724 Verbeke Street, Harrisburg (Dauphin County), PA 17103. Effective August 27, 2013, Plaintiff moved from the address listed on the Writ of Summons issued in this matter to her present address set forth in the Caption above after issuance of the Writ of Summons. The caption here provides the current address.

2.    Defendant, Law Offices of D'Angelo and Eurell (hereinafter the "Firm"), is a Pennsylvania business with a principal place of business located at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110, it is believed and averred that they are a common law partnership between George A. D'Angelo, David S. D'Angelo, John B. Eurell at the times relevant to this Complaint, and not an incorporated entity.

3.    Defendant, David S. D'Angelo, Pa. Atty. I.D. 37347 admitted November 9, 1982 (hereinafter "David"), is a licensed professional with a principal place of business at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110. Plaintiff is asserting a professional liability claim against this defendant.[1]

4.    Defendant, George A. D'Angelo, Pa. Atty. No. 12326 admitted January 1, 1950 (hereinafter "George"), is a licensed professional with a principal place of business at Land Title Building, 22nd Floor, Philadelphia (Philadelphia County), PA 19110. Plaintiff is asserting a professional liability claim against this defendant.

**JURISDICTION AND VENUE**

---

[1] In Preliminary Objections to the original Complaint, one of Defendants objections were related to the fact that Plaintiff's Complaint did not "contain any allegations about licensed professionals." *See* ¶ 27-32. Plaintiff did make numerous assertions regarding Defendants in reference to their professional duties but inadvertently failed to classify individual defendants according to Rule 1042.2(a). For clarity, Plaintiff has pled according to Rule 1042.2(a) in this Amended Complaint and incorporates the reference to Defendants as "licensed professionals" throughout the remainder of her Amended Complaint.

4

5.    Plaintiff lives and resides in Dauphin County, Pennsylvania.

6.    Within the limitation period, George, acting as authorized agent of the Firm, provided legal and financial professional services to Lisa Markley who resided in Dauphin County during the past decade, in a fraudulent and grossly negligent manner, and in breach of fiduciary obligations.

7.    Within the limitation period, David, son of George and an attorney with the Firm, acting on behalf of himself, the Firm and his father George, either negligently, grossly negligently, or intentionally made false and fraudulent statements to Lisa Markley and her counsel Bruce Warshawsky, Esquire regarding the deficiencies in prior services of himself, George and the Firm through false and fraudulent communications directed to Mr. Warshawsky at his office in Dauphin County, each of which involved a continuing course of conduct involving breaches of legal and fiduciary duties of George, David and the Firm.

8.    It is believed and averred that David also knowingly participated in the fraudulent and intentional conduct, grossly negligent services and breaches of fiduciary responsibility referenced in Paragraph 6 above, as a protective son, associate counsel of the Firm, and eventually as managing attorney of the Firm.

9.    It is believed and averred that George and David acted as authorized agents of the Firm and it is further believed and averred that other members and attorneys of the Firm knew or should have known of the misconduct, and condoned it by either direct support or inaction, and in any event shared in the fruit of the ill-gotten gains which were commingled with Firm assets.

10.    While earlier services, relevant to the *res gestae* of the claims, had been provided to Lisa Markley when she resided in other jurisdictions; all services provided in the past decade,

5

ALLIEDWORLD00000221

**App. 311**

which are the basis for the claims herein, where provided while she was a resident of Dauphin County, PA.

11.    It is believed and averred that All Defendants have periodically appeared in appeals courts located in Dauphin County and purposefully sought and provided services in this County, including services to Lisa Markley.

12.    Jurisdiction and venue over all claims set forth in this Complaint are proper in the Court of Common Pleas of Dauphin County, Pennsylvania.

## FACTS COMMON TO ALL COUNTS

13.    The conduct in question involves the denouement of a concealed course of fraudulent conduct which began when the Plaintiff was a young child and continued into her adulthood, culminating in her discovery that Defendants had mismanaged or misappropriated more than a million dollars' worth of her inheritance from her parents, leaving her with no funds in the accounts they managed.

### Summary of the Basis of the Fraud and Professional Liability Actions

14.    While there are multiple claims and theories of liability, the essence of the action is that over a period of decades George D'Angelo used his position as counsel for Lisa Markley's mother and then Lisa Markley herself to develop a special relationship of trust and a highly irregular Power of Attorney (discussed in detail and attached as an exhibit, see Paragraph 92 below) which he used to secure improper fees and control over Lisa Markley's assets, which he then systematically mismanaged and misappropriated, while making continuously false and fraudulent statements regarding his rights with respect to fees, the amount and status of her funds and the reasons for delay in providing accountings and back-up documentation.

6

ALLIEDWORLD00000222
**App. 312**

15.    George's son David assisted George in perpetrating and attempting to conceal the fraudulent conduct, all of which was done through the Firm; David's name appears in various transfers from the account and David had communications with Lisa Markley's attorney concerning the accounting for Lisa Markley's funds which contained false and deceptive statements; the full extent of his knowledge and involvement in Lisa Markley's finances generally, the excessive fees claimed, misappropriated and/or comingled is not yet known.

16.    The Firm knew or should have known of the grossly negligent, unethical and wrongful conduct being done in its name and that George and David were at all times authorized agents of the Firm so as to make the Firm responsible for their respective misconduct.

**Background Conduct Outside the Applicable Limitations Period**

17.    Significant conduct occurred outside the applicable limitations periods for the claims asserted which are relevant to issues such as the existence of a special relationship and the reasonableness of reliance of Lisa Markley on the assurances of George in relation to the continuing fraudulent conduct which continued and culminated in discovery of the misappropriations during the applicable limitations periods; David attempted to conceal the conduct by providing materially misleading statements to Lisa's counsel Bruce and by failing to disclose material facts to Lisa.

18.    The professional relationship between Lisa Markley and Defendants goes back over a period of decades to a point where George had first represented her through her mother in divorce, support and alimony proceedings when Lisa Markley was still a minor (hereinafter "Prior Representation").

19.    While no cause of action is asserted here as to conduct in the Prior Representation, the facts of the Prior Representation are relevant to current claims with regard to the existence of

7

a special relationship of trust with regard to fiduciary obligations related to the financial transactions at issue.

20.    The Prior Representation is also relevant as to false and fraudulent offset credits claimed by George, David, and the Firm, when providing their false, materially fraudulent "accounting" as to monies admitted to have been improperly diverted as detailed below.

21.    The degree to which George had insinuated himself into a position of trust and control *vis-à-vis* Lisa Markley and her mother is also relevant to the claims below with respect to both the existence and scope of fiduciary duties arising from a special relationship of trust and as to the reasonableness of Lisa Markley's reliance upon the serial misrepresentations, and Lisa Markley's delay in discovery of the multifaceted continuing course of fraudulent misrepresentations pertaining to outright misappropriations and gross negligence in the management and nearly complete dissipation of the Trust assets of Lisa Markley.

### GEORGE'S PRIOR REPRESENTATION OF LISA MARKLEY'S MOTHER

22.    George is a named partner in the Firm, and has been practicing law since 1950.

23.    Defendants knew Lisa Markley from the long-standing legal relationship George had with Lisa Markley's mother, which dated back to at least 1965.

24.    His initial contact with Lisa Markley's mother began with his legal representation of her during her divorce appeal, discussed above and below.

25.    Lisa Markley was a minor child at the time of the divorce proceedings.

26.    During the divorce proceedings and for years afterwards, George, unethically and without any apparent basis, contended that adverse determinations in those proceedings arose from improper and unethical conduct of others, *including the Common Pleas Court.*

27.    These baseless allegations were designed to cloak him in the false mantle of noble

8

champion, and to allow him to insinuate himself into a close personal relationship with the Markley family, notwithstanding his singular lack of success in the appeals actually pursued.

28.    The appellate decisions issued in those proceedings reveal that George misrepresented the nature of the divorce proceedings, that he (or his predecessor) neglected them, and then he wrongly traduced the local judiciary to cover his (or his predecessor's) neglect.

29.    It is believed and averred that neither Lisa Markley nor her mother were ever shown the actual decisions.

30.    The split decision on the appeal which George used to cover his or his predecessor's neglect, related only to the appeal of the decision to allow divorce on indignities grounds.  The Appeals Court decision on the support issue which was the focal point of George's discussions with Lisa Markley and her mother was a 5-1 decision which affirmed the decision of the Trial Court which stated in pertinent part:

> The applicable legal principles are well settled.  The purpose of a support order is to secure such an allowance to the wife and child as is reasonable, having in mind the husband's property and earning capacity and the station in life of the parties:…
>
> […]  In the instant case the court below took into consideration the fact that appellant and her daughter are living in a substantial home, completely furnished, on which appellee pays $2,124.00 annual carrying charges, that appellee has created a $15,000.00 trust fund for the daughter's future education, and has agreed to pay tuition and other charges for the daughter at private school, summer camp, dancing and piano lessons. *The record discloses that the amounts awarded for maintenance of the wife and daughter coincide almost exactly with the total required, as established by the testimony. Moreover, the order below could not have been so grossly inadequate as is now alleged, since appellant permitted this appeal to rest unargued for over two years, and then argued it only because her request for a further continuance was denied.*
>
> The principal complaint of present counsel for appellant is directed to the finding of the court below that appellee's net income after taxes and expenses is only $30,000.00 per year. *Appellant's trial counsel had before him a copy of appellee's income tax return, and was afforded full opportunity to cross-examine with regard thereto.* The effect of income tax upon the parties is a proper matter for consideration: *Commonwealth ex rel. Kailen v. Kailen*, 202 Pa. Superior Ct. 500,

9

> 198 A. 2d 331. *There is nothing in the testimony which justifies any material question concerning appellee's estimate of his net income.* In brief, **we perceive no basis on this record for charging the lower court with an abuse of discretion.**

*Markley v. Markley,* 207 Pa. Super. 294, 297; 218 A.2d 84, 85 (1966).

31.     It is far from clear why an appeal regarding support was even undertaken.

32.     Lisa Markey first learned of the actual rulings of the appeals courts after securing new counsel for this matter within the limitation periods and was surprised by the content of the rulings, as it was materially different from what she had been told by George on all prior occasions.

33.     The results and rationale had been repeatedly materially misrepresented to Lisa Markley (and it is believed and averred her mother as well) in order to create and foster dependence on George and to evade discovery of the deficiencies in that Prior Representation.

34.     Despite request, George has produced no records as to the date on which he undertook the Prior Representation or the state of the pleadings at that time.

35.     However, even assuming all material errors identified by the Appeals Court opinion had been committed by his predecessor, that would still not justify misrepresentations as to the true state of the case, advisability of pursuing the appeals, and/or his serial misrepresentation as to the actual basis for the Court's separate decisions.

36.     Despite request, George has produced no records which would in any way justify the aspersions cast upon the local judiciary in the divorce case; this not only involves a serious ethical violation, but was the foundation upon which George systematically insinuated himself into legal, financial and personal matters of the Markley family.

37.     George intentionally, fraudulently and unethically infected Lisa Markley and her mother with distrust for any other participant in the legal system as well as the local judiciary and encouraged dependence upon himself as "their *Champion*," with the chimera of corruption as the

ALLIEDWORLD00000226
**App. 316**

convenient excuse for any adverse developments.

### GEORGE A. D'ANGELO'S SPECIAL RELATIONSHIP WITH LISA MARKLEY

38.     Despite the profound lack of success in the divorce and support litigation appeals, George managed to deceive Lisa Markley and her mother into a false belief that his services had been "heroic" despite his having lost, and convinced them to have him act as their regular counsel and general adviser.

39.     George cultivated mistrust of the system and dependence upon him in Lisa Markley, during the time before she reached majority and thereafter.

40.     George sought to establish himself as a surrogate "father figure" to Lisa Markley after the acrimonious and litigious divorce proceedings in which George played an active role.

41.     George continued to address issues regarding support items throughout Lisa Markley's minority, particularly as to implementation of the ongoing support obligations related to camps and other miscellaneous matters.

42.     In January 1976, George sent Lisa Markley a note:

> Dear Lisa,
>
> Your mother has spoken to me in reference to a recent legacy which you are about to receive. Your mother was of the thought that I could be of assistance to you. If you would like to consult with this office please call me and we shall discuss the matter.

43.     In and around April 1976 George provided legal services to Lisa Markley regarding an inheritance from a friend of her father, under a will which gave her father trustee status as to the funds regarding which George encouraged confrontation, described innocuous conduct regarding a relatively small amount as "reprehensible" and "unforgivable" on the part of both her father and a local attorney who had indicated that her father respected her privacy and had agreed that she could discuss the trust and any disbursements with the local counsel rather than her

11

estranged father who had been designated the Trustee. Even after all but $1,835.97 had been distributed, he advised, "… I think that it would be very unwise to have these (trust) monies remain with Sidney M. Markley (her estranged father)."

44.    The relationship continued for the next two decades and was sufficiently close that George attended Lisa Markley's out of state, college graduation in 1998; Lisa Markley's friends who were present at the time were struck by the fatherly demeanor George exhibited toward her at that event.

45.    The graduation picture reflects his efforts to establish a surrogate paternal relationship with Lisa Markley, as does George's follow up note which declared:

> Dear Lisa,
>
> What an exciting time. I am so proud of you and delight in your friends.
>
> Your letters to Sylvia and Mel and Elaine are charming. The French touch reflects the very subtle qualities of kindness and love that is in you.
>
> I wish you all the best and you are instructed to stay in touch

46.    To the great detriment of Lisa Markley, she did as *instructed* and George proceeded to take improper advantage of the trust he had so carefully cultivated.

47.    George continued to represent Lisa Markley regarding various legal issues and provided legal services and financial management services as a trusted father figure from the date of her majority until he was discharged by new counsel, Mr. Warshawsky, in June 2012.

48.    The "special relationship" of George in relation to Lisa Markley was admitted on behalf of the Firm, David and George, when in June 2012, David, on behalf of George and the Firm, responded to new counsel Mr. Warshawsky's request for initial documentation regarding the trust funds by stating:

ALLIEDWORLD00000228
**App. 318**

I am in receipt of your letter of June 12, 2012 directed to my father. *He is disappointed that, after 46 years of representation of Lisa and her mother in a myriad of professional and very personal affairs and the close bond that they had*, that she would retain you to contact him and that she, herself, *would not have given him that courtesy, caring and respect*.

From your request to UBS Financial, you will be receiving records of all financial transactions conducted on Lisa's behalf. That will serve as your precise and accurate accounting. (Emphasis added.)

49.    Rather than providing a "precise and accurate accounting," the third party records in fact disclosed that George had misappropriated and/or squandered more than a million dollars.

50.    While Lisa Markley was generally aware that the account balances on certain investment reports had declined after the general downturn in 2008, George had explained to Lisa Markley that he had taken money out of the "volatile market" and "invested it in non-volatile physical investments," and in 2010 had a particular conversation about the appreciation of gold and other metals during the time period.

51.    Lisa Markley reasonably understood from various conversations with George that the trust account funds had been moved to investments in gold and/or other precious metals which would not be reported on the stock type trading account reports; he had indicated that the metals were "private sale" items, and that he could provide an inventory (which never materialize) or show them to her; but on the occasion when Lisa Markley indicated her ability and desire to do so, George apologized and explained that unfortunately he would be "out of town."

52.    Because she trusted George, she reasonably accepted what she thought was a truthful and reasonable explanation of a prudent investment move made for her benefit by a trusted advisor and family friend; while his avoidance may be apparent in hindsight, his conduct at the time seemed reasonable and convincing to Lisa Markley in light of their relationship.

ALLIEDWORLD00000229

53.    Lisa Markley did not have cause to question the explanations provided until delay in providing requested documentation caused her to consult new counsel in 2012, when she was shocked to learn that her *entire* Trust was gone, there were *no precious metals investments* and *no accounting was forthcoming*.

54.    At the same time, she first learned that several prior seemingly reasonable explanations for fees and withdrawals had been false fraudulent, improper and unethical.

55.    Inconsistent and incomplete explanations by all Defendants make specific attribution of precise missing amounts to specific pretextual justifications problematic, but the entire amount missing and apparently misappropriated exceeds a million dollars.

56.    Details regarding various false, fraudulent and pretextual explanations for declining balances are detailed topically below.

57.    The conduct as a whole was false, fraudulent, and egregious and warrants punitive damages under multiple theories of liability set forth in the various Counts below.

### MISAPPROPRIATIONS

58.    George initially withdrew from the account money roughly proportionate to the 1/3 fee he claimed as to money received from her father's estate, which is discussed further below.

59.    George indicated that he would charge a 1.5% management fee for management of the remaining funds as a financial manager and for investment services discussed below; however, thereafter without further discussion with Lisa Markley, George made regular and irregular withdrawals from the account which did not correlate to any specific agreement or justification shared or explained at the time of the withdrawals, and which did not reflect reductions in the amount managed over time.

ALLIEDWORLD00000230

**App. 320**

60.    Based on documents received it is believed and averred that upon the death of Lisa Markley's mother December 14, 2005, Lisa Markley received approximately $283,723.75 from her mother's estate in Arizona and deposited with George's investment account on or about August 16, 2006.

61.    George did not make Lisa Markley aware of any claim that he had taken additional monies based upon an alleged agreement with her mother that he would receive "a 1/3 contingency fee" on the money Lisa Markley had received from her mother's estate because her mother could not pay for the prior legal services he had provided as long as 40 years earlier, until after Mr. Warshawsky became involved in the effort to secure an accounting discussed below.

62.    As of December 12, 2012, David admitted in a telephone conversation that the mother's estate was not included in the Power of Attorney Contingent Fee claim, and stated that he did not believe that 1/3 of the money from the mother's estate had been taken. (*See* Paragraph 92 below).

63.    However, after receiving spreadsheets demonstrating that the amounts taken exceeded the amounts the prior position could justify, David reversed his position in a January 7, 2013 email and claimed that there had been an agreement, of which Lisa Markley was aware, that George was also to receive 1/3 of her mother's estate; in February 2013 he further reversed his position to claim that the 1/3 fee from the mother's estate was included in the Power of Attorney despite the fact that her estate was not included in those specifically identified.

64.    George had been the long-term attorney first for Lisa Markley's mother, and then for Lisa Markley herself; furthermore Lisa Markley had no independent knowledge of either the law or norms of the legal community in matters at issue herein; and so Lisa had no reason to question his false and fraudulent assertions.

15

ALLIEDWORLD00000231
**App. 321**

65.   It is believed and averred that no such contingent fee agreement ever existed.

66.   It is separately believed and averred that if such an agreement did exist with Lisa Markley's mother, such a fee would have been contrary to numerous ethics provisions, fraudulent, and a patently excessive and prohibited fee as to Lisa Markley's mother.

67.   The contingent fee alleged by George would have been patently excessive for the limited services rendered relating to either the divorce or estate, particularly in light of the issues discussed above regarding extent, quality, and efficacy/advisability of the appeals services in the divorce matter and virtually non-existent involvement in the administration of her Arizona estate which was completed by Lisa as her mother's personal representative. Pa.R.Prof.C. 1.5.

68.   Any such alleged contingent fee agreement with Lisa Markley's mother also would have been contrary to several applicable ethics rules, in that it would have: 1) not been reduced to writing as required, 2) involved prohibited self-dealing without documentation of advice to consult separate counsel, 3) been patently excessive, and 4) involved a prohibited contingent fee in an alimony and divorce matter. *See* Pa.R.Prof.C. 1.5 (a), (1-7); 1.5 (c); 1.5(d); and 1.8.

69.   The claim also amounts to an unethical testamentary gift from a client to counsel in an agreement originated, but not even memorialized in writing, by counsel. Pa.R.Prof.C. 1.8 (c).

70.   The representation that Lisa Markley's mother could not and/or did not pay fees is believed and averred to be fraudulent and false as the Appeals Court decision specifically noted:

> As to the third count, an opinion was filed in the lower court on August 5, 1963, *allowing interim counsel fees,* temporarily refusing alimony, costs and expenses, and making an order for the wife's maintenance in the sum of $ 125.00 per week, and for the daughter's maintenance in the sum of $ 35.00 per week.

Had *any* appeal been appropriate, George was free to petition the court for payment of any fees deemed reasonable and proportionate to the services provided; no record of such a request

16

ALLIEDWORLD00000232

**App. 322**

appeared in the file provided by the Firm, and no Defendant has explained why such a Petition was not or could not be filed.

71.    Attorney's fees, if any were warranted, should have been received by petition to the Court for additional attorney's fees *pendente lite*. *Markley v. Markley*, 207 Pa. Super. 294, 297; 218 A.2d 84, 85 (1966). Both related Markley Divorce Appeal decisions are attached hereto as Exhibit "A."

72.    In a February 6, 2013 email from David to Attorney Bruce Warshawsky, David claimed that "several feet of Markley files" were "lost in a flood," and so "there is no documentation regarding the above matters. However, there is sufficient public record and testimony to substantiate the facts." *See* Exhibit "B."

73.    No portion of the alleged public record was provided to justify the fees claimed, nor was any detail supplied as to what "testimony" could justify such a fee.

74.    From the records available, it does not appear that George asserted or reported *any* fee claim in the administration of the estate of Lisa Markley's mother.

75.    Any obligation for attorney's fees relating to representation of Lisa Markley's mother was personal to Lisa Markley's mother, and subject to claim *in the administration of the estate, with supervision of the probate court*; and not by self-help, self-dealing, patent conflict of interest, misrepresentation and misappropriation by George.

76.    It is believed and averred that no such fee could have or would have been approved by any Court, had any claim been asserted against Lisa Markley's mother's estate.

77.    It is believed and averred that George and David knew that any alleged agreement was unenforceable as to Lisa Markley, unethical and in breach of fiduciary duties by misrepresenting the existence and enforceability of the claimed obligation.

17

ALLIEDWORLD00000233
**App. 323**

78.    It is believed and averred that George and David also knew that assertion of the adverse claim against Lisa Markley in relation to the alleged fee owed by her mother from the estate was in gross violation of the patently unwaivable conflict involved in assertion of such a claim while representing Lisa Markley and/or the estate, particularly without advising her in writing to consult separate counsel.

79.    Taking the improper fee related to services claimed to have been rendered to the mother decades earlier from the funds inherited by Lisa Markley was false and fraudulent and violated the fiduciary, ethical and contractual duties of George and the Firm as to Lisa Markley; particularly with respect to his duty to communicate truthfully with Lisa Markley regarding the existence, propriety and enforceability of any such alleged oral agreement. Pa.R.Prof.C. 1.4; 1.8.

80.    Assertion of such an obligation as to Lisa Markley by George, while representing Lisa Markley, constituted a gross impermissible and unwaivable conflict of interest, impermissible self-dealing, improper solicitation of a testamentary gift, and impermissible attempt to have a third party pay fees of litigation without required disclosures. Pa.R.Prof.C. 1.8 (a), (b), (c), (e), (f).

81.    Lisa Markley reasonably relied upon the representations of George who consistently provided explanations sufficient to allay any concerns of an individual in which he had fostered a relationship of special trust over a period of decades.

82.    George knowingly and intentionally fostered a relationship of special trust with Lisa Markley, and then used that special trust to perpetrate a series of fraudulent misappropriations, and to evade discovery of the misappropriations.

83.    George made false and misleading statements to Lisa Markley in an attempt to evade discovery throughout; George and David, both knowingly and intentionally made false and fraudulent statements regarding the status of the assets and the amounts and reasons for

ALLIEDWORLD00000234

**App. 324**

withdrawals for the benefit of George and/or the Firm after Lisa Markley had consulted new counsel Mr. Warshawsky.

84.　It is believed and averred that additional sums, *beyond the amounts referenced above,* may also have been misappropriated, and that George is believed to have taken a total amount equal to 1/3 of all funds received from Lisa Markley's mother's estate.

85.　Accurate, complete disclosures by Defendants are required to determine the full amount misappropriated on this basis.

86.　Despite request, Defendants provided no accounting of the totals received from either estate, nor did they make a specific attribution of specific withdrawals for specific reasons.

87.　It is believed all justifications are false, pretextual, and *post hoc* rationalizations.

**IMPROPER FEES: LISA MARKLEY'S FATHER'S ESTATE LITIGATION**

88.　Lisa Markley was estranged from her natural father after the acrimonious and litigious divorce in which George represented her mother, and in which George took pains to fuel fires of acrimony and mistrust, without ever adequately documenting any basis for the aspersions cast on the other participants.

89.　The misrepresentations of George regarding the state of the evidence, the proof offered, the regularity of proceedings and the outcomes exacerbated the estrangement of Lisa Markley from her natural father and complicated any efforts at reconciliation; George reinforced this mistrust in the 1976 representation discussed above.

90.　In 1988, following the death of Lisa Markley's natural father July 21, 1986, there was litigation concerning Lisa Markley's share in her father's estate.

91.　Despite the fact that the litigation was pending in California, George and the Firm abused the special relationship between George and Lisa Markley to have her hire his Firm in

ALLIEDWORLD00000235

**App. 325**

addition to the active counsel in California; thereby creating an unjustified duplication of effort, unwarranted travel expenses, and patently unreasonable and unethical fees.

92.     Again, contrary to standard and usual practice, and various applicable ethical rules, George did not enter into anything vaguely approximating a proper or lawful *contingent fee agreement*, as that term is used in Pa.R.Prof.C. 1.5 (c).

93.     George also did not maintain any records regarding the extent of his claimed "assistance" in the matter.

94.     Instead, George drafted a document for Lisa Markley to sign and have notarized which was deceptively styled "*a Power of Attorney*" and purported to give George an "***irrevocable***" Power of Attorney which covered any and all matters pertaining to Lisa Markley, *including but expressly not limited to* the Estate Trust matters relating to her deceased, estranged father. *See* Exhibit "C."

95.     George then used the power of attorney to retain and pay local counsel in California.

96.     The inartfully drafted document also purported to authorize a 33 1/3% contingent fee regarding the father's estate claim, even though at the outset the only disputed issue was whether the language left her a ½ share or a 1/3 share in the portion for his children.

97.     Given the nature of the litigation, it is averred and contended that the fee was excessive, unreasonable and unethical.

98.     By letter dated January 13, 2013, California counsel Kenneth G. Compton, Esquire, indicated that his file had been shredded, that he had represented Lisa Markley in hearings in 1991 and 1992, and that counsel only recalled George attending one appellate argument in 1994.

99.     No records were proffered by defendants to Mr. Warshawsky indicating any other actual work by George, and so it reasonably appears the net result was receipt of what had

ALLIEDWORLD00000236

**App. 326**

originally been conceded, the 1/3 share of the Trust, *less contingent and local counsel fees.*

100.    It is believed and averred that the February 6, 2013 email indicating loss of records relating to "these matters" applied equally to this second alleged representation.

101.    There is no record that Lisa Markley was consulted regarding the hiring of California counsel or was consulted, consented to, or was ever informed of any agreement as to how any fee would be split between California counsel and George; the only known communication appears to have materially misrepresented George's actual role as lead counsel and directing the litigation though California counsel has indicated otherwise.

102.    Any such conduct would be contrary to applicable ethical requirements regarding payments to third parties and sharing of fees.

103.    It is believed and averred that the fee claimed by George in connection with the Estate and Trusts of Lisa Markley's deceased father were unconscionable, disproportionate, and unethical.

104.    It is believed and averred that the fee splitting arrangement was unauthorized and unethical, that the combined fee was unreasonable and unethical, and that the Power of Attorney was void and voidable as an unethical, unreasonable, and disproportionate fee agreement gained through serial ethical violations including particularly self-dealing, inadequate disclosure, and gross overreaching, particularly as to the "irrevocable" nature of the grant as drafted by George.

105.    Based upon a March 2001 letter of Kenneth Brandt, CPA regarding distributions made by the estate and trusts, it is believed and averred that George received approximately $1,000,000 on behalf of Lisa Markley on or about August 30, 2000, and an additional distribution of approximately $176,114 sometime after that date, though access to original and third party records would be required to confirm the precise actual amounts.

21

ALLIEDWORLD00000237

106.    It is believed and averred that additional amounts were later distributed, and that an accounting is required to determine the total amount received by George, as a 2001 letter specifically referenced escrows for contingencies presumably subject to final distribution in the event of net balances; it is believed and averred that additional sums were in excess of $50,000.

107.    It is believed and averred that George withdrew from the funds received on behalf of Lisa Markley an unreasonable fee of at least 33 1/3% of all such monies received; and that such fee was grossly disproportionate to the value of services rendered.

108.    In June 2000, after money was received from Lisa Markley's father's estate, George supplemented his prior unethical and unconscionable "Irrevocable Power of Attorney" by having Lisa execute a "General Trading Authorization" with Paine Webber which gave him full power as "broker" or "dealer" to make trades on her account and "to transfer funds to her or others."

109.    The December 2000 Paine Webber Resource Management Account Report for Lisa Markley's funds also indicates that checks totaling $446,599 were issued to defendants in 2000, with checks in the amounts of $184,275 and $166,824 drawn to "David S. D'Angelo" and $25,000, $15,000 and $55,000 drawn to "GAD" (presumably George), "George DeAngelo," and "Jorge A Dangelo."

110.    While it is not known what amount was paid to California counsel, it is believed and averred that the Firm and George had a legal and ethical obligation to ensure that the net fee in the representation was reasonable; and that the amount to be disgorged as unreasonable should be equal to the difference between the amount paid to all counsel and the amount deemed to be reasonable, rather than merely in reference to the amount received by the Firm and/or George.

111.    Lisa Markley does not know the amount(s) paid to the California firm, but does not imply any misconduct on their part.

22

ALLIEDWORLD00000238
**App. 328**

112.  David and all Defendants have claimed entitlement for undocumented, alleged travel expenses of George for multiple alleged, unspecified, and undocumented trips to California.

113.  This claim is inconsistent with the communication of the California counsel who recalled only a single trip; and in no way explains why such duplicative services were necessary or reasonable for attendance at argument.

114.  The Power of Attorney, pursuant to which already improper and excessive fees were claimed, had no provision for payment of additional "expenses" beyond the excessive and highly irregular contingent fee claimed.

115.  All Defendants engaged in continued unethical conduct and exacerbated the adverse effects of prior unethical conduct by acting in concert to evade disclosure of known gross violations of contractual, legal, fiduciary and ethical duties of all Defendants throughout.

116.  David and the Firm became accessories after the fact and co-conspirators as to all the prior misconduct by their joint and systematic effort to mislead Lisa Markley as to the amount and nature of the withdrawals made from the funds of Lisa Markley deposited with the Firm, and the actual net balance of funds held by the Firm.

117.  It is believed and averred that David knew of, condoned, failed to disclose, and participated in some, part, or all of the misconduct of his father regarding the excessive fees and false and fraudulent accountings of funds held in trust for Lisa Markley; belief is based in part on the fact that funds were withdrawn from her account and recorded as being disbursed to David as well as George.

118.  It is believed and averred that the misappropriated funds were comingled with Firm funds, and that all Defendants improperly benefited financially from the misappropriations; there are also checks with "no designee," payment to taxing authorities and to "OSayle & Eurell" which

ALLIEDWORLD00000239
**App. 329**

are also without any appropriate accounting and appear improper.

### FINANCIAL MANAGEMENT AND INVESTMENT SERVICES

119.    George also used his status as counsel, and the special relationship he had cultivated with Lisa Markley to take absolute control of her investments as financial manager.

120.    No written agreement regarding fees for such services was provided to or executed by Lisa Markley, and none of the Defendants acquitted themselves of the obligation to recommend consultation with separate counsel regarding such self-dealing with a client.

121.    Neither the Power of Attorney nor the "General Trading Authorization" with Paine Webber in any way set forth or authorized fees for financial management services.

122.    Upon information and belief, Lisa Markley avers that negligent and/or grossly negligent financial services were provided through the Firm by both George and David, prior to the express revocation of the Power of Attorney in June 2012 and termination of services of the Defendants after the near complete dissipation of assets was discovered.

123.    George was the primary financial manager, and generally acted without notice or solicitation of opinion or approval from Lisa Markley as to investment decisions and/or fee claims, and checks drawn to George, David or other third parties for which no accounting has been provided.

124.    No Defendant was licensed within the Commonwealth of Pennsylvania as a financial advisor, "broker," "dealer" or otherwise.

125.    George informed Lisa Markley that he would charge a 1.5% fee for management of her funds, again without reducing any agreement to writing or advising Lisa Markley of the propriety of having another attorney review any such agreement.

126.    Defendants continued to charge Lisa Markley $15,000 per year for management of

ALLIEDWORLD00000240
**App. 330**

the assets even after George's misappropriations and disastrous investments had substantially depleted the amount managed by Defendants below the million dollar trust corpus which had been the theoretical justification for the original improper and excessive 1.5% fee claimed.

127.    Defendants falsely and fraudulently concealed both misappropriations and losses due to the misappropriations and incompetent financial services provided.

128.    The fees actually taken were irregular, unauthorized and excessive.

129.    George provided financial services in a negligent, grossly negligent and incompetent manner resulting in dramatic depletion of funds.

130.    George concealed the losses from Lisa Markley and continued to withdraw sums as fees which were reflective of an undiminished balance despite the fact that the fees represented dramatic increases in the percentage of assets managed, and were patently unreasonable in amount even had services been competent, which they were not.

### Gross Professional Incompetence and Fraud

131.    George provided unlicensed financial management services through the Firm, and upon information and belief it is averred David assisted him in providing such services by acting as a conduit for communications and recipient of funds on a periodic basis.

132.    George provided these unlicensed, financial management services through the Firm, without written agreement, on patently unreasonable terms, and without ensuring that Lisa Markley had the benefit of advice of independent counsel as required for attorney business transactions with clients.

133.    All Defendants owed Lisa Markley a duty of professional and fiduciary care regarding the financial services.

134.    All Defendants knew or should have known that George was unqualified to provide

ALLIEDWORLD00000241
**App. 331**

such services.

135.   George provided negligent, grossly negligent, and epically incompetent investment management services which caused a dramatic decrease in the funds supervised.

136.   All Defendants knew or should have known that George had made a continuing series of bad investments and improvident asset liquidations causing losses to Lisa Markley which should have been disclosed, but were not.

137.   When Lisa Markley noted that broker account balance reports had decreased, George falsely and fraudulently stated to Lisa Markley that he had taken funds out of the "volatile broker accounts" and had provided her a hedge against the market uncertainty by purchasing secure durable assets and precious metals.

138.   Because she had agreed to the 1.5% fee and Defendants continued to withdraw an annual $15,000.00 fee, and because of the relationship of special trust George had carefully cultivated, Lisa Markley reasonably believed that the net value of the brokerage investments and the separate precious metal/durable goods investments together remained at or above $1,000,000.

139.   Lisa Markley was repeatedly told by George that the $15,000 fee was a 1.5% commission for Defendants' management of the assets.

140.   By continuing to report a $15,000 per year fee, Defendants knowingly and intentionally deceived Lisa Markley as to the amount of funds still under management and effectively concealed from her the dramatic losses incurred as the result of George's incompetence as a financial manager and dishonesty as their custodian.

141.   It is believed and averred that David knew of the losses and misrepresentations and knowingly and intentionally participated in the misrepresentations and stalling activities to prevent or delay discovery of the full extent of the negligence, fraud and misappropriations.

ALLIEDWORLD00000242

142.     David falsely and fraudulently claimed that there was an alleged written agreement, but that it was destroyed in the 2004 flood.

143.     There was never a written agreement.

144.     No action was taken by Defendants between 2004 and 2012 to replace the falsely alleged "lost" agreement; and such a file should have been available on an electronic back-up.

145.     Even if such an agreement existed, an agreement which required $15,000 in annual fees regardless of how much money George had lost through gross negligence, would be unconscionable, patently excessive and unreasonable.

146.     The management fee charged was grossly exorbitant and excessive.

147.     By May 2012, George had squandered virtually all of the approximately 1.5 million dollar sum placed under his dubious financial management, through incompetent investment and his excessive, irregular, and unethical fee practices.

UNAUTHORIZED WITHDRAWALS FROM INVESTMENT ACCOUNTS

148.     Based upon records supplied by Defendants, in addition to charging excess fees to Lisa Markley's investment accounts, George simply misappropriated funds without any semblance of justification.

149.     Beginning in 2003, George made several intermittent, unexplained, and unauthorized withdrawals, in increments ranging from $5,000 to $10,000.

150.     This practice continued through 2008, at which point the frequency of such withdrawals increased.

151.     Withdrawals at the increased pace continued through 2010, when both the frequency and the amount of such withdrawals again increased.

152.     From 2010 until 2012 when Defendants' access to the accounts was revoked, amounts withdrawn ranged from $10,000 to $20,000.

27

ALLIEDWORLD00000243

153.    While they were consistent with the assurance that money was being withdrawn from volatile markets and put in durable assets and precious metals, none were accounted for or transferred and no other justification has been proffered for these withdrawals; it retrospect. It appears that George simply decided to use the funds of Lisa Markley as a personal ATM.

154.    Despite plundering Lisa Markley's funds held in trust; in May 2012, George had the gall to prepare for Lisa Markley a one-page will which named George Executor, gave him extraordinary powers over estate assets, and relieved him of the burden of posting a bond.

155.    At that point, George knew Lisa Markley had extremely limited assets and little need of a will; but it is believed and averred that in providing one, George sought to fraudulently preserve the false illusion that Lisa Markley still had a substantial estate requiring administration.

156.    Continued failure to provide documentation regarding the precious metal investment eventually overcame the ingrained trust which George cultivated in Lisa Markley.

157.    Written notice was provided on June 12, 2012 that *any* Power of Attorney was revoked, and that new counsel was seeking a *voluntary accounting* of funds and transfer of all assets held by Defendants, including the precious metals and durable goods George claimed to have purchased on behalf of Lisa Markley.

158.    Even after new counsel intervened, Defendants attempted to misrepresent the state of affairs and cause(s) of reductions in principal, while systematically delaying any meaningful disclosures.

159.    David participated actively and knowingly in that deception after that point.

160.    As noted above, the initial response by David feigned hurt feelings and claimed as to the brokerage reports already requested from third parties:

28

ALLIEDWORLD00000244
**App. 334**

From your request to UBS Financial, you will be receiving records of all financial transactions conducted on Lisa's behalf. *That will serve as your precise and accurate accounting. (Emphasis added).*

161.    Defendants knew the brokerage reports in no way contained a "precise and accurate accounting;" intentionally declined to provide anything approximating an actual accounting; and instead engaged in an active campaign of delay, denial, and deception.

162.    David made a series of knowingly false statements designed to prevent new counsel from discovering the full nature and scope of the misconduct of his father, George, himself, and the Firm.

163.    On October 5, 2012, after a series of communications from new counsel documenting *known* discrepancies, David sent a letter on behalf of himself, his father, George, and the Firm admitting *euphemistically* that George had "*made overpayments*" to himself in an amount they calculated as totaling approximately $500,000 from Lisa Markley's investment accounts from 2003 through 2012. *See* "Exhibit D."

164.    Defendants made an *unconditional assurance* that payment *would be made within 60 days*; but no such payment was forthcoming.

165.    While present counsel have never had sufficient information to determine the precise amounts wrongfully taken, Mr. Warshawsky documented to Defendants discrepancies and amounts presumed to be owed in excess of $1,000,000.

166.    Defendants continued to make a series of false and misleading statements to support a fraudulently deflated claimed amount owed.

167.    In specific instances, claims were made and documented to be false, without Defendants then acknowledging any increase in the previously admitted net balance.

168.    Eventually, Defendants forwarded a partial disgorgement of misappropriated funds

ALLIEDWORLD00000245

**App. 335**

in the amount of $328,752.40 drawn on the Firm's IOLTA account, without any accompanying accounting which could in any way justify either the reduction from the amount admitted to be owed in October 2012, or refutation of any of the additional amounts identified as due in December 2012.

169.    Individually and collectively the serial breaches of contractual, ethical, and fiduciary obligations are outrageous and warrant imposition of punitive damages.

170.    A significant portion of the misappropriations amount to brazen theft by unlawful disposition; and likewise warrant imposition of punitive damages for outrageous intentional tortious conduct.

171.    While the conduct of George is the most egregious, it is respectfully submitted that by facilitating, condoning, and retaining the tainted fruit of the grossly negligent and intentional misconduct of George, and by actively aiding and abetting the conduct in a failed attempt to coverup its nature and extent after the fact, the conduct of the Firm and David is sufficiently egregious that punitive damages are warranted against them as well.

172.    Similarly, attorney's fees should be awarded against all Defendants on the fraud, intentional tort, and breach of fiduciary obligation counts below and/or as part of punitive damages regarding such counts.

### COUNT I – PROFESSIONAL NEGLIGENCE - LEGAL AND FINANCIAL
### Against All Defendants

173.    Plaintiff incorporates Paragraphs 1 through 172 by reference as if restated verbatim herein.

174.    Defendants entered into a contractual relationship with Lisa Markley in which they contracted to provide competent professional legal and financial services.

175.    Defendants owed a duty of care to Lisa Markley to provide legal and financial

ALLIEDWORLD00000246

**App. 336**

services in a competent and professional manner.

176.    As detailed in Paragraphs 1 through 172, all Defendants collectively and individually provided materially deficient services and engaged in serial intentional breaches of legal, ethical, and fiduciary obligations relating to the professional services.

177.    George intentionally, negligently, and/or grossly negligently misappropriated to himself and to his Firm funds of Lisa Markley.

178.    The Firm and David intentionally, negligently, and/or grossly negligently assisted and/or unreasonably failed to prevent, disclose, or remedy the wrongful conduct of George.

179.    The negligence and/or gross negligence of Defendants directly and proximately caused financial injury, ordinary distress, and unreasonable expense to Lisa Markley.

180.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make full restitution of all misappropriated funds.

181.    The conduct was reckless, outrageous, egregious, and warrants punitive damages.

WHEREFORE, Plaintiff respectfully requests compensatory and punitive damages in an unliquidated amount in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

## COUNT II – BREACHES OF FIDUCIARY DUTIES
### Against All Defendants

182.    Plaintiff incorporates Paragraphs 1 through 181 by reference as if restated verbatim herein.

183.    As to legal and financial services, all Defendants had fiduciary duties to Lisa Markley.

184.    Because funds were held in trust regarding compensated services, all Defendants had a fiduciary duty to Lisa Markley.

31

ALLIEDWORLD00000247

**App. 337**

185.    George cultivated a close relationship of personal trust as to the professional and financial services provided and owed a special heightened fiduciary duty as to Lisa Markley regarding all services.

186.    As detailed in Paragraphs 1 through 181 above, all Defendants engaged in intentional, grossly negligent and/or negligent conduct which materially breached their respective fiduciary responsibilities.

187.    All Defendants' breaches of fiduciary duties, directly and proximately, caused financial injury, ordinary distress and unreasonable expense to Lisa Markley.

188.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make full restitution of all misappropriated funds.

189.    The conduct was reckless, outrageous, egregious, and warrants imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

### COUNT III – FRAUD
### Against All Defendants

190.    Plaintiff incorporates Paragraphs 1 through 189 by reference as if restated verbatim herein.

191.    All Defendants participated in the serially fraudulent conduct detailed in Paragraphs 1 through 189.

192.    The conduct of Defendants was intentional, fraudulent, and designed to defraud Lisa Markley of substantial sums of money.

32

193. Lisa Markley actually and reasonably relied upon communications of Defendants which were materially false and incomplete.

194. As a direct and proximate result of the wrongful and fraudulent misrepresentations, Lisa Markley was injured financially, suffered ordinary distress and was forced to incur unreasonable expense after having been rendered impecunious by the wrongful conduct of Defendants.

195. George, in particular, intentionally and systematically cultivated and took advantage of a special relation of trust arising from his representation of Lisa Markley since she was a minor child; his conduct was particularly reprehensible in that respect.

196. Defendants' conduct was intentional, wrongful, and outrageous and warrants the award of punitive damages and legal fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with interest, attorneys' fees and such other relief as this Court may deem just.

### COUNT IV -- BREACH OF CONTRACT
### Against All Defendants

197. Plaintiff incorporates Paragraphs 1 through 196 by reference as if restated verbatim herein.

198. Lisa Markley contractually engaged Defendants to provide competent legal and financial services.

199. All Defendants serially breached all contractual obligations as detailed in Paragraphs 1 through 196 above.

33

ALLIEDWORLD00000249

**App. 339**

200.    As a direct and proximate result of Defendants' serial breaches of legal and financial services obligations, Plaintiff suffered monetary damages in an amount in excess of the local arbitration limits.

201.    The breaches were sufficiently pervasive and egregious as to warrant disgorgement of all fees paid to all defendants.

202.    Defendants should be compelled to make full restitution of all amounts lost in the investment process and/or misappropriated by defendants.

203.    The breaches of financial duties resulted in both actual losses and lost opportunities which should be included in compensatory damages.

204.    In order to make Lisa Markley whole and to prevent an improper windfall to Defendants, prejudgment interest should be awarded as to all sums determined to be owed as a result of the breaches.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants and an award of compensatory and punitive damages in unliquidated amounts in excess of the local arbitration limits, together with pre and post judgment interest, attorneys' fees and such other relief as this Court may deem just.

### COUNT V – THEFT AND/OR CONVERSION
### Against All Defendants

205.    Plaintiff incorporates Paragraphs 1 through 204 by reference as if restated verbatim herein.

206.    Defendants knowingly and intentionally converted to their own use and benefit, without consent by Lisa Markley and without justification, significant amounts of money rightfully belonging to Lisa Markley.

207.    The conduct amounts to the common law tort of theft by unlawful disposition.

34

208.    The wrongful conversion by Defendants was outrageous and malicious, willful and wanton, and warrants the award of punitive damages.

209.    The theft and/or intentional wrongful conversion of Defendants directly and proximately caused financial injury, ordinary distress, and unreasonable expense to Lisa Markley.

210.    Defendants should be compelled to disgorge all fees received, pay reasonable unliquidated compensatory damages, and make a full accounting with full restitution of all misappropriated funds.

211.    The conduct was reckless, outrageous, egregious, and warrants imposition of punitive damages.

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in her favor and against Defendants in an amount in excess the local arbitration amounts, together with punitive damages, interest, costs, attorneys' fees, and such other relief as this Court deems just.

## COUNT VI -- VICARIOUS LIABILITY / CIVIL CONSPIRACY
### Against All Defendants

212.    Plaintiffs incorporate Paragraphs 1 through 211 by reference as if restated verbatim herein.

213.    George and David acted in concert in furtherance of all the wrongful conduct detailed in the counts above.

214.    Each acted on behalf of the Firm and the Firm received and retained the illicit fruit of their wrongful conduct.

215.    David and the Firm are vicariously liable for the negligent acts, fraud, and misrepresentations of George, who was at all times acting on behalf of the Firm under the theories of *respondeat superior*.

35

ALLIEDWORLD00000251

App. 341

216.    George and the Firm are vicariously liable for the negligent acts, fraud, and misrepresentations of David, who was at all times acting on behalf of the Firm under the theories of *respondeat superior*.

217.    David knowingly and intentionally acted in furtherance of the general scheme to defraud Lisa Markley by repeatedly dodging accounting questions or inquiries by indicating he was not familiar with Lisa Markley's assets and would have to talk to his father, George.

218.    He engaged in delay tactics designed to cover up George's conduct and defalcations.

219.    David has also materially aided in deceiving Lisa Markley out of substantial sums of money by improperly intermingling Lisa Markley's funds with those of the Firm.

220.    In response to repeated requests for accounting on Lisa Markley's investments, David made material misrepresentations and was wilfully deceptive.

221.    David and the Firm materially facilitated the deception by forwarding false communications regarding false "accountings," false assurances that insurance counsel had been contacted, and would be taking over communications, and false promises of imminent payment of $500,000 which was acknowledged in writing to have been wrongfully taken by George.

222.    Amounts taken far exceed amounts returned by Defendants to Lisa Markley.

223.    All Defendants engaged in concerted wrongful conduct which directly and proximately caused the injuries set forth in each individual count above.

224.    All Defendants acted in furtherance of the unprivileged, wrongful civil conspiracy and therefore should be deemed to share joint and several liability for the above referenced misconduct under both *respondeat superior* and civil conspiracy theories of joint liability.

225.    The conduct was egregious and outrageous and warrants punitive damages.

36

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in her favor and against all Defendants jointly and severally as to any amount awarded on any claim herein in an amount of unliquidated compensatory damages in excess the local arbitration amounts, together with punitive damages, interest, costs, attorneys' fees, and such other relief as this Court deems just.

Respectfully submitted,

By:_____

Andrew W. Barbin, Esquire
Atty. No. 43571
ANDREW W. BARBIN, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
(717) 506-4670
DATED:  March 25, 2015                Attorney for Plaintiff

ALLIEDWORLD00000253

**App. 343**

Andrew W. Barbin, Esquire
Atty I.D. 43571
ANDREW W. BARBIN, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
717-506-4670

Attorney for Plaintiff

| | |
|---|---|
| **LISA MARKLEY** | **: IN THE COURT OF COMMON PLEAS** |
| 1724 Verbeke Street | : DAUPHIN COUNTY, PENNSYLVANIA |
| Harrisburg, PA 17103, | : |
| Plaintiff | : |
| | : |
| v. | : CIVIL ACTION – LAW |
| | : |
| LAW OFFICES OF D'ANGELO AND | : No. 2013-CV-3010-CV |
| EURELL | : |
| Land Title Building, 22nd Floor | : |
| Philadelphia, PA 19110, | : |
| And | : |
| DAVID S. D'ANGELO, ESQUIRE | : |
| Law Offices of D'Angelo and Eurell | : |
| Land Title Building, 22nd Floor | : |
| Philadelphia, PA 19110, | : |
| And | : |
| GEORGE A. D'ANGELO, ESQUIRE | : |
| Law offices of D'Angelo and Eurell | : |
| Land Title Building, 22nd Floor | : |
| Philadelphia, PA 19110, | : |
| Defendants | : |

## VERIFICATION

I, Lisa Markley, do hereby state that the statements made in the foregoing AMENDED

COMPLAINT are true and correct based upon my knowledge information and belief. I understand

that false statements are made subject to penalties of 18 Pa. C.S. § 4904 relating to unsworn

falsification to authorities.

_____
Lisa Markley

Dated: April 8, 2015

ALLIEDWORLD00000254
**App. 344**

# "EXHIBIT A"

ALLIEDWORLD00000255



1 of 100 DOCUMENTS

Markley v. Markley, Appellant

No. 5, October Term, 1964

Superior Court of Pennsylvania

*207 Pa. Super. 294; 218 A.2d 84; 1966 Pa. Super. LEXIS 1112*

December 17, 1965, Argued
March 24, 1966, Decided

**PRIOR HISTORY:**    [***1] Appeal from order of Court of Common Pleas of Northumberland County, Sept. T., 1962, No. 370, in case of Sidney M. Markley v. Rosalie S. Markley.

**DISPOSITION:**    Order affirmed.

**COUNSEL:** *George A. D'Angelo,* for appellant.

*Michael Kivko,* with him *Robert McK. Glass,* for appellee.

**JUDGES:** Ervin, P. J., Wright, Watkins, Montgomery, Jacobs, and Hoffman, JJ. (Flood, J., absent). Opinion by Wright, J. Hoffman, J., dissents.

**OPINION BY:** WRIGHT

**OPINION**

[*296]  [**85]  On June 25, 1962, in the Court of Common Pleas of Northumberland County, Sidney M. Markley filed a complaint against his wife under the provisions of The Divorce Law of May 2, 1929, P. L. 1237, as enlarged by the amendment of December 30, 1959, P. L. 2055, 23 P.S. 15. This complaint contained three counts. The first count was an action in divorce a.v.m. on the ground of indignities to the person. The second count was an action for rights of visitation with and custody of Lisa Markley, the minor daughter of the

parties, born February 9, 1954. The third count was an action to fix the amount of alimony, maintenance and counsel fees. The eventual disposition by the lower court of the first count forms the basis of a companion [***2] appeal. See *Markley v. Markley, 207 Pa. Superior Ct. 758, 216 A. 2d 621.* The second count was disposed of by an order of the lower court dated April 22, 1963, from which order [1] no appeal was taken. As to the third count, an opinion was filed in the lower court on August 5, 1963, allowing interim counsel fees, temporarily refusing alimony, costs and expenses, and making an order for the wife's maintenance in the sum of $ 125.00 per week, and for the daughter's maintenance in the sum of $ 35.00 per week.

1  "And Now, April 22, 1963, the custody of Lisa Markley is awarded to her Mother, Rosalie S. Markley. The Father, Sidney M. Markley, to have the right of visitation with and the custody of Lisa on alternate week-ends of each month of each year. The visitation period to begin one hour after the conclusion of the school day on Friday, and extend to not later than 8 o'clock P.M. on Sunday. The custody and visitation rights of the Father under this Order, shall begin April 26, 1963".

[*297]  We are [***3] here concerned with an appeal by the wife from the order of August 5, 1963, involving the third count, in which appellant's only contention is that "the amount of support is inadequate. We have made a painstaking review of the voluminous

ALLIEDWORLD00000256

207 Pa. Super. 294, *297; 218 A.2d 84, **85;
1966 Pa. Super. LEXIS 1112, ***3

original record in this and the companion appeal. The case was bitterly contested. The docket entries alone cover eight typewritten pages. The notes of testimony are contained in ten folio volumes, totaling over twenty-two hundred pages. [**86] An effort will be made to limit this opinion to the sole issue before us in the instant appeal. The factual situation, so far as here pertinent, appears in the following excerpt from the opinion below.

"The relevant facts for the determination of the questions herein presented disclose the following history. The plaintiff, Sidney M. Markley, and the defendant, Rosalie S. Markley, were married November 23, 1949 and subsequent thereto resided in New York City for a period of about five years. On February 9, 1954 a daughter, Lisa, was born to this marriage. In the latter part of 1954 the parties moved to Rye, New York, where they remained for about six years. In March 1961 they moved to Yardley, [***4] Bucks County, Pennsylvania, where they separated either in late June or early July, 1961, when the plaintiff packed his belongings and left their home. The plaintiff resides in Sunbury in this County, and the defendant and the minor child reside in Yardley. The plaintiff is presently 56 years of age, engaged in the motion picture business, is President of A. G. E. Films, Inc., who employ him under a written contract by the terms of which he is paid $ 1250.00 per week. He has an additional income of $ 4,000.00 per year. This contract with the film company began March 12, 1962 and is for a period of five years duration. His net income is between $ 25,000.00 and $ 30,000.00 per year, and his net worth between [*298] $ 125,000.00 and $ 135,000.00. He provides a home for his wife and child in Yardley titled in his own name, which he purchased at a cost of about $ 26,000.00. The home is mortgaged and he pays the sum of $ 177.00 per month on account of the mortgage, which includes taxes and insurance. The separate estate of the defendant consists of U. S. Savings Bonds of the value of $ 700.00 at maturity, and dividends from stock in the amount of $ 165.00 annually".

The applicable [***5] legal principles are well settled. The purpose of a support order is to secure such an allowance to the wife and child as is reasonable, having in mind the husband's property and earning

capacity and the station in life of the parties: Commonwealth ex rel. Kallen v. Kallen, 200 Pa. Superior Ct. 507, 190 A. 2d 175. In support cases the court below is the arbiter of the facts: Commonwealth ex rel. Iezzi v. Iezzi, 200 Pa. Superior Ct. 584, 190 A. 2d 334. No hard and fast rule can be enunciated which will apply in all cases: Commonwealth ex rel. Taylor v. Taylor, 193 Pa. Superior Ct. 519, 165 A. 2d 394. The appellate court will not interfere with the determination of the court below unless there has been a clear abuse of discretion: Commonwealth ex rel. O'Hey v. McCurdy, 199 Pa. Superior Ct. 115, 184 A. 2d 291.

In the instant case the court below took into consideration the fact that appellant and her daughter are living in a substantial home, completely furnished, on which appellee pays $ 2,124.00 annual carrying charges, that appellee has created a $ 15,000.00 trust fund for the daughter's future education, and has agreed to pay tuition and other charges for the daughter [**86] at private school, summer camp, dancing and piano lessons. The record discloses that the amounts awarded for maintenance of the wife and daughter coincide almost exactly with the total required, as established by the testimony. Moreover, the order below could not have been [*299] so grossly inadequate as is now alleged, since appellant permitted this appeal to rest unargued for over two years, and then argued it only because her request for a further continuance was denied.

The principal complaint of present counsel for appellant is directed to the finding of the court below that appellee's net income after taxes and expenses is only $ 30,000.00 per year. Appellant's trial counsel had before him a copy of appellee's income tax return, and was afforded full opportunity to cross-examine with regard thereto. The effect of income tax upon the parties is a proper matter for consideration: Commonwealth ex rel. Kallen v. Kallen, [**87] 202 Pa. Superior Ct. 500, 198 A. 2d 331. There is nothing in the testimony which justifies any material question concerning appellee's estimate of his net income. In brief, we perceive no basis on this record for charging the lower court [***7] with an abuse of discretion.

Order affirmed.

ALLIEDWORLD00000257

Page 1



4 of 23 DOCUMENTS

Markley v. Markley, Appellant.

The Superior Court of Pennsylvania

207 Pa. Super. 758; 221 A.2d 565; 1966 Pa. Super. LEXIS 1263

Argued December 17, 1965; reargument refused April 15, 1966
March 24, 1966

**PRIOR HISTORY:** [*1] [*1] Appeal, No. 780, Oct. T., 1965, from decree of Court of Common Pleas of Northumberland County, Sept. T., 1962, No. 370. Divorce proceeding.

**COUNSEL:** *George A. D'Angelo,* for appellant; *Michael Kivko,* with him *Robert McK. Glass,* for appellee.

**OPINION**

PER CURIAM: The six judges who heard the argument of this appeal being equally divided in opinion, the decree of the court below is affirmed.

FLOOD, J., absent.

ALLIEDWORLD00000258

**App. 348**

# "EXHIBIT B"

## Bruce J. Warshawsky

| | |
|---|---|
| **From:** | ddsdangelo@cs.com |
| **Sent:** | Wednesday, February 06, 2013 10:44 AM |
| **To:** | BJW@cclawpc.com |
| **Subject:** | Re: Status |

Bruce,

For the purposes of resolution only, the $100,000.00 apparently made payable to Pugh & Hughes will be added to the payments to my father.

As discussed earlier, my father represented Lisa's mother and Lisa from 1962. In the divorce, support and custody proceedings, there were thousands of pages of testimony and evidence which my father had to review and present a rigorous appeal. I have indicated to you the citations of the cases. Lisa is aware that my father was not paid for his representation, as her mother had no money but agreed that the fee would be paid out of her estate, over forty years later. The fee agreement with Lisa is inclusive and does cover the proceeds of her mother's estate, even if not legally enforceable, which is not conceded here, at least, morally and in equity.

The close relationship continued for fifty years. My father was involved in many varied aspects of Lisa's mother's and Lisa's life, including supporting and attending her graduation from Smith. The breadth, depth and meaning of that relationship should not be discarded or discounted because of the recent circumstances.

The annual fee of $15,000.00 had been paid and claimed in the tax returns each year for the twelve year period. The amount has been adjusted, as you point out in your prior letter, to reflect just the twelve year period.

The outline of the settlement proposal is as follows:

Reimbursement of the overpayment.
Inclusion of the $100,000.00 as being paid to my father.
Reduction for reasonable expenses in travel, eleven times, estimated conservatively at $2000.00 a trip or as we agree.
Inclusion of Rosalie Markley's estate proceeds for the purposes of calculating fees.
Reimbursement of margin fees to be determined.
Payment of your attorney's fees to be determined.

Unfortunately, in 2004, our office suffered a loss of files, furniture, etc because of a flood in the building. Many files were lost, including several feet of Markley files. Therefore, there is no documentation regarding the above matters. However, there is sufficient public record and testimony to substantiate the facts.

I look forward to hearing from you. Payment of the settlement will be made immediately upon agreement.

David

-----Original Message-----
From: Bruce J. Warshawsky <BJW@cclawpc.com>
To: 'ddsdangelo@cs.com' <ddsdangelo@cs.com>
Cc: Lisa Markley (lsmarkley@comcast.net) <lsmarkley@comcast.net>; Bruce J. Warshawsky <BJW@cclawpc.com>
Sent: Mon, Feb 4, 2013 2:55 pm
Subject: Status

David:

"EXHIBIT C"

POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that I, LISA MARKLEY, residing at 1089 C Michigan Drive, Harrisburg, Pennsylvania, 17111, have made, constituted, and appointed, and by these presents irrevocably do make, constitute and appoint, GEORGE A. D'ANGELO, of Angelcourt, Black Rock Road, Bryn Mawr, Pennsylvania 19110, my true and lawful attorney, for me and in my name and on my behalf, generally to perform all matters and things, transact all business, make, execute and acknowledge all contracts, orders, deeds, writings, assurances, and instruments which may be requisite or proper to effectuate any matters or things appertaining or belonging to me, particularly as to the Estate of Sidney M. Markley, deceased, the trusts created by Sidney M. Markley and Marjorie S. H. Markley under deed dated June 25, 1986, the Estate of Rachel Neiman, deceased, the Estate of Pierson Neiman, deceased, with the same powers, and to all intents, and purposes with the same validity as I could, if personally present; hereby confirming whatever my attorney-in-fact shall do by virtue of the powers granted in this instrument.

The compensation for George A. D'Angelo shall be Thirty Three and One-Third per cent (33 1/3%) of all monies received. In the event no monies are received, there shall be no claim for services. I acknowledge receiving a copy of this power.

The following is a specimen signature of the person to whom this power is given:

_____  GEORGE A. D'ANGELO

IN WITNESS WHEREOF, I, LISA MARKLEY, have hereunto set my hand and seal this _____ day of _____, 1988.

ALLIEDWORLD00000262

**App. 352**

ACKNOWLEDGR

COMMONWEALTH OF PENNSYLVANIA:
                                SS
COUNTY OF PHILADELPHIA        :

      Before me, a notary public in and for the Commonwealth of Pennsylvania, duly commissioned, residing in Philadelphia County, personally appeared the above named, LISA MARKLEY, and in due form of law acknowledged the foregoing power of attorney to be her act and deed.

      WITNESS my hand and notarial seal this     day of        , 1988.

                                                             NOTARY PUBLIC

-2-

# "EXHIBIT D"

ALLIEDWORLD00000264

LAW OFFICES

D'ANGELO AND EURELL

TWENTY-SECOND FLOOR

LAND TITLE BUILDING

PHILADELPHIA, PA. 19110

(215) 564-5022

FAX (215) 857-7651

October 5, 2012

Bruce J. Warshawsky, Esquire
Cunningham & Chernicoff, P.C.
P.O. Box 60457
Harrisburg, PA 17106

     RE:  Lisa Markley

Dear Mr. Warshawsky:

    Further to our conversation, enclosed please find a copy of the Summary of Disbursements prepared by the accountant. As we discussed, the Summary shows an overpayment of commissions in the amount of $499,135.32. This amount will be sent to you within 60 days from the date of this letter.

    I am enclosing a copy of the letter dated April 14, 2011 with the PA-40 2010 tax return sent to Lisa via Federal Express.

    If you have any questions, please do not hesitate to contact me. I look forward to a prompt resolution of this matter and thank you for your courtesies.

    Very truly yours,

    DAVID S. D'ANGELO

DSD/cms
Enclosures

09/06/201_ /15:28    2155727448          CPP                    PAGE  02/03

## LISA MARKLEY INVESTMENT ACCOUNT

Calculation of Amonts Due For Advisor Fees

| | | |
|---|---|---|
| Investments Received Into Account | | $ 1,148,916.01 |
| Cash Received Into Account | 04/02/2000  $ | 176,114.00 |
| | 04/02/2000  $ | 4,745.78 |
| | 08/23/2006  $ | 283,723.75 |
| Total Received | | $ 1,613,499.54 |
| Compensation Percentage | | 33.33% |
| Compensation Amount | | $  537,779.40 |
| Annual Fee | 12.5 yrs $15,000  $ | 187,500.00 |
| Total Due Advisor | | $  726,279.40 |

ALLIEDWORLD00000266

**App. 356**

## LISA MARKLEY INVESTMENT ACCOUNT

### SUMMARY OF DISBURSEMENTS

| Year | Amount | Beneficiary | Trustee | Other |
|------|--------|-------------|---------|-------|
| 2000 | 536,099.00 | 89,500.00 | 446,599.00 | – |
| 2001 | 547,382.96 | 288,233.96 | 259,149.00 | – |
| 2002 | 141,204.79 | 90,097.00 | 46,666.66 | – |
| 2003 | 122,199.33 | 88,199.33 | 24,000.00 | 10,000.00 |
| 2004 | 90,911.31 | 67,361.31 | 5,000.00 | 18,550.00 |
| 2005 | 87,749.76 | 72,749.76 | 15,000.00 | – |
| 2006 | 101,733.17 | 91,733.17 | 10,000.00 | – |
| 2007 | 99,727.60 | 69,727.60 | 30,000.00 | – |
| 2008 | 116,475.87 | 71,475.81 | 45,000.06 | – |
| 2009 | 279,385.55 | 71,885.55 | 207,500.00 | – |
| 2010 | 202,447.50 | 72,947.50 | 129,500.00 | – |
| 2011 | 52,857.32 | 46,857.32 | 6,000.00 | – |
| 2012 | 26,432.50 | 26,432.50 | – | – |
| | 2,404,606.66 | 1,147,200.81 | 1,224,414.72 | 28,550.00 |

**PaineWebber**  GP

MICROFILM I.D. NUMBER



## GENERAL TRADING AUTHORIZATION FOR SECURITIES AND/OR OPTIONS ACCOUNTS
(Authorization may not be extended to employees of PaineWebber)

| ACCOUNT NAME | Branch | Account Number | Broker |
|---|---|---|---|
| Lisa Markley | NQ | 1 5 9 5 6 | 8 6 |

This will confirm the authority of

George A. D'Angelo, Esquire

2226 Land Title Building, Philadelphia, PA 19110

to enter orders with you as brokers, or as dealers acting for your own account, or as brokers for some other person, and in accordance with your terms and conditions for my account and risk. To purchase and sell securities and similar property and enter into those option contracts indicated below. I hereby ratify and confirm any and all transactions, trades or dealings effected in and for my account by my agent in connection with the authority granted hereunder.

(Initial boxes to indicate agency granted)

(1) ☐    To buy and sell on margin: (cash account only if not initialed)

(2) ☐    To sell short: (box (1) must also be initialed)

(3) [initialed]    To give you instructions as to the transfer of money and property from my account to me, or to others

(4) ☐    To do Options as follows: [THE TERM "OPTIONS" IS INCLUSIVE OF PUTS AND CALLS]

☐ COVERED WRITING ONLY     ☐ BUY OPTIONS AND COVERED WRITING ONLY     ☐ ALL OPTION TRANSACTIONS (including uncovered options)

This authorization is in addition to (and in no way limits or restricts) any and all rights which you may have under any other agreement(s) between your firm and me and is to remain effective until you receive written notice from me to the contrary, shall survive my disability or incompetence, shall bind my estate on all transactions by you after but without knowledge of my death and shall inure to your benefit and the benefit of any successor corporation or firms.

Signed, sealed and delivered by _____    DATE _____

In the presence of: _____    DATE 6/15/00

## INSTRUCTIONS AS TO NOTICES

Please send all confirmation, statements, and other communications as checked below:

☐ Send to me only

☒ Send to me and to agent.    _____ Lisa Markley

Acceptance of Agency    _____ Geo. A. D'Angelo

DATE 6/14/00

DATE _____

Option Accounts:
Limitations

Senior ROP Approval: _____    DATE _____

D.N.A.C. 4    REV. 1A/91    IMPORTANT -- Reverse side must be completed by Agent

ALLIEDWORLD00000268

**App. 358**

LISA MARKLEY,                     : IN THE COURT OF COMMON PLEAS
                     Plaintiff   : DAUPHIN COUNTY, PENNSYLVANIA
                                  :
        v.                        :      NO. 2013-CV-3010-CV
                                  :
LAW OFFICES OF D'ANGELO AND       :
EURELL, DAVID S. D'ANGELO, Esquire :
and GEORGE A. D'ANGELO,           :
                     Defendants   :

## CERTIFICATE OF SERVICE

I, Andrew W. Barbin, Esquire, hereby certify that I am this day serving a copy of the

foregoing document upon the person(s) and in the manner indicated below, which service satisfies

the requirements of the Pennsylvania Rules of Civil Procedure, by depositing a copy of the same

in the United States Mail, Mechanicsburg, Pennsylvania, with first-class postage prepaid, as

follows:

> John P. McShea, Esquire
> Conrad O. Kattner, Esquire
> McShea Law Firm, P.C.
> Centre Square, West Tower
> 1500 Market Street, Suite 4000
> Philadelphia, PA 19102-2100

                                        Andrew W. Barbin

DATED:      April 8, 2015

ALLIEDWORLD00000269

**App. 359**

LISA MARKLEY,                          : IN THE COURT OF COMMON PLEAS
                         Plaintiff     : DAUPHIN COUNTY, PENNSYLVANIA
                                       :
        v.                             :      NO. 2013-CV-3010-CV
                                       :
LAW OFFICES OF D'ANGELO AND            :
EURELL, DAVID S. D'ANGELO, Esquire     :
and GEORGE A. D'ANGELO,                :
                         Defendants    :

### SUPPLEMENTAL CERTIFICATE OF MERIT

Plaintiff, by and through counsel hereby files this Certificate of Merit regarding claims as to Defendant, George A. D'Angelo, and avers as follows:

An appropriate legal professional has issued a written statement that based upon the verified factual averments of the Plaintiff and available documentary support consistent with the averments, "there exists an reasonable probability that the care, skill and/or knowledge exercised or exhibited toward Plaintiff Lisa Markley by Defendant George D'Angelo, Esquire fell outside of applicable statutory, regulatory and professional standards and that such conduct was a cause in bringing about the harm alleged in the Complaint."

Respectfully Submitted,

Andrew W. Barbin
Atty. No. 43571
Andrew W. Barbin, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
(717) 506-4670

DATED:      April 8, 2015

ALLIEDWORLD00000270

**App. 360**

LISA MARKLEY,                            : IN THE COURT OF COMMON PLEAS
                        Plaintiff        : DAUPHIN COUNTY, PENNSYLVANIA
                                         :
            v.                           :    NO. 2013-CV-3010-CV
                                         :
LAW OFFICES OF D'ANGELO AND              :
EURELL, DAVID S. D'ANGELO, Esquire :
and GEORGE A. D'ANGELO,                  :
                        Defendants       :

## CERTIFICATE OF SERVICE

I, Andrew W. Barbin, Esquire, hereby certify that I am this day serving a copy of the

foregoing document upon the person(s) and in the manner indicated below, which service satisfies

the requirements of the Pennsylvania Rules of Civil Procedure, by depositing a copy of the same

in the United States Mail, Mechanicsburg, Pennsylvania, with first-class postage prepaid, as

follows:

> John P. McShea, Esquire
> McShea Law Firm, P.C.
> Centre Square, West Tower
> 1500 Market Street, 40th Floor
> Philadelphia, PA  19102-2100

                                    _____
                                            Andrew W. Barbin

DATED:      April 8, 2015

ALLIEDWORLD00000271

**App. 361**

LISA MARKLEY,                                    : IN THE COURT OF COMMON PLEAS
                                Plaintiff        : DAUPHIN COUNTY, PENNSYLVANIA
                                                 :
            v.                                   :      NO. 2013-CV-3010-CV
                                                 :
LAW OFFICES OF D'ANGELO AND                      :
EURELL, DAVID S. D'ANGELO, Esquire               :
and GEORGE A. D'ANGELO,                          :
                                Defendants       :

### SUPPLEMENTAL CERTIFICATE OF MERIT

    Plaintiff, by and through counsel hereby files this Certificate of Merit regarding claims as

to Defendants Law Offices of D'Angelo and Eurell, and avers as follows:

    An appropriate legal professional has issued a written statement that based upon the

verified factual averments of the Plaintiff and available documentary support consistent with the

averments, "there exists an reasonable probability that the care, skill and/or knowledge exercised

or exhibited toward Plaintiff Lisa Markley by Defendant Law Offices of D'Angelo and Eurell fell

outside of applicable statutory, regulatory and professional standards and that such conduct was a

cause in bringing about the harm alleged in the Complaint."

                                        Respectfully Submitted,

                                        _____
                                        Andrew W. Barbin
                                        Atty. No. 43571
                                        Andrew W. Barbin, P.C.
                                        5 Kacey Court, Suite 102
                                        Mechanicsburg, PA  17055
                                        (717) 506-4670

DATED:      April 8, 2015

ALLIEDWORLD00000272

**App. 362**

LISA MARKLEY,                                : IN THE COURT OF COMMON PLEAS
                              Plaintiff      : DAUPHIN COUNTY, PENNSYLVANIA
                                             :
              v.                             :      NO. 2013-CV-3010-CV
                                             :
LAW OFFICES OF D'ANGELO AND                  :
EURELL, DAVID S. D'ANGELO, Esquire :
and GEORGE A. D'ANGELO,                      :
                              Defendants     :

## CERTIFICATE OF SERVICE

I, Andrew W. Barbin, Esquire, hereby certify that I am this day serving a copy of the

foregoing document upon the person(s) and in the manner indicated below, which service satisfies

the requirements of the Pennsylvania Rules of Civil Procedure, by depositing a copy of the same

in the United States Mail, Mechanicsburg, Pennsylvania, with first-class postage prepaid, as

follows:

John P. McShea, Esquire
McShea Law Firm, P.C.
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102-2100

Andrew W. Barbin

DATED:      April 8, 2015

ALLIEDWORLD00000273
**App. 363**

LISA MARKLEY,                                    :  IN THE COURT OF COMMON PLEAS
                              Plaintiff          :  DAUPHIN COUNTY, PENNSYLVANIA
                                                 :
        v.                                       :       NO. 2013-CV-3010-CV
                                                 :
LAW OFFICES OF D'ANGELO AND                      :
EURELL, DAVID S. D'ANGELO, Esquire :
and GEORGE A. D'ANGELO,                          :
                              Defendants         :

### SUPPLEMENTAL CERTIFICATE OF MERIT

Plaintiff, by and through counsel hereby files this Certificate of Merit regarding claims as to Defendant, David S. D'Angelo, and avers as follows:

An appropriate legal professional has issued a written statement that based upon the verified factual averments of the Plaintiff and available documentary support consistent with the averments, "there exists an reasonable probability that the care, skill and/or knowledge exercised or exhibited toward Plaintiff Lisa Markley by Defendant David S. D'Angelo fell outside of applicable statutory, regulatory and professional standards and that such conduct was a cause in bringing about the harm alleged in the Complaint."

Respectfully Submitted,

Andrew W. Barbin
Atty. No. 43571
Andrew W. Barbin, P.C.
5 Kacey Court, Suite 102
Mechanicsburg, PA 17055
(717) 506-4670

DATED:       April 8, 2015

ALLIEDWORLD00000274

**App. 364**

| LISA MARKLEY, | : IN THE COURT OF COMMON PLEAS |
| Plaintiff | : DAUPHIN COUNTY, PENNSYLVANIA |
| | : |
| v. | : NO. 2013-CV-3010-CV |
| | : |
| LAW OFFICES OF D'ANGELO AND | : |
| EURELL, DAVID S. D'ANGELO, Esquire | : |
| and GEORGE A. D'ANGELO, | : |
| Defendants | : |

### CERTIFICATE OF SERVICE

I, Andrew W. Barbin, Esquire, hereby certify that I am this day serving a copy of the foregoing document upon the person(s) and in the manner indicated below, which service satisfies the requirements of the Pennsylvania Rules of Civil Procedure, by depositing a copy of the same in the United States Mail, Mechanicsburg, Pennsylvania, with first-class postage prepaid, as follows:

John P. McShea, Esquire
McShea Law Firm, P.C.
Centre Square, West Tower
1500 Market Street, 40th Floor
Philadelphia, PA 19102-2100

Andrew W. Barbin

DATED:      April 8, 2015

ALLIEDWORLD00000275

**App. 365**

# January 5, 2016 Denial



1776 K STREET NW
WASHINGTON, DC 20006

www.wileyrein.com

Richard A. Simpson
202.719.7314
rsimpson@wileyrein.com

Leland H. Jones IV
202.719.7178
lhjones@wileyrein.com

January 5, 2016

**VIA CERTIFIED MAIL,**
**RETURN RECEIPT REQUESTED**

John P. McShea, Esq.
McShea Law Firm, P.C.
1500 Market Street, Centre Square
West Tower, Suite 4000
Philadelphia, PA 19102-2100

Re:  **Insured:**         **D'Angelo & Eurell**
     **Insurer:**         **Darwin National Assurance Company**
     **Policy No.:**      **0307-7741**
     **Policy Period:**   **8/20/2012 to 8/20/2013**
     **Claimant:**        **Lisa Markley**
     **Claim No.:**       **2013002782**

Dear Mr. McShea:

Allied World National Assurance Company, claim manager for its affiliate,
Darwin National Assurance Company (collectively, "Darwin"), retained our
firm in connection with this matter. Darwin issued Lawyers Professional
Liability Policy No. 0307-7741 to D'Angelo & Eurell (the "Firm") for the
**Policy Period** August 20, 2012 to August 20, 2013 (the "Policy").[1] The Policy
has a $500,000 per **Claim** and $1 million aggregate limit of liability for all
**Claims**, inclusive of **Claims Expenses**. The Policy also has a $5,000 per **Claim**
retention.

We write to acknowledge receipt of your November 23, 2015 letter enclosing
the April 8, 2015 amended complaint filed by Lisa Markley (the "Markley
Action") and to provide you with Darwin's position regarding coverage under
the Policy for the Markley Action. In a November 26, 2014 letter, which is
enclosed and incorporated herein by reference, Darwin concluded that no
coverage is available under the Policy for the original complaint in the Markley
Action based on the allegations in the original complaint. The April 8, 2015
amended complaint contains identical allegations and causes of action as the
original complaint, except that the amended complaint asserts that Messrs.
David and George D'Angelo are "licensed professionals." *See* Amended

---

[1] Terms in bold are defined in the Policy.

DAngelo-0025

**App. 367**



John P. McShea, Esq.
January 5, 2016
Page 2

Complaint, ¶¶ 3-4. Thus, for the same reasons set forth in the November 26, 2014 letter, no coverage is available under the Policy for the Markley Action.

To the extent that you disagree with Darwin's position, Darwin invites you to provide it with any additional information that you believe impacts coverage for this matter, and Darwin will give that information careful consideration. In addition, if Markley files a second amended complaint, please provide it to us, and Darwin will evaluate whether coverage is available under the Policy for the Markley Action based on the allegations in that pleading.

Darwin continues to reserve all of its rights under the Policy and applicable law.

Very truly yours,

WILEY REIN LLP

Richard A. Simpson
Leland H. Jones IV

Enclosure

cc:    Gale S. Dwyer, Esq. (via email)

# December 11, 2015 to April 11, 2016 Email Correspondence

| | |
|---|---|
| **From:** | Andrew W. Barbin |
| **To:** | John P. McShea |
| **Subject:** | RE: Markley v D"Angelo, et al. |
| **Date:** | Monday, April 11, 2016 1:07:06 PM |
| **Attachments:** | 20160411104717737.pdf |

John,

The silence following my response to your last email in February was disconcerting.

I hope that you have filed the declaratory judgment action and had the good sense to do so in Dauphin County.

Be that as it may, the line from procedural matters on which I can and will extend every reasonable courtesy and substantive concerns was crossed and I had no choice but to act as I had indicated I would.

Attached is my status report and request for an Order on the Deposition *de benne esse*. The mail copy was before time stamp and so I email this with the filing stamp.

Expense could still be avoided with a Stipulated Order, but the window for that may be quite narrow.

Sincerely,

Andrew W. Barbin

**From:** John P. McShea [mailto:JMcShea@mcshealawfirm.com]
**Sent:** Thursday, February 11, 2016 2:55 PM
**To:** Andrew W. Barbin <andrewbarbin@aol.com>
**Subject:** RE: Markley v D'Angelo, et al.

Andrew,

I apologize for any mix-up in communications. Regarding the "copy of the pleading as filed" that you refer to in your email, what pleading are you referring to? In what I believe was my last communication, I attached a copy of a letter from counsel for my clients' professional liability carrier that, based on your amended complaint, denies coverage - both costs of defense and indemnity.

John P. McShea

DAngelo-4849

McShea Law Firm, P.C.
Centre Square West, 40th Floor
1500 Market Street
Philadelphia, Pa. 19102
215-599-0800 (Tel.)
215-599-0888 (Fax)
jmcshea@mcshealawfirm.com

**From:** Andrew W. Barbin [mailto:andrewbarbin@aol.com]
**Sent:** Thursday, February 11, 2016 2:50 PM
**To:** John P. McShea
**Subject:** RE: Markley v D'Angelo, et al.

John,

Having received no reply to prior communications, I will file a Status Report and a request for an Order granting leave to schedule the video deposition *de bene esse.*

My Friday morning Court cancelled and so I will do so before I leave for afternoon court in Snyder County.

I regret the necessity, but a failure to communicate is a communication.

Andrew W. Barbin

**From:** Andrew W. Barbin [mailto:andrewbarbin@aol.com]
**Sent:** Monday, February 1, 2016 3:45 PM
**To:** 'John P. McShea' <JMcShea@mcshealawfirm.com>
**Cc:** 'Bruce Warshawsky' <bjw@cclawpc.com>
**Subject:** RE: Markley v D'Angelo, et al.

John,

I intend every courtesy consistent with my duty as an advocate, but you have not forwarded a copy of the pleading as filed., and have not responded to the questions previously posed, particularly deposition of D'Angelo Senior *de bene esse.*

In absence of response I will be forced to take unilateral action.

DAngelo-4850

App. 371

I would hope that we could act on this aspect cooperatively and promptly.

Sincerely,

Andrew W. Barbin

---

**From:** Andrew W. Barbin [mailto:andrewbarbin@aol.com]
**Sent:** Thursday, January 14, 2016 11:34 AM
**To:** 'John P. McShea' <JMcShea@mcshealawfirm.com>
**Cc:** 'Bruce Warshawsky' <bjw@cclawpc.com>
**Subject:** RE: Markley v D'Angelo, et al.

John,

Thank you for the prompt response.

I would still like to get agreement that we tell the Court you are filing the coverage action; but we agree to have a deposition *de bene esse* as to D'Angelo the Elder.

I believe Dauphin remains the best forum for the declaratory judgment action and that it should be done sooner rather than later.

Please advise as to the deposition. For my purposes I just need his basic answers to the core allegations, whatever they may be, to avoid Deadman's Rule complications to the litigation which could arise in the event of his untimely death.

In absence of agreement, I would petition to compel such a video tape deposition.

Otherwise I am willing to recommend holding matters so you can seek an expedited determination on the duty to9 defend and coverage issues.

Sincerely,

Andrew W. Barbin

**From:** John P. McShea [mailto:JMcShea@mcshealawfirm.com]
**Sent:** Thursday, January 14, 2016 11:24 AM
**To:** Andrew W. Barbin <andrewbarbin@aol.com>
**Cc:** 'Bruce Warshawsky' <bjw@cclawpc.com>
**Subject:** RE: Markley v D'Angelo, et al.

Timely email. Please see the attached letter we received last week from my clients' professional liability carrier. I'd have sent this to you sooner, but I first needed to discuss the letter with my clients, who this week authorized me to share this letter with you. Clearly the carrier's counsel is unpersuaded that plaintiff's amended complaint move this case closer to coverage. As a result, my clients have authorized us to file a declaratory judgment action.

**From:** Andrew W. Barbin [mailto:andrewbarbin@aol.com]
**Sent:** Thursday, January 14, 2016 11:08 AM
**To:** John P. McShea
**Cc:** 'Bruce Warshawsky'
**Subject:** RE: Markley v D'Angelo, et al.

John,

I read the denial letter and remain of the opinion that the denial was unusual and in error; and that an action to confirm the duty to defend as to the firm, father, and son should be pursued. Please note that as to the son there is a case to be made for negligence rather than intent even if the insurer deems the repayment to have been an admission of intentional conduct of the father.

I believe that declaratory action could be pursued here where the defense is to be provided, and that it would likely receive expedited treatment in Dauphin County as there is a judge familiar with the matter.

I do not see where any further revisions to the Amended Complaint would be necessary or appropriate for that purpose.

Negligent and intentional conduct have been unequivocally plead *alternatively*; and the likelihood is that the non-malpractice general business claim coverage may also apply as to arguably non-legal business activities.

They may wish to consult their homeowner and/or umbrella policies as well (if any).

Regardless, were to get back to the Court within 45 days, and that time has

elapsed.

I would not mind holding certain aspects in abeyance if you were promptly pursuing a determination on coverage; but I do think it is *necessary* to get a deposition *de bene esse* in the can in light of the father's age.

Please respond at your earliest opportunity.

Sincerely,

Andrew W. Barbin

**From:** John P. McShea [mailto:JMcShea@mcshealawfirm.com]
**Sent:** Friday, December 11, 2015 4:08 PM
**To:** andrewbarbin@aol.com
**Cc:** Conrad O. Kattner <CKattner@mcshealawfirm.com>
**Subject:** Markley v D'Angelo, et al.

Andrew:

You asked to see a copy of the letter from counsel for my clients' carrier stating their position regarding coverage for the claims set forth in your complaint. I have attached a copy of the letter from coverage counsel denying coverage of the claims alleged in your original complaint. I spoke today with Leland Jones, Esq., one of the carrier's attorneys, and he advised us that his client's coverage position remains the same after reviewing your client's amended complaint.

If you have time next week (for me, best after Tuesday), let's discuss next steps in this case.

John

John P. McShea
McShea Law Firm, P.C.
Centre Square West, 40th Floor
1500 Market Street
Philadelphia, Pa. 19102
215-599-0800 (Tel.)
215-599-0888 (Fax)
jmcshea@mcshealawfirm.com

DAngelo-4853

App. 374

DAngelo-4854

App. 375

# Markley's Expert Report, October 2019

FILED
04 NOV 2019 03:26 pm
Civil Administration
C. KEENAN

# EXHIBIT 22

DAngelo-2148

Case ID: 17060061
Control No.: 1911035

App. 377

LISA MARKLEY, : IN THE COURT OF COMMON PLEAS
          Plaintiff : DAUPHIN COUNTY, PENNSYLVANIA
      :
    v. : NO. 2013-CV-3010-CV
      :
LAW OFFICES OF D'ANGELO AND :
EURELL, DAVID S. D'ANGELO, :
ESQUIRE and GEORGE A. D'ANGELO, :
         Defendants :

**Expert Report of Lori K. Serratelli, Esq regarding Breach of Professional Responsibilities and Fiduciary Duties by Defendants, Law Offices of D'Angelo and Eurell, David S. D'Angelo and George A. D'Angelo in the matter of Markley v. Law Offices of D'Angelo and Eurell**

I.     <u>Scope of Report:</u>

The scope of this report encompasses an expert opinion as to whether the manner in which Defendants[1] handled their professional responsibilities and fiduciary duties toward the Plaintiff, Lisa Markley (hereinafter referred to as "Lisa") fell outside of accepted applicable statutory, regulatory and professional standard of care for the practice of law within a reasonable degree of professional certainty.

My opinion is based upon review of verified factual averments and testimony of the Plaintiff, deposition testimony of David S. D'Angelo, and available documentary support consistent with said averments and testimony.

II.    <u>Credentials of Expert:</u>

I am a licensed attorney in the Commonwealth of Pennsylvania since May 1978. I have concentrated my practice in the areas, among others, of family law, estate practice including the

---

[1] The Law Office of D'Angelo & Eurell, David S. D'Angelo personally, and David S. D'Angelo and Christopher S. D'Angelo, Co-Executors of the Estate of George A. D'Angelo, Deceased

DAngelo-2149

Case ID: 17060061
Control No.: 1911035

**App. 378**

drafting of wills and powers of attorney, and litigation in Orphans Court. From July 2016

through January 2018, I served on the Dauphin County Court of Common Pleas in the Family,

Civil and Orphans Court divisions. I have lectured on Family law and the Rules of Professional

Responsibility for the PBI. I am a co-author of Fee Agreements in Pennsylvania published by

the PBI. My curriculum vitae is attached. (Attachment 1 - CV)


III.    Documents Reviewed in Preparation of the Report:

I have been supplied with and reviewed the Pleadings; affidavit of Plaintiff; deposition

testimony of Defendant David S. D'Angelo; the Power of Attorney which Defendant George A.

D'Angelo (hereinafter referred to as "George") claim to be a fee agreement; the case of Markley

v. Markley, 218 A.2d 84 (1966), the Affidavit of Plaintiff's counsel, Bruce Warshawsky, Esq.,

and the Pennsylvania Rules of Professional Conduct and relevant case law.

While many of the documents date back forty years regarding Defendant George

D'Angelo's handling of Plaintiff's mother's divorce, the probate of her mother's estate in 2005

and that of her father in 1986-88, they are relevant to consider since Defendant D'Angelo used

those matters as justification for the fees he deducted from Plaintiff's inherited investments

which Defendant managed for the Plaintiff for approximately 15 years until she terminated her

attorney/client and investor/financial manager relationship with Defendant in 2012. Defendant

died in 2018 and his son, Defendant David S. D'Angelo, became co-executor of his estate.


IV.    Historical Interaction between Defendants and Markley Family

A.    Facts of the Case


2

DAngelo-2150

Case ID: 17060061
Control No.: 1911035

**App. 379**

drafting of wills and powers of attorney, and litigation in Orphans Court. From July 2016

through January 2018, I served on the Dauphin County Court of Common Pleas in the Family,

Civil and Orphans Court divisions. I have lectured on Family law and the Rules of Professional

Responsibility for the PBI. I am a co-author of Fee Agreements in Pennsylvania published by

the PBI. My curriculum vitae is attached. (Attachment 1 - CV)

### III.    Documents Reviewed in Preparation of the Report:

I have been supplied with and reviewed the Pleadings; affidavit of Plaintiff; deposition

testimony of Defendant David S. D'Angelo; the Power of Attorney which Defendant George A.

D'Angelo (hereinafter referred to as "George") claim to be a fee agreement; the case of Markley

v. Markley, 218 A.2d 84 (1966), the Affidavit of Plaintiff's counsel, Bruce Warshawsky, Esq.,

and the Pennsylvania Rules of Professional Conduct and relevant case law.

While many of the documents date back forty years regarding Defendant George

D'Angelo's handling of Plaintiff's mother's divorce, the probate of her mother's estate in 2005

and that of her father in 1986-88, they are relevant to consider since Defendant D'Angelo used

those matters as justification for the fees he deducted from Plaintiff's inherited investments

which Defendant managed for the Plaintiff for approximately 15 years until she terminated her

attorney/client and investor/financial manager relationship with Defendant in 2012. Defendant

died in 2018 and his son, Defendant David S. D'Angelo., became co-executor of his estate.

### IV.    Historical Interaction between Defendants and Markley Family

#### A.  Facts of the Case

2

Case ID: 17060061
Control No.: 1911039

**App. 380**

The information I have reviewed presents a picture of a woman, now age 65, who for much of her life regarded Defendant, George A. D'Angelo (hereinafter George) as a father figure. She was a child of 7 when her parents separated and George represented her mother, Rosalie Markley in the support and divorce action against her father, Sidney Markley. (Affidavit of Lisa)

Even though the net worth of the marital estate was only $125,000 and the father's income was modest, George litigated the matter up to the Superior Court on behalf of Lisa's mother which ultimately, in 1966, affirmed the 1962 lower court decision. George never pursued a claim for attorney's fees, other than some interim fees, on behalf of his client, to my knowledge from a review of the appellate decision.

The five or so years of litigation were not fruitful for Rosalie Markley. In fact, the Superior Court remarked in the decision that "(T)be record discloses that the amount awarded for maintenance of wife and daughter coincide almost exactly with the total requested, as established by the testimony. Moreover, the order below could not have been so grossly inadequate as George argued on appeal, since he permitted this appeal to rest unargued for over two years. He then argued it only because his request for a further continuance was denied. Markley v. Markley, 207 Pa. Super. 299 (PA Super. 1966)"

In her affidavit, Lisa attested to the fact that George "presented himself as the hero and my father as a villain." Sidney Markley passed away in 1986 and Rosalie suggested to Lisa that George could assist her with her legacy. Lisa retained George to deal with the matter of a trust created by her father's will which distributed monies to Lisa. Rather than an engagement letter or retainer agreement, George had Lisa sign a Power of Attorney to authorize him to act on her behalf as to her father's estate and related matters. Lisa recalls no discussion of a contingent fee.

3

Case ID: 17060061
Control No.: 1911035

**App. 381**

The POA did include a one-third contingency clause on "all monies received" for litigation fees with no detail or clarification.

George did not keep Lisa informed of the litigation. (Attachment 2 - Affidavit of Lisa) He continued to paint Sydney Markley as a villain even though Lisa felt he had provided for her generously in the will. George pursued a theory that she was entitled to half of the estate rather than one third and authorized and engaged in unmeritorious litigation in the state of California where he appeared only once.

Lisa's mother passed away in 2005 leaving approximately $284,000 to Lisa. By Lisa's account, it was a straight-forward, uncomplicated probate action. (Affidavit of Lisa)

The combined assets which Lisa received from her parents' estates were approximately $1.7 million dollars as determined by an accounting summary provided in the ongoing litigation of this case. Lisa felt unable to manage the monies and turned to George for assistance. George managed the money, investing it in Paine Webber and UBS and allegedly precious metals for which he took a 1.5% management fee. Lisa was unaware of the amount of her assets and was not kept informed of them by George. She was given an agreed allowance which apparently satisfied her needs but was not kept informed of withdrawals by George to himself and his firm. George hired an accountant for Lisa and she dutifully signed the tax returns, trusting George was acting in her best interest.

### B. Conduct of George D'Angelo

#### 1. Claim for Unpaid Legal Fees in Markley divorce

As indicated in the Facts of the Case, per her Affidavit, Lisa Markley had known George D'Angelo both as a child and throughout her adult life. While obviously too young to be aware

4

Case ID: 17060061
Control No.: 1911039

**App. 382**

of George's behavior in the divorce litigation between her mother and father, George early on demonstrated a proclivity for ignoring ethical conduct expected of lawyers, even in the 1960s. From reading Markley v. Markley, 207 Pa. Super 299, as a practicing family lawyer for 40 years, it is my opinion that the case was handled without regard for the client's interest but rather to churn a fee. Given the small estate, even by 1966 standards, the case should not have been appealed. Moreover, during the lower court proceedings, George apparently made no claim for reimbursement of his client's attorney's fees incurred. She was the dependent spouse, and may have qualified for such reimbursement. The Superior Court even noted the appeal was specious, especially since George by his actions caused the appeal to languish for two years

George was to later claim the attorney's fees incurred by Rosalie Markley in her divorce from Sidney Markley as an unpaid debt to him and his firm.

### 2. Representation Agreement in Probate of Sydney Markley's Will

When Lisa's father died in 1986, again George was at Lisa's side. She trustingly signed a Power of Attorney into which he inserted a "fee agreement" entitling him to one-third of the inheritance she was to receive. Such fee agreements have been discouraged for decades in favor of an hourly rate which must be approved by the court. The litigation took place in California handled by local counsel. I am advised that George's co-counsel confirmed that George made only one appearance in the case by George in the California court. (Attachment 3 - Affidavit of Bruce Warshawsky) Moreover, George's theory prompting the will contest produced no more monies that the one-third to which Lisa was entitled under her father's will.

### 3. Non-Legal Services provided by George D'Angelo

At this juncture, in 1988, George changed "hats" and offered his services as a financial investor. He had the estate monies transferred to his own account to act as a broker advisor,

depositing the funds into investment accounts. He told Lisa he would take a 1.5% management fee. Lisa did not know what was in the account. Statements on the investments were sent to George directly. Lisa never saw an invoice for George's fees nor an accounting. Lisa was provided an allowance by George that apparently satisfied her needs. George secured an accountant to prepare returns which Lisa dutifully signed when requested. (Affidavit of Lisa)

From the documents I reviewed, and David D'Angelo's deposition transcript, there is no evidence that George was a licensed broker nor a credentialed financial advisor under the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) regulations. (Attachment 4 - Deposition Transcript of David S. D'Angelo)

In 2005, when Lisa's mother died in Arizona, Lisa received $283,723.75 which she turned over to George to manage. Lisa learned later when she dismissed George as her attorney in favor of Attorney Bruce Warshawsky that George had taken one-third of her mother's estate to pay him for the alleged unpaid attorney's fees he incurred handling her estate. Lisa attests she never agreed to such a retainer agreement, nor did she agree George could take unpaid fees from her mother's divorce decades ago. (Affidavit of Lisa) Further there is no evidence that George had a contingent fee arrangement with Rosalie Markley and, if had such a retainer agreement, it would have violated the prohibition against contingent fees in support or alimony cases codified in the current Rules of Professional Conduct. Lastly, if the fees were unpaid, the statute of limitations to sue on contract for fees owed had long expired since almost forty years had passed.

4. **Appearance of a Firm**

While George was managing Lisa's investments, he did so as an attorney in the firm of D'Angelo and Burell. Again, to my knowledge, he was not a licensed broker nor credentialed as a financial advisor. George's son, David S. D'Angelo was also an attorney in the firm. David

6

Case ID: 17060061
Control No.: 1911035

**App. 384**

D'Angelo clearly assisted his father per Lisa's affidavit and communicated to her when his father was not available. For all intents and purposes, Lisa believed George and David practiced together in a firm. The letterhead gave the appearance of a partnership firm.

A check written by George in 2013, during the pendency of this lawsuit, in the amount of $328,752.40 representing a refund to Lisa of an overpayment to himself, was written from an IOLTA account in the name of George A. D'Angelo & David S. D'Angelo. (Affidavit of Bruce Warshawsky) This account is another clear indication that George and David were a partnership and firm. David Markley claimed no knowledge of any of the Markley monies going into the IOLTA account with his father, nor if reconciliations of the account were named periodically. That begs the questions of whose funds were used to refund Lisa the $328,752.40 since they were disbursed from the IOLTA account.

5. Conflict of Interest

George wrote a new will for Lisa in 2012 and named himself executor. Such conduct by a lawyer drafting a will of inserting oneself as executor violates the Conflict of Interest Rules in the Rules of Professional Conduct.

6. Misconduct

Because of George's advancing age, Lisa thought it best to obtain new counsel which was a fortuitous decision on her part. It was not until new counsel asked for records of investments and revoked the Power of Attorney given to George that the multiple violations of the Rules of Professional Conduct, which set the standard of care for the practice of law in the jurisdiction in which George was licensed, and the loss of over $1,000,000 of her inheritance invested by George, became apparent.

DAngelo-2156

Case ID: 17060061
Control No.: 1911039

**App. 385**

V.    <u>Issues covered by this Report:</u>

The following issues will be covered in my opinion of whether the Defendants violated their ethical and professional responsibilities to the degree that their conduct fell short of the expected standard of care to be followed in the practice of law, as defined by the Pennsylvania Rules of Professional Conduct:

1.    Did Defendant George D'Angelo violate the Rules of Professional Conduct by collecting alleged unpaid fees based on an alleged 1/3 contingent fee incurred in the 1960s while representing Plaintiff's mother in a divorce action; and by further withdrawing the funds from the bequest left to Plaintiff by her mother upon her death in 2005 to satisfy that alleged debt? <u>Opinion: Yes</u>

2.    Did Defendant George D'Angelo charge an allowable and reasonable fee of a one-third contingency to handle a will contest of Plaintiff's father estate in California in the late 1980s? <u>Opinion: No</u>

3.    Did Defendant improperly appoint himself as Executor of Plaintiff's last will and testament in 2012? <u>Opinion: Yes</u>

4.    Did Defendant George A. D'Angelo hold himself out to be a member of the law firm of D'Angelo and Eurell? <u>Opinion: Yes</u>

5.    Did Defendant George A. D'Angelo and David S. D'Angelo hold themselves out to be engaged as partners in the practice of law? <u>Opinion: Yes</u>

6.    Did Defendant George D'Angelo engage in financial advising and investing without appropriate licensing in violation of the Rules of Professional Conduct? <u>Opinion: Yes</u>

DAngelo-2157

Case ID: 17060061
Control No.: 1911035

**App. 386**

7.    Did Defendant George D'Angelo misappropriate Plaintiff's monies which were invested on her behalf? Opinion: Yes

8.    Did all of the above examples of the conduct of Defendant George A. D'Angelo, et. al. fall short of the reasonable standard of care expected in the practice of law? Opinion: Yes

VI.    Pennsylvania Rules of Professional Conduct (PRCP)

The Preamble to the PRCP generally defines the responsibilities of a lawyer which is a special responsibility for the quality of justice in our society.  In essence the PRCP establishes the standard of care expected of a lawyer practicing in the Commonwealth of Pennsylvania. Preamble (1)

These rules apply even to attorneys who are not active in the practice of law who may commit fraud in the conduct of a business and are subject to discipline for engaging in conduct involving dishonesty, fraud, deceit and misrepresentation.  Preamble (3)

A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. Preamble (5)

The Scope of the Rules is to provide a framework for the ethical practice of law. (15)

Rule 1.0 addresses terminology and clearly defines a "firm" or "law firm", "Confirmed in Writing", "Writing", "Reasonable Belief", "Reasonably" or "Reasonable", "Fraud", "Knowingly", Informed Consent" and "Fraud" which will be used in this report in the context of their definitions under the Rule.

9

DAngelo-2158

The Rules most relevant to this report are discussed below.

## VII.    Application of the Rules of Professional Conduct to the Facts Presented:

### 1.1  Competence:

From his obituary (Attachment 5 - Obituary), I am aware George graduated from the University of Pennsylvania in 1950. Ironically it states he taught professional responsibility at Temple Law School from 1954-69.

As a family lawyer myself, his handling of the divorce of Rosalie Markley did not demonstrate a competency in family law. At worse it demonstrated greed in encouraging a frivolous appeal for which he then paid himself almost 40 years later out of the client's estate intended for her daughter. My opinion is bolstered by the words of the Superior Court in noting the appeal seemed imprudently and unnecessarily brought. Clearly his handling of the divorce action up through an appeal to the Superior Court did not demonstrate nor meet the reasonable standard of care expected of an attorney.

### 1.3  Diligence

George's pursuit of Rosalie Markley's divorce and appeal was beyond reasonable diligence as discussed above. It produced no tangible results and angered the appeals court. It was self-serving in pursuing a fee that he unlawfully and unethically collected decades later, assuming Rosalie had not paid him which we do not know to be true.

Another example of unreasonable and self-serving diligence was the pursuit of a will contest of Sydney Markley's will in California under a bogus theory which produced no tangible result for Lisa Markley who received exactly what was bequeathed to her by her father.

10

DAngelo-2159

Case ID: 17060061
Control No.: 1911038

**App. 388**

George's conduct in handling the divorce action and Lisa's mother and later the probate of her parents' estates did not rise to the level of reasonable standard of care expected. He went beyond reasonable diligence into self-serving, predatory conduct which benefitted only himself and not the client.

### 1.4 Communication

From the representation of Lisa in the will contest in her father's estate, through the investments of her inheritance, George continuously violated this rule which requires 1) that the lawyer promptly inform the client of any decision or circumstance with respect to which the client's informed consent is required; 2) reasonable consultation with the client about their objectives to be accomplished; 3) that the client reasonably be informed about the status of the matter; and 4) that the lawyer is to explain a matter to the extent reasonably necessary to permit the client to make informed decision.

Lisa's affidavit is replete with statements that she was never kept informed through the probate of her father's estate, and, thereafter, when George took on the non-lawyer role of financial adviser and broker with the investments from her inheritances.

Rule 1.4 sets the standard of care expected between attorney and client. George's continuous acts of omission in keeping Lisa informed fell entirely and without question short of the reasonable standard of care contemplated by this rule.

### 1.5 Fees:

George presented his retainer agreement to Lisa in 1986 as part of a Power of Attorney which, in my experience, is highly unusual. The Rules of Professional Conduct were first

DAngelo-2160

Case ID: 17060061
Control No.: 1911039

**App. 389**

adopted in 1987 by the Pennsylvania Supreme Court codifying ethical standards expected of lawyers in the Commonwealth which have been amended continuously up through 2019.

The rules state a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee considering (8) factors:

(1) Whether the fee is fixed or contingent;

(2) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(3) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(4) The fee customarily charged in the locality for similar legal services;

(5) The amount involved and the results obtained;

(6) The time limitations imposed by the client or by the circumstances;

(7) The nature and length of the professional relationship with the client; and

(8) The experience, reputation, and ability of the lawyer or lawyers performing the services.

The "retainer" agreement embedded in the Power of Attorney stated nothing except that George was entitled to 1/3 of the fee for handling all matters related to the Estate of Sydney M. Markley, deceased and the Trust created by Mr. Markley in 1986, as well as the Estates of Rachel Neiman, deceased and Pierson Neiman, deceased. By the standard of care in the practice of law in 1987 and today especially, there is no evidence that fee charged and taken by George was sanctioned by a court on petition to the Orphan's Court in Pennsylvania or Probate Court of another state. The information provided to me by Lisa's counsel, confirmed by co-counsel in the matter, was that George had a very limited role in the litigation which took place in California

DAngelo-2161

Case ID: 17060061
Control No.: 1911039

**App. 390**

where George appeared only once. (Affidavit of Bruce Warshawsky) The Power of Attorney entitled George to one-third compensation of all monies received in his pursuit against the estates, with no limitations or caps on his one-third fee depending on the amount of those monies nor time spent on the matter.

George's conduct in the establishment of his fee arrangement with Lisa violated Rule 1.5 which prohibits clearly excessive fees and falls extremely below the expected reasonable standard of care set forth in 1.5 (1)-(8).

### 1.7 Conflict of Interest: Current Clients: Comment And General Principals:

Comment (27) in this Rule refers to conflicts that may arise in estate planning and administration. By naming himself as Executor of Lisa's will drafted in 2012, George was creating a potential conflict of interest in identifying whom he represented. The Executor is to administer the estate which potentially could be potentially adverse to the interests of Lisa, his current client and beneficiary under the will. Moreover, George had already secured Lisa's consent to take a 1.5% management fee of her sizeable estate and was now setting himself up for the second time to take additional fees as Executor on the monies from which he already profited. His inserting himself in the management of Lisa's funds which would comprise her estate upon her death and then naming himself as Executor created the blatant appearance of a conflict.

As a practicing attorney of 40 years and former judge, I know that the practice of naming oneself as Executor is not condoned and falls short of the reasonable standard of care in the practice of wills and estate law. It creates a situation rife with conflict of interest.

DAngelo-2162

Case ID: 17060061
Control No.: 1911039

**App. 391**

### 1.8 Conflict of Interest: Current Clients: Specific Rules:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

    (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;

    (2) The client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

    (3) The client gives informed consent in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

George took possession of the inherited funds from both Lisa's father's estate and her mother's estate. George did not explain his role as a fiduciary and whether he had any expertise in financial advice or investment. He did not clarify to Lisa how he was charging his fees and blurred the lines between his role as attorney and fiduciary to safeguard her investments. He withdrew fees for her mother's divorce allegedly outstanding for 40 years in addition to taking a 1/3 fee from the inheritance from her father. He withdrew money for his own purposes and alleged fees without her permission or knowledge. (Affidavits of Lisa and Bruce Warshawsky)

The Comment on Business Transactions between Client and Lawyer speak specifically to the risk to the client being its greatest when the client expects the lawyer to represent the client in the transaction itself or when the lawyer's financial interest otherwise poses a significant risk that

14

DAngelo-2163

Case ID: 17060061
Control No.: 1911039

**App. 392**

the lawyer's representation of the client will be materially limited by the lawyers financial interest in the transaction. The lawyer should disclose the risk associated with the dual role of both legal adviser and participant in the transaction. In this case, George's role as fiduciary/financial advisor and legal advisor was tainted by his obvious self interest in the management fee.

All of his actions violate this Rule and the reasonable standard of care expected of a lawyer. Further, Georges actions were both tortious and criminal conduct which fall short of not only the reasonable standard of care in the practice of law but also expose him to both civil and criminal liability.

### 2.1 Advisor:

A client is entitled to straightforward advice expressing the lawyer's honest assessment. George breached the duty to advise historically by failing to do so for Rosalie Markley in her divorce action. He should have honestly pointed out the cost of litigation versus any amount of money to be gained as well as the litigation risks. The same is certainly true for Lisa when he encouraged her to contest her father's will and trust. Lisa seemed to have received no explanation or discussions of the risks and rewards of engaging in the litigation. When an attorney drives the litigation without consultation with the client, there is an inherent financial conflict of interest that should be kept in check.

George's conduct as an advisor fell far below the reasonable standard of care in the practice of law.

15

DAngelo-2164

Case ID: 17060061
Control No.: 1911039

**App. 393**

### 3.1 Meritorious Claims and Contentions:

This rule states that a lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

George breached this duty to not only Lisa's mother in the 1966 appeal to the Superior Court of her divorce, but also breached his duty to Lisa in pursuing a will contest which achieved nothing greater than the original bequest to her which Lisa, in fact, felt was generous enough. (Affidavit of Lisa).

As stated above regarding Rule 1.3 Diligence, George's conduct fell far short of the reasonable standard of care in the practice of law.

### 5.1 Responsibilities of Partners, Managers and Supervisory Lawyers:

Lisa has attested to the fact that David D'Angelo would advise her and fill in for George when he was not available. All partners in a firm have a joint responsibility to ensure that the firm has measures in effect giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct. Therefore, it is my opinion that based on George and David conducting themselves as a firm, evidenced by 1) using the same bank account, 2) using letterhead that indicated they were a firm, 3) sharing the same IOLTA account, and 4) working together on cases for which they both had legal professional liability for how Lisa's case or cases were handled.

The joint behavior and conduct of George and David in creating the de facto appearance of being part of a law firm, in their representation of Lisa and to the public at large was dishonest

DAngelo-2165

Case ID: 17060061
Control No.: 1911039

**App. 394**

and violative of this rule which establishes the standard of care in the practice of law. David claimed the very loose practice of how the IOLTA account was managed was unknown to him. (Deposition of David) It could very well have resulted in George paying Lisa the refund for his overpayment to himself from another client's funds. The joint conduct of David and George as well as the law firm fell well below the standard of care in the practice of law.

### 5.7 Providing Non-Legal Services:

A lawyer who provides nonlegal services to a recipient that are not distinct from legal services provided to that recipient is subject to the Rules of Professional Conduct with respect to the provision of both legal and non-legal. George blurred the lines of contesting the will of Lisa's father, then taking fiduciary custody of the monies to invest for Lisa. He used the funds as his own personal fund to withdraw alleged unpaid fees for the divorce he handled decades ago for Lisa's mother, took an outrageously unreasonable fee of one-third of the inheritance which amounted to the same inheritance she would have received absent the litigation. The retainer agreement embedded in the Power of Attorney allowed George to take one-third of "all monies received". It did not distinguish that the fee would be limited to monies received beyond what the original, uncontested bequest would have been for Lisa. She was already assured some bequest. For a lawyer to then include in his "retainer agreement" as part of a Power of Attorney that he would receive one-third of all monies received borders on the unconscionable.

The Comment cautions that legal and non-legal services may be so closely entwined that they cannot be extinguished from each other. George blurred the lines as referenced above. His conduct fell well below the reasonable standard of care in the practice of law.

17

DAngelo-2166

## 5.8  Dealing in Investment Products: Prohibitions and Restrictions:

The Supreme Court made it clear that a lawyer <u>shall not</u> broker, offer to sell, sell, or place any investment product unless separately licensed to do so. There is no indication in the record that George was a licensed broker. This is a clear breach of the Rule in that George was personally profiting by receiving a 1.5% management fee while using the funds as his personal slush fund without his client's consent or knowledge. Comment (2) speaks to exactly what transpired in this case. The lawyer should not recommend or offer an investment product to a client or any person with whom the lawyer had a fiduciary relationship if the lawyer has an interest in compensation paid which George clearly did.

This Rule sets forth a clear mandate of prohibited behavior and George flagrantly violated this rule. His conduct was exceedingly reckless, negligent and grossly harmful to his client which fell below any reasonable standard of care in the practice of law.

## 7.5  Firms Names and Letterheads:

Lawyers shall not state or imply that they practice in a partnership or other organization unless that is the fact. A lawyer shall not use a firm name, letterhead or other professional designation that violates Rule 7.1 which prohibits a lawyer from making a false or misleading communication about the lawyer or the lawyer' services. For all intents and purposes, David and George represented to Lisa that they were a firm, using the name of D'Angelo and Eurell. David D'Angelo stated in his deposition that he never told Lisa they were not a firm. The check issued by George D'Angleo to Lisa in 2013 for an overpayment to himself by was written out of the IOLTA account of George A. D'Angelo and David S, D'Angelo. The cover letter with the

Case ID: 17060061
Control No.: 1911039

**App. 396**

check was written on stationary of D'Angelo and Eurell Law Offices (David S. D'Angelo's Deposition, 188, Ex. 9)

As stated above regarding Rule 5.1, all named Defendants' conduct fell well below the reasonable standard of care in the practice of law.

## 8.4 Misconduct

It is professional misconduct for a lawyer to:

(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) Commit a criminal act that reflect adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) Engage in conduct that is prejudicial to the administration of justice;

(e) State or imply an ability to influence improperly a governmental agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or

(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

A review of the history of George's conduct as attorney for Lisa beginning with the probate of her father's estate in the late 1980's demonstrated a continuation of his misconduct as far back as the late 1960s when he represented Lisa's mother in her divorce.

19

Case ID: 17060061
Control No.: 1911035

**App. 397**

Rule 8.4 (a) through (c) apply most appropriately to the Defendants and specifically George's conduct. As outlined above, George violated the standard of care for the practice of law as required by the Rules of Professional Conduct in the Commonwealth of Pennsylvania under at least 12 other Rules listed above. The totality of his misconduct falls so far below the reasonable standard of care in the practice of law that, at best, it enters the realm of dishonesty, untrustworthiness and gross negligence and, at worst, the realm of criminal behavior with the intent to defraud and deceive a trusting and naïve client. Unfortunately for him but fortunately for Lisa, he was caught. The original offer to pay $500,000, acknowledged by David in his deposition, as a refund of an overpayment to George is an admission that he was using the Lisa's funds as his private bank account. In the end only $328,752.40 has been paid. (Affidavit of Bruce Warshawsky)

VIII.   Conclusion: Professional and Financial Liability

In my expert opinion, within a reasonable degree of professional certainty, George, David and the Law Firm, acting in concert, violated all of the above referenced Rules of Professional Conduct and the professional and ethical responsibility they owe as lawyers to Lisa Markley to the degree that their misconduct fell well below the standard of care of the practice of law.

As stated above, the manner in which George handled his legal services related to her parent's estates, the grossly unreasonable and unjustified, excessive fees charged and withdrawn from her inheritances from both of her parents set the stage for the eventual fraud, deceit and outright theft of his client's investment funds. These initial funds of her inheritance would have

20

Case ID: 17060061
Control No.: 1911035

**App. 398**

been much greater if George had not deducted the allege unpaid debt from Lisa's mother's divorce without her knowledge and consent, as well as his taking an outrageously high and unjustified one third fee from her father's estate.

George's further misconduct continued with his acting as a fiduciary and unlicensed financial investor/advisor when he himself benefitted from unreasonably high management fees based on a percentage rather than based on actual time spent. A search revealed that George was not registered with the (SEC) Securities and Exchange Commission nor with FINRA (Financial Industry Regulatory Authority) although he purported to act as a full-service broker and financial advisor for Lisa, charging her a 1.5% management fee on her investments. By providing such non-legal services of investment advisor and broker, he specifically violated RPC 5.8.

In my professional expert opinion within a reasonable degree of professional certainty, George engaged in actions that constitute conduct involving dishonesty, fraud, deceit and misrepresentation which would have subjected him to disciplinary action. His conduct fell well below any reasonable standard of care in the practice of law to the point where many of his actions shock the conscience.

Now that he is deceased, his estate, the firm and to some degree David S. D'Angelo can be held to account for this misconduct. The documentation of the firm letterhead and a joint IOLTA account demonstrate that George and David acted as lawyers within the same firm. They gave the appearance to Lisa they practiced law as a firm, and not as individual solo practitioners.

The combination of clearly excessive fee structures of taking one-third of Lisa's inherited funds from her father's estate and possibly her mother's estate as well, the payment to himself of an alleged uncollected debt for handling Rosalie Markley's divorce, the charging of a 1.5% management fee for approximately 15 years when George was neither a licensed, registered

21

Case ID: 17060061
Control No.: 19110139

**App. 399**

investment broker or financial advisor, caused the apparent loss of almost $1,000,000 to Lisa Markley. (Affidavits of Bruce Warshawsky and Lisa)

The Defendants have provided no documentation to explain the severe losses considering Lisa had received $1,000,000 from her father's estate in August 2000, plus an additional distribution of $176,114 at a later date, $283,723 from her mother's estate and $100,000 from the sale of her mother's home. (Affidavit of Bruce Warshawsky)

Records from Paine Webber Resource Management Account report for Lisa revealed $446,599 in checks were issued to David S. D'Angelo, George A. D'Angelo and Jorge A. Dangelo. Withdrawals of various amounts by Defendants over the yeas up through June 2012 when Lisa finally revoked their access to her account. (Affidavit of Bruce Warshawsky).

There is no logical explanation for the severe losses in the investment accounts other than due to the withdrawals by Defendants of excessively high fees, management fees and other unexplained withdrawals. Defendants have admitted to "overpayments" to themselves from 2003 through 2012. It is not difficult to reach the reasonable conclusion that Defendants' misconduct caused Lisa the loss of $1,000,000 based on the one-third contingency fee for legal work on Lisa's father's estate, possibly on her mother's estate as well, and whatever the unpaid divorce fees may have been, coupled with $225,000 of 15 years of $15,000 in management fees. These are only the items for which Defendant has accounted to date.

From the records they have been able to uncover in discovery, Lisa's counsel estimate $1,000,000 in lost investments which, in my professional opinion, within a reasonable degree of professional certainty, were caused by the intentional misconduct, gross negligence, deceit and fraud perpetrated upon Lisa by George D'Angelo during his lifetime in concert with his law firm and David S. D'Angelo who himself assisted Lisa in George's absence and was at least

22

Case ID: 17060061
Control No.: 1911035

**App. 400**

tangentially aware of George's activities in a legal and non-legal capacity.  (Deposition of David

S. D'Angelo) (Affidavit of Bruce Warshawsky).  Defendants jointly and severally participated

and benefitted from the misconduct perpetrated on Lisa Markey.

Respectfully submitted,

Date:  _10/4/19_

Lori K. Serratelli, Esquire
PA Atty ID No. 27426
Schiffman, Sheridan & Brown, P.C.
2080 Linglestown Road
Suite 201
Harrisburg, PA  17110
(717) 540-9170
lserratelli@ssbc-law.com

23

DAngelo-2172

Case ID: 17060061
Control No.: 1911039

**App. 401**

# November 15, 2012 Correspondence Enclosing Expert Report

**Archived:** Thursday, March 14, 2024 4:33:01 PM
**From:** John P. McShea
**Mail received time:** Fri, 15 Nov 2019 13:58:20
**Sent:** Fri, 15 Nov 2019 18:58:03
**To:** Jones, Leland  Simpson, Richard
**Cc:** Conrad O. Kattner
**Subject:** Markley v. D'Angelo, et al. (Phila. Co. CCP)
**Importance:** Normal
**Sensitivity:** None
**Attachments:**
11-15-19 Ltr to WileyRein (00151652xD3162).pdf

---

Gentlemen:

Please see our letter (without exhibits) attached. We will be mailing you the letter with exhibits today.

John P. McShea

McShea Law Firm, P.C.

Centre Square West, 40th Floor

1500 Market Street

Philadelphia, Pa. 19102

215-599-0800 (Tel.)

215-599-0888 (Fax)

jmcshea@mcshealawfirm.com

# McShea Law Firm

November 15, 2019

*VIA E-MAIL AND REGULAR MAIL*

Richard A. Simpson, Esq.
Leland H. Jones, IV, Esq.
Wiley Rein, LLP
1776 K Street, NW
Washington, D.C. 20006

RE:   **Insured: D'Angelo & Eurell**
      **Insurer: Darwin National Assurance Company**
      **Policy No.: 0307-7741**
      **Policy Period: 8/20/2012 to 8l20/2013**
      **Claimant: Lisa Markley**
      **Claim No.: 2013002782**

Dear Messrs. Simpson and Jones:

  Plaintiff, Lisa Markley, recently served the enclosed report of her expert witness, Lori Serratelli, Esquire, on the defendants, Law Offices of D'Angelo & Eurell, David S. D'Angelo, and David S. D'Angelo and Christopher S. D'Angelo, Co-Executors of the Estate of George A. D'Angelo, Deceased, in the civil action currently pending in the Philadelphia Court of Common Pleas, No. 170600611 ("Philadelphia action"). Plaintiff's expert in professional negligence opines, "George, David and the Law Firm, acting in concert" violated various Rules of Professional Conduct and "the professional and ethical responsibility they owe as lawyers to Lisa Markley to the degree that their misconduct fell well below the standard of care of the practice of law." (Report at 20.)

  Plaintiff's expert echoes Ms. Markley's position that defendants' representation of her fell below the standard of care applicable to a legal professional. Accordingly, my clients renew their demand that Darwin assume the defense of defendants in the Philadelphia action and provide full coverage under the policy.

  We also enclose a copy of the Court's Revised Case Management Order in the Philadelphia action. A settlement conference is scheduled for December 2, 2019, and it is anticipated that the case will be ready for trial by March 2, 2020. As the insurer, Darwin's participation in the settlement conference is essential. Therefore, it is incumbent upon the insurer to be represented at the December 2nd settlement conference and any subsequent Court-mandated conferences.

McShea Law Firm, P.C.
1500 Market Street, Centre Square
West Tower, Suite 4000
Philadelphia, PA 19102-2100
215.599.0800 tel
215.599.0888 fax

AlliedWorld00001407
**App. 404**

# McShea Law Firm

Richard A. Simpson, Esq.
Leland H. Jones, IV, Esq.
November 15, 2019
Page 2

     We also enclose a copy of the Motion for Summary Judgment defendants filed on November 4, 2019 in the Philadelphia action.  Plaintiff has until December 4, 2019 to file a response to the motion.

     Should you have any questions, please do not hesitate to contact me.

     Sincerely,

     John P. McShea

JPM/plr
Enclosures

AlliedWorld00001408

**App. 405**

# Verdict Sheet, April 23, 2021

| | |
|---|---|
| **LISA MARKLEY**, | PHILADELPHIA COUNTY |
|            Plaintiff, | COURT OF COMMON PLEAS |
| | TRIAL DIVISION - CIVIL |
| v. | |
| | JUNE TERM, 2017 |
| **LAW OFFICES OF D'ANGELO AND** | |
| **EURELL, DAVID S. D'ANGELO, and** | No. 00611 |
| **DAVID S. D'ANGELO and** | |
| **CHRISTOPHER S. D'ANGELO, CO-** | |
| **EXECUTORS OF THE ESTATE OF** | |
| **GEORGE A. D'ANGELO, DECEASED**, | |
| | |
|            Defendants. | |

## VERDICT SHEET

1. Do you find that Lisa Markley knew or reasonably should have known of the facts and circumstances giving rise to her claims of Negligence, Breach of Fiduciary Duty, and Conversion before April 5, 2011?

   Law Offices of D'Angelo and Eurell     Yes ___✗___     No _____
   George D'Angelo                    Yes, ___ *Ex*     No ___✗___
   David D'Angelo                   Yes ___✗___     No _____

*If you answered "Yes" as to all defendants, proceed to Question 9.*

*If you answered "No" as to any defendant, proceed to Question 2. Do not answer Questions 2-8 as to any defendant about whom you answered "Yes" to Question 1.*

## NEGLIGENCE

2. Do you find that Lisa Markley proved by a preponderance of the evidence that the defendants breached a professional duty of care owed to her in the performance of legal services?

   Law Offices of D'Angelo and Eurell     Yes _____     No _____
   George D'Angelo                    Yes ___✗___     No _____
   David D'Angelo                   Yes _____     No _____

*If you answered "No" as to all defendants that you considered, proceed to Question 4. If you answered "Yes" as to any defendant, proceed to Question 3. Only answer Question 3 as to any defendant about whom you answered "Yes" in Question 2.*

3. Do you find that Lisa Markley proved by a preponderance of the evidence that the defendants' negligence in the performance of those legal services was a factual cause in bringing about harm to Lisa Markley?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes ☒ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*Proceed to Question 4.*

## BREACH OF FIDUCIARY DUTY

4. Do you find that Lisa Markley proved by clear and convincing evidence the existence of a fiduciary relationship between herself and the defendants?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes ☒ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "No" as to all defendants that you considered, proceed to Question 7. If you answered "Yes" as to any defendant, proceed to Question 5. Only answer Question 5 as to any defendant about whom you answered "Yes" in Question 4.*

5. Do you find that Lisa Markley proved by clear and convincing evidence that the defendants breached a fiduciary duty?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes ☒ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "No" as to all defendants that you considered, proceed to Question 7. If you answered "Yes" as to any defendant, proceed to Question 6. Only answer Question 6 as to any defendant about whom you answered "Yes" in Question 5.*

6. Do you find that Lisa Markley proved by clear and convincing evidence that the defendants' breach of fiduciary duty was a factual cause in bringing about harm to Lisa Markley?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes __✕__ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*Proceed to Question 7.*

## CONVERSION

7. Do you find that Lisa Markley proved by a preponderance of the evidence that the defendants deprived her of a right of property in, or use or possession of, a chattel, without her consent and without lawful justification?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes __✕__ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "No" as to all defendants that you considered, proceed to Question 9. If you answered "Yes" as to any defendant, proceed to Question 8. Only answer Question 8 as to any defendant about whom you answered "Yes" in Question 7.*

8. Do you find that Lisa Markley proved by a preponderance of the evidence that she had an immediate right to possession of the property or chattel at the time she was so deprived by the defendants?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes __✕__ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*Proceed to Question 9.*

**App. 409**

## BREACH OF CONTRACT

9. Do you find that Lisa Markley knew or reasonably should have known of the facts and circumstances giving rise to her claim of Breach of Contract before April 5, 2009?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes _____ | No _____ |
| David D'Angelo | Yes _____ | No __✕____ |

*If you answered "No" as to any defendant, proceed to Question 10. Only answer Question 10 as to any defendant about whom you answered "No" in Question 9.*

*If you answered "Yes" as to all defendants that you considered for Question 9, and answered "Yes" as to any defendant in Questions 3, 6 or 8, proceed to Question 13. Only answer Question 13 as to any defendant about whom you answered "Yes" in Questions 3, 6, or 8.*

*If you answered "Yes" as to all defendants in Question 9 and you did not answer "Yes" as to any defendant in Questions 3, 6, or 8, Plaintiff cannot recover and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

10. Do you find that Lisa Markley proved by a preponderance of the evidence the existence of a contract with the defendants?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes __✕____ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "Yes" as to any defendant, proceed to Question 11. Only answer Question 11 as to any defendant about whom you answered "Yes" in Question 10.*

*If you answered "No" as to all defendants that you considered for Question 10, but answered "Yes" as to any defendant in Questions 3, 6 or 8, proceed to Question 13. Only answer Question 13 as to any defendant about whom you answered "Yes" in Questions 3, 6, or 8.*

*If you did not answer "Yes" as to any defendant in Questions 3, 6, 8, or 10, Plaintiff cannot recover and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

**App. 410**

11. Do you find that Lisa Markley proved by a preponderance of the evidence that the defendants breached that contract?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes ___✗___ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "Yes" as to any defendant, proceed to Question 12. Only answer Question 12 as to any defendant about whom you answered "Yes" in Question 11.*

*If you answered "No" as to all defendants that you considered for Question 11, but answered "Yes" as to any defendant in Questions 3, 6 or 8, proceed to Question 13. Only answer Question 13 as to any defendant about whom you answered "Yes" in Questions 3, 6, or 8.*

*If you did not answer "Yes" as to any defendant in Questions 3, 6, 8, or 11, Plaintiff cannot recover and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

12. Do you find that Lisa Markley proved by a preponderance of the evidence that the defendants' breach of contract was a factual cause in bringing about harm to Lisa Markley?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes ___✗___ | No _____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "Yes" as to any defendant in Questions 3, 6, 8, or 12, proceed to Question 13. Only answer Question 13 as to any defendant about whom you answered "Yes" in Questions 3, 6, 8, or 12.*

*If you did not answer "Yes" as to any defendant in Question 3, 6, 8, or 12, Plaintiff cannot recover and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

5

**App. 411**

## DAMAGES

13. State the amount of compensatory damages, if any, sustained by Lisa Markley as a result of the conduct of the defendants:

Law Offices of D'Angelo and Eurell       $ _____
George D'Angelo                           $  600 000.00
David D'Angelo                            $ _____

*Proceed to Question 14.*

14. State the total amount of compensatory damages, if any, sustained by Lisa Markley:

$ 600,000

*If you answered "Yes" as to any defendant for Question 6 or 8, proceed to Question 15. Only answer Question 15 as to any defendant about whom you answered "Yes" in Question 6 or 8.*

*If you did not answer "Yes" as to any defendant for Question 6 or 8, your deliberations are complete and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

15. Was the conduct of the defendants sufficiently outrageous to warrant imposition of Punitive Damages?

| | | |
|---|---|---|
| Law Offices of D'Angelo and Eurell | Yes _____ | No _____ |
| George D'Angelo | Yes _____ | No ✕_____ |
| David D'Angelo | Yes _____ | No _____ |

*If you answered "No" as to all defendants that you considered, you have completed your deliberations and you should not answer any further questions. Please sign and date the verdict sheet and notify Court staff that you have reached a verdict.*

*If you answered "Yes" as to any defendant in Question 15, proceed to Question 16. Only answer Question 16 as to any defendant about whom you answered "Yes" to Question 15.*

DAngelo-4788

**App. 412**

16. State the amount of punitive damages, if any, you award to Lisa Markley:

| | |
|---|---|
| Law Offices of D'Angelo and Eurell | $_____ |
| George D'Angelo | $_____ |
| David D'Angelo | $_____ |

PLEASE SIGN AND DATE THE VERDICT SHEET AND NOTIFY COURT STAFF THAT YOU HAVE REACHED A VERDICT.

By the Jury,

_4 - 23 - 2021_
**DATE**

_Everett Rigg_
**FOREPERSON**

7

# Docket Sheet in Underlying Action





No Items in Cart    LOGIN

Civil Docket Report

A $5 Convenience fee will be added to the transaction at checkout.

**Case Description**

| | |
|---|---|
| **Case ID:** | 181003585 |
| **Case Caption:** | D'ANGELO & EURELL ETAL VS DARWIN NATIONAL ASSURANC |
| **Filing Date:** | Thursday , October 25th, 2018 |
| **Court:** | COMMERCE - STANDARD, NON JURY |
| **Location:** | CITY HALL |
| **Jury:** | NON JURY |
| **Case Type:** | CONTRACTS OTHER |
| **Status:** | STAYED BY ORDER OF COURT |

**Related Cases**

*No related cases were found.*

**Case Event Schedule**

*No case events were found.*

**Case motions**

*No case motions were found.*

**Case Parties**

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | MCSHEA, JOHN P |
| **Address:** MC SHEA LAW FIRM 1500 MARKET STREET, 40TH FL PHILADELPHIA PA 19102 (215)599-0800 courtfilings@mcshealawfirm.com | | **Aliases:** | *none* | |
| 2 | | | DEFENDANT | DARWIN NATIONAL ASSURANCE COMPANY |
| **Address:** CORPORATION SERVICE CO 251 LITTLE FALLS DR WILMINGTON DE 19808 | | **Aliases:** | *none* | |
| 3 | | | DEFENDANT | ALLIED WORLD SPECIALTY INSURANCE COMPANY |
| **Address:** CORPORATION SERVICE CO 251 LITTLE FALLS DR WILMINGTON DE 19808 | | **Aliases:** | *none* | |
| 4 | 1 | | PLAINTIFF | DANGELO & EURELL |
| **Address:** 651 BLACK ROCK RD BRYN MAWR PA 19010 | | **Aliases:** | *none* | |
| 5 | 1 | | PLAINTIFF | DANGELO, DAVID S |
| **Address:** 133 W FIRST AVE CONSHOHOCKEN PA 19427 | | **Aliases:** | *none* | |
| 6 | 1 | | EXECUTOR - PLAINTIFF | DANGELO, CHRISTOPHER S |
| **Address:** 212 ROSE LN HAVERFORD PA 19041 | | **Aliases:** | *none* | |
| 7 | | | TEAM LEADER | PADILLA, NINA W |
| **Address:** 360 CITY HALL PHILADELPHIA PA 19107 | | **Aliases:** | *none* | |

**App. 415**

| 8 | | 1 | | EXECUTOR - PLAINTIFF | DANGELO, DAVID S |
|---|---|---|---|---|---|
| **Address:** | 212 ROSE LN HAVERFORD PA 19041 | | **Aliases:** | *none* | |

**Docket Entries**

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 25-OCT-2018 05:21 PM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 1810059525 | | |
| | | | |
| 25-OCT-2018 05:21 PM | COMMENCEMENT OF CIVIL ACTION | MCSHEA, JOHN P | |
| **Documents:** | ⚖ Click link(s) to preview/purchase the documents Final Cover | | 🛒 Click HERE to purchase all documents related to this one docket entry |
| **Docket Entry:** | *none.* | | |
| | | | |
| 25-OCT-2018 05:21 PM | PRAE TO ISSUE WRIT OF SUMMONS | MCSHEA, JOHN P | |
| **Documents:** | ⚖ Click link(s) to preview/purchase the documents 00132136.PDF Commerce Addendum | | 🛒 Click HERE to purchase all documents related to this one docket entry |
| **Docket Entry:** | PRAECIPE TO ISSUE WRIT OF SUMMONS FILED. WRIT OF SUMMONS ISSUED. | | |
| | | | |
| 25-OCT-2018 05:21 PM | WAITING TO LIST CASE MGMT CONF | MCSHEA, JOHN P | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 30-OCT-2018 10:19 AM | NOTICE FILED | | |
| **Docket Entry:** | ***PLEASE NOTE: ON THIS DATE, CHRISTOPHER S. D'ANGELO WAS SWTCHED TO EXECUTOR - PLAINTIFF AND DAVID S. D'ANGELO WAS ADDED AS AN EXECUTOR - PLAINTIFF. ...KBB OJR. | | |
| | | | |
| 05-DEC-2018 08:56 AM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 07-DEC-2018 12:30 AM | NOTICE GIVEN | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 18-JAN-2019 03:24 PM | WAITING TO LIST CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 18-JAN-2019 03:24 PM | LISTED FOR CASE MGMT CONF | | |
| **Docket Entry:** | *none.* | | |

**App. 416**

| 22-JAN-2019<br>12:30 AM | NOTICE GIVEN | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 28-JAN-2019<br>04:36 PM | PRAECIPE TO REISSUE SUMMONS | MCSHEA, JOHN P | |
|---|---|---|---|
| **Documents:** | ⚘ Click link(s) to preview/purchase the documents<br>00136970.PDF | | 🛒 **Click HERE to purchase all documents**<br>**related to this one docket entry** |
| **Docket Entry:** | PREACIPE TO REISSUE WRIT OF SUMMONS FILED. WRIT REISSUED. (FILED ON BEHALF OF DAVID S DANGELO, CHRISTOPHER S D'ANGELO, DAVID S D'ANGELO AND D'ANGELO & EURELL) | | |

| 15-FEB-2019<br>11:29 AM | ACCEPTANCE OF SERVICE FILED | MCSHEA, JOHN P | |
|---|---|---|---|
| **Documents:** | ⚘ Click link(s) to preview/purchase the documents<br>00137916.PDF | | 🛒 **Click HERE to purchase all documents**<br>**related to this one docket entry** |
| **Docket Entry:** | SERVICE OF PLAINTIFF'S WRIT OF SUMMONS ACCEPTED BY DARWIN NATIONAL ASSURANCE COMPANY AND ALLIED WORLD SPECIALTY INSURANCE COMPANY ON 02/15/2019 FILED. (FILED ON BEHALF OF DAVID S DANGELO, CHRISTOPHER S D'ANGELO, DAVID S D'ANGELO AND D'ANGELO & EURELL) | | |

| 26-FEB-2019<br>03:39 PM | WAITING TO LIST CASE MGMT CONF | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 26-FEB-2019<br>03:39 PM | LISTED FOR CASE MGMT CONF | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 28-FEB-2019<br>12:30 AM | NOTICE GIVEN | | |
|---|---|---|---|
| **Docket Entry:** | *none.* | | |

| 14-MAR-2019<br>04:59 PM | MOTION TO STAY PROCEEDINGS | MCSHEA, JOHN P | |
|---|---|---|---|
| **Documents:** | ⚘ Click link(s) to preview/purchase the documents<br>00139349.PDF<br>Motion CoverSheet Form | | 🛒 **Click HERE to purchase all documents**<br>**related to this one docket entry** |
| **Docket Entry:** | 56-19032256 EMERGENCY (FILED ON BEHALF OF DAVID S DANGELO, CHRISTOPHER S D'ANGELO, DAVID S D'ANGELO AND D'ANGELO & EURELL) | | |

| 15-MAR-2019<br>09:12 AM | MOTION ASSIGNED | | |
|---|---|---|---|
| **Docket Entry:** | 56-19032256 MOTION TO STAY PROCEEDINGS ASSIGNED TO JUDGE: PADILLA, NINA W. . ON DATE: MARCH 15, 2019 | | |

| 15-MAR-2019<br>03:43 PM | STAYED BY ORDER OF COURT | PADILLA, NINA W | |
|---|---|---|---|
| **Documents:** | ⚘ Click link(s) to preview/purchase the documents<br>ORDST_18.pdf | | 🛒 **Click HERE to purchase all documents**<br>**related to this one docket entry** |
| **Docket Entry:** | 56-19032256 AND NOW, THIS 15TH DAY OF MARCH 2019, UPON CONSIDERATION OF PLAINTIFFS' UNCONTESTED MOTION FOR STAY OF PROCEEDINGS IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED AND IT IS FURTHER ORDERED THAT: 1. THE CASE MANAGEMENT CONFERENCE SCHEDULED IN THIS ACTION FOR MARCH 21, 2019 IS CANCELLED. 2. ALL PROCEEDINGS IN THIS ACTION ARE STAYED, AND THIS ACTION SHALL BE PLACED IN CIVIL SUSPENSE, UNTIL THE FINAL DISPOSITION OF THE ACTION DOCKETED IN THIS COURT AS LISA MARKLEY V. LAW OFFICES OF D'ANGELO & EURELL, DAVID S. D'ANGELO, AND DAVID S. D'ANGELO AND CHRISTOPHER S. D'ANGELO, CO-EXECUTORS OF THE | | |

**App. 417**

| | ESTATE OF GEORGE A. D'ANGELO, DECEASED, JUNE TERM, 2017, NO. 00611 ("2017 ACTION") AND ALL APPEALS THEREFROM. BY THE COURT: JUDGE PADILLA, 3/15/19. | | |
|---|---|---|---|
| 15-MAR-2019 03:43 PM | NOTICE GIVEN UNDER RULE 236 | | |
| **Docket Entry:** | NOTICE GIVEN ON 18-MAR-2019 OF STAYED BY ORDER OF COURT ENTERED ON 15-MAR-2019. | | |
| 15-MAR-2019 03:43 PM | EVENT CANCELLED-CASE DEFERRED | | |
| **Docket Entry:** | *none.* | | |
| 01-APR-2021 08:30 AM | 230.2-DOCKET INACTIVITY NOTICE | | |
| **Docket Entry:** | *none.* | | |
| 03-APR-2021 12:30 AM | NOTICE GIVEN | | |
| **Docket Entry:** | NOTICE PURSUANT TO PA.R.C.P. 230.2 GIVEN. | | |
| 29-APR-2021 04:00 PM | STATEMENT-INTENTION TO PROCEED | MCSHEA, JOHN P | |
| **Documents:** | Click link(s) to preview/purchase the documents 00177074.PDF | | Click HERE to purchase all documents related to this one docket entry |
| **Docket Entry:** | STATEMENT OF INTENTION TO PROCEED FILED. (FILED ON BEHALF OF DAVID S DANGELO, CHRISTOPHER S DANGELO, DAVID S DANGELO AND DANGELO & EURELL) | | |
| 06-JAN-2023 04:13 PM | COMPLAINT FILED NOTICE GIVEN | MCSHEA, JOHN P | |
| **Documents:** | Click link(s) to preview/purchase the documents COMPLAINT (00204862xD3162).PDF | | Click HERE to purchase all documents related to this one docket entry |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. (FILED ON BEHALF OF DAVID S DANGELO, CHRISTOPHER S DANGELO, DAVID S DANGELO AND DANGELO & EURELL) | | |

▸Case Description    ▸Related Cases    ▸Event Schedule    ▸Case Parties    ▸Docket Entries

Search Home    Return to Results

**App. 418**